UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| INSCRIBED PLLC; INTEGRATIVE NEUROLOGY PLLC; DIAGNOSTIC SOLUTIONS LLC; WOOK KIM, M.D., P.C. d/b/a FARMBROOK INTERVENTIONAL PAIN & EMG; DETROIT INSTITUTE OF PAIN MUSCULOSKELETAL MEDICINE PLLC; MICHIGAN INSTITUTE OF MUSCULOSKELETAL MEDICINE PLLC; ZMC PHARMACY, L.L.C.; INTEGRA LAB MANAGEMENT LLC; GIREESH VELUGUBANTI, M.D.; ARVINDER DHILLON, M.D.; BACHU ABRAHAM, M.D.; and JALAL ZAWAIDEH, R.PH., | **COMPLAINT** |
| Defendants. | |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company (hereinafter, "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   INTRODUCTION

1.     This is a case about medical clinics, a pharmacy, a clinical urine drug testing laboratory, and the physicians, owners, managers, agents, and representatives of the same who abused the unlimited benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered and, if performed at all, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendants Inscribed PLLC ("Inscribed"); Integrative Neurology PLLC ("Integrative Neurology"); Diagnostic Solutions LLC ("Diagnostic Solutions"); Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG ("Farmbrook"); Detroit Institute of Pain Musculoskeletal Medicine PLLC

2

("DIPMM"); Michigan Institute of Musculoskeletal Medicine PLLC ("MIMM"); ZMC Pharmacy, L.L.C. ("ZMC Pharmacy"); Integra Lab Management LLC ("Integra") (collectively, the "Defendant Entities"); Gireesh Velugubanti, M.D. ("Velugubanti"); Arvinder Dhillon, M.D. ("Dhillon"); Bachu Abraham, M.D. ("Abraham"); and Jalal Zawaideh, R.Ph. ("Zawaideh") (collectively with the Defendant Entities referred to hereinafter as "the defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.       The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

4.       The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were not actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.       To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients to undergo unnecessary treatment and services.

6.     The treatment, when provided, was part of a predetermined protocol consisting of unreasonable and unnecessary diagnostic testing, injections and other procedures, medications, and urine drug testing.

7.     The defendants also engaged in several fraudulent billing practices, including unbundling services to inflate the amount charged and upcoding office visits in order to charge Allstate for more services than were actually provided.

8.     The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including office visits, diagnostic testing, injections, durable medical equipment ("DME"), and medication.

9.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

10.     Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

11.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

12.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

13.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

14.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract applicable in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

15.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

16.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

17.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending

bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful services and treatment that was designed and implemented solely to increase their profits; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

18.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $2,547,427 to them related to the patients at issue in this Complaint.

## II.   **PARTIES**

### A.   **PLAINTIFFS**

19.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

20.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

21.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

22.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company each have their respective principal places of business in San Francisco, California.

23.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.     DEFENDANTS

#### 1.     Inscribed PLLC

24.     Inscribed PLLC is a professional limited liability company organized under the laws of the State of Michigan.

25.     Inscribed is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Inscribed described throughout this Complaint.

26.     Defendants Dhillon, Abraham, Zawaideh, Diagnostic Solutions, Farmbrook, DIPMM, and ZMC Pharmacy also participated in the control and operation of Inscribed.

27.     Inscribed's principal place of business is located in Southfield, Michigan.

28.     Inscribed billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent treatment was rendered at all),

and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 1.

## 2.   **Integrative Neurology PLLC**

29.   Integrative Neurology PLLC is a professional limited liability company organized under the laws of the State of Michigan.

30.   Integrative Neurology is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Integrative Neurology described throughout this Complaint.

31.   Defendants Dhillon, Zawaideh, Diagnostic Solutions, Farmbrook, and ZMC Pharmacy also participated in the control and operation of Integrative Neurology.

32.   Integrative Neurology's principal place of business is located in Ann Arbor, Michigan.

33.   Integrative Neurology billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

## 3.   **Diagnostic Solutions LLC**

34.   Diagnostic Solutions LLC is a limited liability company organized under the laws of the State of Michigan.

35.     Diagnostic Solutions is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Diagnostic Solutions described throughout this Complaint.

36.     Defendants Inscribed and Integrative Neurology also participated in the control and operation of Diagnostic Solutions.

37.     Diagnostic Solution's principal place of business is located in Southfield, Michigan.

38.     Diagnostic Solutions billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.     Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG

39.     Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG is a professional service corporation incorporated under the laws of the State of Michigan.

40.     Farmbrook is owned and controlled by defendant Dhillon, and Dhillon is responsible for all actions of Farmbrook described throughout this Complaint.

41.     Defendants Velugubanti, Zawaideh, Inscribed, Integrative Neurology, and ZMC Pharmacy also participated in the control and operation of Farmbrook.

42.     Farmbrook's principal place of business is located in Southfield, Michigan.

9

43.     Farmbrook billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.     Detroit Institute of Pain Musculoskeletal Medicine PLLC

44.     Detroit Institute of Pain Musculoskeletal Medicine PLLC is a professional limited liability company organized under the laws of the State of Michigan.

45.     DIPMM is owned and controlled by defendant Abraham, and Abraham is responsible for all actions of DIPMM described throughout this Complaint.

46.     Defendants Velugubanti, Inscribed, and Integra also participated in the control and operation of DIPMM.

47.     DIPMM's principal place of business is located in Southfield, Michigan.

48.     DIPMM billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.     Michigan Institute of Musculoskeletal Medicine PLLC

49.     Michigan Institute of Musculoskeletal Medicine PLLC is a professional limited liability company organized under the laws of the State of Michigan.

50.     MIMM is owned and controlled by defendant Abraham, and Abraham is responsible for all actions of MIMM described throughout this Complaint.

51.     Defendants DIPMM, Velugubanti, Inscribed, and Integra also participated in the control and operation of MIMM.

52.     MIMM's principal place of business is located in Southfield, Michigan.

53.     MIMM billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.     ZMC Pharmacy, L.L.C.

54.     ZMC Pharmacy, L.L.C is a limited liability company organized under the laws of the State of Michigan.

55.     ZMC Pharmacy is owned and controlled by defendant Zawaideh, and Zawaideh is responsible for all actions of ZMC Pharmacy described throughout this Complaint.

56.     Defendants Velugubanti, Dhillon, Inscribed, Integrative Neurology, and Farmbrook also participated in the control and operation of ZMC Pharmacy.

57.     ZMC Pharmacy's principal place of business is in Royal Oak, Michigan.

58.     ZMC Pharmacy billed Allstate at excessive rates for unlawful and unnecessary medications allegedly distributed to several patients at issue herein, including the patients set out in Exhibit 7.

### 8.     Integra Lab Management LLC

59.     Integra Lab Management LLC is a limited liability company organized under the laws of the State of Florida.

60.     Defendants Abraham, DIPMM, and MIMM participated in the control and operation of Integra.

61.     Integra's principal place of business is in Jupiter, Florida.

62.     Integra filed its Certificate of Authority to Transact Business in Michigan on January 10, 2017.

63.     Integra billed Allstate for testing that was medically unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 8.

### 9.     Gireesh Velugubanti, M.D.

64.     Gireesh Velugubanti, M.D. is a resident and citizen of the State of Michigan.

65.     At all times relevant to this Complaint, Velugubanti owned and controlled Inscribed, Integrative Neurology, and Diagnostic Solutions, and participated in the control and operation of Farmbrook, DIPMM, MIMM, and ZMC Pharmacy.

66.     As an owner and manager of Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, and ZMC Pharmacy, Velugubanti rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including for the patients listed in Exhibits 1 through 7.

### 10.     **Arvinder Dhillon, M.D.**

67.     Arvinder Dhillon, M.D. is a resident and citizen of the State of Michigan.

68.     At all times relevant to this Complaint, Dhillon owned and controlled Farmbrook and participated in the control and operation of Inscribed, Integrative Neurology, and ZMC Pharmacy.

69.     As an owner and manager of Farmbrook, Inscribed, Integrative Neurology, and ZMC Pharmacy, Dhillon rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment services billed at excessive rates, including for the patients listed in Exhibits 1, 2, 4, and 7.

### 11.     **Bachu Abraham, M.D.**

70.     Bachu Abraham, M.D. is a resident and citizen of the State of Michigan.

71.     At all times relevant to this Complaint, Abraham owned and controlled DIPMM and MIMM, and participated in the control and operation of Inscribed and Integra.

72.     As an owner and manager of DIPMM, MIMM, Inscribed, and Integra, Abraham rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including for the patients listed in Exhibits 1, 5, 6, and 8.

### 12.     **Jalal Zawaideh, R.Ph.**

73.     Jalal Zawaideh, R.Ph. is a resident and citizen of the State of Michigan.

74.     At all times relevant to this Complaint, Zawaideh owned and controlled ZMC Pharmacy and participated in the control and operation of Inscribed, Integrative Neurology, and Farmbrook.

75.     As an owner and manager of Inscribed, Integrative Neurology, Farmbrook, and ZMC Pharmacy, Zawaideh rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including the patients listed in Exhibits  1, 2, 4, and 7.

## III.    **JURISDICTION AND VENUE**

76.     Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

77.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

78.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are citizens of the State of Illinois for purposes of 28 U.S.C. § 1332.

79.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are citizens of the States of Wisconsin and California for purposes of 28 U.S.C. § 1332.

80.     Inscribed is a professional limited liability company organized under the laws of the State of Michigan.

81.     Velugubanti, the sole member of Inscribed, is a citizen of and resides in Michigan.

82.     Thus, Inscribed is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

83.     Integrative Neurology is a professional limited liability company organized under the laws of the State of Michigan.

84.     Velugubanti, the sole member of Integrative Neurology, is a citizen of and resides in Michigan.

85.     Thus, Integrative Neurology is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

86.     Diagnostic Solutions is a limited liability company organized under the laws of the State of Michigan.

87.     Velugubanti, the sole member of Diagnostic Solutions, is a citizen of and resides in Michigan.

88.     Thus, Diagnostic Solutions is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

89.     Farmbrook is a professional service corporation organized under the laws of the State of Michigan.

90.     Farmbrook's principal place of business is located in Southfield, Michigan.

91.     Thus, Farmbrook is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

92.     DIPMM is a professional limited liability company organized under the laws of the State of Michigan.

93.     Abraham, the sole member of DIPMM, is a citizen of and resides in Michigan.

94.     Thus, DIPMM is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

95.     MIMM is a professional limited liability company organized under the laws of the State of Michigan.

96.    Abraham, the sole member of MIMM, is a citizen of and resides in Michigan.

97.    Thus, MIMM is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

98.    ZMC Pharmacy is a limited liability company organized under the laws of the State of Michigan.

99.    All members of ZMC Pharmacy are citizens of and reside in Michigan.

100.   Thus, ZMC Pharmacy is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

101.   Integra is a limited liability company organized under the laws of the State of Florida.

102.   Thomas Hughes, the sole member of Integra, is a citizen of and resides in Florida.

103.   Thus, Integra is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

104.   Velugubanti is a resident and citizen of the State of Michigan.

105.   Dhillon is a resident and citizen of the State of Michigan.

106.   Abraham is a resident and citizen of the State of Michigan.

107.   Zawaideh is a resident and citizen of the State of Michigan.

108.   Further, the amount in controversy as to each defendant, exclusive of interest and costs, exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

109.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   BACKGROUND ON THE DEFENDANTS' SCHEME TO DEFRAUD

110.   Velugubanti established a series of entities to bill Allstate for medically unnecessary and excessive treatment, if any treatment was rendered at all.

111.   Velugubanti used Inscribed and Integrative Neurology to bill Allstate for unnecessary patient evaluations, injections, and diagnostic tests (such as ambulatory Electroencephalography ("EEG") and Quantitative EEG ("qEEG") diagnostic tests).

112.   Velugubanti also used Integrative Neurology and Diagnostic Solutions to bill Allstate for medically unnecessary neurofeedback therapy and sleep studies.

113.   Velugubanti used his three (3) entities (defendants Inscribed, Integrative Neurology, and Diagnostic Solutions) interchangeably.

114.   Patient I.S. (Claim No. 0428425573)[1] told Allstate that Inscribed and Diagnostic Solutions "are side by side and that the people go back and forth between the two."

115.   Integrative Neurology allegedly stopped treating patients in October 2018 and Velugubanti transferred the evaluations to Inscribed and the diagnostic tests and neurofeedback therapy to Diagnostic Solutions.

116.   Velugubanti hired unlicensed individuals to render treatment at his entities, as discussed *infra*.

117.   To increase the amount billed to Allstate, Velugubanti entered into *quid pro quo* arrangements with pain management physicians to refer patients to him.

118.   Velugubanti coordinated with defendants Dhillon and Abraham through *quid pro quo* arrangements.

119.   Dhillon and Abraham, through Farmbrook, DIPMM, and MIMM, fabricated patient head injuries to justify referrals to Inscribed and Integrative Neurology.

120.   In turn, Velugubanti recommended that patients continue to treat at Farmbrook, DIPMM, and MIMM for pain management of injuries allegedly suffered to other areas of the patients' body.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate hereinafter refers to each by his or her initials and Allstate claim number.

121.   Velugubanti's clinics are located directly next to Farmbrook and Dhillon in the Farmbrook Medical Building.

122.   Velugubanti testified that Simrat Dhillon—Farmbrook's office manager and defendant Dhillon's wife—is his point of contact regarding Inscribed's use of space in the Farmbrook Medical Building and that "[w]e go to her with issues . . . ."

123.   Dhillon testified that he receives patients from Velugubanti and that he refers patients to Velugubanti as well.

124.   DIPMM, MIMM, and Abraham operate across the street from the Farmbrook Medical Building.

125.   Velugubanti and Abraham previously treated patients at Michigan Neurology Associates, P.C.

126.   Velugubanti submitted a letter of support for Abraham as part of a formal disciplinary proceeding against Abraham in the State of Michigan.

127.   Inscribed, Integrative Neurology, Farmbrook, Velugubanti, and Dhillon required patients at issue in this Complaint to have their prescriptions filled by their co-conspirator ZMC Pharmacy.

128.   DIPMM, MIMM, and Abraham also ordered unnecessary and excessive definitive urine drug testing, which was billed by Integra.

129.   Defendants Velugubanti and Abraham have significant disciplinary and criminal histories.

130.   Velugubanti pleaded guilty to operating a vehicle while under the influence on December 13, 2006.  He was sentenced to forty-six (46) days in jail, twelve (12) months' probation, and fines and costs, and was required to attend outpatient substance abuse counseling three (3) times per week.

131.   Velugubanti testified that his staff privileges at an Albuquerque, New Mexico hospital were revoked due to drug and alcohol issues:

> Q.   Have you had your privileges revoked at any time?
>
> A.   While I was working in Albuquerque, New Mexico, briefly I had my staff privileges revoked.
>
> Q.   At both locations?
>
> A.   It was related to a drug and alcohol problem I had in 2000.
>
> Q.   In 2000 you said?
>
> A.   2010, sorry.

132.   Velugubanti and the New Mexico Medical Board entered into a Stipulation of Licensure on March 31, 2011.

133.   Pursuant to the March 31, 2011 Stipulation, Velugubanti entered into a treatment contract with the Monitored Treatment Program.

134.   The State of Michigan filed an Administrative Complaint against Velugubanti on March 2, 2012, alleging that the New Mexico disciplinary proceeding and his 2006 conviction violated the Public Health Code.

135.   Velugubanti entered into a Stipulation with the State of Michigan on June 26, 2012, through which he agreed to enter into a three-year monitoring program.

136.   Pursuant to a July 8, 2012 Consent Order, the State of Michigan placed Velugubanti on probation for one (1) year and required him to enter into a monitoring agreement with the Health Professional Recovery Program.

137.   The Arizona Medical Board denied Velugubanti's medical license application in April 2016 after Velugubanti refused to comply with a requested assessment by the Arizona Physician's Health Program.

138.   In December 2016, the State of Michigan received a complaint from a former colleague of Velugubanti detailing numerous allegations, including that Velugubanti (1) prescribed medications for off-label use, (2) over-diagnosed patients with traumatic brain injury ("TBI") to justify billing for unnecessary services, (3) charged insurance companies for unnecessary EEGs, (4) charged insurance companies for services not rendered, (5) upcoded services by spending excessive time during patient encounters, (6) overmedicated patients with unnecessary and

irrelevant medications, (7) used a template for his physical examinations, and (8) recommended unnecessary follow-up visits for lab work, imaging, and evaluation.

139.   The State of Michigan filed an Administrative Complaint against Velugubanti on June 8, 2017, alleging that Velugubanti accessed patient files without authorization twelve (12) times between August 22, 2015 and September 15, 2015 and that he failed to complete 196 progress notes on patients' charts.

140.   Velugubanti entered into a Consent Order on November 14, 2018, finding the allegations against him true and that he violated the Public Health Code. The State of Michigan placed him on probation for one (1) year, fined him $10,000, and required that he complete additional continuing education credits.  The terms of his probation require that Velugubanti meet on a quarterly basis with a reviewer approved by the Michigan Board of Medicine.  The Consent Order also prohibits Velugubanti from "work[ing] in any capacity for which a medical doctor license is required" until the Michigan Department of Licensing and Regulatory Affairs ("LARA") received written confirmation that a reviewer has been approved.

141.   Velugubanti testified in January 2019 that he was not treating patients "for health reasons."

142.   These purported "health reasons" were in fact him awaiting Board approval of a person to review his medical records.

143.   Velugubanti also testified that Integrative Neurology stopped treating patients on October 5, 2018 due to his "health reasons."

144.   In truth, Velugubanti signed a Stipulation just three (3) days earlier on October 2, 2018, through which he agreed that the facts alleged in the June 8, 2017 Administrative Complaint are true and that he agreed to the terms of the November 14, 2018 Consent Order.

145.   The estate of Marc Orlewicz, D.O. ("Orlewicz") filed a medical malpractice and wrongful death lawsuit against Velugubanti on January 4, 2019. The lawsuit alleges that Velugubanti prescribed Orlewicz with the maximum daily dosage of Vyvanse for a period of at least five (5) months despite Velugubanti's awareness of Orlewicz's substance abuse history.

146.   As discussed *infra*, Velugubanti prescribed Vyvanse to patients at issue in this Complaint as part of his predetermined treatment protocol.

147.   Orlewicz's autopsy revealed that he died of amphetamine toxicity, and an affidavit by Michael Gold, M.D. affirmed that Velugubanti and Integrative Neurology failed to perform necessary acts and violated the standard of care by repeatedly prescribing Vyvanse to Orlewicz.

148.   Abraham is currently subject to an open formal proceeding in the State of Michigan.

149.   The Bureau of Professional Licensing filed an Administrative Complaint against Abraham on March 15, 2018, stemming from a procedure that he performed on August 20, 2015.

150.   According to the Administrative Complaint, Abraham failed to confirm the site was numb before initiating a medial branch nerve block, and he ignored the patient's requests that he stop the procedure.

151.   Between injections, Abraham asked a nurse to numb the area so he could continue, but the patient again experienced severe pain and repeatedly asked Abraham to stop the procedure.

152.   A nurse entered the surgery room and stated to Abraham that the patient could feel everything, to which Abraham stated that he was almost done with the procedure.

153.   Abraham also allegedly failed to change into proper surgical attire and performed the procedure with a lead apron over his street clothes.

## V.   <u>BILLING FOR SERVICES NOT RENDERED</u>

154.   The defendants' pervasive pattern of faxing and mailing demands for payment to Allstate for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

155.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never actually occurred are fraudulent.

156.   Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

157.   A former employee of Inscribed has testified that her name was placed on EEGs that she did not perform and that patients were charged by Inscribed for testing even though the corresponding reports failed to identify any of the data allegedly determined by said testing:

> Q.   Can you repeat why you stopped working there at Inscribed?
>
> A.   Many reasons.  I found out that my name was being placed on tests that I did not perform.  There was people being charged for tests and there was no data.

158.   The former employee's testimony confirms that Inscribed billed for services that were never rendered.

159.   The defendants routinely submitted claims for reimbursement for services that were not performed in each of the categories set forth below.

## A.   BILLING FOR EVALUATIONS NOT PERFORMED

160.   Defendants Integrative Neurology and Farmbrook faxed and mailed bills to Allstate seeking payment for patient evaluations.

161.   Defendant Integrative Neurology billed Allstate for evaluations purportedly conducted by Velugubanti when they were performed by a nurse practitioner or physician assistant, if performed at all.

162.   Integrative Neurology submitted bills containing Velugubanti's signature and National Provider Identifier ("NPI") number.

163.   Velugubanti, however, did not render any treatment to the patient.

164.   Each instance of Integrative Neurology submitting bills to Allstate seeking payment for an evaluation by Velugubanti when in fact Velugubanti was not present is an instance of billing for an evaluation that was not performed.

## B.   BILLING FOR AMBULATORY EEGs NOT PERFORMED

165.   Defendants Inscribed and Integrative Neurology faxed and mailed bills to Allstate seeking payment for the purported performance of ambulatory EEGs on patients at issue in this Complaint.

166.   Inscribed and Integrative Neurology billed Allstate using Current Procedural Terminology ("CPT") Code[2] 95951 for supposedly conducting ambulatory EEGs.

167.   According to the CPT Code Book, CPT Code 95951 is for "combined electroencephalographic (EEG) and video recording and interpretation . . . each 24 hours."

168.   This CPT Code *requires* that the patient's behavior be monitored and recorded using visual video equipment throughout the duration of the EEG, with that video being reviewed and interpreted by the neurologist to correlate EEG readings with observed patient behavior.

169.   Despite Inscribed and Integrative Neurology's use of the video EEG billing code for every ambulatory EEG at issue in this Complaint, not once was a video EEG actually performed.

170.   Every instance of Inscribed and Integrative Neurology billing under CPT Code 95951 is an instance of billing for a service that was never rendered.

171.   Moreover, Inscribed and Integrative Neurology billed Allstate for ambulatory EEGs lasting 72 hours when the EEG was performed for a substantially shorter period of time, if it was performed at all.

---

[2] CPT Codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

172.   Allstate is not required to compensate Inscribed or Integrative Neurology for services that were never rendered and is entitled to the return of money paid in reliance on their fraud.  *See* Exhibits 1 and 2.

### C.   BILLING FOR NEUROBEHAVIORAL ASSESSMENTS NOT PERFORMED

173.   Defendant Inscribed faxed and mailed bills to Allstate seeking payment for allegedly conducting neurobehavioral assessments on patients at issue in this Complaint.

174.   Inscribed billed Allstate using CPT Code 96116 for each neurobehavioral assessment.

175.   According to the CPT Code Book, CPT Code 96116 is for "[n]eurobehavioral status exam . . . per hour of the psychologist's or physician's time, both face-to-face time with the patient and time interpreting test results and preparing the report."

176.   The AMA therefore requires that a licensed psychologist or physician perform the services billed for under CPT Code 96116, which include both performance of the assessment and interpretation of the assessment's results.

177.   Inscribed billed Allstate for neurobehavioral assessments performed and interpreted by individuals who were not licensed psychologists or physicians.

178.   For example, Inscribed billed Allstate under CPT Code 96116 for neurobehavioral assessments allegedly conducted for Patient S.N. (Claim No. TXA-0178760) on January 29, 2018 and March 19, 2018.

179.   Inscribed's records note that the assessment was "performed by [the] patient with the assistance of Ms. Christina Hammond."

180.   Christina Hammond, R.N. ("Hammond") is not a licensed psychologist or physician.

181.   Marianne McKissick, P.A. ("McKissick") interpreted the results for both assessments.

182.   McKissick is not a licensed psychologist or physician.

183.   A licensed psychologist or physician is required to perform the assessment and interpret the results when billing CPT Code 96116.

184.   Inscribed did not provide services from a licensed psychologist or physician to patients at issue in this Complaint even though Allstate was billed for such treatment.

185.   Allstate is not required to compensate Inscribed for services that were not rendered and is entitled to the return of money paid in reliance on its fraud. *See* Exhibit 1.

### D.   BILLING FOR SURGICAL ASSISTANT SERVICES NOT PERFORMED

186.   Defendant DIPMM mailed bills to Allstate seeking payment for Abraham allegedly assisting on surgeries purportedly performed on patients at issue in this Complaint.

187.   However, Abraham was not physically present in the operating room to assist on these surgeries.

188.   Summit Surgical Neuro Monitoring Services, LLC f/k/a Summit Neuromonitoring Services, LLC ("Summit") submitted bills and medical records through the U.S. Mail seeking payment for services Abraham provided outside of the surgical suite during the exact time Abraham was allegedly in the surgical suite assisting on surgical procedures.

189.   In other words, DIPMM billed Allstate claiming that Abraham was assisting on surgical procedures performed in a surgical suite while Summit billed Allstate seeking payment for services Abraham provided outside of the surgical suite relating to the same patient and on the same date of service.

190.   It is impossible for Abraham to physically be in two separate locations at the same exact time.

191.   Allstate is not required to compensate DIPMM and Abraham for services that were never rendered and is entitled to a return of money paid in reliance of its fraud.

### E.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

#### 1.   Patient S.G. (Claim No. 0482998035)

192.   Patient S.G. allegedly presented to defendant Integrative Neurology on January 2, 2018 for an initial evaluation.

193.   Integrative Neurology submitted a bill to Allstate containing Velugubanti's signature and NPI number for a level four (4) initial patient evaluation, but Velugubanti did not conduct the examination, which constitutes fraudulent billing for services not rendered.

#### 2.   Patient M.M. (Claim No. 0421745613)

194.   Patient M.M. was allegedly involved in a motor vehicle accident on July 20, 2016.

195.   M.M. allegedly presented to defendant Integrative Neurology on September 8, 2016.

196.   Integrative Neurology billed Allstate for allegedly conducting a 72-hour ambulatory EEG that allegedly began on September 9, 2016 and ended on September 11, 2016.

197.   Integrative Neurology submitted a report to Allstate dated September 10, 2016 documenting the results for a 24-hour ambulatory EEG.

198.   Integrative Neurology then submitted an "[e]dited correction" to Allstate dated September 14, 2016 for a 72-hour ambulatory EEG.

199.   The date of study in the "correction," however, is September 9, 2016 through September 10, 2016, which is a 24-hour ambulatory EEG.

200.   Integrative Neurology therefore billed Allstate $28,500 for an ambulatory EEG that was not rendered.

201.   Integrative Neurology submitted claims for payment and accompanying medical records relative to M.M. to Allstate through the U.S. Mail and interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

202.   Allstate is not required to pay Integrative Neurology for treatment that was never rendered to M.M.

### 3.   Patient S.H. (Claim No. 0421535188)

203.   Patient S.H. was allegedly involved in a motor vehicle accident on July 18, 2016.

204.   S.H. allegedly presented to defendant Inscribed on November 16, 2017.

205.   Inscribed billed Allstate for a 72-hour ambulatory EEG that allegedly began on November 20, 2017 and ended on November 22, 2017.

206.   Diverse Transportation Services LLC ("Diverse Transportation") transported S.H. to Inscribed on November 20, 2017 at 9:15 a.m.

207.   Diverse Transportation then picked up S.H. at 11:00 a.m. that same day and transported her to physical therapy for a 12:00 p.m. appointment.

208.   A person cannot perform physical therapy while wearing ambulatory EEG equipment.

209.   Inscribed therefore billed Allstate $28,500 for an ambulatory EEG that was not rendered.

210.   Inscribed submitted claims for payment and accompanying medical records relative to S.H. to Allstate through interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

211.   Allstate is not required to pay Inscribed for treatment that was never rendered to S.H.

### 4.   Patient R.P. (Claim No. 0461342511)

212.   Patient R.P. was allegedly involved in a motor vehicle accident on May 30, 2017.

213.   R.P. allegedly presented to defendant Inscribed on November 14, 2017.

214.   Inscribed billed Allstate for allegedly performing a neurobehavioral assessment of R.P. on November 14, 2017 using CPT Code 96116.

215.   As discussed *supra*, a licensed psychologist or physician must perform the assessment and interpret its results in order to bill for services under CPT Code 96116.

216. Inscribed faxed medical records to Allstate stating that the neurobehavioral assessment was "performed by [the] patient with the assistance of Angela Pace MA."

217. "Angela Pace" is not a licensed physician or psychologist in the State of Michigan.

218. Inscribed therefore billed Allstate $650 for a neurobehavioral assessment that was not rendered by a licensed physician or psychologist.

219. Inscribed submitted claims for payment and accompanying medical records relative to R.P. to Allstate through interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

220. Allstate is not required to pay Inscribed for treatment that was never rendered to R.P. and is entitled to the return of money paid to Inscribed in reliance on its fraudulent bills.

### 5.    Patient A.F. (Claim No. 0541405619)

221. Patient A.F. was allegedly involved in a motor vehicle accident on March 20, 2019.

222. A.F. allegedly presented to defendant Farmbrook on May 14, 2019.

223. Farmbrook billed Allstate for trigger point injections into the right trapezius muscle with steroid that was purportedly performed by Dhillon on May 14, 2019.

224.   Farmbrook submitted a procedure note that listed Hangming Ruan, P.A. ("Ruan") and stated that "dr. D is in office with me" and was also allegedly electronically signed by Dhillon on May 19, 2019 at 1:10 p.m.:

> hangming Ruan PA.,
> dr D is in office with me.
>
> Electronically signed by Arvinder Dhillon MD on 5/19/2019 1:10:17 PM

225.   However, according to Dhillon's own wife, Dhillon was on medical leave from open heart surgery that started March 1, 2019 and he was not back to work until June 2019, one month after he allegedly performed the trigger point injection procedure billed to Allstate.

226.   Farmbrook billed Allstate in excess of $4,374 for an injection procedure that was not rendered by Dhillon.

227.   Farmbrook submitted claims for payment and accompanying medical records relative to A.F. to Allstate through the U.S. Mail for treatment that was not provided, upon which Allstate relied in adjusting the claims.

228.   Allstate is not required to pay Farmbrook for treatment that was never rendered to A.F.

**6.   Patient J.M. (Claim No. 0479909185)**

229.   Patient J.M. was allegedly involved in a motor vehicle accident on October 26, 2017.

230.   J.M. allegedly presented to the Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View Surgery Center") on October 4, 2018 for an anterior cervical discectomy procedure that was purportedly performed by Stefan Pribil, M.D. ("Pribil") and assisted by Abraham.

231.   DIPMM billed Allstate $37,730.00 for Abraham allegedly assisting Pribil perform the anterior cervical discectomy procedure on J.M. at Fountain View Surgery Center on October 4, 2018.

232.   Summit also billed Allstate for neurophysiology monitoring of J.M. during the October 4, 2018 surgical procedure using CPT Code 95941 (*"Continuous intraoperative neurophysiology monitoring, from outside the operating room (remote or nearby) or for monitoring of more than one case while in the operating room, per hour"*).

233.   According to the CPT Code Book, CPT Code 95941 should be reported "for all cases in which there was no physical presence by the monitoring professional in the operating room during the monitoring time or when monitoring more than one case in the operating room."

234.   The Neurophysiology Tech Report that was submitted to Allstate by Summit for the neurophysiology monitoring of J.M. during his October 4, 2018 surgical procedure identifies Abraham as the "Remote Monitorist" and further

confirms that  J.M.'s "case was monitored remotely and read by licensed medical professional and a dedicated Neurophsiologist."

235.   In other words, Summitt billed Allstate seeking payment for Abraham remotely monitoring (outside of the operating room) the neurophysiology activity of J.M. during the same time that Abraham claimed to be assisting Pribil with the anterior cervical discectomy procedure for which DIPMM billed Allstate $37,730.00.

236.   DIPMM therefore billed Allstate $37,730.00 for Abraham assisting on a surgical procedure when he was not physically located in the operating room.

237.   Allstate is not required to pay DIPMM for treatment that was never rendered to J.M.

## VI.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

### A.   UNLICENSED TREATMENT RENDERED BY LIMITED LICENSE PSYCHOLOGISTS

238.   Defendants Inscribed, Integrative Neurology, and Diagnostic Solutions billed for treatment to patients by unsupervised limited license psychologists in violation of Michigan law.

239.   The State of Michigan requires a limited license psychologist to be supervised by a licensed psychologist to engage in the practice of psychology.  Mich. Comp. Laws § 333.18223(2).

240. The State of Michigan defines the "practice of psychology" to include rendering services that "involv[e] the application of principles, methods, and procedures . . . for the purposes of the diagnosis, assessment related to diagnosis, prevention, amelioration, or treatment . . . ." Mich. Comp. Laws § 333.18201(1)(b).

241. The "practice of psychology" includes biofeedback techniques and psychological tests. Id.

242. Inscribed, Integrative Neurology, and Diagnostic Solutions submitted bills and records to Allstate for services performed by unsupervised limited license psychologists that engaged in the practice of psychology.

243. Velugubanti testified that he contracted with limited license psychologists "to perform psychological services and neurofeedback services."

244. Inscribed billed Allstate for neurobehavioral assessments performed by limited license psychologists, which Inscribed then (improperly) used to diagnose TBIs.

245. Integrative Neurology and Diagnostic Solutions billed Allstate for qEEGs conducted by limited license psychologists, which Inscribed and Integrative Neurology then (improperly) used to diagnose TBIs.

246. Integrative Neurology and Diagnostic Solutions billed Allstate for neurofeedback therapy—also known as biofeedback therapy—allegedly provided to patients at issue in this Complaint.

247.   No licensed psychologist supervised any services rendered by limited license psychologists at Inscribed, Integrative Neurology, or Diagnostic Solutions.

248.   Indeed, Integrative Neurology submitted records falsely identifying a licensed psychologist, William Brooks, Ed.D. ("Brooks"), as Integrative Neurology's "Clinical Supervisor."  *See* Exhibit 9.

249.   Despite listing Brooks on its medical records, Velugubanti testified that Brooks was not employed by Integrative Neurology:

> Q.   Okay.  And then who is William Brooks?
>
> A.   I'm not familiar with that name.
>
> Q.   You're not familiar with a William Brooks who's a counselor out of Kalamazoo?
>
> A.   No.
>
> Q.   Have you ever known that name to be employed by Integrative Neurology as an employee or an independent contractor?
>
> A.   No.

250.   Integrative Neurology listed Brooks on its medical records to conceal the fact that it rendered unsupervised—and therefore unlawful—treatment by limited license psychologists.

251.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

252.   Allstate is not required to pay Inscribed, Integrative Neurology, or Diagnostic Solutions for the unlawful services billed by limited license psychologists and is entitled to restitution of monies paid.

### B.   UNLICENSED TREATMENT RENDERED BY PHYSICIAN ASSISTANTS

253.   Defendant Inscribed billed for unlicensed treatment by physician assistants operating without a practice agreement in violation of Michigan law.

254.   As of March 22, 2017, the State of Michigan prohibits a physician assistant from "engag[ing] in the practice as a physician's assistant except under the terms of a practice agreement."  Mich. Comp. Laws § 333.17047(1).

255.   The State of Michigan even defines "practice as a physician's assistant" to mean "the practice of medicine with a participating physician **under a practice agreement**."  Mich. Comp. Laws § 333.17001(1)(k) (emphasis added).

256.   The Michigan Board of Medicine requires "a physician who supervises a physician's assistant" to "establish a written authorization that delegates to the physician's assistant the performance of medical care services."  Mich. Admin. Code R. 338.2409(1).

257.   The Michigan Board of Medicine requires the participating physician to maintain the written practice agreement at his "primary place of practice."  Mich. Admin. Code R. 338.2409(3).

41

258.   A physician assistant cannot prescribe medication in the State of Michigan without the existence of a practice agreement.   Mich. Comp. Laws § 333.17076(2).

259.   Physician assistants McKissick and Ruan allegedly treated patients and prescribed medication to patients at Inscribed after March 22, 2017.

260.   Upon information and belief, no practice agreements ever existed between Ruan, McKissick, and any "participating physician" at Inscribed.

261.   When asked about the existence of a written practice agreement between Velugubanti and physician assistants at Inscribed, Inscribed did not admit the existence of a practice agreement.

262.   Velugubanti acknowledged under oath that the State of Michigan requires that he supervise physician assistants treating patients at Inscribed:

> Q.   Here's what I'm getting at.   You referred to Mr. Ruan as your subordinate—
>
> A.   As a mid-level.
>
> Q.   —because he is a physician's assistant who must work under your license.
>
> A.   Yes.
>
> . . .
>
> Q.   So Mr. Ruan doesn't need your supervision when he prescribes medicine?
>
> A.   In the State of Michigan he needs my supervision.

263. Nonetheless, Ruan and McKissick rendered treatment to Inscribed patients without Velugubanti's supervision or a written practice agreement.

264. For example, Patient I.S. (Claim No. 0428425573) told Allstate that McKissick treated her on two (2) visits, and that she was upset that Velugubanti was not even in the building.

265. Treatment and services rendered by physician assistants without a practice agreement is rendered in violation of Michigan law.

266. Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

267. Allstate is not required to pay Inscribed for unlawful treatment rendered by physician assistants

### C. DEFENDANTS FAILED TO OBTAIN THE REQUIRED LICENSURE TO ISSUE DME IN THE STATE OF MICHIGAN

268. Defendants Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, and Abraham issued DME to patients without obtaining the required licensure from the State of Michigan.

269. The Michigan Board of Pharmacy governs the "practice of pharmacy" in the State of Michigan. Mich. Comp. Laws § 333.17722.

270. The Michigan Board of Pharmacy's duties include the "regulat[ion], control, and inspect[ion] [of] the character and standard of pharmacy practice and of

drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** and procure samples and limit or prevent the sale of drugs **and devices** that do not comply with this part."  Mich. Comp. Laws § 333.17722(a) (emphasis added).

271.  "Device" means "an instrument, apparatus, or contrivance, including its components, parts, and accessories, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or other animals, or to affect the structure or function of the body of human beings or other animals." Mich. Comp. Laws § 333.17703(2).

272.  One of the ways in which the Michigan Board of Pharmacy regulates, controls, and inspects the issuance of devices in the State of Michigan is to require an individual or entity issuing the device to obtain a license from the Board.  Mich. Comp. Laws § 333.17722(c).

273.  The issuance of a license for an activity within the scope of the Michigan Board of Pharmacy's governance determines whether the activity is lawful.  Mich. Comp. Laws § 333.16106(2).

274.  The Michigan Public Health Code defines a "license" as "an authorization issued under this article to practice **where practice would otherwise be unlawful**."  Id. (emphasis added).

275.   Therefore, the State of Michigan requires a license issued by the Michigan Board of Pharmacy in order to issue medical equipment/devices to individuals.

276.   Defendants Inscribed, Integrative Neurology, DIPMM, Velugubanti, and Dhillon each failed to obtain a license from the Board of Pharmacy and therefore unlawfully issued DME to patients at issue herein.

277.   Defendants Farmbrook and Dhillon issued DME to patients at issue in this Complaint before obtaining a license from the Board of Pharmacy on or about August 22, 2017.  *See* Exhibit 4.

278.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

279.   Allstate is not required to pay Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, or Abraham for the unlawful issuance of DME and is entitled to restitution of monies paid.

## VII.   UNLAWFUL SOLICITATION

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

280.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

281.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

282.   A former employee of Inscribed testified that patients "would come in in bus loads" with "no[] understanding why they were there" and that this employee "would get the burden of trying to explain why they were there."

283.   The same former employee further testified that some of the patients had case workers appear with them at Inscribed and that she witnessed "a large amount of cash in the case workers' bags that I could just see bluntly there."

284.   It is illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

285.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

286.   As set forth more fully below, the defendants participated in, and willingly benefited from, schemes to solicit patients through conduct prohibited under Michigan law.

### B.     ILLEGAL SOLICITATION OF MOTOR VEHICLE ACCIDENT VICTIMS

287.   Defendants Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham obtained patients through *quid pro quo* arrangements with personal injury attorneys.

288.   These personal injury attorneys solicited motor vehicle accident victims within days and weeks of their alleged motor vehicle accidents.

289.   Michigan's anti-solicitation laws also apply to solicitation conducted through attorneys.

290.   After retaining the accident victims as clients, the personal injury attorneys referred them to Integrative Neurology, Farmbrook, DIPMM, and MIMM for unnecessary treatment and services.

291.   Treatment directed by layperson attorneys rather than by licensed medical professionals is unlawful, unreasonable, and unnecessary, and Allstate has no obligation to pay any charges resulting therefrom.

292.   Unlawful solicitation and unqualified referrals by laypersons to the defendants negate the validity of the medical treatment billed by the defendants.

293.   Referrals of solicited patients to the defendant clinics and physicians bore no relation to actual medical necessity, as the patients at issue in this Complaint would not have sought treatment but for the unlawful solicitation.

294.   By steering patients to defendants Integrative Neurology, Farmbrook, DIPMM, and MIMM, the defendants knew that the patients would receive excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges billed to Allstate.

295.   Accordingly, the defendants' treatment of the solicited patients was unlawful and led directly to unreasonable and unnecessary care.

### C.   SPECIFIC EXAMPLES OF PATIENT SOLICITATION

296.   The following representative patients exemplify the fact and extent of the defendants' illegal solicitation.

### 1.   Patient K.L. (Claim No. TXA-0187454)

297.   Patient K.L. was allegedly involved in a motor vehicle accident on April 27, 2017.

298.   K.L. testified that "Rodney the One" approached him in the hospital about obtaining an attorney:

> Q.   What is Rodney The One?
>
> A.   He said, that's what his name is. The One. Because of his job. What he does. Goes out scouting for people who have been in accidents. And gets them too, with his lawyer.

299.   Rodney the One picked K.L. up at his home a few days later and drove him to meet with the attorney.

300.   K.L. testified that the attorney referred him to Abraham:

Q.   Okay.  So here's what I want to know.  So, first off, we've already identified the picture that you're looking at as Dr. Abraham that you treated with?

A.   Yes.

Q.   Who referred you to Dr. Abraham?

A.   Uhm, it was Dailey Law Firm, Justin Grove.

. . .

Q.   So the only way you got to Dr. Abraham is because Justin Grove with the Dailey Law Firm told you, hey, go to see Dr. Abraham?

A.   Yes.

301.   K.L. presented to DIPMM on June 9, 2017 for an initial patient evaluation that was purportedly performed by Abraham.

302.   DIPMM, Integra, and Abraham submitted claims for payment and medical records relative to K.L. through the U.S. Mail upon which Allstate relied in adjusting the claims.

303.   Allstate is not required to compensate DIPMM, Integra, or Abraham for unnecessary treatment that derived from illegal solicitation and is entitled to a return of monies paid to DIPMM.

### 2.    Patient S.G. (Claim No. 0482998035)

304.   Patient S.G. was allegedly involved in a motor vehicle accident on November 22, 2017.

305.   S.G. presented to defendant Farmbrook on December 6, 2017 for an initial evaluation with defendant Dhillon.

306.   S.G. told an independent medical evaluator that she went to Farmbrook at the direction of her attorney.

307.   S.G. presented to defendant Integrative Neurology on January 2, 2018 for an initial evaluation.

308.   S.G. told an independent medical evaluator that her attorney referred her to Integrative Neurology.

309.   Farmbrook, Integrative Neurology, and Dhillon submitted claims for payment and medical records relative to S.G. through the U.S. Mail and interstate wires upon which Allstate relied in adjusting the claims.

310.   Allstate is not required to pay Farmbrook, Integrative Neurology, or Dhillon for unnecessary treatment that derived from illegal solicitation and is entitled to a return of monies paid to Farmbrook.

### 3.    Patient T.S. (Claim No. 0461626020)

311.   Patient T.S. was allegedly involved in a motor vehicle accident on June 24, 2017.

312. T.S. presented to A. Rodnick Chiropractic, P.C. ("Rodnick Chiropractic") to initiate chiropractic treatment.

313. T.S. testified that his lawyer instructed him to receive chiropractic treatment and referred him to Rodnick Chiropractic:

> Q.   Okay.  How did you find Rodnick Chiropractic?
>
> A.   That was – they mentioned.
>
> Q.   Who mentioned?
>
> A.   Mike Morse.
>
> Q.   So someone at Mike Morse told you about Rodnick Chiropractic?
>
> A.   Yes, because they were close to where I lived.
>
> Q.   Okay.  Did they tell you – did someone tell you to go to a chiropractor –
>
> A.   Yes.
>
> Q.   -- or did you just go of your own volition?
>
> A.   They told me.

314. T.S. testified that Rodnick Chiropractic referred him to defendants Farmbrook and Dhillon.

315. Farmbrook and Dhillon submitted claims for payment and medical records relative to T.S. through the U.S. Mail upon which Allstate relied in adjusting the claims.

316.   Allstate is not required to pay Farmbrook or Dhillon for unnecessary treatment that derived from illegal solicitation.

### 4.   Patient D.J. (Claim No. TXA-0185605)

317.   Patient D.J. was allegedly involved in a motor vehicle accident on May 12, 2017.

318.   D.J. testified that an individual approached him in the hospital about obtaining a personal injury attorney.

319.   D.J. then presented to DIPMM on May 30, 2017 for an initial patient evaluation that was purportedly performed by Abraham.

320.   DIPMM, Integra, and Abraham submitted claims for payment and medical records relative to D.J. through the U.S. Mail upon which Allstate relied in adjusting the claims.

321.   Allstate is not required to compensate DIPMM, Integra, or Abraham for unnecessary treatment that derived from illegal solicitation.

### 5.   Patient R.L. (Claim No. TXA-0197188)

322.   Patient R.L. was allegedly involved in a motor vehicle accident on December 12, 2017.

323.   R.L. testified that a transportation company picked him up at his home one (1) week after his alleged accident and drove him to an attorney's office.

324.   R.L. testified that his attorney referred him to defendants Farmbrook and Dhillon.

325.   R.L. presented to Farmbrook on January 3, 2018 for an initial patient evaluation that was purportedly performed by Dhillon.

326.   Farmbrook, ZMC Pharmacy, and Dhillon submitted claims for payment and medical records relative to R.L. through the U.S. Mail upon which Allstate relied in adjusting the claims.

327.   Allstate is not required to pay Farmbrook, ZMC Pharmacy, or Dhillon for unnecessary treatment that derived from illegal solicitation.

## VIII.   UNREASONABLE AND UNNECESSARY MEDICAL TREATMENT

328.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) unlicensed, and (3) not lawfully rendered demonstrates their willingness to also bill for treatment that was unnecessary and unreasonable.

329.   Moreover, but for the solicitation of patients, as discussed *supra*, the patients at issue herein would not have sought treatment with or by the defendants.

330.   The defendants' goal in treating patients was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

331.   As set out below, the defendants grossly overutilized diagnostic tests, injections, neurofeedback therapy, medications, and urine drug testing in wanton disregard for standards of care.

332.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective benefit to patients.

333.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment for which they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

334.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes the services and treatment billed to Allstate relating to the patients set out in the charts annexed hereto at Exhibits 1 through 8.

335.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable services and treatment are fraudulent.

A.   PREDETERMINED TREATMENT PROTOCOL

336.   The defendants engaged in a predetermined treatment protocol that consisted of Farmbrook, DIPMM, MIMM, Dhillon, and Abraham fabricating

diagnoses of headaches and referring patients to treat with Velugubanti at Inscribed and/or Integrative Neurology.

337.   Velugubanti, by and through Inscribed and Integrative Neurology, then made the following referrals or decisions to nearly every patient during the initial patient evaluation: (1) order an ambulatory EEG; (2) order a qEEG; (3) prescribe unnecessary medications and provide samples of a dietary supplement; (4) perform canalith repositioning (also known as epley maneuver); (5) perform injections; (6) issue DME (specifically a cervical pillow and heating pad unit); (7) discuss and recommend neurofeedback therapy; (8) order a brain magnetic resonance imaging ("MRI") scan; and (9) refer the patient to an optometrist.

338.   Velugubanti referred patients to entities owned by him (Integrative Neurology and Diagnostic Solutions) to bill for the ambulatory EEG, qEEG, and neurofeedback.

339.   Farmbrook, DIPMM, MIMM, Dhillon, and Abraham rendered concurrent treatment pursuant to the predetermined protocol.

340.   Farmbrook and Dhillon billed for urine drug screens, EMGs, and injections, and issued DME and compounded medications to nearly every patient at issue in this Complaint.

341.   DIPMM, MIMM, and Abraham performed injections and ordered definitive urine drug testing, for which Integra billed Allstate.

342.   The defendants also prescribed medication pursuant to a protocol, which was then billed for by ZMC Pharmacy.

343.   The defendants engaged in this protocol for nearly every patient at issue in this Complaint regardless of the particular needs of each patient.

344.   A former staff member at Inscribed testified that Velugubanti provided the staff member with a treatment protocol to follow for Inscribed patients.

345.   This staff member testified that every patient received a cervical pillow, a heating pad unit, a bottle of 5-HTP, and a bottle of L-Theanine.

346.   Velugubanti told this staff member to provide every patient with the above DME and nutritional supplements not based on medical necessity, but because Velugubanti "wanted patients to leave with gifts, so to speak, and to make them come back."

347.   This staff member testified further that Velugubanti instructed staff to order a 72-hour ambulatory EEG, a qEEG, an MRI scan of the brain, and a neurobehavioral assessment for every patient.

348.   Every patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

349.   The defendants also engaged in symptom magnification, often identifying symptoms and diagnoses that conflict with emergency room records.

350.   Diagnosis of a TBI requires review of records immediately following the onset of the allegedly injury (i.e., the emergency room records).

351.   This type of information includes the Glasgow Coma Scale score, documented loss of consciousness, documented posttraumatic confusion, neurologic examination, and neuroimaging results.

352.   The Glasgow Coma Scale is a neurological rating scale that aims to give a reliable and objective way of recording the conscious state of a person for initial as well as subsequent assessment by assigning points based on level of functioning in the areas of eye opening response, best verbal response, and best motor response after trauma.

353.   Scores between thirteen (13) and fifteen (15) can be indicative of concussion, but a score of fifteen (15) is also the score that would be given to anyone who has normal functioning without trauma.

354.   If one has a score of 15 and has sustained a concussion, there must be another indicator of trauma such as the factors noted above (e.g., loss of consciousness, posttraumatic confusion or disorientation, etc.).

355.   The defendants rarely (if ever) reviewed the emergency room records to determine the existence of a brain injury.

356.   A former Inscribed staff member testified that Inscribed physicians reviewed prior medical records "approximately 10 percent of the time."

357.   Farmbrook, DIPMM, MIMM, Dhillon, and Abraham used subjective complaints of headaches to justify medically unnecessary referrals to Inscribed, Integrative Neurology, and Velugubanti.

358.   Inscribed, Integrative Neurology, and Velugubanti then used self-assessment questionnaires completed by the patients to determine diagnoses instead of an objective examination of the patient.

359.   This resulted in Inscribed, Integrative Neurology, and Velugubanti exaggerating symptoms with template notes indicating that patients suffered from headaches, dizziness, short-term memory loss, irritability, and changes in their mood.

360.   Indeed, Velugubanti reported symptoms and diagnoses which often conflicted with statements made by his patients.

361.   For example, Patient S.C. (Claim No. 0392658324) told Velugubanti that "I didn't catch a headache until later on," but Velugubanti noted that S.C. suffered from daily headaches since the alleged accident.

362.   Inscribed, Integrative Neurology, and Velugubanti listed an absurd number of diagnoses in an attempt to mask the fact that the patient did not actually suffer from a TBI.

363.   Moreover, Velugubanti included diagnoses for which he did not have the neuropsychological test data to support.

364.    For example, Velugubanti frequently diagnosed patients with "frontal lobe and executive functioning deficit."  This diagnosis is cognitive in nature, and requires formal testing to support it.  Velugubanti failed to perform any formal testing to support diagnoses that are cognitive in nature.

365.    In addition to using unsupported diagnoses to falsely support findings of TBI in patients, one former employee from Inscribed testified that she manipulated the testing data to support TBI findings "if [Velugubanti] felt that the patient did have a TBI, based on clinical symptoms, and it was not producing a TBI automatically, then I would extract raw data that fit the guidelines."

366.    In fact, she further testified that testing results often failed to evidence TBI in patients and that when this occurred, Inscribed would send the data out to a doctor in Texas who would then return results that supported a TBI finding:

> A.    Now, there was [sic] times where it did not produce a TBI.  There were oftentimes it did not produce a TBI.  So, then they would send that data to some doctor in, I can't recall, in Texas.  I can't recall his name.
>
> Q.    And what would he do with that data?
>
> A.    They would often come back and that patient would have a TBI.

367.    A former Inscribed staff member testified that Velugubanti prohibited medical staff from determining the diagnosis codes listed in the medical records, but instead instructed a transcription company to determine diagnoses.

368.   Inscribed and Velugubanti therefore allowed individuals with no healthcare licensure to determine the medical diagnoses of Inscribed patients.

369.   Velugubanti attempted to use Conners Continuous Performance Test 3rd Edition ("CPT-3") assessments to justify some diagnoses; however, CPT-3 assessments are not accepted in the medical field as a tool to assess cognitive function or the existence of a TBI.  Rather, the CPT-3 assessment is used to assess attention deficit hyperactivity disorder ("ADHD").  Indeed, the indices derived from the CPT-3 are specific to the diagnosis of ADHD and the test is sensitive to that condition.

370.   Inscribed and Velugubanti used all of these false diagnoses in an attempt to justify treatment that was above and beyond the standard of care for treating a concussion.

371.   Even if the patients sustained a concussion (which almost none did), treatment went on much longer than would be expected and was excessive.

372.   Concussions typically resolve themselves without formal treatment in approximately seven (7) to ten (10) days.

373.   Inscribed, Integrative Neurology, and Velugubanti also billed Allstate for unnecessary canalith repositioning (also known as epley maneuvers) on patients as part of the predetermined treatment protocol.

374.   The epley maneuver is used to treat benign paroxysmal positional vertigo, a condition from which none of the patients at issue in this Complaint actually suffered.

375.   The epley maneuver is performed by having the patient lie down with a pillow placed at their shoulder so that their neck and head are lower than their shoulders.  This is a simple maneuver, which can be performed at home and can be shown through an instructional video, which Velugubanti purportedly did.

376.   Inscribed, Integrative Neurology, and Velugubanti charged Allstate $300 for performing this routine, medically unnecessary "procedure."

377.   The defendants also engaged in a consistent pattern of ordering MRI scans of the brain without any of the necessary associated findings to justify the need for an MRI scan.

378.   Furthermore, the treatment rendered to the patients did not change after the patient received the MRI scan.

379.   Brain MRI guidelines direct to reserve imaging for patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

380.   The defendants, however, ordered brain MRI scans based on subjective complaints of headaches.

381.   The defendants also ordered brain MRI scans unnecessarily using susceptibility weighted imaging ("SWI") and NeuroQuant Volumetric Analysis ("NeuroQuant") in the scans.

382.   Neither SWI nor NeuroQuant are accepted in the medical field as the standard of care for determining the existence of a concussion or TBI.

383.   Indeed, SWI is considered an experimental protocol and has been criticized for having too many false positives.

384.   NeuroQuant is more often used in assessing epilepsy and dementia, and even in these clinical settings, there have been problems with reliability and validity.

385.   NeuroQuant detects atrophy in the brain; however, it does not distinguish between atrophy that occurs as a normal part of the aging process and atrophy stemming from a motor vehicle accident.

### B.   UNNECESSARY AND EXCESSIVE DIAGNOSTIC TESTING

386.   Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon billed Allstate for excessive and unnecessary diagnostic tests, including ambulatory EEGs, qEEGs, EMGs, and sleep studies.

387.   These tests had no effect on medical decision making by these defendants, as the reports containing the results contained template entries, and the results were often not even mentioned in the ordering physicians' subsequent records, including Velugubanti and Dhillon.

388.   Among the most brazen of the tests and services routinely billed by the defendants without any indication of medical need were 72-hour ambulatory EEGs.

389.   Ambulatory EEGs are tests that are used to detect seizures and to confirm diagnoses of epilepsy.

390.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

391.   The defendants' use of ambulatory EEGs was not only medically unnecessary for the types of symptoms (allegedly) reported by patients, they were performed in disregard for the appropriate course of care, which calls for a traditional, in-office EEG to be performed before subjecting a patient to a three-day-long procedure.

392.   The methodology allegedly used by Inscribed and Integrative Neurology was to attach the equipment to a patient's head and direct him or her to keep the equipment on for three (3) days while performing normal activities.

393.   The dates of the ambulatory EEG tests allegedly performed by the defendants rarely, if ever, corresponded with dates that patients were at Inscribed and Integrative Neurology.

394.   Inscribed and Integrative Neurology invariably charged Allstate $9,500 per day, or $28,500 per ambulatory EEG test allegedly performed.  *See* Exhibits 1 and 2.

395.   The ambulatory EEGs for which Inscribed and Integrative Neurology billed Allstate, if performed at all, were never medically necessary.

396.   The standard of care calls for a traditional, in-office EEG to be performed before subjecting a patient to an extended EEG.

397.   The defendants ordered 48- or 72-hour ambulatory EEGs with no clinical basis and without performing or ordering an in-office EEG.

398.   The defendants also relied upon qEEG, a procedure that processes the recorded EEG activity from a multi-electrode recording using a computer that processes the EEG activity into color maps of brain functioning.

399.   The defendants' reliance on qEEG is not an accepted assessment and treatment tool due to poor reliability and validity, and qEEG is considered experimental with no clinical value.

400.   Formulas used for diagnosis of a TBI via qEEG have not been independently replicated.

401.   The defendants inappropriately used qEEGs as a method to diagnose TBIs.

402.   Velugubanti has testified that qEEG provides "screening software that helps us determine causation."

403.   The qEEG is not an appropriate method to diagnose TBI because TBI is diagnosed based on acute injury characteristics alone, and not findings many months or years later.

404.   Multiple patients indicated that the defendants never discussed the results of their qEEGs with them.

405.   In the EEG reports, Velugubanti stated that many of the findings are consistent with medication effects.  This indicates that there are factors other than a TBI that may be disrupting electrical systems in the brain.  Velugubanti therefore discounts his own findings when he is treating these individuals for TBI.

406.   A former Inscribed staff member testified that the qEEGs ordered and billed for by the defendants were medically unnecessary.

407.   The staff member testified that Velugubanti used the qEEG "to rate the severity of a traumatic brain injury," but that "[p]eople got the same treatment regardless" of the rating issued by the defendants.

408.   Other diagnostic tests billed by the defendants were also unnecessary, excessive, and well below the standard of care.  For example, the sleep studies ordered and billed for by the defendants never altered the treatment rendered by the defendants.

409.   In fact, patients at issue in this Complaint stated that no one went over the sleep study results with them.

410.   As another example, electromyography ("EMG") testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

411.   An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

412.   There are at least two (2) components to a properly administered EMG test.

413.   First, after the needle is inserted below the skin, the muscle is examined at rest.

414.   In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

415.   A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

416.   The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

417.   In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

418.   If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

419.   Farmbrook improperly double billed Allstate for EMG testing purportedly performed on a patient's upper extremity during one (1) visit and then billed Allstate for performing a second EMG of the same patient's lower extremity during the next office visit.

420.   The EMG testing billed by Farmbrook was unnecessary and problematic because the defendants failed to discuss the EMG results with patients and, furthermore, the EMG results were not used in any way to affect patient treatment.

### C.   UNNECESSARY AND EXCESSIVE USE OF INJECTION PROCEDURES

421.   Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham billed Allstate for excessive, unnecessary, and unreasonable injections.

422.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon an adequate diagnosis and legitimate medical necessity.

423.   The defendants repeatedly recommended and billed Allstate for performing injections to patients even when not medically necessary.

424.   The defendants exaggerated symptoms as a basis to justify performing medically unnecessary and excessive injections.

425.   For example, Inscribed, Integrative Neurology, and Velugubanti billed Allstate for trigger point and Xeomin injections conducted during patients' initial visits to treat spasmodic torticollis.

426.   Spasmodic torticollis, also known as cervical dystonia, is an extremely painful chronic neurological movement disorder that causes the neck to involuntarily turn.

427.   The defendants failed to document any subjective complaints by patients describing this condition or document any objective examination findings indicating the existence of spasmodic torticollis.

428.   The defendants therefore falsely used this diagnosis in order to bill Allstate for excessive and unnecessary injections.

429.   The defendants also inappropriately performed Xeomin injections as an initial procedure rather than attempting more conservative treatment methods.

430.   Xeomin injections may be used to treat chronic headaches; however, it is the standard of care to use at least two (2) or three (3) other preventative agents for a reasonable period of time prior to initiating the injections.

431.   In direct violation of the standard of care, Inscribed, Integrative Neurology, and Velugubanti injected patients with Xeomin during the initial evaluation and before more conservative preventative agents were attempted.

432.   The defendants also billed Allstate for injecting an excessive amount of Xeomin.

433.   The manufacturer of Xeomin's website recommends 120 units as an initial dose to treat cervical dystonia.

434.   A clinical trial conducted by the manufacturer of Xeomin revealed that there is no meaningful efficacy difference between 120 units and 240 units.

435.   Inscribed and Velugubanti billed for injecting 400 units of Xeomin into patients at issue in this Complaint, which is far above the recommended amount.

436.   Inscribed and Velugubanti also violated the standard of care by performing multiple Xeomin injections within a 90-day period.

437.   The standard of care requires that Xeomin injections be separated by at least 90 days.

438.   The manufacturer of Xeomin's website states that the frequency of repeat treatments for cervical dystonia should generally be no more frequent than every twelve (12) weeks.

439.   Inscribed, Integrative Neurology, and Velugubanti also consistently billed Allstate for greater occipital nerve blocks, which were often done during the initial evaluation.

440.   DIPMM, MIMM, and Abraham also billed Allstate for injections that provided no therapeutic value and were therefore medically unnecessary.

441.   For example, patient D.J. (Claim No. TXA-0185605) testified that he received an injection from Abraham at DIPMM and "I told him the injection he gave me really wasn't working."

442.   Patient S.J. (Claim No. TXA-0185605) testified that her injection provided relief for only two (2) hours, and "they said some people they get it and it lasts a month, some it don't [sic] work."

### D.   UNNECESSARY AND EXCESSIVE USE OF NEUROFEEDBACK THERAPY

443.   Defendants Inscribed, Integrative Neurology, and Diagnostic Solutions (by and through Velugubanti) billed Allstate for excessive, unnecessary, and unreasonable neurofeedback therapy.

444.   Neurofeedback, also known as biofeedback, measures brain waves to produce a signal than can be used as feedback to teach self-regulation of brain function.

445.   Neurofeedback commonly uses video or sound, with positive feedback for desired relaxation levels and negative feedback for undesired activity levels.

446.   Neurofeedback is not an accepted treatment tool in the medical field for brain injuries.

447.   It has been used mostly for ADHD, but even in that condition the clinical guidelines are mixed.

448.   Velugubanti testified that neurofeedback is "brain training" and acknowledged that it is "mostly defined as third, fourth, fifth line therapy for treatment of neurological conditions."

449.   Velugubanti confirmed that first and second "lines" of therapy include medication and rehabilitation and one-on-one counseling with a psychologist.

450.   Nonetheless, Velugubanti, by and through Inscribed, Integrative Neurology, and Diagnostic Solutions, consistently billed Allstate for neurofeedback therapy conducted before the patient ever received rehabilitation or counseling.

451.   Velugubanti's patient evaluation records included a template note to recommend or schedule "neurofeedback therapy as a form of neurocognitive treatment concomitantly with neurocognitive rehabilitation of close head injuries through neuroplasticity."

452.   Despite including this note in almost every patient record, the defendants never provided simultaneous "neurocognitive rehabilitation," nor did they make referrals for such treatment.

453.   Indeed, even if the patients had received such rehabilitation services (which they did not), providing concurrent neurofeedback and neurocognitive rehabilitation is not accepted in the medical field to treat head injuries.

454.   Finally, Velugubanti's statement that neurofeedback helps with "neuroplasticity" is not supported by empirical evidence.

455.   Integrative Neurology submitted template neurofeedback records confirming that treatment had no effect on the patient.

456.   For example, Integrative Neurology billed Allstate for thirty-seven (37) sessions of neurofeedback therapy allegedly rendered to Patient S.C. (Claim No. 0392658324) between March 29, 2017 and November 3, 2017.

457.   For all thirty-seven (37) sessions spanning more than seven (7) months, Integrative Neurology reported that S.C. had the exact same orientation ("fully oriented"), mood ("anxious"), affect ("normative/consistent"), cognitive condition ("inattentive"), manner ("co-operative"), and appearance ("well groomed/neat/clean").

458.   Moreover, the plan of care remained the same for every single visit: "Client will attend one to two sessions weekly to improve cognitive function, stabilize mood, improve sleep and reduce chronic pain."

459.   The identical, template nature of the treatment records demonstrates that neurofeedback therapy had no effect on S.C.'s condition and that the treatment plan never changed despite the lack of improvement in S.C.'s mood and cognitive function.

E.   MEDICALLY UNNECESSARY MEDICATION

460.   Defendants Inscribed, Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham violated established standards of care

by prescribing medications, including controlled substances, following the initial evaluation of patients.

461.   Inscribed, Integrative Neurology, and Velugubanti prescribed the same drugs to nearly every patient during their initial evaluation, including (1) a controlled substance used to treat ADHD, (2) an NSAID, and (3) a dietary supplement.

462.   The defendants then arranged to have these unnecessary prescriptions filled by defendant ZMC Pharmacy as part of their *quid pro quo* agreements.

### 1.   Medically Unnecessary Controlled Substances

463.   The defendants prescribed controlled substances that were not indicated at all for the treatment of patients' purported conditions.

464.   Inscribed, Integrative Neurology, and Velugubanti prescribed Vyvanse and Focalin, which are classified as Schedule II controlled substances because they can be abused and lead to dependence.

465.   A former employee who worked with Velugubanti testified that her "employment [was] terminated at Inscribed because I refused to write Dr. Gireesh Beluguvanti [sic] a prescription for Vyvanse."

466.   Vyvanse and Focalin are traditionally prescribed to treat ADHD, which is a condition that Velugubanti did not diagnose for the patients at issue in this Complaint (all of whom were allegedly involved in motor vehicle accidents).

467.   The defendants' frequent prescription of Schedule II controlled substances is particularly egregious, as it contributed to a significant public health crisis in Michigan.

468.   On October 26, 2015, a bipartisan task force formed by Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

469.   The task force reported:

> Prescription drug abuse has reached epidemic proportions.   The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers.   In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

470.   The defendants prescribed Schedule II controlled substance medications as a matter of course at the expense of the proper care and safety of their patients and the safety of the community at large.

### 2.   Medically Unnecessary Compounded Medications

471.   Farmbrook and Dhillon billed Allstate for prescribing and dispensing compounded cream as part of their predetermined treatment protocol.

472.   There is little to no research to support the use of topical compounded products and they are therefore largely considered experimental.

473.   In order to establish any medical necessity for compounded topical agents, one or more of the following must be established: (1) intolerance to

commercially available products; (2) failure to improve in spite of commercially available products; (3) avoidance of gastrointestinal problems from oral intake; (4) need to reduce systematic exposure; or (5) documented difficulties ingesting oral medication.

474.   Farmbrook and Dhillon never documented any justification for the use of compounded medications.

475.   Rather, the use of compounded medications was part of their predetermined slate of medication prescribed as a matter of course without any analysis of the efficacy or tolerance of other commercially-available options.

476.   When compounded medications were prescribed to the patients at issue herein, it was never clear what body part(s) the cream was intended to treat.

477.   Farmbrook and Dhillon never provided patients with specific instructions as to where or how the compounded creams prescribed were to be applied.

478.   Instead, Farmbrook and Dhillon provided boilerplate instructions to apply the cream to the "affected area(s)" without identifying which part(s) of the patient's body constituted an affected area.

479.   As with the other treatment and testing described herein, the compounded cream billed for by Farmbrook and Dhillon was designed solely to

increase the total amount of charges submitted to Allstate and not for the actual medically necessary treatment of patients.

### 3.    Other Medically Unnecessary Medications

480.   Velugubanti, by and through Inscribed and Integrative Neurology, billed for medications that were of no clinical value.

481.   For example, Velugubanti provided patients with L-Theanine, which he testified was used as a natural alternative for "sleep promotion."

482.   Velugubanti gave patients an instruction sheet for use of L-Theanine with a link to the National Institute of Health.  That site states that the U.S. Food and Drug Administration allows the sale of L-Theanine "as a dietary supplement."

483.   The website also mentions that the European Food Safety Authority advised negatively on health claims related to L-Theanine and cognitive function, alleviation of psychological stress, and maintenance of normal sleep.

### F.    MEDICALLY UNNECESSARY URINE DRUG TESTING

484.   Defendants Farmbrook and Dhillon billed Allstate for presumptive urine drug screening that was billed for as a matter of course and was not used to affect each patient's treatment plan.

485.   Integra billed Allstate for definitive urine drug testing that was medically unnecessary, unreasonable, excessive, and not performed in accordance with established standards of care.

486.   Farmbrook, Integra, and Dhillon routinely billed for urine drug testing for the same patient on a regular schedule, often within weeks of each other.

487.   DIPMM, MIMM, and Abraham failed to perform presumptive urine drug screening prior to referring specimens to Integra for excessive and unnecessary definitive urine drug testing in violation of the standard of care.

488.   These defendants also routinely billed for urine drug testing on urine specimens provided by patients who were not prescribed controlled substances at all, rendering such urine drug testing unnecessary.

### 1.   Medically Unnecessary Presumptive Urine Drug Screens

489.   Farmbrook and Dhillon required patients to undergo presumptive urine drug screening on every visit.

490.   Presumptive urine drug screening is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

491.   Toxicology monitoring is only reasonable and medically necessary when it is performed randomly to assess a patient's compliance with treatment with controlled substances.

492.   Farmbrook and Dhillon billed Allstate for presumptive urine drug screens performed as a matter of course and without regard to medical necessity.

493.   The presumptive urine drug screens billed to Allstate had no effect on medical decision making by Farmbrook and Dhillon.

494.   These defendants continued rendering treatment pursuant to their predetermined protocol and did not alter treatment decisions based upon the results of the presumptive urine drug screens.

495.   Allstate is not required to reimburse Farmbrook for medically unnecessary urine drug screening, and Allstate is entitled to a return of monies it paid to Farmbrook for these medically unnecessary urine drug screens.

## 2.   Medically Unnecessary Definitive Urine Drug Testing

496.   DIPMM, MIMM, and Abraham routinely ordered, and Integra routinely billed for, medically unnecessary definitive urine drug testing for dozens of substances for the same patient on a regular schedule, often within just weeks of each other, which violates the standard of care for urine drug testing.

497.   The standard of care for urine drug testing is that only unexpected screening results should be confirmed (absent extenuating circumstances that must be documented in the patient's medical records by the treating provider).

498.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not

always necessary.   Clinical correlation is appropriate . . . .   In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.   However, if the patient disputes the <u>unexpected findings</u>, a confirmatory test should be done" (emphasis added).

499.   Thus, SAMHSA confirms that, at most, only *unexpected* initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

500.   However, DIPMM, MIMM, and Abraham never performed presumptive urine drug screening before referring patients' specimens to Integra for expensive and medically unnecessary definitive urine drug testing.

501.   In these instances, pursuant to the standard of care for clinical laboratories, Integra should have performed its own presumptive testing instead of immediately performing definitive testing, but it did not.

502.   At all relevant times to this Complaint, Integra submitted charges to Allstate seeking payment for presumptive testing relative to only eight (8) dates of service.   *See* Exhibit 8.

503.   This is not surprising as presumptive testing is usually reimbursed at a much lower rate than definitive testing per specimen.

504.   At all relevant times, Integra has been, and remains, capable of performing presumptive testing.

505.   But instead of performing a presumptive test in those instances where a screen had not already been performed by DIPMM, MIMM, and Abraham to determine whether definitive testing was warranted, Integra instead made the deliberate decision to perform definitive testing immediately.

506.   Integra's decision resulted in hundreds of instances where expensive and complex definitive testing was unnecessarily performed that could have been avoided if initial testing to screen out expected results had been performed.

507.   Integra can offer no legitimate or valid reason why it did not perform presumptive testing on specimens received from DIPMM, MIMM, and Abraham when no presumptive testing results were submitted to Integra.

508.   Indeed, as discussed above, the standard of care in the clinical laboratory community is to conduct a presumptive test and then confirm only those drugs/drug categories where the screening result was unexpected or where the treating provider has a patient-specific reason to request confirmation of a presumptive test result.

509.   Integra blatantly disregarded the standard of care in favor of maximizing its profits.

510.   Furthermore, the level of definitive testing that DIPMM, MIMM, and Abraham ordered, and Integra billed for, on the specimens of patients undergoing pain management treatment after involvement in predominantly low-level motor vehicle accidents significantly exceed the level of confirmation required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

511.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

512.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3)(i).

513.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory drug testing."  10 C.F.R. § 26.5.

514.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

515.   In comparison, DIPMM, MIMM, and Abraham ordered, and Integra billed for, unnecessary definitive testing for almost every patient at issue herein, all

of which involve patients purportedly injured in low-level motor vehicle accidents and none of whom are known to maintain and/or operate nuclear power reactors.

516.   DIPMM, MIMM, and Abraham ordered definitive urine drug tests on patients even when the patient was not prescribed any medications, or was prescribed only non-controlled substances, which has no medical basis.

517.   Patient D.J. (Claim No. TXA-0185605) testified that DIPMM and Abraham required D.J. to provide a urine sample during every visit and that Abraham explained that it is "just normal procedure."

518.   Patient G.E. (Claim No. TXA-0230489) also testified that even though he refused prescriptions from Abraham, Abraham required G.E. to provide a urine sample during each office visit because "[t]hat's one of his requirements."

519.   The definitive testing at issue herein was ordered only to generate charges to Allstate; it was not used to influence the treatment plan of patients, which was also predetermined.

520.   The failure to actually use test results to inform treatment plans reveals that the defendants ordered such testing as a matter of course to increase charges submitted to Allstate, and not out of medical necessity for the treatment of the patients at issue herein.

521.   Not only were the results of tests not used to alter patient treatment, but in many instances DIPMM, MIMM, and Abraham never even consulted the results prior to continuing a patient's medication regimen.

522.   The ordering of definitive urine drug testing for nearly every DIPMM and MIMM patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

523.   Furthermore, the fact that patients were very much aware that they were required to provide a urine specimen each time they presented to Abraham at DIPMM and MIMM further supports that the definitive urine drug testing at issue herein was useless in determining a patient's compliance with his/her treatment regimen because it was not performed randomly.

524.   Integra has also confirmed that the urine drug testing ordered by DIPMM, MIMM, and Abraham is based upon non-patient specific panel preferences:

| ORDERED TESTS | | | | |
|---|---|---|---|---|
| **Presumptive Testing (EIA)** | | | | **Confirmatory Testing (LC/MS/MS)** |
| □ Standard 8 Panel Screen | *Reflex:* Targ. | Exp. | None | □ Standard Comprehensive Panel |
| □ Standard 10 Panel Screen | *Reflex:* Targ. | Exp. | None | ☒ Standard Basic Panel |
| □ Standard 12 Panel Screen | *Reflex:* Targ. | Exp. | None | □ Standard Custom Panel |
| Specimen Validity Test. | | YES | NO | □ Confirmation of POC/EIA Results   Targ.   Exp. |
| Additional Screening Tests: | | | | □ Confirmation of Prescribed/Listed Medications: |
| | | | | □ Other Tests: |

PATIENT RELEASE, CONSENT, AND ASSIGNMENT

I understand that I have the right to select the laboratory of my choice to conduct testing on my behalf. I authorize Integra Lab Solutions to conduct testing on this specimen and bill my coverage provider for all associated costs. I grant to Integra Lab Solutions an assignment of right to enforce full payment of all claims and appeals related to testing of this specimen and/or charges incurred for benefits due/past due for medical services for which charges are payable under any policy of insurance. This includes self-insured coverages and the right to file suit to enforce the full payment of the benefits due or past due. I acknowledge that Integra Lab Solutions may be out of network with my coverage provider and agree to remit any payments in full made to me for the testing of this specimen directly to Integra Lab Solutions within 30 days, as required by law. I agree to accept full financial responsibility for all costs directly related to the testing of this

7·10·18

83

525.   Abusive laboratory practices, including non-patient specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

526.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

527.   With respect to custom profiles and testing panels, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "standing orders . . . too often . . . have led to abusive practices."  Id. at 45081.

528.   The OIG has also stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."  Id. at 45079.

529.   The OIG further guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition."  Id.

530.   Integra's use of predetermined testing violates established standards of practice that demand that only medically necessary urine drug testing be performed, as decided on a patient-by-patient and visit-by-visit basis by a licensed healthcare professional.

531.   By testing for the exact same substances for every patient, regardless of age, medications prescribed, comorbidities, or other factors, Integra knowingly submitted claims that could not have been medically necessary for each patient's clinical condition.

532.   It is the responsibility of Integra to assure that it is performing only tests that are reasonable and medically necessary.

533.   None of the records submitted to Allstate by DIPMM or MIMM contain any indication that the DIPMM and MIMM physicians ordering urine drug tests, including Abraham, made any determination as to what type of testing should be performed or for which substances should be tested.

534.   No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes medically necessary urine drug testing in all cases.

535.   Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

536.   Instead of taking steps to ensure that it was only submitting claims for necessary urine drug testing, Integra intentionally worked to increase the number of medically unnecessary tests billed to payors like Allstate.

537.   Tests that have no bearing on patient treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

538.   Allstate is not required to reimburse Integra for urine drug testing that is not patient-specific and that is unnecessary, and Allstate is entitled to a return of monies it paid to Integra for these medically unnecessary urine drug tests.

## G.   SPECIFIC EXAMPLES OF UNREASONABLE AND UNNECESSARY TREATMENT

539.   The following claims exemplify the defendants' billing for unreasonable and unnecessary treatment.

### 1.   Patient S.G. (Claim No. 0482998035)

540.   S.G. was allegedly involved in a motor vehicle accident on November 22, 2017.

541.   S.G. presented to Farmbrook on December 6, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

542.   Dhillon also wrote a prescription that ordered MRI scans of S.G.'s lumbar spine, cervical spine, and brain.

543.   S.G. presented to Integrative Neurology on January 2, 2018 where she was allegedly seen by Dawn Daniels, NP-C ("Daniels"), notwithstanding the fact that Integrative Neurology submitted a bill to Allstate for the January 2, 2018 date of service that states Velugubanti treated S.G.

544.   According to the medical record dated January 2, 2018, Integrative Neurology ordered an ambulatory EEG, qEEG, marked the CPT-3 assessment, and diagnosed S.G. with "frontal lobe and executive functioning deficit" among seven (7) additional diagnoses.

545.   Integrative Neurology billed Allstate for DME consisting of a cervical pillow and heating pad unit that was allegedly issued to S.G. on January 2, 2018 for which there is no evidence supporting that S.G. was actually given the DME that was billed to Allstate.

546.   On February 12, 2018, almost three (3) months after the alleged motor vehicle accident, Integrative Neurology billed Allstate for a qEEG procedure that was purportedly performed on S.G. by Velugubanti.

547.   According to the report generated by the experimental qEEG procedure, S.G. had a "moderate" TBI level of severity.

548.   qEEG is not an accepted assessment and treatment tool and is considered to have no clinical value in determining TBI, especially months after the alleged traumatic event occurred.

549.   In fact, S.G. presented to Henry Ford Hospital shortly after her motor vehicle accident and received a neurological exam that was negative, as was her psychiatric/behavioral examination, and the medical records submitted to Allstate by Henry Ford Hospital indicated that S.G. was fully oriented, her head was described as "atraumatic," her pupils were reactive to light, and S.G. was not diagnosed with a brain injury.

550.   Farmbrook billed Allstate for upper extremity EMG testing that was purportedly performed on S.G. on August 29, 2018.

551.   According to the report authored by Dhillon, there was no evidence of radiculopathy in S.G.'s upper extremity.

552.   All of the treatment and testing ordered and billed for by Farmbrook and Integrative Neurology was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient S.G., and was medically unnecessary and performed in disregard for the applicable standards of care.

553.   Farmbrook and Integrative Neurology submitted claims for payment and accompanying medical records relative to S.G. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

554.   Allstate is not required to pay Farmbrook and Integrative Neurology for the fraudulent, unnecessary, and unreasonable treatment and testing related to S.G.

## 2.    Patient I.S. (Claim No. 0428425573)

555.   I.S. was allegedly involved in a motor vehicle accident on September 8, 2016 and presented to Botsford Hospital on the same date.

556.   According to the medical record submitted to Allstate by Botsford Hospital, I.S. was in a "[v]ehicle going about 15-20 miles per hour when it struck a parked car" and I.S. was "unsure" whether she suffered any loss of consciousness resulting from the motor vehicle accident.

557.   The medical record submitted by Botsford Hospital also indicated that there were no focal neurologic deficits noted and the diagnostic imaging of I.S.'s head resulted in a negative finding for brain injury.

558.   I.S. presented to Inscribed on January 4, 2018 for an initial patient evaluation that was purportedly performed by Velugubanti.

559.   Contrary to the medical record submitted by Botsford Hospital that was authored on the same date as the alleged motor vehicle accident, Velugubanti reported that I.S. "was going at 55 miles per hour" and that she reported "[p]ositive loss of consciousness" as a result of the motor vehicle accident.

560.   Velugubanti ordered a "48-Hour Ambulatory EEG assessment," "[qEEG] testing ordered for diagnostic screening of TBI trauma with loss of consciousness," prescribed Vyvanse for I.S.'s ADHD, and issued I.S. DME

consisting of a cervical pillow, heating pad, a bottle of 5-HTP, and a bottle of L-Theanine.

561.   I.S. presented to Inscribed on February 12, 2018 and purportedly met with McKissick who reported that I.S. received Xeomin injections during the January 4, 2018 office visit.

562.   McKissick recommended steroid treatment but I.S. refused and instead opted for Xeomin injections going forward.

563.   McKissick also ordered a "72-hour ambulatory EEG assessment" instead of the 48-hour ambulatory EEG ordered by Velugubanti.

564.   All of the treatment and testing ordered and billed by Inscribed and Velugubanti was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient I.S., and was medically unnecessary and performed in disregard for the applicable standards of care.

565.   Inscribed submitted claims for payment and accompanying medical records relative to I.S. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

566.   Allstate is not required to pay Inscribed for the fraudulent, unnecessary, and unreasonable treatment and testing related to I.S.

### 3.    Patient T.S. (Claim No. 0461626020)

567.    T.S. was allegedly involved in a motor vehicle accident on June 24, 2017.

568.    T.S. presented to Farmbrook on May 23, 2018 for an initial patient evaluation that was purportedly performed by Dhillon and resulted in Dhillon assessing T.S. with the following three (3) diagnoses: (1) lower back pain, (2) lumbar herniated disc, and (3) lumbar radiculopathy.

569.    Dhillon also ordered T.S. to undergo EMG studies of his bilateral lower extremities and then to follow up after the EMG studies were completed even though there was no medical justification for EMG studies.

570.    T.S. presented to Farmbrook on November 12, 2018 for EMG studies of his bilateral lower extremities that was purportedly performed by Jacqueline Tribelhorn, N.P. ("Tribelhorn") "with Dr. Dhillon in office and immediately available for assistance."

571.    Tribelhorn listed "numbness and tingling" under the "Review of Systems" section of the medical record dated November 12, 2018 and also assessed T.S. with "Paresthesias."   Both of these entries were not originally included by Dhillon during T.S.'s initial patient evaluation.

572.   T.S. presented to Farmbrook on December 10, 2018 for EMG studies of his upper bilateral extremities even though T.S. first presented to Farmbrook with complaints of only his lower back.

573.   Dhillon diagnosed T.S. with a cervical sprain/strain and carpel tunnel syndrome for the first time since the alleged motor vehicle accident.

574.   Without any basis, Dhillon diagnosed T.S. with lower back pain and lumbar herniated disc/bilateral L5 radiculopathy during the March 25, 2019 follow-up evaluation.

575.   All of the treatment and testing ordered and performed by Farmbrook was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient T.S., and was medically unnecessary and performed in disregard for the applicable standards of care.

576.   Farmbrook submitted claims for payment and accompanying medical records relative to T.S. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

577.   Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to T.S.

4.     **Patient S.N. (Claim No. TXA-0178760)**

578.   S.N. was allegedly involved in a motor vehicle accident on December 15, 2016.

579.   S.N. presented to Inscribed on January 29, 2018 for an initial patient evaluation that was purportedly performed by McKissick.

580.   McKissick reported that S.N. "cannot recall for certain if she lost consciousness" as a result of the motor vehicle accident.

581.   A CPT-3 assessment was performed on S.N. during her initial patient evaluation that purportedly produced results indicating S.N. had "a very high likelihood of having a disorder characterized by attention deficits such as ADHD."

582.   McKissick ordered S.N. to undergo a Brain MRI with SWI and Neuroquant protocol, a 72-hour EEG assessment, and a qEEG for "diagnostic screening of TBI trauma with loss of consciousness" even though S.N. did not report loss of consciousness.

583.   McKissick also prescribed and dispensed L-Theanine PM and 5-HTP to S.N. in addition to prescribing and issuing S.N. DME consisting of a cervical pillow and a heating pad.

584.   All of the treatment and testing ordered and billed for by Inscribed and McKissick was based on predetermined and boilerplate findings that did not have

any relation to the individual needs of patient S.N., and was medically unnecessary and performed in disregard for the applicable standards of care.

585.   Diagnostic Solutions billed Allstate for a sleep study relating to S.N. that was allegedly performed on January 30, 2018.

586.   According to the medical record submitted by Diagnostic Solutions, a report that is completely devoid of any findings, S.N.'s appointment time was listed as 8:30 p.m. and her arrival time is listed as 9:21 a.m.

587.   It is highly unlikely that the sleep study billed by Diagnostic Solutions occurred at all.

588.   Furthermore, Diagnostic Solutions billed Allstate for an EMG that was purportedly performed on S.N. on February 9, 2018, which resulted in normal findings.

589.   Diagnostic Solutions also billed Allstate for a second EMG just a month later that was purportedly performed on S.N. on March 9, 2018 but failed to document any findings in the corresponding medical record dated March 9, 2018.

590.   Inscribed and Diagnostic Solutions submitted claims for payment and accompanying medical records relative to S.N. to Allstate through interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

591.   Allstate is not required to pay Inscribed or Diagnostic Solutions for the fraudulent, unnecessary, and unreasonable treatment and testing related to S.N.

### 5.   Patient J.F. (Claim No. 0491502597)

592.   J.F. was allegedly involved in a motor vehicle accident on February 11, 2018.

593.   J.F. presented to DIPMM on March 8, 2018 for an initial patient evaluation that was purportedly performed by Abraham.

594.   Abraham indicated that J.F. "will continue to get medication from another doctor" without identifying the medications at issue.

595.   J.F. allegedly provided a urine specimen during her March 8, 2018 DIPMM office visit that was referred to Integra for definitive urine drug testing.

596.   According the lab report submitted to Allstate by Integra, J.F.'s urine specimen tested positive for Nortriptyline, Sertraline, THC-COOH, Gabapentin, and Oxycodone.

597.   The lab report submitted by Integra fails to identify what medications were prescribed to J.F. as of March 8, 2018.

598.   J.F. presented to DIPMM for a follow-up evaluation that was purportedly performed by Abraham on April 12, 2018.

599.   The April 12, 2018 medical record submitted to Allstate by DIPMM is devoid of any reference relating to the March 8, 2018 definitive urine drug testing

results identified in Integra's lab report, including any acknowledgement of the five (5) positive findings.

600.   Abraham allegedly collected a urine specimen from J.F. during the April 12, 2018 office visit and referred the specimen to Integra for definitive urine drug testing without making a single notation in the medical record why additional urine drug testing was warranted at all.

601.   According to the lab report submitted to Allstate by Integra, J.F.'s urine specimen that was allegedly collected on April 12, 2018 tested positive for Nortriptyline, Sertraline, Gabapentin, and Oxycodone.

602.   Both the March 8, 2018 and the April 12, 2018 medical records indicate only that J.F. "will continue to get medication from another doctor."

603.   J.F. presented to DIPMM for another follow-up office visit on May 17, 2018 that was purportedly performed by Abraham.

604.   According to the May 17, 2018 medical record, J.F.'s April 12, 2018 urine drug testing results were "consistent w/ meds. pt will continue getting narcotics from kneepro."

605.   Although Abraham had not prescribed J.F. any narcotics during her three (3) office visits to DIPMM, Abraham allegedly collected another urine specimen from J.F. that was referred to Integra for definitive urine drug testing.

606.   There was no medical necessity for Abraham to order excessive and expensive definitive urine drug testing relating to J.F. when Abraham was not prescribing controlled substances or narcotics to J.F. and, furthermore, Abraham failed to identify the "narcotics" J.F. was prescribed by "kneepro."

607.   Integra submitted claims for payment and accompanying medical records relative to J.F. to Allstate through the U.S. Mail for unreasonable and unnecessary definitive urine drug testing, and Allstate relied upon the same in adjusting the claims.

608.   Allstate is not required to pay Integra for the fraudulent, unnecessary, and unreasonable definitive urine drug testing relative to J.F.

**6.   Patient J.W. (Claim No. TXA-0205887)**

609.   J.W. was allegedly involved in a motor vehicle accident on June 3, 2018.

610.   J.W. presented to Farmbrook the following day on June 4, 2018 for an initial patient evaluation that was purportedly performed by Dhillon.

611.   Dhillon diagnosed J.W. with "[h]eadache/dizziness/blurry vision," "[l]umbar sprain strain/radiculopathy," "[c]ervical sprain strain/radiculopathy," and "[m]ultiple lacerations" according to the medical record authored by Dhillon that is dated June 4, 2018.

612.   Dhillon wrote a prescription that ordered MRI scans of J.W.'s lumbar spine, cervical spine, and brain and a prescription for Norco.

613.   Dhillon issued J.W. a disability certificate that not only disabled J.W. from housework, driving, and recreational activities, but also allowed for attendant care services and case management.

614.   The disability certificate lists the four (4) diagnoses identified by Dhillon but also includes two (2) additional diagnoses of shoulder pain and knee pain.

615.   Farmbrook also billed Allstate for performing a presumptive urine drug test on June 4, 2018 that is not mentioned in the medical records submitted by Farmbrook.

616.   J.W. presented to Farmbrook on June 15, 2018 for trigger point injections that were purportedly performed by Tribelhorn on J.W.'s left shoulder and lower back despite Dhillon indicating less than two (2) weeks prior during the initial patient evaluation that J.W. "may benefit from some physical therapy for his neck and low back."

617.   Tribelhorn also added TBI and long term use of opiates to J.W.'s growing list of diagnoses.

618.   Farmbrook billed Allstate for performing a presumptive urine drug test on J.W. on July 3, 2018.

619.   According to the medical records submitted by Farmbrook, Tribelhorn continued to prescribe Norco to J.W. on July 3, 2018, March 19, 2019, and April 17, 2019 even though the presumptive urine drug testing "[r]esults [were] pending review."

620.   In fact, the presumptive urine drug testing results on March 19, 2019 and April 17, 2019 both returned a negative result for opiates, indicating that J.W. was not complying with his opiate medication.

621.   Yet, Tribelhorn failed to discuss or mention this in the medical records submitted to Allstate, instead, she continued to prescribe Norco to J.W.

622.   All of the treatment and testing ordered and billed for by Farmbrook was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient J.W., and was medically unnecessary and performed in disregard for the applicable standards of care.

623.   Farmbrook submitted claims for payment and accompanying medical records relative to J.W. to Allstate through the U.S. Mail for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

624.   Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to J.W.

### 7.    Patient J.F. (Claim No. TXA-0193637)

625.    J.F. was allegedly involved in a motor vehicle accident on October 10, 2017.

626.    J.F. presented to Farmbrook on October 19, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

627.    Dhillon issued J.F. DME consisting of a back brace and transcutaneous electrical nerve stimulation ("TENS") unit, dispensed lidocaine cream, prescribed Oxaydo and Amrix to J.F., and also prescribed MRIs of the cervical spine, lumbar spine, and brain with neuroquant technology during the October 19, 2017 initial patient evaluation.

628.    J.F. presented for a follow-up patient evaluation on November 20, 2017 that was purportedly performed by Dhillon.

629.    Dhillon ordered J.F. to undergo EMG studies of her bilateral upper extremities and referred J.F. to a neurologist.

630.    J.F. presented to Inscribed on January 18, 2018 for an initial patient evaluation that was purportedly performed by McKissick.

631.    McKissick reported "[p]ositive loss of consciousness with a recollected memory of her car turning before losing consciousness," contradicting Dhillon's initial patient evaluation indicating that J.F. "does not recall if she had a loss of consciousness" as a result of the motor vehicle accident.

632.   A CPT-3 assessment was performed on J.F. during her initial patient evaluation that purportedly produced results indicating J.F. had "a moderate likelihood of having a disorder characterized by attention deficits such as ADHD."

633.   McKissick ordered J.F. to repeat her Brain MRI with SWI and Neuroquant protocol, a 72-hour EEG assessment, and a qEEG for "diagnostic screening of TBI trauma with loss of consciousness" even though J.F. originally stated that she was unsure if she experienced a loss of consciousness.

634.   McKissick also prescribed Cambia, L-Theanine, and 5-HTP to J.F. in addition to prescribing and issuing J.F. DME consisting of a cervical pillow and a heating pad.

635.   All of the treatment and testing ordered and performed by Inscribed and McKissick was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient J.F., and was medically unnecessary and performed in disregard for the applicable standards of care.

636.   On March 9, 2019, almost five (5) months after the alleged motor vehicle accident, Diagnostic Solutions billed Allstate for a qEEG procedure that was purportedly performed on J.F. by Donald Magder, M.A., T.L.L.P. ("Magder").

637.   Diagnostic Solutions failed to submit a report identifying the results of the alleged qEEG procedure to Allstate.

638.   qEEG is not an accepted assessment and treatment tool and is considered to have no clinical value in determining TBI, especially months after the alleged traumatic event occurred.

639.   The qEEG billed by Diagnostic Solutions was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient J.F., and was medically unnecessary and performed in disregard for the applicable standards of care.

640.   Farmbrook, Inscribed, and Diagnostic Solutions submitted claims for payment and accompanying medical records relative to J.F. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

641.   Allstate is not required to pay Farmbrook, Inscribed, or Diagnostic Solutions for the fraudulent, unnecessary, and unreasonable treatment and testing related to J.F.

### 8.    Patient D.C. (Claim No. 0556565588)

642.   D.C. was allegedly involved in a motor vehicle accident on August 8, 2019.

643.   D.C. presented to MIMM on October 1, 2019 for a patient evaluation that was purportedly performed by Abraham.

644.   D.C. allegedly provided a urine specimen during his October 1, 2019 MIMM office visit that was referred to Integra for definitive urine drug testing.

645.   Abraham selected Integra's "Standard Comprehensive Panel" on the requisition form submitted to Integra.

646.   The requisition form fails to identify any medications prescribed to D.C. and also indicates that no presumptive urine drug screen was performed by Abraham during the October 1, 2019 office visit.

647.   Instead of performing a presumptive urine drug screen in-office, Abraham referred D.C.'s urine specimen for expensive definitive urine drug testing even though Abraham indicated that D.C. was not currently prescribed any narcotics during his October 1, 2019 office visit.

648.   There was no medical necessity for Abraham to order excessive and expensive definitive urine drug testing relating to D.C. when Abraham was not prescribing controlled substances or narcotics to D.C.

649.   In support of Integra's definitive urine drug testing charges, it submitted a generic letter of medical necessity that was not related to D.C. that Integra's Chief Executive Officer and sole member Thomas Hughes admitted "makes the general case" for the definitive urine drug testing billed to Allstate.

650. However, the letter of medical necessity submitted to Allstate fails to state why definitive urine drug testing, the urine drug testing billed by Integra, was medically necessary for D.C.

651. MIMM and Integra submitted claims for payment and accompanying medical records relative to D.C. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary medical treatment and definitive urine drug testing, and Allstate relied upon the same in adjusting the claims.

652. Allstate is not required to pay MIMM and Integra for the fraudulent, unnecessary, and unreasonable treatment and definitive urine drug testing relative to D.C.

### 9. Patient T.A. (Claim No. TXA-0187110)

653. T.A. was allegedly involved in a motor vehicle accident on June 13, 2017.

654. T.A. presented to Farmbrook on August 4, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

655. Dhillon indicated that T.A. "states that her neck pain is constant and it is intermittently radiating into the left upper extremity."

656. Dhillon issued T.A. a TENS unit, dispensed Lidocaine cream to T.A. during her office visit, ordered MRIs of her cervical and lumbar spine, and further

indicated that T.A. will "initiate some conservative care to help reduce the intensity of her neck and lower back pain."

657.   T.A. presented to Farmbrook on September 20, 2017 for a follow-up patient evaluation that was purportedly performed by Tribelhorn.

658.   Tribelhorn issued T.A. DME consisting of a back brace and knee brace and further ordered an EMG of her upper and lower extremities indicating that T.A. "has radicular signs on exam, numbness, and disc bulges on the MRI reports."

659.   Farmbrook billed Allstate for an EMG of T.A.'s upper extremities that was purportedly performed on October 9, 2017 by Dhillon that resulted in normal findings with no evidence of radiculopathy.

660.   Farmbrook then billed Allstate for an EMG of T.A.'s lower extremities that was purportedly performed on November 9, 2017 by Dhillon that also resulted in normal findings with no evidence of radiculopathy.

661.   Notwithstanding the fact that the EMGs purportedly performed by Farmbrook each returned results of no radiculopathy in T.A.'s upper and lower extremities, medical records submitted by Farmbrook dated December 8, 2017, January 10, 2018, and February 9, 2018 each continue to include diagnoses for cervical and lumbar radiculopathy relating to T.A. in an attempt to falsely justify continued treatment.

662.   The EMGs billed by Farmbrook were not used to further T.A.'s treatment, as the results were not used to further her treatment plan or confirm her diagnoses.

663.   Instead, the EMGs billed by Farmbrook were based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient T.A., and were medically unnecessary and performed in disregard for the applicable standards of care.

664.   Farmbrook submitted claims for payment and accompanying medical records relative to T.A. to Allstate through the U.S. Mail for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

665.   Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to T.A.

## IX.   **FRAUDULENT BILLING PRACTICES**

666.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

667.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

668.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

669.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

670.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

671.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.   IMPROPER BILLING FOR EVALUATIONS

1.   Fraudulently Upcoded Office Visits

672.   Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

673.   It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

674.   As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were not actually performed, (2) were not lawfully rendered, (3) were not performed consistent with the AMA's requirements, and (4) were wholly unwarranted and unnecessary.

675.   Moreover, the billing codes submitted to Allstate by, and on behalf of, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

676.   Most prominently, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham submitted bills to Allstate seeking reimbursement for high-level office visits and office consultations that did not occur as billed.

677.   There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex.

678.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

679.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

680. The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

681. Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

682. The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

683. The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99211 | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| 99212 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99213 | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| 99214 | Detailed | Detailed | Moderate complexity | 25 minutes |
| 99215 | Comprehensive | Comprehensive | High complexity | 40 minutes |

684.   Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

685.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

686.   The criteria developed by the AMA to properly assign the CPT Code for an initial consultation include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99241 | Problem focused | Problem focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

687.   The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| Straight forward decision making (CPT Code 99201-99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT Code 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT Code 99204) | Multiple | Moderate | Moderate |

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

688. The AMA has published examples of office visits that are appropriately

billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

689. The AMA has published examples of office visits that are appropriately

billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion.

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

690. The AMA has published examples of office visits that are appropriately

billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

691.   The AMA has published examples of office visits that are appropriately

billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

692.   The AMA has published examples of office visits that are appropriately

billed using CPT Code 99245, including:

- "Initial office consultation of a 35-year-old multiple trauma male patient with complex pelvic fractures, for evaluation and formulation of management plan."

- "Office consultation for independent medical examination of a patient with a history of complicated low back and neck problems with previous multiple failed back surgeries."

*CPT 2015: Professional Edition Codebook.*

693.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99244, including:

- "Initial office consultation for a patient with a failed total hip replacement with loosening and pain upon walking."

- "Office consultation for 66-year-old female, history of colon restriction for adenocarcinoma six years earlier, now with severe mid-back pain; X-rays showing osteoporosis and multiple vertebral compression fractures."

*CPT 2015: Professional Edition Codebook.*

694.   The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

695.   Instead, at most, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints.

696.   Yet, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham almost always billed Allstate for level four (4) and five (5) examinations for patient evaluations (i.e., CPT Codes 99204, 99205, 99214, 99215, 99244, and 99245).

697.   Inscribed billed for a level four (4) and five (5) evaluation more than 99% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 1.

698.   Integrative Neurology billed for a level four (4) and five (5) evaluation or consultation more than 94% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 2.

699.   DIPMM and Abraham billed for a level four (4) and five (5) evaluation more than 95% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 5.

700.   MIMM and Abraham billed for a level four (4) and five (5) evaluation 100% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 6.

701.   The defendants' billing for level four (4) or five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered, as the defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

702.   By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

703.   However, all of the bills prepared and submitted by Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham were submitted using fraudulent and deceptive examination CPT Codes.

704.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

## 2.   Fraudulent Billing for Prolonged Evaluations

705.   Defendants Integrative Neurology and MIMM submitted charges to Allstate for alleged prolonged evaluations using billing codes indicating a longer evaluation than was actually rendered.

706.   The evaluation and management of a patient that extends beyond the period of time provided for in the CPT Code for office visits/examinations or consultations is billed under CPT Codes 99354 and 99355.

707.   Per the CPT Code Book, CPT Code 99354 is used to report the first hour of prolonged services, and CPT Code 99355 is used to report each additional thirty (30) minutes beyond the first hour.

708.   The AMA has published the total duration of prolonged services required to bill for CPT Code 99354 or 99355:

| TOTAL DURATION OF PROLONGED SERVICES | CODE(S) |
|---|---|
| Less than 30 minutes | Not reported separately |
| 30-74 minutes | 99354 |
| 75-104 minutes | 99354 and 99355 |
| 105 minutes or more | 99354 and 2 units of 99355 |

*CPT 2017: Professional Edition Codebook.*

115

709. A physician must bill using CPT Code 99354 for the first hour of prolonged services before billing for services under CPT Code 99355.

710. CPT Code 99355 is reimbursed at a higher rate than CPT Code 99354 because CPT Code 99355 indicates a prolonged examination lasting longer than an additional hour.

711. Integrative Neurology and MIMM charged Allstate for prolonged evaluations and consultations using CPT Code 99355 without first using CPT Code 99354. *See* Exhibits 2 and 6.

712. By failing to use CPT Code 99354, Integrative Neurology fraudulently billed Allstate seeking a higher level of reimbursement than the services allegedly performed during the prolonged evaluations.

713. MIMM billed Allstate for a level five (5) initial patient evaluation (i.e., CPT Code 99205) and prolonged evaluation services under CPT Code 99354 for an initial evaluation of thirty-seven (37) year old Patient J.P. (Claim No. 0548836725) on July 3, 2019.

714. Yet, there is nothing contained in the July 3, 2019 MIMM medical record authored by Abraham that justifies a level five (5) initial patient evaluation, much less a charge for a prolonged level five (5) office visit.

715. Abraham's July 3, 2019 medical record evidences that: (1) there is no comprehensive history listed for J.P., (2) Abraham did not perform a comprehensive

examination, and (3) Abraham's diagnoses do not rise to the level of high complexity.

716.   Moreover, there is nothing that indicates Abraham required no less than an additional thirty (30) minutes (in addition to the typical 60 minutes usually spent face-to-face with the patient during a level five (5) initial patient evaluation) to complete J.P.'s initial patient evaluation on July 3, 2019.

717.   MIMM billed Allstate the unreasonable and excessive amount of $3,509.56 for Abraham's purported level five (5) patient evaluation of J.P. on July 3, 2019.

718.   MIMM then billed Allstate for a level five (5) patient evaluation (i.e., CPT Code 99215) of J.P. on July 25, 2019 and then again on August 23, 2019.

719.   MIMM also billed Allstate using CPT Code 99354 on both July 25, 2019 and August 23, 2019.

720.   Again, the medical records submitted by MIMM relating to Abraham's purported performance of level five (5) established patient evaluations of J.P. on July 25, 2019 and August 23, 2019 fail to justify not only the level five (5) established patient evaluations billed under CPT Code 99215 but also the prolonged evaluation services lasting at least thirty (30) minutes that were billed under CPT Code 99354.

## B.   FRAUDULENT BILLING PRACTICE OF UNBUNDLING

721.   The Centers for Medicare and Medicaid Services instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

722.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and reimbursement) of the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

723.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure which are included in another billing code also billed for the same date of service.

724.   Each NCCI edit has a modifier indicator assigned to it.

725.   A modifier indicator of "0" indicates a modifier cannot be used to bypass the edit.

726.   A modifier indicator of "1" indicates that a properly-codified modifier can be used to allow submitted services or procedures if certain criteria are met.

727.   Many procedure codes cannot be reported together because they are mutually exclusive of each other and mutually exclusive procedures cannot be performed at the same anatomic site or during the same patient encounter.

728. Integra submitted bills to Allstate that contained unbundled charges in order to inflate the amount it charged Allstate.

729. For example, Integra submitted bills to Allstate that contained charges for CPT Codes 80369 and 80370 for the same patient on the same date of service.

730. CPT Code 80369 ("Skeletal muscle relaxants; 1 or 2") is a Column Two code and CPT Code 80370 ("Skeletal muscle relaxants; 3 or more") is a Column One code when each are billed on the same date of service for the same patient.

731. CPT Code 80369 cannot be billed on the same date of service for the same patient as CPT Code 80370 under any circumstances.

732. Yet, Integra submitted a charge under CPT Code 80369 in addition to a charge under CPT Code 80370 on the same date of service and for the same patient 370 times regarding patients at issue in this Complaint. *See* Exhibit 10.

733. Integra also submitted bills to Allstate that contained charges for CPT Code 80336 ("Antidepressants, tricyclic and other cyclicals; 3-5") and CPT Code 80337 ("Antidepressants, tricyclic and other cyclicals; 6 or more") for the same patient on the same date of service.

734. CPT Code 80336 ("Antidepressants, tricyclic and other cyclicals; 3-5") is a Column Two code and CPT Code 80337 ("Antidepressants, tricyclic and other cyclicals; 6 or more") is a Column One code when each are billed on the same date of service for the same patient.

735. CPT Code 80336 cannot be billed on the same date of service for the same patient as CPT Code 80337 under any circumstances.

736. However, Integra submitted a charge under CPT Code 80336 in addition to a charge under CPT Code 80337 on the same date of service and for the same patient at least twelve (12) times regarding patients at issue in this Complaint. *See* Exhibit 11.

737. Unbundling that is done knowingly and intentionally constitutes a fraudulent billing practice.

738. Allstate is not obligated to pay the defendants for fraudulently billed treatment.

## X.   <u>EXCESSIVE AND UNREASONABLE CHARGES</u>

739. The amounts the defendants charged to Allstate were far above reasonable and customary prices for the treatment and services allegedly rendered.

740. Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee." <u>McGill v. Auto. Ass'n</u>, 207 Mich. App. 402, 405 (1994).

741. The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder. Mich. Comp. Laws § 500.3107(1)(a).

742.   Michigan law is clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider and insurers have an obligation to police and challenge unreasonable charges.

743.   For the reasons discussed *infra*, the defendants cannot meet their burden, thereby vitiating Allstate's obligation to pay any of the unreasonable charges for office visits, injections, diagnostic testing, neurofeedback, urine drug testing, issuing DME, and dispensing medication, and entitling Allstate to reimbursement for those amounts paid that are in excess of a reasonable amount for the services purportedly rendered.

## A.   UNREASONABLE CHARGES FOR PATIENT EVALUATIONS

744.   In addition to not providing treatment that warranted level four (4) or five (5) evaluations, as discussed *supra*, the defendants charged excessive amounts for their purported evaluations.

745.   Defendants DIPMM and Abraham submitted bills to Allstate for level four (4) and five (5) initial evaluations that were as high as $1,056.00, and for level four and five (5) re-evaluations as high as $736.00.  *See* Exhibit 5.

746.   Defendants MIMM and Abraham submitted bills to Allstate for level five (5) initial evaluations that were charged at $2,153.12, and for level four (4) and five (5) re-evaluations that were as high as $1,506.16.  *See* Exhibit 6.

747. Defendants Inscribed, Integrative Neurology, and Velugubanti submitted bills to Allstate for level four (4) and five (5) initial evaluations that were as high as $715.00, and for level four (4) and five (5) re-evaluations as high as $495.00. *See* Exhibits 1 and 2.

748. Defendant Inscribed regularly charged Allstate at these excessive rates for patient evaluations conducted by physician assistants.

749. Defendant Inscribed submitted bills for these physician assistant evaluations signed by defendant Velugubanti in an attempt to mask the fact that the services were rendered by a physician assistant rather than a medical doctor (if they were rendered at all).

750. The rates at which defendant Inscribed charged Allstate are excessive for services provided by a medical doctor; they are egregious for services provided by a physician assistant.

751. In addition to these outrageous charges, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham billed Allstate at excessive rates for alleged prolonged patient evaluations.

752. As discussed *supra*, the defendants submitted bills for prolonged evaluations using CPT Codes 99354 and 99355.

753.   Defendants Inscribed, Integrative Neurology, and Velugubanti billed Allstate up to $330.00 under CPT Code 99354, and as much as $550.00 under CPT Code 99355.  *See* Exhibits 1 and 2.

754.   Defendants DIPMM and Abraham billed Allstate up to $750.00 under CPT Code 99354, and as much as $669.28 under CPT Code 99355.  *See* Exhibit 5.

755.   Defendants MIMM and Abraham billed Allstate $1,356.44 under CPT Code 99354 and $1,258.00 under CPT Code 99355.  *See* Exhibit 6.

756.   The excessive and outrageous nature of these charges for a patient evaluation are best demonstrated by the example of charges submitted to Allstate for the alleged initial patient evaluation of Patient T.G. (Claim No. 0383060746) by defendant Inscribed.

757.   Inscribed billed Allstate $715.00 for a level five (5) initial patient evaluation, $330.00 for the evaluation lasting an additional hour, and $440.00 for the evaluation continuing an additional half hour.  Inscribed therefore submitted charges totaling $1,485.00 for a single patient evaluation.

758.   The excessive rates charged by the defendants further demonstrate that the purpose of their scheme was to maximize the amount they billed to auto insurers like Allstate.

759.   Allstate is not obligated to pay any pending bills for patient evaluations billed at excessive amounts, and it is entitled to reimbursement for the evaluations for which it has already tendered payment.

### B.   UNREASONABLE CHARGES FOR XEOMIN INJECTIONS

760.   In addition to injecting a medically unsafe amount of Xeomin into patients at issue in this Complaint as discussed *supra*, defendants Inscribed and Velugubanti charged Allstate at excessive rates for these medically unnecessary injections.

761.   Inscribed and Velugubanti charged Allstate $10,000.00 for injecting 400 units of Xeomin.  *See* Exhibit 1.

762.   The same amount of Xeomin may be purchased at local pharmacies in Southfield for less than $2,000.00.

763.   Inscribed and Velugubanti therefore charged Allstate more than five (5) times the cost to obtain the same amount of Xeomin from a local pharmacy.

764.   Inscribed and Velugubanti cannot justify the nearly $8,000.00 price difference as purported medical decision making to inject the Xeomin, as they separately billed for office visits.

765.   Allstate is not obligated to pay any pending bills for Xeomin injections, and it is entitled to reimbursement for the injections for which it has already tendered payment.

### C.    UNREASONABLE CHARGES FOR DIAGNOSTIC TESTING

766.   As discussed above, defendants Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon aggressively pressured patients to undergo unnecessary testing, including EEGs, EMGs, sleep studies, and nerve conduction studies.

767.   When the defendants were successful in coercing patients to undergo medically unnecessary testing, the bills that resulted from such testing and treatment were staggering.

768.   For example, defendants Inscribed, Integrative Neurology, and Velugubanti submitted charges of $9,500.00 per day for purported ambulatory EEG monitoring using CPT Code 95951.

769.   The average Medicare reimbursement for CPT Code 95951 in the Detroit area is $335.52.

770.   Defendant Diagnostic Solutions submitted charges of $10,000.00 for purported sleep studies using CPT Code 95810.

771.   The average Medicare reimbursement for CPT Code 95810 in the Detroit area is $624.45.

772.   Defendants Farmbrook and Dhillon submitted charges of $3,500.00 for nerve conduction studies using CPT Codes 95910 and 95911.

773. The average Medicare reimbursement for CPT Code 95910 in the Detroit area is $199.97.

774. The average Medicare reimbursement for CPT Code 95911 in the Detroit area is $240.23.

775. Defendants Farmbrook and Dhillon also submitted charges up to $4,000.00 for EMGs using CPT Code 95886.

776. The average Medicare reimbursement for CPT Code 95886 in the Detroit area is $96.88.

777. Allstate is not suggesting that a reasonable price under the No-Fault Act is necessarily equivalent to Medicare reimbursement rates, but charges that are up to thirty (30) times higher than the amounts paid by other payors are *per se* unreasonable.

778. Defendants Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon's charges are well outside the spectrum of reasonableness and they cannot sustain their burden of proving otherwise.

779. Allstate is not obligated to pay any pending bills for testing billed at excessive amounts, and it is entitled to reimbursement for the testing for which it has already tendered payment.

### D.  UNREASONABLE CHARGES FOR NEUROFEEDBACK THERAPY

780. In addition to charging Allstate for unlicensed and medically unnecessary neurofeedback therapy, as discussed *supra*, defendants Inscribed, Integrative Neurology, Diagnostic Solutions, and Velugubanti billed Allstate at excessive rates for said therapy.

781. These defendants charged Allstate $495.00 per session of neurofeedback therapy.

782. Patient I.S. (Claim No. 0428425573) told Allstate that her neurofeedback sessions lasted about fifteen (15) minutes.

783. Indeed, defendant Diagnostic Solutions's own website promotes that neurofeedback "[t]reatment times are extremely short (about 5 minutes)." *See* Exhibit 12.

784. Charging Allstate $495.00 for five (5) to fifteen (15) minutes of unlicensed and medically unnecessary treatment is excessive, and defendants Inscribed, Integrative Neurology, and Diagnostic Solutions cannot meet their burden of proving otherwise.

785. Allstate is not obligated to pay any pending bills for neurofeedback therapy billed at excessive amounts, and it is entitled to reimbursement for the bills for which it has already tendered payment.

### E.   UNREASONABLE CHARGES FOR ISSUING DME

786.   As discussed above, the predetermined treatment protocol used by the defendants involved the (unlawful) issuance of DME.

787.   In addition to being unlicensed, defendants Inscribed and Farmbrook charged Allstate at excessive rates for issuing this DME.

788.   For example, Farmbrook billed Allstate $2,450.00 per unit for the "IF 4000 Tens Unit" and $400 for the accompanying electrodes.

789.   The IF-4000 Inferential Unit and four (4) electrodes may be purchased at retail for $199.00.

790.   Farmbrook therefore billed Allstate over fourteen (14) times more than the retail price for the same product.

791.   Inscribed also billed Allstate up to $3,850.00 for issuing TENS units to patients at issue in this Complaint.

792.   When told the amount that Farmbrook charged Allstate for a TENS unit, Patient E.J. (Claim No. 0483737482) testified, "I didn't know that thing cost that much.  I would have been like no thank you."

793.   Farmbrook also billed Allstate up to $3,300.00 per back brace issued to patients at issue in this Complaint.

794.   Farmbrook submitted a list to the State of Michigan with the DME "we plan on dispensing/prescribing," which included TENS units, "orthoses – pre-fab," and "orthoses – off the shelf."  *See* Exhibit 13.

795.   Billing Allstate $3,300.00 for an off-the-shelf, pre-fabricated back brace is not reasonable.

796.   Farmbrook also billed Allstate $200.00 per patient using CPT Code 97760 for purportedly showing the patients how to use the DME.

797.   Charging $200.00 to supposedly show a patient how to put on and take off an off-the-shelf back brace confirms that defendant Farmbrook's goal—like the goal of all of the defendants—was to maximize the amount billed to Allstate.

798.   Allstate is not obligated to pay any pending bills for DME billed at excessive amounts, and it is entitled to reimbursement for the DME for which it has already tendered payment.

### F.   UNREASONABLE CHARGES FOR DISPENSING MEDICATION

799.   Defendants ZMC Pharmacy and Farmbrook charged Allstate at excessive rates for allegedly dispensing medication to patients at issue in this Complaint.

800.   The charges for medication dispensed by ZMC Pharmacy are excessive when compared to pricing from pharmacies dispensing the same medications in the same geographic area.

801.   Indeed, the excessive nature of the charges is indicated by the mark-up from what it cost ZMC Pharmacy to obtain the medication compared to what it charged Allstate for dispensing the medication.

802.   For example, ZMC Pharmacy billed Allstate up to $6,807.00 for dispensing 90 tablets of Duexis 26.6mg/800mg.

803.   That same medication can be obtained from a local pharmacy in Royal Oak—the same city in which ZMC Pharmacy is located—for between $2,500.00 and $2,600.00.

804.   ZMC Pharmacy therefore charged Allstate more than two-and-a-half times as much as local pharmacies to dispense the same medication.

805.   As another example, ZMC Pharmacy billed Allstate up to $2,986.50 for dispensing thirty (30) tablets of Amrix 30mg.

806.   That same medication can be obtained from a local pharmacy in Royal Oak for between $1,120.00 and $1,150.00.

807.   ZMC Pharmacy therefore charged Allstate more than two-and-a-half times as much as local pharmacies to dispense the same medication.

808.   ZMC Pharmacy also billed Allstate up to $214.65 for dispensing sixty (60) tablets of Naproxen 500mg.

809.   That same medication can be obtained from a local pharmacy in Royal Oak for less than $20.00.

810.    ZMC Pharmacy therefore charged Allstate more than ten (10) times as much as local pharmacies to dispense the same medication.

811.    Defendant Zawaideh testified that ZMC Pharmacy's rates are reasonable because negotiating with automobile insurance companies is "very labor intensive" and because ZMC Pharmacy needs to wait a longer period of time to receive payment:

> Q.    -- that the rates charged must be reasonable. Have you ever considered that question in regard to how much you charge?
>
> A.    Sure. I mean, I look at the turnaround time and – so, I mean, in your client's case we have claims that date back over a year, so, I mean, you're asking me to compare that to other claims where the typical turnaround time in a Blue Cross claim is going to be two weeks.
>
> Q.    So you're saying – and by turnaround time you mean the time between the time you submit the bill and the time you're paid?
>
> A.    Correct.
>
> Q.    Okay. And you're saying that the rates were reasonable because the turnaround time is longer in the case of Allstate?
>
> A.    There's a higher – there's a higher risk.

812.    A hypothetical delay in payment for services rendered does not justify charging over two-and-a-half times more than surrounding pharmacies, nor does it justify charging more than three (3) times the cost to obtain the medication.

813.   Defendant Farmbrook submitted charges to Allstate at excessive rates for dispensing ibuprofen cream.

814.   Defendant Farmbrook billed Allstate $1,550.00 for dispensing 120 grams of ibuprofen 10% cream.

815.   One hundred-twenty (120) grams of Ibuprofen 10% gel—the same product in gel form—is available at retail at less than $150.00.

816.   Farmbrook therefore charged Allstate more than ten (10) times the retail price for ibuprofen cream.

817.   Moreover, an article published in December 2017 analyzed the effect of ibuprofen taken orally and topically, and determined that "topical ibuprofen has comparable efficacy to oral ibuprofen."  Martin Anthony Christopher Manoukian, *et al.*, *Topical Administration of Ibuprofen for Injured Athletes: Considerations, Formulations, and Comparison to Oral Delivery*, SPORTS MED. – OPEN, Dec. 2017, at 5.

818.   Farmbrook therefore charged Allstate $1,550.00 for a product available for purchase in pill form—with comparable effect—for less than $20.00.

819.   Allstate is not obligated to pay any pending bills for medication billed at excessive amounts, and it is entitled to reimbursement for the medication for which it has already tendered payment.

## XI.  MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.  MISREPRESENTATIONS BY THE DEFENDANTS

820.  To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they provided and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

821.  Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

822.  Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

823.  Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

824. There are no less than thirteen (13) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.   The defendants billed Allstate for treatment and service that were not actually provided. Integrative Neurology and Velugubanti billed for patient evaluations not performed on patients at issue in this Complaint. Inscribed and Integrative Neurology submitted bills to Allstate for ambulatory EEGs that were never performed. Inscribed also billed Allstate for neurobehavioral assessments that were not performed. DIPMM billed for Abraham assisting on surgical procedures when he was not physically present to do so.

b.   Inscribed, Integrative Neurology, and Diagnostic Solutions billed for treatment through limited license psychologists and physician assistants in violation of Michigan law. Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, and Abraham also issued DME to and for patients at issue in this Complaint without the necessary licensure. Allstate is not required under the Michigan No-Fault Act to compensate the defendants for unlawfully rendered services.

c.   The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with layperson attorneys. The defendants' method of obtaining patients did not include considerations of medical necessity.

d.   The defendants used an unlawful predetermined treatment protocol, implemented by the ordering of unnecessary ambulatory EEGs, qEEGs, and brain MRI scans to falsely justify TBI diagnoses, prescribing unnecessary medications, performing unnecessary injection procedures, issuing unwarranted DME as a matter of course, and referring patients for excessive and unnecessary definitive urine drug testing. This predetermined protocol is also confirmed by the substantially similar treatment billed relative to all patients at issue in this Complaint, including treatment plans that have no patient-specific considerations.

e.    Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon subjected patients to excessive and unnecessary diagnostic tests, including ambulatory EEGs, qEEGs, EMGs, and sleep studies. The results of the diagnostic testing described herein were not used to guide patient treatment but instead were used to falsely justify TBI diagnoses.

f.    Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham subjected patients to excessive, unnecessary, and unreasonable injection procedures. These defendants exaggerated symptoms for patients in order to justify performing the medically unnecessary and excessive injection procedures, including trigger point injections and Xeomin injections. The medically unnecessary injection procedures were ordered and billed for in violation of applicable standards of care.

g.    Inscribed, Integrative Neurology, and Diagnostic Solutions billed Allstate for excessive, unnecessary, and unreasonable neurofeedback therapy relating to patients who allegedly received a TBI during motor vehicle accidents. Neurofeedback therapy is not an accepted treatment tool in the medical field for brain injuries. Velugubanti typically included a template note in each patient's record recommending "neurofeedback therapy as a form of neurocognitive treatment concomitantly with neurocognitive rehabilitation of close head injuries" yet patients were never provided with "neurocognitive rehabilitation," nor were patients referred for such rehabilitation by Inscribed, Integrative Neurology, Diagnostic Solutions, or Velugubanti.

h.    Inscribed, Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham violated established standards of care by prescribing medications, including controlled substances and compounded medications, following the initial evaluation of patients on a *pro forma* basis in an attempt to incentivize patients to continue to return to them for medically unnecessary treatment. The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

i.      Integra submitted bills to Allstate for unnecessary and excessive urine drug testing, primarily at the request of DIPMM, MIMM, and Abraham, with no justification or basis for such testing.  DIPMM, MIMM, and Abraham ordered and Integra billed for drug testing for patients at issue in this Complaint regardless of whether medications were actually prescribed.  This further demonstrates that the defendants billed for urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

j.      Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham fraudulently upcoded office visits, as almost every single office visit billed to Allstate was for level four (4) or five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels.  When done intentionally, upcoding constitutes a fraudulent billing practice.

k.      Integrative Neurology and MIMM charged Allstate for prolonged patient evaluations through CPT Codes suggesting a longer patient evaluation than was actually performed, which is a fraudulent billing practice.

l.      Integra submitted claims using multiple CPT Codes to describe the same procedure allegedly performed, which constitutes a fraudulent billing practice known as unbundling.

m.     Inscribed, Integrative Neurology, DIPMM, MIMM, Diagnostic Solutions, Farmbrook, ZMC Pharmacy, Velugubanti, Dhillon, and Abraham submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services herein, including office evaluations, injections, diagnostic testing, neurofeedback therapy, DME, and medication.

825.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

826.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary under Michigan law.

827.   The foregoing facts – billing for services not rendered, unlawfully soliciting patients, unlicensed treatment and services, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of procedures allegedly performed, and using fraudulent billing practices such as upcoding and unbundling – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

828.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing billed for by the defendants unnecessary and unlawful.

829.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 8, 10, and 11.

830.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

831. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

832. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, DME, and ancillary services for which they billed Allstate.

833. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

834. As licensed medical professionals, defendants Velugubanti, Dhillon, Abraham, and Zawaideh were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

835. Each misrepresentation made by Velugubanti, Dhillon, Abraham, and Zawaideh was in violation of their legal and ethical obligations as healthcare professionals.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

836.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

837.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

838.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek reimbursement under Michigan's No-Fault Act.

839.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

840.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

841.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

139

842.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

843.   As a result, Allstate has paid in excess of $2,547,427 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

844.   As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

845.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 8, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

846.   This objective necessarily required the submission of claims for reimbursement to Allstate.

847.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail

matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

848.  All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

849.  All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

850.  Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

851.  Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate for filing.

852.  It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

853.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

854.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

855.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 14.

856.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires or the U.S. Mail related to each exemplar patient discussed in this Complaint.

857.   It was within the ordinary course of business for Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra to submit claims for No-Fault reimbursement to insurance carriers like Allstate through interstate wires and the U.S. Mail.

858.   Moreover, the business of providing medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking reimbursement to which each Defendant Entity is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

859.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the Defendant Entities.

860.   The Defendant Entities, at the direction and with the knowledge of their owners and managers (the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to litigate against Allstate seeking to collect on unpaid claims.

861.   Thus, the defendants' commission of mail and wire fraud continues.

862.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

863.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

864.   Allstate reasonably relied on the submissions it received from Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra, including the representative submissions set out in Exhibit 14 annexed hereto and identified in the exemplar claims above.

865.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII. **DAMAGES**

866.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

867.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $2,547,427.

868.   Exhibits 15 through 22 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

869.   Exhibit 15 details payments made by Allstate to Inscribed since 2017.

870.   Exhibit 16 details payments made by Allstate to Integrative Neurology since 2016.

871.   Exhibit 17 details payments made by Allstate to Diagnostic Solutions since 2018.

872.   Exhibit 18 details payments made by Allstate to Farmbrook since 2011.

873.   Exhibit 19 details payments made by Allstate to DIPMM since 2016.

874.   Exhibit 20 details payments made by Allstate to MIMM since 2019.

875.   Exhibit 21 details payments made by Allstate to ZMC Pharmacy since 2013.

876.   Exhibit 22 details payments made by Allstate to Integra since 2015.

877.   Every claim identified in Exhibits 15 through 22 derives from an Allstate insurance policy.

878.   Allstate's claim for compensatory damages, as set out in Exhibits 15 through 22, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

879.   Every payment identified in Exhibits 15 through 22 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 15 through 22.

880.   Moreover, every payment identified in Exhibits 15 through 22 derives from a check sent by Allstate to the defendants through the U.S. Mail.

881.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

882.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

883.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Inscribed Enterprise)
### Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.

884.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

885.   Inscribed constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

886.   In connection with each of the claims identified in the within Complaint, Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon,

146

M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Inscribed, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Inscribed's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Inscribed would occur, in furtherance of the Count I defendants' scheme to defraud.

887. The Count I defendants employed, knew, or should have foreseen that, two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

888. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

889. Policies of insurance were delivered to insureds through the U.S. Mail.

890. Payments to Inscribed from Allstate were transmitted through the U.S. Mail.

891. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Inscribed, which they knew would be billed by Inscribed, in order to collect payment

from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

892.   Velugubanti owned and managed Inscribed and was responsible for all actions taken by Inscribed and its physicians.

893.   Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Inscribed.

894.   Diagnostic Solutions and its owner Velugubanti billed for unwarranted diagnostic testing such as neurofeedback therapy, ambulatory EEG, qEEG, and other procedures, if performed at all, that were each used to falsely create the appearance that patients sustained a head injury as a result of the alleged motor vehicle accident, thereby allowing Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

895.   Farmbrook and its owner Dhillon fabricated medical records indicating patients suffered head injuries, such as TBI, during motor vehicle accidents in order to falsely justify patient referrals made to Inscribed pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

896.   DIPMM and its owner Abraham also fabricated medical records indicating patients suffered head injuries during motor vehicle accidents in order to falsely justify patient referrals made to Inscribed pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged head injury.

897.   ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged injury.

898.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Inscribed for the benefit of the Count I defendants that would not otherwise have been paid.

899.   The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

900.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

901.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Inscribed for the benefit of the Count I defendants.

902.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

903.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

904.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

905.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

906.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

907.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Inscribed Enterprise)**
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook**
**Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal**
**Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.;**
**Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.**

908.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

909.   Defendants Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Inscribed.

910.   The Count II defendants each agreed to further, facilitate, support, and operate the Inscribed enterprise.

911.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

912.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Inscribed even though Inscribed was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

913.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

914.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

915.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Integrative Neurology Enterprise)
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

916.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

917.   Integrative Neurology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

918.   In connection with each of the claims identified in the within Complaint, Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Integrative Neurology, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Integrative Neurology's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Integrative Neurology would occur, in furtherance of the Count III defendants' scheme to defraud.

919.   The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment

from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

920.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

921.   Policies of insurance were delivered to insureds through the U.S. Mail.

922.   Payments to Integrative Neurology from Allstate were transmitted through the U.S. Mail.

923.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Integrative Neurology, which they knew would be billed by Integrative Neurology, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

924.   Velugubanti owned and managed Integrative Neurology and was responsible for all actions taken by Integrative Neurology and its physicians.

925.   Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Integrative Neurology.

926.   Diagnostic Solutions and its owner Velugubanti billed for unwarranted diagnostic testing such as neurofeedback therapy, ambulatory EEG, qEEG, and other procedures, if performed at all, that were each used to falsely create the appearance that patients sustained a head injury as a result of the alleged motor vehicle accident, thereby permitting Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

927.   Farmbrook and its owner Dhillon fabricated medical records indicating patients suffered head injuries, such as TBI, during motor vehicle accidents in order to falsely justify patient referrals made to Integrative Neurology pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

928.   ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged injury.

929.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Integrative Neurology for the benefit of the Count III defendants that would not otherwise have been paid.

930.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

931.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

932.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Integrative Neurology for the benefit of the Count III defendants.

933.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

934.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

935.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

936.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

937.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

938.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Integrative Neurology Enterprise)
### Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

939.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

940.   Defendants Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count IV

defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Integrative Neurology.

941. The Count IV defendants each agreed to further, facilitate, support, and operate the Integrative Neurology enterprise.

942. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

943. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Integrative Neurology even though Integrative Neurology was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

944. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

945. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

946. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Diagnostic Solutions Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh**
**Velugubanti, M.D.**

947.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

948.   Diagnostic Solutions constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

949.   In connection with each of the claims identified in the within Complaint, Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D. ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Diagnostic Solutions, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Diagnostic Solutions's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Diagnostic Solutions would occur, in furtherance of the Count V defendants' scheme to defraud.

950.   The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment

from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

951.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

952.   Policies of insurance were delivered to insureds through the U.S. Mail.

953.   Payments to Diagnostic Solutions from Allstate were transmitted through the U.S. Mail.

954.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Diagnostic Solutions, which they knew would be billed by Diagnostic Solutions, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

955.   Velugubanti owned and managed Diagnostic Solutions and was responsible for all actions taken by Diagnostic Solutions and its representatives.

956.   Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Diagnostic Solutions.

957. Inscribed, Integrative Neurology, and Velugubanti were responsible for the improper referrals that resulted in testing and services billed by Diagnostic Solutions.

958. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Diagnostic Solutions for the benefit of the Count V defendants that would not otherwise have been paid.

959. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

960. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

961. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Diagnostic Solutions for the benefit of the Count V defendants.

962.   The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

963.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

964.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

965.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

966.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

967.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Diagnostic Solutions Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D.

968. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

969. Defendants Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Diagnostic Solutions.

970. The Count VI defendants each agreed to further, facilitate, support, and operate the Diagnostic Solutions enterprise.

971. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

972. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Diagnostic Solutions even though Diagnostic Solutions was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

973. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

974.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

975.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Farmbrook Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

976.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

977.    Farmbrook constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

978.    In connection with each of the claims identified in the within Complaint, Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Farmbrook, or knew that such false medical

documentation would be faxed and mailed in the ordinary course of Farmbrook's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Farmbrook would occur, in furtherance of the Count VII defendants' scheme to defraud.

979.   The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

980.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

981.   Policies of insurance were delivered to insureds through the U.S. Mail.

982.   Payments to Farmbrook from Allstate were transmitted through the U.S. Mail.

983.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Farmbrook, which they knew would be billed by Farmbrook, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

984.   Dhillon owned and managed Farmbrook and was responsible for all actions taken by Farmbrook and its representatives.

985.   Dhillon rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Farmbrook.

986.   Inscribed, Integrative Neurology, and their owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing Farmbrook to continue billing for unlawful and medically unnecessary evaluations, urine drug screens, EMGs, and injections, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

987.   ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Farmbrook to continue billing for unlawful and medically unnecessary evaluations, urine drug screens, EMGs, and injections, if performed at all, relating to each patient's alleged injury.

988.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Farmbrook for the benefit of the Count VII defendants that would not otherwise have been paid.

989.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

990.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

991.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Farmbrook for the benefit of the Count VII defendants.

992.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

993.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

994.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

995.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

996.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

997.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT VIII**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Farmbrook Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.;  Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

998.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

999.   Defendants Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Farmbrook.

1000. The Count VIII defendants each agreed to further, facilitate, support, and operate the Farmbrook enterprise.

1001. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1002. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Farmbrook even though Farmbrook was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1003. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1004. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

1005. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (DIPMM Enterprise)
### Against Inscribed PLLC; Integra Lab Management LLC; Gireesh
### Velugubanti, M.D.; and Bachu Abraham, M.D.

1006.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1007.  DIPMM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1008.  In connection with each of the claims identified in the within Complaint Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by DIPMM, or knew that such false medical documentation would be faxed and mailed in the ordinary course of DIPMM's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by DIPMM would occur, in furtherance of the Count IX defendants' scheme to defraud.

1009.  The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

1010. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1011. Policies of insurance were delivered to insureds through the U.S. Mail.

1012. Payments to DIPMM from Allstate were transmitted through the U.S. Mail.

1013. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by DIPMM, which they knew would be billed by DIPMM, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1014. Abraham is the owner of DIPMM and is responsible for all actions taken by DIPMM and its representatives.

1015. Abraham rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by DIPMM.

1016. Inscribed and its owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing DIPMM to continue

billing for unlawful and medically unnecessary evaluations, injections, diagnostic testing, and other procedures, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

1017. Integra billed for medically unnecessary and excessive definitive urine drug testing that was allegedly ordered by DIPMM, if performed at all, that allowed DIPMM to continue billing for unlawful and medically unnecessary evaluations, if performed at all, that were used to continue to prescribe medically unnecessary medications, including controlled substances to patients.

1018. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to DIPMM for the benefit of the Count IX defendants that would not otherwise have been paid.

1019. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

1020. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the

Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1021. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to DIPMM for the benefit of the Count IX defendants.

1022. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1023. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

1024. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1025. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1026. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1027. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (DIPMM Enterprise)
### Against Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.

1028.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1029.  Defendants Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of DIPMM.

1030.  The Count X defendants each agreed to further, facilitate, support, and operate the DIPMM enterprise.

1031.  As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1032.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of DIPMM even though DIPMM was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1033.  The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

1034. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1035. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (MIMM Enterprise)
### Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.

1036. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1037. MIMM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1038. In connection with each of the claims identified in the within Complaint Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.

("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by MIMM, or knew that such false medical documentation would be faxed and mailed in the ordinary course of MIMM's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by MIMM would occur, in furtherance of the Count XI defendants' scheme to defraud.

1039.  The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

1040.  Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1041.  Policies of insurance were delivered to insureds through the U.S. Mail.

1042.  Payments to MIMM from Allstate were transmitted through the U.S. Mail.

1043.  As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by MIMM, which they knew would be billed by MIMM, in order to collect payment

from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1044. Abraham is the owner of MIMM and is responsible for all actions taken by MIMM and its representatives.

1045. Abraham rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by MIMM.

1046. DIPMM and its owner Abraham billed for unlawful and medically unnecessary evaluations, injections, diagnostic testing, and other procedures, if performed at all, that were each used to falsely justify patient referrals to MIMM, thus allowing MIMM to continue billing for the same unlawful and medically unnecessary treatment that was billed by DIPMM, if performed at all.

1047. Inscribed and its owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing MIMM to continue billing for unlawful and medically unnecessary evaluations and injections, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

1048. Integra billed for medically unnecessary and excessive definitive urine drug testing that was allegedly ordered by MIMM, if performed at all, that allowed MIMM to continue billing for unlawful and medically unnecessary evaluations, if

performed at all, that were used to continue to prescribe medically unnecessary medications, including controlled substances to patients.

1049. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to MIMM for the benefit of the Count XI defendants that would not otherwise have been paid.

1050. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

1051. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1052. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to MIMM for the benefit of the Count XI defendants.

1053. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1054. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

1055. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1056. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1057. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1058. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (MIMM Enterprise)
### Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.

1059. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1060. Defendants Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of MIMM.

1061. The Count XII defendants each agreed to further, facilitate, support, and operate the MIMM enterprise.

1062. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1063. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of MIMM even though MIMM was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1064. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1065. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1066. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT XIII</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(ZMC Pharmacy Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D.,**
**P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti,**
**M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, M.D.**

1067. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1068. ZMC Pharmacy constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1069. In connection with each of the claims identified in the within Complaint, Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by ZMC Pharmacy, or knew that such false medical documentation would be faxed and mailed in the ordinary course of ZMC Pharmacy's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation

181

by ZMC Pharmacy would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1070. The Count XIII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

1071. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1072. Policies of insurance were delivered to insureds through the U.S. Mail.

1073. Payments to ZMC Pharmacy from Allstate were transmitted through the U.S. Mail.

1074. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by ZMC Pharmacy, which they knew would be billed by ZMC Pharmacy, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1075. Zawaideh is the owner of ZMC Pharmacy and is responsible for all actions taken by ZMC Pharmacy and its representatives.

1076. Inscribed, Integrative Neurology, Farmbrook, Velugubanti, and Dhillon were responsible for the medically unnecessary drug prescriptions that allowed ZMC Pharmacy to submit bills to Allstate.

1077. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to ZMC Pharmacy for the benefit of the Count XIII defendants that would not otherwise have been paid.

1078. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

1079. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1080. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to ZMC Pharmacy for the benefit of the Count XIII defendants.

1081.  The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1082.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

1083.  The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1084.  Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1085.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1086. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (ZMC Pharmacy Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D.,
### P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti,
### M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

1087. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1088. Defendants Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of ZMC Pharmacy.

1089. The Count XIV defendants each agreed to further, facilitate, support, and operate the ZMC Pharmacy enterprise.

1090. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1091. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of ZMC Pharmacy even though ZMC Pharmacy was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1092. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1093. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

1094. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Integra Enterprise)
**Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.**

1095. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1096. Integra constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1097. In connection with each of the claims identified in the within Complaint, Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan

Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D. ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Integra, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Integra's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Integra would occur, in furtherance of the Count XV defendants' scheme to defraud.

1098. The Count XV defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

1099. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1100. Policies of insurance were delivered to insureds through the U.S. Mail.

1101. Payments to Integra from Allstate were transmitted through the U.S. Mail.

1102. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by

Integra, which they knew would be billed by Integra, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1103. DIPMM, MIMM, and Abraham were responsible for the medically unnecessary urine drug test prescriptions that allowed Integra to submit bills to Allstate.

1104. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Integra for the benefit of the Count XV defendants that would not otherwise have been paid.

1105. The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

1106. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1107. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Integra for the benefit of the Count XV defendants.

1108. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1109. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

1110. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1111. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1112. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1113. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Integra Enterprise)
### Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.

1114.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1115.  Defendants Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D. ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Integra.

1116.  The Count XVI defendants each agreed to further, facilitate, support, and operate the Integra enterprise.

1117.  As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1118.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Integra even though Integra was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1119.  The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1120. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

1121. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## COMMON LAW FRAUD
### Against All Defendants

1122. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1123. The scheme to defraud perpetrated by Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XVII defendants") was dependent upon a succession of material misrepresentations

of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1124. The misrepresentations of fact made by the Count XVII defendants include, but are not limited to, those material misrepresentations discussed in section XI *supra*.

1125. The Count XVII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1126. The misrepresentations were intentionally made by the Count XVII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

1127. The Count XVII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1128. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1129. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XVIII
## CIVIL CONSPIRACY
### Against All Defendants

1130. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1131. Defendants Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XVIII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

1132. The Count XVIII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1133. This purpose was known to all of the Count XVIII defendants and intentionally pursued.

1134. Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XVIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1135. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1136. All of the Count XVIII defendants directly benefited from the payments made to Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC.

1137.  All of the Count XVIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVIII defendants in the commission of acts done for the benefit of all Count XVIII defendants and to the unjustified detriment of Allstate.

1138.  Accordingly, all of the Count XVIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XIX
## PAYMENT UNDER MISTAKE OF FACT
### Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC

1139.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1140.  Allstate paid the amounts described herein and itemized in Exhibits 15 through 22 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine

PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC ("Count XIX defendants").

1141.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1142.   The Count XIX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1143.   Allstate is entitled to restitution from each of the Count XIX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XX
## UNJUST ENRICHMENT
**Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC**

1144.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1145.   Allstate paid monies, including those amounts set out in Exhibits 15 through 22, in response to the claims submitted, or caused to be submitted, by

defendants Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC ("Count XX defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1146. Allstate's payments constitute a benefit which the Count XX defendants aggressively sought and voluntarily accepted.

1147. The Count XX defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1148. The Count XX defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

1149. The Count XX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXI
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1150. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

1151. Defendants Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain &

EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XXI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1152. The Count XXI defendants also billed for services that were never rendered, which is clearly fraudulent.

1153. The Count XXI defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

1154. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

1155. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

1156. The lack of lawfully-rendered treatment (such as lack of licensure and treatment arising from illicit solicitation or from kickbacks) is also a defense to an insurer's obligation to pay No-Fault benefits.

1157. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1158. Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

1159. The Count XXI defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1160. The Count XXI defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XXI defendants for any or all of the reasons set out in the within Complaint.

1161. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants billed for

unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

1162.  Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1163.  As such, the Count XXI defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1164. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Inscribed Enterprise)**
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Inscribed Enterprise)
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Integrative Neurology Enterprise)
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Integrative Neurology Enterprise)
### Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Diagnostic Solutions Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Diagnostic Solutions Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Farmbrook Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Farmbrook Enterprise)
**Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (DIPMM Enterprise)
**Against Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (DIPMM Enterprise)
**Against Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (MIMM Enterprise)
**Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (MIMM Enterprise)
**Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (ZMC Pharmacy Enterprise)
**Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (ZMC Pharmacy Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Integra Enterprise)
### Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Integra Enterprise)**
**Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT XVII**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT XVIII**
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT XIX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions**
**LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG;**
**Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute**
**of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.;**
**and Integra Lab Management LLC**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT XX**
**UNJUST ENRICHMENT**
**Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions**
**LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG;**
**Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute**
**of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.;**
**and Integra Lab Management LLC**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

210

(b)   GRANT all other relief this Court deems just.

## COUNT XXI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)   DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. for any or all of the reasons set out in the within Complaint;

(b)   DECLARE that Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any

lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI. DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all clams.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Property and Casualty*
*Insurance Company, Allstate Fire and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated:  December 19, 2019

213