# EXHIBIT 6

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC, E.D.Mich., May 27, 2015

520 Fed.Appx. 409

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.

See also U.S.Ct. of App. 6th Cir. Rule 32.1.

United States Court of Appeals, Sixth Circuit.

ALLSTATE INSURANCE CO., Plaintiff–Appellant,

v.

GLOBAL MEDICAL BILLING, INC., et al., Defendants–Appellees.

No. 12–1263.
|
April 8, 2013.

**Synopsis**

**Background:** Automotive insurer brought action against individual and corporate providers of medical services, alleging a scheme to obtain payment on fraudulent insurance claims in violation of Michigan insurance law, the Racketeer Influenced and Corrupt Organizations Act (RICO), and other common law theories. The United States District Court for the Eastern District of Michigan, 2011 WL 721299, Lawrence P. Zatkoff, J., dismissed. After insurer's motion for reconsideration was denied, 2012 WL 344930, insurer appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:

[1] insurer's argument that it had standing to challenge claims for which it had not been reimbursed was forfeited on appeal, and

[2] insurer's argument that it should be permitted to amended its complaint was not preserved for appeal.

Affirmed.

West Headnotes (2)

**[1]** **Federal Courts**
 Mode and sufficiency of presentation

Automobile insurer's argument that it had standing to challenge allegedly fraudulent claims for which it had not been reimbursed was forfeited on appeal when insurer first raised the argument in a motion for reconsideration, in action against providers of medical services alleging a scheme to obtain payment on fraudulent insurance claims, where insurer failed to respond to provider's argument in provider's motion to dismiss that insurer had not suffered any damages and lost any right to assert a claim.

18 Cases that cite this headnote

**[2]** **Federal Courts**
 Pleading

Automobile insurer's argument that it should be permitted to amend its complaint to clarify that it was seeking damages for non-reimbursed claims as well as those for which it had been reimbursed was not preserved for appeal, in action against providers of medical services for an alleged scheme to obtain payment on fraudulent insurance claims, where insurer raised the argument for the first time on appeal.

4 Cases that cite this headnote

***409** On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

**Opinion**

CLAY, Circuit Judge.

****1** Plaintiff Allstate Insurance Co. appeals the district court's dismissal of its complaint for lack of standing. Plaintiff filed a seven-count complaint against twenty-four individual and corporate providers of medical services, alleging a scheme to obtain payment on fraudulent insurance claims

in violation of Michigan insurance law, *see* Mich. Comp. Laws § 500.4501, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), and various common law theories. Because Plaintiff failed to raise its only potentially winning argument at the proper time, it cannot now receive a second bite at the **\*410** apple. Therefore, we **AFFIRM** the district court's dismissal of Plaintiff's complaint.

## BACKGROUND

Under Michigan's "no-fault" automobile insurance statute, insurers are required to pay personal protection insurance benefits without regard to fault when an individual suffers bodily injury as a result of an automobile accident. *See* Mich. Comp. Laws § 500.3105. If a person is injured in an automobile accident but has no insurance of his or her own, as would be the case with a passenger or a pedestrian, that person's claim for insurance benefits is assigned to an insurer by the Assigned Claims Facility ("ACF"), an arm of Michigan's Department of State. *Id.* § 500.3172. The insurer to whom a claim is assigned is then obligated to make "prompt payment" on the claim, and it will subsequently be reimbursed by the ACF for the payments, the insurer's related costs, and interest. *Id.* § 500.3175(1). This system, known as the Assigned Claims Plan, facilitates the payment of claims to uninsured individuals by essentially outsourcing the processing and adjustment of such claims to private insurance companies.

Plaintiff writes and sells automobile insurance policies in Michigan and is therefore subject to have claims assigned to it by the ACF. In its complaint, Plaintiff alleged that Defendants engaged in a complex scheme to submit false or fraudulent insurance claims to the ACF, that those claims were assigned to it pursuant to the Assigned Claims Plan, and that it made payments on those claims as required by law. Plaintiff alleged that it paid some $680,000 to Defendants over approximately a six-year period.

On December 23, 2009, Plaintiff filed a seven-count complaint in the Eastern District of Michigan against fourteen individuals and ten corporate entities. The complaint alleged that Defendants violated Michigan's insurance code and the federal RICO statute, along with common-law civil conspiracy, payment under mistake of fact, silent fraud, unjust enrichment, misrepresentation, and practicing medicine without a license. Shortly thereafter, Defendants

filed a motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and failure to plead fraud with specificity pursuant to Rule 9(b). Among other arguments, the motion to dismiss asserted that Plaintiff lacked constitutional and prudential standing to sue because it had been fully reimbursed by the ACF for all allegedly fraudulent claims it had paid. (R. 15, Mot. to Dismiss 10–11.)

**\*\*2** In its response to the motion to dismiss, Plaintiff entirely neglected to respond to the assertion that it had been fully reimbursed by the ACF. (*See* R. 23, Resp. to Mot. to Dismiss.) From Plaintiff's silence, the district court deemed that assertion undisputed, and it granted Defendants' motion to dismiss on the basis that Plaintiff lacked standing. A short time later, on March 9, 2011, Plaintiff filed a motion for reconsideration, asserting for the first time that its complaint sought recovery for non-reimbursed claims that it paid on behalf of its own insureds. On February 1, 2012, the district court denied Plaintiff's motion for reconsideration, and Plaintiff timely appealed.

## DISCUSSION

We review a dismissal for lack of standing *de novo*. *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir.2012) (citing *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir.2007)). Although the parties and the district court considered the issue of standing as a failure to state a **\*411** claim under Rule 12(b)(6), it is more properly considered an attack on the court's subject-matter jurisdiction under Rule 12(b)(1). *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n. 2 (5th Cir.2011); *see also Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir.2012) (noting that a party must have standing to invoke the subject-matter jurisdiction of the federal courts). The distinction is important because a dismissal for failure to state a claim is considered an adjudication on the merits with full preclusive effect in later litigation, while a dismissal for lack of subject-matter jurisdiction does not operate as a merits adjudication and is presumably granted without prejudice. *See Pratt v. Ventas, Inc.*, 365 F.3d 514, 523 (6th Cir.2004).

As with a motion under Rule 12(b)(6), a facial challenge to subject-matter jurisdiction under Rule 12(b)(1) requires the district court to accept all the factual allegations in the complaint as true. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir.2012). To adequately allege jurisdiction,

the complaint "must contain non-conclusory facts which, if true, establish that the district court had jurisdiction over the dispute." *Id.*

In its motion for reconsideration before the district court and in its briefing before this Court, Plaintiff argued that its complaint described two categories of claims: those for which it had been reimbursed by the ACF, and those that it had paid on behalf of its own insureds. The district court interpreted the complaint to refer only to the claims that had been reimbursed by the ACF and, on that basis, dismissed the complaint for lack of standing. In its briefing before this Court, Plaintiff did not challenge the district court's conclusion with respect to the reimbursed claims, and at oral argument, Plaintiff confirmed its concession that it lacked standing to assert claims for which it had been reimbursed by the ACF. [1]

**\*\*3** **[1]**  The only issue before us, then, is whether the district court erred when it failed to consider the argument raised in Plaintiff's motion for reconsideration—namely, that the complaint sought damages for fraudulent claims for which it had not been reimbursed. It is well established that an argument raised for the first time in a motion for reconsideration is "untimely and forfeited on appeal." *Evanston Ins. Co. v. Cogswell Props., LLC,* 683 F.3d 684, 692 (6th Cir.2012). This rule is prudential, not jurisdictional, and can be overlooked "in exceptional cases" or when the rule would produce a "plain miscarriage of justice." *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 552 (6th Cir.2008). Plaintiff has not argued that this case presents such exceptional circumstances, nor has it attempted to excuse its failure to raise the argument about non-reimbursed claims prior to its motion for reconsideration.

Instead of attempting to excuse its own failure to raise the argument at the proper time, Plaintiff asserted repeatedly at oral argument that Defendants' motion to dismiss never stated that the ACF had reimbursed all of Plaintiff's claims. On the **\*412** contrary, the motion to dismiss stated almost exactly that. Under the unmistakable heading that reads, in part, "Plaintiff has not suffered any damages," Defendants laid out the constitutional and prudential requirements of standing and stated, in no uncertain terms, that Plaintiff "lost any right to assert a claim for indemnity or reimbursement from Defendant when the [ACF] reimbursed Plaintiff for monies paid to Defendants in accordance with the Michigan No–Fault Act...." (R. 15, Mot. to Dismiss 10.) The motion to dismiss went on to state that "Plaintiff has not suffered any money damages" because of the "[r]eimbursements that have been

provided to Plaintiff by the ACF." (R. 15, Mot. to Dismiss 11.) Having not suffered any damages, Defendants argued, Plaintiff lacked standing to maintain its complaint.

In its response to Defendants' motion to dismiss, Plaintiff seems to have misunderstood Defendants' standing argument. Plaintiff apparently believed that Defendants were challenging its status as a real party in interest under Federal Rule of Civil Procedure 17(a). (*See* R. 23, Resp. to Mot. to Dismiss 3–5.) It is unclear why Plaintiff would have thought this, as Defendants never mentioned Rule 17 in their motion to dismiss. [2]  Nonetheless, Plaintiff never attempted to respond to or refute Defendants' standing arguments or the assertion that it was fully reimbursed by the ACF.

Only after the district court granted the motion to dismiss did Plaintiff argue that its complaint also asserted claims based on payments it made to Defendants on behalf of its own insureds. Plaintiff's failure to respond to Defendants' attack on its standing and its failure to refute the assertion that it had been fully reimbursed amounts to a waiver of the argument, and we decline to address it on appeal. *See Humphrey v. U.S. Att'y Gen.'s Office,* 279 Fed.Appx. 328, 331 (6th Cir.2008) ("[W]here, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); *see also ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 299 (3d Cir.2012) ("It is not the district court's responsibility to help a party correct an error or a poor exercise of judgment.").

**\*\*4** **[2]**  Plaintiff further argues that it should be permitted to amend its complaint to clarify that it was seeking damages for non-reimbursed claims as well as those for which it had been reimbursed by the ACF. Not only was this argument raised for the first time on appeal, but it is also an attempt to resurrect the same argument that Plaintiff inexcusably waived by failing to raise it at the proper time before the district court. As with arguments raised for the first time in motions for reconsideration, arguments raised for the first time on appeal are generally deemed waived absent exceptional circumstances or a "plain miscarriage of justice." *Flowers,* 513 F.3d at 552. In order to encourage litigants to fully and completely address all issues before the district court in the first instance and avoid unfair surprises to the opposing party, we rarely exercise our discretion to address belatedly raised arguments. *See id.* Because **\*413** Plaintiff makes no persuasive argument to excuse its failure to timely present to the district court the argument regarding its non-reimbursed claims or its request to amend the complaint to include such

claims, we find that Plaintiff has not properly preserved these arguments for appeal.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Plaintiff's complaint.

**All Citations**

520 Fed.Appx. 409, 2013 WL 1405142

Footnotes

1    Plaintiff could not easily challenge the district court's conclusion even if it had wished to do so because it cannot establish redressability, one of the elements that comprises "the irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The ACF has already repaid Plaintiff's losses. Any injury suffered as a result of Defendants' alleged fraud has therefore been remedied. Because Plaintiff cannot show that it "would benefit in a tangible way from the court's intervention," *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), it cannot establish standing under Article III.

2    Rule 17(a)(1) states that "[a]n action must be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a)(1). Although this inquiry has some overlap with the standing inquiry, in that both require a named party to have a real interest in the case, the two are conceptually distinct. The Federal Rules cannot expand the subject-matter jurisdiction of the federal courts; therefore, an analysis under Rule 17 can only be conducted after a party has established its standing to sue. *See Zurich Ins. Co. v. Logitrans, Inc.,* 297 F.3d 528, 531–32 (6th Cir.2002).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Cochran v. VendMasters, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2709777, RICO Bus.Disp.Guide 11,161

2006 WL 2709777
United States District Court,
S.D. Ohio,
Western Division.

W. Davis C. COCHRAN, Jr., et al., Plaintiffs,
v.
VENDMASTERS, INC., et al., Defendants.

No. 3:04-CV-024.
|
Sept. 20, 2006.

**Attorneys and Law Firms**

Mary K. Carrothers Soter, Dayton, OH, for Plaintiffs.

Drew Corner Piersall, Attorney General's Office, Columbus, OH, John Randolph Folkerth, Jr., Weprin Folkerth & Routh LLC, Dayton, OH, for Defendants.

**ENTRY AND ORDER GRANTING VENDMASTERS AND ADVANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc.# 52); DISMISSING COUNTS ONE AND THREE OF COCHRANS' VERIFIED COMPLAINT WITH PREJUDICE; DISMISSING COUNTS TWO AND FOUR OF COCHRANS' VERIFIED COMPLAINT AND VENDMASTERS' COUNTERCLAIM WITHOUT PREJUDICE AND TERMINATING THIS CASE**

THOMAS M. ROSE, District Judge.

**\*1** This dispute arises from an attempt by Plaintiffs W. Davis Cochran, Jr. and Robert E. Cochran, Sr. (the "Cochrans") to establish a business venture together involving vending machines. In an effort to establish the business venture, the Cochrans allegedly contacted, among others, Defendants VendMasters, Inc. ("VendMasters"); Advance Placement Service, Inc. ("Advance"); Vend Star, Inc.; VDSR Associates, Inc.; and Floyd Perkins ("Perkins"). Several John Does are also named as Defendants but they have yet to be identified.

The Cochrans brought a four-count verified Complaint. Count One is for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 et seq. Count Two is a state-law claim for making false representations. Count Three is for violation of the Ohio

Pattern of Corrupt Activities ("PCA") Act, Ohio Rev.Code § 2923.31 et seq. and Count Four is for violation of Ohio Rev.Code § 1703.30 which prohibits the transaction of business in Ohio by officers of unlicensed corporations. Federal question jurisdiction exists because Count One is a claim brought pursuant to federal law. VendMasters counterclaimed alleging that the Cochrans have engaged in frivolous conduct in violation of Ohio Rev.Code § 2323.51. [1] (Doc. # 33.)

Plaintiffs have voluntarily dismissed Defendants Vend Star, Inc. and VDSR Associates, Inc. (Doc. # 24.) Defendant Perkins was served via publication and the Clerk has entered default against Perkins for not filing an answer. Thus, the remaining defendants are VendMasters and Advance. VendMasters is also a counterclaimant.

Now before the Court is Advance and VendMaster's Motion for Partial Summary Judgment. (Doc. # 52.) This motion is now fully briefed and ripe for decision. A brief factual background will first be set forth followed by the standard of review and an analysis of the motion.

**I. FACTUAL BACKGROUND**

The facts set forth in the background are, as they must be, viewed in a light most favorable to the Cochrans, the non-movants in this instance. However, the Cochrans have submitted unsworn declarations that do not comply with the requirements for unsworn declarations set forth in 28 U.S.C. § 1746 in that they do not conclude, as required, with the statement: "I declare under penalty of perjury that the foregoing is true and correct. Executed on (date)(signature)." Therefore, the unsworn declarations cannot be considered as Rule 56 evidence.

Turning to the Rule 56 evidence, in early 2003, the Cochrans, who are brothers, became interested in starting a vending machine business in Dayton, Ohio. (D.Cochran Dep. 18-19 3/7/06.) The Cochrans planned to enter into a partnership with Davis Cochran supplying the money and Robert Cochran supplying the labor. (D. Cochran Dep. 25.)

In pursuit of their desire to enter the vending machine business, the Cochrans searched for vending machine advertisements in newspapers and magazines. (R. Cochran Dep. 13 3/7/06; D. Cochran Dep. 19-22.) After reviewing classified advertisements in the Dayton Daily News and

Case 2:19-cv-13721-LVP-EAS ECF No. 39-6, PageID.1267 Filed 02/28/20 Page 7 of 58
Cochran v. VendMasters, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2709777, RICO Bus.Disp.Guide 11,161

calling potential vendors, the Cochrans decided that VendMasters offered the best business opportunity. (D. Cochran Dep. 28-29, 35-36; R. Cochran Dep. 17.)

**\*2** VendMasters is a Nevada for profit corporation with its principal place of business in Englewood, California. (Richard Black Aff. ¶ 1 7/10/06.) VendMasters' business is selling vending machines. (*Id.*) VendMasters advertises business opportunities in newspapers around the country and responds to inquiries by providing information packets that include a Business Opportunity Disclosure Statement. (*Id.* ¶ 2.)

VendMasters does not provide location services for vending machines but, in response to inquiries, will identify vending location companies or refer inquiries to a National Business Opportunities Bureau listing of vending location companies. (*Id.* ¶ 3.)

Robert Cochran then contacted and received literature from VendMasters via U.S. Mail. (R. Cochran Dep. 18.) Robert forwarded the VendMaster information to Davis Cochran. (R. Cochran Dep. 18-19 .)

In addition to forwarding VendMasters' literature to Davis, Robert contacted VendMasters. (R. Cochran Dep. 19-20.) In one of those conversations, VendMaster employee Vince Collins told Robert that VendMasters sold the vending machines and that Advance could locate and place the vending machines. (*Id.* 30.) VendMasters offered to sell the Cochran's sixty vending machines for $10, 995. (*Id.* 21.)

Advance is an Illinois for profit corporation that provides locating services for vending equipment, racks and displays. (Jay Baird Aff. ¶ 1 7/7/06.) Advance works with professional locators that secure locations for vending machines throughout the United States. (*Id.* ¶ 3.)

Davis Cochran then contacted Jay Baird, Advance's President. (D. Cochran Dep. 44-45.) Mr. Baird told Davis that Advance would charge $1,500 for placing thirty vending machines and that an initial deposit of $750 was required along with a signed Advance Customer Service Agreement. (*Id.* 46; Baird Aff. ¶ 4.)

Davis Cochran sent a signed Advance Customer Service Agreement to Baird along with the initial $750. (Baird Aff. ¶ 4.) Baird then identified Perkins to Davis Cochran as a

professional locator that Advance had worked with in the past. (*Id.*)

In June of 2003, the Cochrans met with Perkins. (D. Cochran Dep. 60-61.) Perkins explained that his role was to contact buildings and businesses in the Dayton area regarding installing vending machines. (*Id.* 62-63.) Perkins also told the Cochrans that they needed to have the vending machines ready to install the same day or the day after the contacts were made. (*Id.* 62.) Perkins also offered to provide the vending machines. (*Id.* 62-63.) At the time, Davis Cochran thought that Perkins would be getting the vending machines from Jay Baird at Advance. (*Id.* 72-73.)

The Cochrans then determined to purchase the vending machines from Perkins. (*Id.* 73.) They gave Perkins a total of three checks in the amounts of $750, $6,000 and $5,393. (*Id.* 73-74; 103.) The latter two were for purchase of the vending machines. (*Id.*)

**\*3** The checks were made payable to Perkins. (*Id.* 72-73.) Although Davis thought he was purchasing the vending machines from Advance, he did not ask why the checks were being made payable to Perkins personally instead of Advance. (*Id.* 73-74.)

The Cochrans never saw Perkins after the June 2003 meeting but spoke with him on the phone numerous times. (*Id.* 75.) When asked about delivery of the vending machines, Perkins would make excuses. (D. Cochran Dep. 77-78; R. Cochran Dep. 65-66.) The Cochrans agreed to meet Perkins on three or four occasions at Robert Cochran's home in Dayton to accept delivery of the vending machines, but Perkins never showed up nor did the vending machines. (D. Cochran Dep. 81-82.)

While the Cochrans were waiting for the vending machines from Perkins, they contacted Jay Baird at Advance to complain that the Customer Agreement was not being fulfilled. (D. Cochran Dep. 54-55.) Baird became upset and told the Cochrans that they should not have given Perkins the money. (*Id.* 54-58.) Baird also said he would take care of the placements for additional money, an offer that the Cochrans declined. (*Id.* 56.)

Having paid their money and received no locations or vending machines, the Cochrans filed this action. The analysis next turns to the standard of review.

2006 WL 2709777, RICO Bus.Disp.Guide 11,161

## II. STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed.R.Civ.P. 56(e)).

*4 Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, Federal Practice and Procedure, § 2726. Rather, credibility determinations must be left to the fact-finder. Id.

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F .2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed.R.Civ.P. 56(c).

Further, statements in a verified complaint, like the one filed by the Cochrans in this action, may function as the equivalent of affidavit statements for purposes of summary judgment. Weberg v. Franks, 229 F.3d 514, 516 n. 13 (6th Cir.2000). However, statements in a verified complaint, like affidavit statements, must be based on personal knowledge." Id. Moreover, "an affidavit not based on personal knowledge does not create issue of fact precluding summary judgment." Erickson v. Farmland Indus., 271 F.3d 718, 728 (8th Cir.2001). Therefore, a statement in a verified complaint that is not based upon personal knowledge does not create an issue of fact precluding summary judgment.

The verified Complaint filed in this matter includes claims brought pursuant to Ohio law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. Northland Ins. Co. v. Guardsman Prods. Inc., 141 F.3d 612, 617 (6th Cir.1998). Specifically, this Court must apply the substantive law of Ohio " 'in accordance with the then-controlling decision of the highest court of the state." ' Imperial Hotels Corp. v. Dore, 257 F.3d 615, 620 (6th Cir.2001) (quoting Pedigo v. UNUM Life Ins. Co., 145 F.3d 804, 808 (6th Cir.1998)). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. Id. (quoting Bailey Farms. Inc. v. NOR-AM Chem. Co., 27 F.3d 188, 191 (6th Cir.1994)). Having set forth the standard of review, the analysis turns to the motion for partial summary judgment.

### III. ANALYSIS OF MOTION FOR
### PARTIAL SUMMARY JUDGMENT

**\*5** Defendants Advance and VendMasters seek summary judgment on Count One and Count Three of Cochrans' Complaint. Count One is for violation of the federal RICO Act and Count Three is for violation of the Ohio PCA Act.

The PCA Act is adopted directly from the RICO Act. *Universal Coach, Inc. v. New York City Transit Authority,* 629 N.E.2d 28, 32 (Ohio Ct.App.1993)(citing *Cincinnati Gas & Electric Co. v. General Electric Co.,* 656 F.Supp. 49 (S.D.Ohio 1986)). As a result, Ohio courts look to federal case law applying the RICO Act when analyzing claims brought under the PCA Act. *Id.; DeNune v. Consolidated Capital of North America, Inc.,* 288 F.Supp.2d 844 (N.D.Ohio 2003); *U.S. Demolition & Contracting, Inc. v. O'Rourke Construction Co.,* 640 N.E.2d 235, 240 (Ohio Ct.App.1994). Therefore, both Counts One and Three of Plaintiffs' Complaint will be analyzed together and under federal RICO law.

Congress's goal when enacting RICO was to protect legitimate businesses from infiltration by organized crime. *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998). RICO, initially a criminal statute, was supplemented by Congress to permit civil enforcement of its provisions. *Goren v. New Vision International, Inc.,* 156 F.3d 721, 726 (7th Cir.1998). A civil RICO claim is an "unusually potent weapon" so a court must ensure that RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies. *Schmidt,* 16 F.Supp.2d at 346.

The RICO statute identifies several prohibited activities. *Id.* Two specific RICO provisions are relevant to this matter. Section 1962(c) prohibits any person associated with any enterprise engaged in activities which affect interstate or foreign commerce from conducting such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c). Section 1962(d) prohibits any person from conspiring to violate any provision of RICO, including that found in § 1962(c). 18 U.S.C. § 1962(d).

#### A. *Section 1962(c) Claim* [2]

The elements of a RICO claim brought pursuant to 18 U.S.C. § 1962(c) are: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity. *Goren v. New Vision International, Inc.,* 156 F.3d 721, 727 (7th Cir.1998). The plaintiff must also show that an injury to business or property occurred as a result of the violation. *VanDenBroek v. Commonpoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir.200). Each of these elements will be analyzed with regard to Cochrans' Section 1962(c) claim.

#### 1. The Conduct Requirement

To satisfy the "conduct" element, a plaintiff must show that the defendant "participated in the operation or management of the enterprise itself" and that the defendant played "some part in directing the enterprise's affairs. *Goren,* 156 F.3d at 727 (citing *Reves v. Ernst & Young,* 507 U.S. 170, 179 (1993)). Therefore, "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable as a result." *Schmidt,* 16 F.Supp.2d at 346 *(citing LaSalle National Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1090 (S.D.N.Y.1996)).

**\*6** There is a substantial difference between actual control over an enterprise and association with an enterprise, and only actual control satisfies the conduct requirement. *Id.* (citing *Department of Economic Development v. Arthur Anderson & Co.,* 924 F.Supp. 449, 466 (S.D.N.Y.1996)). Mere participation in the activities of the enterprise or performing services for an enterprise is not sufficient. *Goren,* 156 F.3d at 727-28. The Defendant must participate in the operation or management of the enterprise. *Id.* at 727.

The Cochrans identify an enterprise composed of VendMasters, Advance Placement and Perkins. They also have presented facts alleging that VendMasters, Advance and Perkins participated in certain activities regarding the supply and location of vending machines.

In response, Advance presents evidence that it is not "affiliated or otherwise connected with any company in the business of selling vending machines" and does not "pay or otherwise provide any form of compensation for referrals from companies that sell vending machines." (Baird Aff. ¶ 2.) Also, VendMasters presents evidence that it has no business affiliation or relationship with Advance, or any company that provides location services, receives no payment or compensation of any kind for referrals, and has no financial interest in whether or not any prospective purchaser of

Cochran v. VendMasters, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 2709777, RICO Bus.Disp.Guide 11,161

vending machines uses the services of any locating company. (Black Aff. ¶ 4.)

While the Cochrans have presented evidence that VendMasters and Advance may have provided services that benefitted an alleged enterprise regarding the sale and location of vending machines, they have presented no evidence that either VendMasters or Advance participated in the operation or management of an enterprise consisting of VendMasters, Advance and Perkins or played some part in directing the affairs of such an enterprise. Therefore, there is no genuine issue of fact regarding the conduct requirement. It has not been satisfied.

### 2. The Enterprise Requirement

An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *VanDenBroek,* 210 F.3d at 699(citing *United States v. Turkette,* 452 U.S. 576 (1981)). An enterprise may be a legal entity or an association in fact. *Schmidt,* 16 F.Supp.2d at 349. The "hallmark" of a RICO enterprise is its ability to exist apart from the pattern of wrongdoing. *VanDenBroek,* 210 F.3d at 699.

An association in fact enterprise, which is alleged in this case, can be proved by showing (1) that the associated persons formed an ongoing organization, formal or informal; (2) that they functioned as a continuing unit; and (3) that the organization was separate from the pattern of racketeering activity in which it engaged. *VanDenBroek,* 210 F.3d at 699. Further, these elements are interpreted to require a certain amount of organizational structure which eliminates simple conspiracies from the RICO act. *Id.* "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *United States v. Tocco,* 200 F.3d 401, 425 (6th Cir.2000)(quoting *United States v. Kragness,* 830 F.2d 842, 856 (8th Cir.1987)), *cert. denied,* 539 U.S. 926 (2003). Each of the elements necessary to show an association in fact will next be analyzed with regard to Cochrans' allegations.

### a. Whether the Associated Persons Formed an Ongoing Organization

**\*7** The Cochrans have identified evidence that Vendmasters is in the business of selling vending machines and that, when called, VendMasters identified Advance to the Cochrans as a company that could provided location services for vending machines. (Black Aff. ¶ 4.) The Cochrans have also identified evidence that Advance entered into an agreement with them to find locations for vending machines and referred them to Perkins for execution of the agreement. (Baird Aff. ¶ 4.) Therefore, the Cochrans have presented evidence of an ongoing, informal organization.

### b. Whether the Associated Persons Functioned as a Continuing Unit

The Cochrans have also identified evidence that VendMasters, Advance and Perkins functioned as a continuing unit. VendMasters is in the business of selling vending machines and regularly refers callers to locating services including Advance. (Black Aff. ¶¶ 1, 4.) Advance is in the business of finding locations for vending machines and regularly refers those who sign their Customer Agreements to Perkins and other "locators." (Baird Aff. ¶¶ 1, 4.) Therefore, the Cochrans have presented evidence that the informal organization composed of VendMasters, Advance and Perkins functioned as a continuing unit.

### c. Whether the Organization Was Separate From the Pattern of Racketeering Activity In Which It Engaged

The Cochrans have presented evidence that VendMasters, Advance and Perkins engaged in a pattern of activity regarding locating and selling vending machines. However, VendMasters and Advance have presented evidence that each of them is not affiliated or otherwise connected with other companies. (Baird Aff. ¶ 2; Black Aff. ¶ 4 .) In response, the Cochrans have presented no evidence that an organization composed of VendMasters, Advance and Perkins existed separately from the pattern of activity.

In sum, the Cochrans have shown that VendMasters, Advance and Perkins engaged in a ongoing, informal organization involving the sale and location of vending machines and that this informal organization was ongoing. However, they have presented no Rule 56 evidence that the informal organization involving VendMasters, Advance and Perkins existed separate from their activities regarding the sale and location of vending machines. Therefore, the Cochrans

have not presented evidence that satisfies the enterprise requirement.

### 3. The Pattern of Racketeering Activity Requirement

"A pattern of racketeering activity consists, at a minimum, of two predicate acts of racketeering committed within a ten-year time period." *Goren,* 156 F.3d at 728. However, while two acts are necessary, they may not be sufficient. *Cincinnati Gas & Electric,* 656 F.Supp. at 78. The target of the RICO Act is not sporadic activity. *Id.*

The predicate acts are violations of a list of criminal laws that are specified in the RICO statute. *Goren,* 156 F.3d at 728. Examples are acts or threats involving murder, kidnapping, gambling, arson, robbery, bribery and extortion that are chargeable under state law and punishable by imprisonment for more than one year. 18 U.S.C.A. § 1961(a)(A). Two or more predicate acts within a ten-year period must be shown to sustain a RICO claim. *Britt v. Fox,* 110 Fed.Appx. 627, 628 (6th Cir.2004), *cert. denied,* 543 U.S. 1026 (2004).

**\*8** A civil RICO action does not require that there be a prior criminal conviction for the conduct that forms the predicate acts. *Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181, 183 (6th Cir.1993), *cert. denied,* 512 U.S. 1207 (1994). Yet, the conduct supporting a civil RICO action must be indictable. *Id.*

A pattern of racketeering can be established by showing that the predicate acts are related and that they amount to or pose a threat of continuing criminal activity. *United States v. Busacca,* 936 F.2d 232, 237 (6th Cir.1991), *cert. denied,* 502 U.S. 985 (1991). Thus, there are two elements of a pattern of racketeering activity which have come to be known as "relatedness" and "continuity." *Id.*

"Continuity" is a temporal concept that refers to either a closed period of repeated conduct or to past conduct that, by its nature, projects into the future with a threat of repetition. *Id.* A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Id.* However, predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy the "continuity" requirement. *Id.* The threat of continued criminal activity is a fact specific concept that may be established by showing that the related predicates

involve a distinct threat of long term racketeering activity, either implicit or explicit, or by showing that the predicate acts are a part of an ongoing entity's regular way of doing business. *Id.* at 238.

Rule 9(b) is applicable to the allegations of fraud as predicate acts in a civil RICO complaint. *Goren,* 156 F.3d at 726. Pursuant to Rule 9(b), the circumstances constituting fraud are to be stated with particularity. *VanDenBroek,* 210 F.3d at 701. Further, a fraud claim requires that the plaintiff show that the defendant made a material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that plaintiff in fact relied upon that material misrepresentation. *Id.*

Turning to this case, VendMasters and Advance present evidence that they have never been charged with any violations of federal or state law and that they did not make any false representations to the Cochrans. The Cochrans respond by identifying seven alleged predicate acts committed by VendMasters, Advance and Perkins.

### a. Predicate Acts

The first predicate act identified by the Cochrans is an allegation that they paid $750 to Advance, that Advance retained their money and that they never received anything of value. This, according to the Cochrans, is a violation of Ohio's criminal code, Ohio Rev Code § 2913.02.

Section 2913.02 is Ohio's criminal theft statute and is a subset of Ohio's theft and fraud law. It prohibits a person from knowingly obtaining control over either the property or service of another person without the express or implied consent of the other person or by deception.

**\*9** Since the Cochrans have presented Rule 56 evidence, with particularity, that they paid $750 to Advance and never received anything of value, they arguably have shown that Advance may be liable for an Ohio theft claim. However, while the Cochrans identify evidence that, for purposes of summary judgment, satisfies an Ohio theft claim, they have not shown that an Ohio theft claim is a RICO predicate act.

The second predicate act identified by the Cochrans is an allegation that they paid money to Perkins as the agent for Advance and VendMasters and that they did not receive

anything for the money. This, also, according to the Cochrans is a violation of Ohio Rev Code § 2913.02.

Since the Cochrans have presented Rule 56 evidence, with particularity, that they paid money to Perkins and never received anything of value, they arguably have shown that Perkins may have violated Ohio's theft law. However, while the Cochrans have identified evidence that Perkins may have violated Ohio's theft law, they have not shown that an Ohio theft claim is a RICO predicate act. Further, this Court need not and has not addressed whether Perkins was an agent for either VendMasters or Advance.

The third and fourth predicate acts alleged by the Cochrans are for mail fraud. The elements of a mail fraud claim are: (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. Central Distributors, 5 F.3d at 184.

In response to this alleged predicate activity, VendMasters and Advance again argue that they have never violated a federal or state law. In response, the Cochrans identify evidence that they contacted VendMasters and Advance and obtained literature from both of them via the U.S. Mail. Further they present evidence that it was this literature that ultimately led them to provide a signed Customer Agreement along with $750 to Advance, again, using the U.S. Mail. Finally, they present evidence that they have never received anything of value from Advance in return.

The alleged scheme to defraud was the alleged scheme by VendMasters, Advance, and Perkins to obtain money from the Cochrans for providing vending machines and locations. As a part of this alleged scheme, both VendMasters and Advance used the U.S. Mail. As to intent, the Cochrans alleged that VendMasters, Advance and Perkins intended to defraud them and cased dispositive findings of intent are generally the province of the finder-of-fact. Therefore, there are genuine issues of material fact as to whether VendMasters and Advance committed mail fraud within a ten-year period.

The fifth, sixth and seventh predicate acts involve claims against Advance for failing to identify vending locations. These claims, according to Advance, were filed in Pennsylvania, Michigan and Indiana and do not allege criminal violations. However, allegations of criminal violations is not the standard. The standard is whether the

predicate acts are indictable. Yet, the Cochrans have not shown that these three claims against Advance are RICO predicate acts.

### b. Summary of Pattern of Racketeering Activity

**\*10** The Cochrans have presented evidence creating genuine issues of material fact, with particularity, as to whether VendMasters, Advance and Perkins committed two predicate acts as defined by the RICO Act within a ten-year period. They have also presented evidence creating genuine issues of material fact that these predicate acts were related to providing and locating vending machines and that, the continuing relationship between VendMasters and Advance poses a threat of continuing criminal activity. Therefore, the Cochrans have presented evidence that arguably satisfies the pattern of racketeering activity requirement.

### 4. Conclusion Regarding Section 1962(c) Claim

The Cochrans have not presented evidence to create genuine issues of material fact regarding two of the three elements of a RICO § 1962(d) claim. While the Cochrans have presented evidence creating a genuine issue of material fact as to whether VendMasters and Advance, along with Perkins, were engaged in a pattern of racketeering activity, they have presented no evidence that VendMasters and Advance were a part of a racketeering enterprise or that they participated in the operation or management of an enterprise or played some part in directing the affairs of an such enterprise.

### B. Section 1962(d) Claim

The Cochrans also alleged that VendMasters and Advance conspired to violate the RICO Act. Section 1962(d) makes actionable a conspiracy to violate the RICO statute. Section 1962(d)'s target is the agreement to violate RICO's substantive provisions and not the actual violations themselves. Goren, 156 F.3d at 731. Liability arises from an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute. Id. at 732. Thus, to show a violation of § 1962(d), a plaintiff must show (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would

Cochran v. VendMasters, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 2709777, RICO Bus.Disp.Guide 11,161

commit as least two predicate acts to accomplish those goals. *Id.* at 732. However, there can be no conspiracy without a substantive RICO violation. *Schmidt,* 16 F.Supp.2d at 353 (citing *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), *cert. denied,* 522 U.S. 809 (1997)).

In this case, the Cochrans have not presented evidence satisfying all of the elements of a substantive RICO violation. Therefore, there can be no conspiracy.

## IV. SUMMARY

VendMasters and Advance's Motion for Partial Summary Judgment is GRANTED. The Cochrans have not presented evidence satisfying two of the three elements of a RICO claim. Also, since the Cochrans have not presented evidence of a substantive RICO violation, there can be no conspiracy to violate the RICO Act. Therefore, there are no genuine issues of material fact and VendMasters and Advance are entitled to judgment as a matter of law on Count One of Cochrans' Complaint for violation of the federal RICO Act and Count Three of Cochrans' Complaint for violation of Ohio's PCA Act. Count One and Count Three are DISMISSED.

**\*11** The basis for subject matter jurisdiction in this case was the RICO claim found in Count One. Since Count One has been dismissed, this Court no longer has original subject matter jurisdiction. Further, this Court declines to exercise supplemental jurisdiction over the remaining claims. See 28 U.S.C.A. § 1367(c)(3).

Counts Two and Four of Cochrans' verified Complaint and VendMasters' Counterclaim are dismissed and have not been adjudicated on their merits. Therefore, they are dismissed without prejudice. [3] The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Twentieth day of September, 2006.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2709777, RICO Bus.Disp.Guide 11,161

Footnotes

1    Advance's Answer also includes a counterclaim but the title of document does not indicate that it includes a counterclaim. (Doc. # 16.) The Cochrans have not responded to the counterclaim imbedded in Advance's Answer.

2    The Cochrans argue that this Court has already ruled by entry of default judgment that Perkins violated the RICO Act. However, default judgment has not been entered against Perkins. An Entry of Default has been made which only determines that Perkins was served with the verified Complaint and failed to answer.

3    Both parties request that these claims be dismissed without prejudice.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

290 Fed.Appx. 832
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

GRANGE MUTUAL CASUALTY CO., Grange
Indemnity Insurance Co., and Trustgard
Insurance Co., Plaintiffs–Appellants,
v.
Joni L. MACK, Defendant–Appellee.

No. 07–6145.
|
Aug. 26, 2008.

**Synopsis**
**Background:** Insurers brought suit claiming that defendant
had joined an ongoing conspiracy that involved fraudulently
billing them for medical expenditures, in violation of the
Racketeer Influenced and Corrupt Organizations Act (RICO).
The United States District Court for the Eastern District
of Kentucky, 2007 WL 2344936,dismissed, and insurers
appealed.

**Holding:** The Court of Appeals, Julia Smith Gibbons, Circuit
Judge, held that a plaintiff asserting a RICO claim predicated
on mail fraud need not show that it relied on the defendant's
alleged misrepresentations.

Vacated and remanded.

West Headnotes (1)

**[1]**      **Racketeer Influenced and Corrupt
        Organizations**
            👉 **Mail and wire fraud**
        **Racketeer Influenced and Corrupt
        Organizations**

👉 **Causal relationship;  direct or indirect injury**
Plaintiff asserting a Racketeer Influenced
and Corrupt Organizations Act (RICO) claim
predicated on mail fraud need not show, either
as an element of its claim or as a prerequisite
to establishing proximate causation, that it relied
on the defendant's alleged misrepresentations. 18
U.S.C.A. § 1962(c, d).

8 Cases that cite this headnote

**\*832**  On Appeal from the United States District Court for
the Eastern District of Kentucky.

Before: DAUGHTREY and GIBBONS, Circuit Judges;
ZATKOFF, District Judge. [\*]

**Opinion**

JULIA SMITH GIBBONS, Circuit Judge.

**\*\*1**  Plaintiffs Grange Mutual Casualty Co., Grange
Indemnity Insurance Co., and Trustgard Insurance Co. appeal
the district court's Rule 12(b)(6) dismissal of their civil action
under the Racketeer Influenced and Corrupt Organizations
Act ("RICO") against defendant Joni L. Mack. Plaintiffs
argue that the district court erred in concluding that plaintiffs
could not establish a private cause of action under **\*833**
18 U.S.C. § 1964(c) against Mack. In light of the Supreme
Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.,
—— U.S. ——, 128 S.Ct. 2131, 2145, 170 L.Ed.2d 1012
(2008),* we vacate the district court's dismissal and remand for
further proceedings.

**I.**

Plaintiffs allege that Mack joined an ongoing conspiracy
that involved fraudulently billing plaintiffs for medical
expenditures. Although Mack is the only defendant in this
case, plaintiffs initiated a separate civil RICO action on
December 4, 2002, against Mack's husband, Greg S. Mack,
and other members of a conspiracy allegedly involving a
number of medical rehabilitation centers. [1]  In this case,
plaintiffs allege that Mack joined the same conspiracy,
alluding to the suit filed against Greg Mack.

Plaintiffs' complaint in this case alleges the following facts, which we accept as true for purposes of reviewing this Rule 12(b)(6) dismissal. *See Kottmyer v. Maas,* 436 F.3d 684, 688 (6th Cir.2006).

Since at least 1998, Greg Mack and other conspirators

> creat[ed] and implement[ed][ ] multiple fraudulent schemes to bill Plaintiffs for medical treatments or supplies that were never rendered or supplied, were medically unnecessary or were billed unlawfully. [In addition, these individuals] caused these fraudulent bills to be submitted to Plaintiffs via the United States mail or interstate wire communications.

The schemes were designed to take advantage of Kentucky's statutory automobile insurance coverage system—which encourages insurers to promptly pay providers for medical costs associated with automobile accidents—in two ways. First, the conspirators coordinated testing services for physicians, which encouraged the physicians to refer patients for unnecessary testing. Second, the conspirators operated clinics—including the Injury & Rehab Centers of Kentucky, PLLC ("IRC")—to cater to automobile victims. At IRC clinics, physicians and other employees were directed to routinely order diagnostic tests, regardless of whether the tests were warranted. IRC then overcharged the plaintiff insurance companies by: double-billing; manipulating billing codes to account for supplies; providing unnecessary supplies; and billing services provided by unlicensed staff as if they were provided by licensed medial practitioners. In both facets of the scheme, plaintiffs allege that the conspirators mailed insurance forms misrepresenting the services that the physicians and clinics provided, and that plaintiffs paid numerous bills relying on these misrepresentations.

In approximately January 2003, Mack became an employee of IRC and assumed a position of management and control. With respect to Mack's role in the conspiracy, plaintiffs allege:

> **2** Defendant Mack joined the RICO conspiracy at least by January 2003, and thereafter committed or agreed for others to commit acts in furtherance of the conspiracy as described [above]. In particular, the Defendant Mack

personally instructed clinic employees to add physical therapy billings for patients regardless of whether the treatment had been prescribed, performed or supervised by a licensed practitioner, in furtherance of the RICO Conspirators' schemes to defraud Plaintiffs in violation of 18 U.S.C. §§ 1341 or 1343.

Defendant Mack also caused computers to be removed from IRC clinics, and replaced with machines that did not retain all of the data relating to operation of the clinics before the filing of *Grange* **834** *v. Mack* [in December 2002]. Defendant Mack personally removed, or directed or caused others to remove, computers from clinics and withheld the computers, or directed or caused others to withhold them, from production during discovery in *Grange v. Mack.* Finally, Defendant Mack also instructed clinic employees to destroy paper documents relating to the treatment of patients in the clinics. Each of these acts constitutes corruptly altering, destroying, mutilating, or concealing an object with intent to impair the objects' integrity or availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(b) or (c).

Plaintiffs also attached an exhibit that included three bills submitted by IRC during 2003–04.

Mack did not file an answer to plaintiffs' complaint. Instead, she filed a motion to dismiss, arguing, *inter alia,* that plaintiffs could not maintain a civil RICO action against her because they did not rely on any of *her* acts or the acts of the conspiracy after she had joined it in 2003. Plaintiffs filed a response in which they acknowledged that Mack did not join the conspiracy until January 2003 and that they did not rely upon any fraudulent bills after 2002. But plaintiffs claimed that because Mack joined an ongoing conspiracy, the acts for which she is jointly and severally liable, plaintiffs could pursue a civil RICO claim against her. [2]

The district court granted Mack's motion to dismiss. It concluded that plaintiffs could not pursue an action under 18 U.S.C. § 1964(c) because they had not alleged that Mack's conduct was the proximate cause of plaintiffs' injuries.

## II.

We review a district court's dismissal of a plaintiff's complaint for failure to state a claim under Rule 12(b)(6) *de novo. Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 451

(6th Cir.2003). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kottmyer*, 436 F.3d at 688 (citation and quotation marks omitted). In considering whether to grant a Rule 12(b)(6) motion, we "accept as true all the allegations contained in the complaint and construe the complaint liberally in favor of the plaintiff." *Id.*

### III.

**\*\*3** Plaintiffs argue that the district court erred by concluding that plaintiffs could not pursue an action under 18 U.S.C. § 1964(c) against Mack because they did not establish proximate cause. Pursuant to § 1964(c), RICO provides a private right of action for treble damages for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." In turn, § 1962 states in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions **\*835** of subsection ... (c) of this section.

A "pattern of racketeering activity" requires at least two acts of "racketeering activity," § 1961(5), defined by § 1961(1) to include a number of acts including mail fraud under § 1341 and witness and evidence tampering under § 1512. Thus, to prove that a defendant violated § 1962(c), it is necessary for the plaintiff to prove that the defendant committed two predicate offenses. But to violate § 1962(d), a defendant need only "agree[ ] that another violate § 1962(c) by committing two acts of racketeering activity." *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986).

A plaintiff asserting a § 1964(c) action must show that the RICO violation she alleges caused her injury. Both "but for" and proximate cause are required. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In terms of proximate causation, "the central question ... is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006).

In *Bridge v. Phoenix Bond & Indemnity Co.,* —— U.S. ——, 128 S.Ct. 2131, 2145, 170 L.Ed.2d 1012 (2008), the Supreme Court recently held that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." [3] While a plaintiff need not establish first-party reliance, she still must establish that the alleged violation was the cause (both "but for" and proximate) of her injury. *Id.* at 2141–42. Usually, this will require a showing of first or third-party reliance. *Id.* at 2144 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.... In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause."). But *Bridge* did not change the overall standard for proximate cause. A plaintiff must still show that "the alleged violation led directly to the plaintiff's injuries." *Id.* at 2142 (quoting *Anza,* 547 U.S. at 461, 126 S.Ct. 1991).

**\*\*4** In this case, the district court treated plaintiffs' complaint as alleging that Mack violated both § 1962(c)'s substantive provision and the § 1962(d) conspiracy provision. It then determined that because the complaint failed "to plead facts demonstrating that [p]laintiffs' injuries were suffered in reliance on the fraudulent conduct of Mack or any conspiratorial acts after her joinder in the conspiracy" it could not conclude "that Mack's conduct was the proximate cause of [p]laintiffs' injuries."

Given that plaintiffs are no longer required to allege reliance following *Bridge,* we remand to the district court for consideration of whether plaintiffs have alleged facts establishing proximate cause for either a § 1962(c) or § 1962(d) violation. To establish proximate cause for a § 1962(c) violation, plaintiffs must allege that Mack's own violations of § 1962(c) led directly to plaintiffs' injuries. *See Anza,* 547 U.S. at 461, 126 S.Ct. 1991. To establish proximate cause for a § 1962(d) violation, plaintiffs must allege that they were injured by reason of *a conspiracy* to violate § 1962(c)'s substantive provision. *See Beck v. Prupis,* 529 U.S. 494, 500, 507, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (holding that to maintain a § 1964(c) claim predicated on § 1962(d), a plaintiff must be injured by an act of "racketeering **\*836** or otherwise unlawful under the statute"). If plaintiffs can make this showing, the district court will need to further consider whether Mack can be held civilly liable for injuries

RICO Bus.Disp.Guide 11,545

caused by the conspiracy but occurring prior to Mack's joinder in the conspiracy.

### IV.

For the foregoing reasons, we vacate and remand to the district court for further consideration consistent with this opinion. [4]

**All Citations**

290 Fed.Appx. 832, 2008 WL 3977579, RICO Bus.Disp.Guide 11,545

Footnotes

\*      The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

1      *See Grange Mut. Cas. Co. v. Mack,* No. 3:02–cv–110 (E.D. Ky., filed Dec. 4, 2002)

2      Mack filed a reply to plaintiffs' response, in which she argued for the first time that plaintiffs' claim was barred by the statute of limitation for civil RICO actions. The district court did not address this argument, but Mack's brief and plaintiffs reply brief on appeal address the limitations issue.

3      Therefore, cases such as *Brown v. Cassens Transport Co.,* 492 F.3d 640 (6th Cir.2007) and *Central Distributors of Beer, Inc., v. Conn,* 5 F.3d 181 (6th Cir.1993) have been vacated and abrogated, respectively.

4      Because we remand based on *Bridge,* we decline to reach the other issues addressed in the appeal.

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1021327
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Roy L. HART, Plaintiff–Appellant,
v.
Cheryl L. HART, Defendant–Appellee.

Docket No. 302111.
|
March 27, 2012.

St. Clair Circuit Court; LC No. 10–002255–CZ.

Before: JANSEN, P.J., and WILDER and K.F. KELLY, JJ.

**Opinion**

PER CURIAM.

*\*1* Plaintiff appeals by right the circuit court's order granting defendant's motion for summary disposition. We affirm.

This case arises from a default judgment of divorce entered in a prior divorce action between the parties. Plaintiff subsequently filed this suit seeking damages and equitable relief from the divorce judgment. Plaintiff alleged that defendant had fraudulently prevented him from seeking legal counsel in the divorce action or otherwise contesting the divorce proceedings. Plaintiff alleged that defendant had taken advantage of his low intelligence and mental disability and had manipulated him by obtaining the default judgment of divorce without his consent. Plaintiff argues that this allowed defendant to obtain much more favorable terms in the divorce than she would have otherwise obtained in an adversarial proceeding.

Defendant moved for summary disposition pursuant to MCR 2.116(C)(7), arguing that plaintiff's claims were barred by res judicata. The circuit court granted the motion, ruling that plaintiff's claims were precluded because they essentially challenged the terms of the divorce judgment entered in the previous action. The circuit court noted that only extrinsic fraud, and not intrinsic fraud, is an exception to the doctrine

of res judicata, and determined that plaintiff's claims solely alleged intrinsic fraud.

We review de novo the circuit court's grant of summary disposition under MCR 2.116(C)(7). Shay v. Aldrich, 487 Mich. 648, 656; 790 NW2d 629 (2010). A defendant is entitled to summary disposition under MCR 2.116(C)(7) if, among other things, the plaintiff's claims are barred by a prior judgment.

Res judicata applies when intrinsic fraud, but not extrinsic fraud, is pleaded. In Triplett v. St Amour, 444 Mich. 170, 175–176; 507 NW2d 194 (1993), our Supreme Court declined to recognize an independent action to recover damages or set aside a judgment on the basis of intrinsic fraud. Instead, when only intrinsic fraud is at issue, the proper remedy is a motion for relief from judgment pursuant to MCR 2.612(C). Sprague v. Buhagiar, 213 Mich.App 310, 314; 539 NW2d 587 (1995).

A separate suit based on intrinsic fraud cannot be maintained as an independent action. Daoud v. De Leau, 455 Mich. 181, 203; 565 NW2d 639 (1997). In contrast, a party may seek relief from judgment by an independent action for extrinsic fraud. MCR 2.612(C)(3); Trost v. Buckstop Lure Co, 249 Mich.App 580, 584–585; 644 NW2d 54 (2002).

Plaintiff's complaint alleged that defendant had prevented him from seeking the services of an attorney in the divorce proceedings, from reviewing the terms of the divorce judgment prior to its entry, and from appearing in court in the previous action. But as the circuit court correctly determined, these allegations did not rise to the level of actual, extrinsic fraud. It was beyond genuine factual dispute that plaintiff was properly served in the divorce action and was fully aware of the existence and nature of the proceedings. Thus, despite plaintiff's assertion that he suffers from low intelligence, no reasonable person could have concluded that plaintiff was actually, fraudulently induced into agreeing to the default judgment or foregoing the right to an adversarial hearing. See Sprague, 213 Mich.App at 314. Because plaintiff's claims did not rise to the level of actual, extrinsic fraud, and because his claims could have been fully litigated in the earlier divorce action, the circuit court properly determined that they were barred by the doctrine of res judicata. See Washington v. Sinai Hospital, 478 Mich. 412, 418; 733 NW2d 755 (2007). Plaintiff's other claims concerning the division of marital property and the amount of spousal support were similarly barred by res judicata for the same reasons. The circuit court

did not err by granting summary disposition in favor of defendant.

**\*2**  Affirmed. As the prevailing party, defendant may tax costs pursuant to MCR 7.219.

**All Citations**

Not Reported in N.W.2d, 2012 WL 1021327

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 53166
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

HMV PROPERTIES, LLC, et al., Plaintiffs,
v.
IDC OHIO MANAGEMENT, LLC, et al., Defendants.

No. 2:08–cv–895.
|
Jan. 6, 2011.

**Attorneys and Law Firms**

Amy Kathleen Burma, Shawn Michael Blatt, Freund Freeze & Arnold, Brandon Charles Hedrick, Hedrick & Jordan Co LPA, Dayton, OH, for Plaintiffs.

Eric Kendall Combs, Catherine Elizabeth Howard, Taft Stettinius & Hollister, Richard Michael Goehler, Frost Brown Todd LLC, Charles M. Miller, Keating Muething & Klekamp PLL, Cincinnati, OH, Nelson Eugene Genshaft, Strip Hoppers Leithart McGrath & Terlecky Co LPA, Kevin Shook, William M. Harter, Frost Brown Todd LLC, Thomas Arden Dillon, Roetzel & Andress, Amelia A. Bower, April Opper Davis, Plunkett & Cooney PC, Al A. Mokhtari, Reminger & Reminger Co LPA, Columbus, OH, for Defendants.

***OPINION AND ORDER***

JAMES L. GRAHAM, District Judge.

**\*1** Plaintiffs HMV Properties, LLC, The Perinpanathan Trust, and The Oswood Family Trust bring this action against Defendants IDC Ohio Management, LLC, IDC Ohio Holdings, LLC (together, "the IDC Entities"), Tom Slack, John Slack, Susan Machuga,[1] (together, "the Slack Defendants"), Benjamin Flinders, Krikorian Investment Services, Inc. ("IREA"[2]), PGP Valuation, Inc. ("PGP"), Chicago Title Insurance Company, Barry S. Slatt Mortgage Company ("Slatt Mortgage"), and John Does I–III, alleging that the collective Defendants participated in a conspiracy and perpetrated a scheme to dupe Plaintiffs into purchasing over-valued real estate in Ohio, violating the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C.

§§ 1961–1968 (2006). (Am. Compl., Counts I and III, R. 85.) Plaintiffs also allege several Ohio state claims. This matter is before the Court on the Motions to Dismiss filed by Defendants Tom Slack and Susan Machuga (R. at 93), IREA and Benjamin Flinders (R. at 95), John Slack (R. at 99), and Chicago Title Insurance Company (R. at 117).

**I. FACTS**[3]

Plaintiffs HMV Properties, LLC, The Perinpanathan Trust, and The Oswood Family Trust (referred to herein as "Vora[4], Perin[5], and the Oswood Trust, respectively) are all residents of California who were duped into entering into sales agreements for Ohio Dairy Queen properties based on over-inflated property appraisals, over-hyped "triple-net" leases, and the over-stated expertise of several of the Defendants. Acting in concert, the Defendants approached each Plaintiff, misrepresented the value of Dairy Queen properties in Ohio, misrepresented their own ownership interest in the properties they offered for sale, misrepresented the taxes owed on some of the properties, and misrepresented their ability to run each Dairy Queen. Each Plaintiff purchased at least one Dairy Queen property (the Oswood Trust purchased two). Once the deals closed, Defendants failed to operate any of the Dairy Queens, failed to fulfill lease obligations, and failed to perform promised renovations. Each plaintiff is now left with a Dairy Queen property valued at far less than the purchase price, each with either no tenant at all or with a new tenant paying below the original triple-net-lease rate.

While Plaintiffs frequently refer to "Defendants" in the aggregate in the Amended Complaint, the facts and circumstances specific to each Defendant are set forth as follows:

- Each Plaintiff worked with Defendant Flinders, as agent of Defendant IREA ("Flinders/IREA"), to identify and purchase investment property; Flinders/IREA represented themselves as experts in triple-net leases. (Am.Compl., ¶¶ 60, 63, 101, 144, 145.) The timeframe provided is not clear, but Perin learned about "triple-net lease" properties from Flinders/IREA in "early 2007" (*id.*, ¶ 60), and Vora sometime in "approximately 2006"; no date was provided for the Oswood Trust's first encounter with Flinders/IREA.

**\*2** • Flinders/IREA marketed the Dairy Queen investment opportunities as a triple-net property investment, in which the purchaser buys an Ohio Dairy Queen and

then leases it—via a "triple-net lease"—to a tenant who would pay rent and expenses. (*Id.,* ¶¶ 60, 64, 103, 145.)

- In the "spring of 2007," via email, Flinders/IREA provided each Plaintiff with a marketing brochure and "other marketing materials" for each Dairy Queen property. (*Id.,* ¶¶ 67, 104, 146.) According to the Amended Complaint, the marketing materials misrepresented the IDC Entities as owner/operators of Dairy Queen properties and as the "largest operator of Dairy Queens in Ohio" and as being well-suited to run Dairy Queen properties. (*Id.,* ¶¶ 66, 68, 104, 113, 146, 148.) A portion of the "marketing materials" is attached to the Amended Complaint as Exhibit A.

- Flinders/IREA sent the Oswood Trust a "Statement of Assets, Liabilities and Equity" for IDC Ohio Holdings, dated March 31, 2007. The date and manner of communication was not specified. At another unspecified time Flinders/IREA sent the Oswood Trust "other financial statements for the IDC Entities." (*Id.,* ¶ 148.)

- Each Plaintiff entered into a sales agreement for at least one Dairy Queen property. On April 23, 2007, Perin entered into a sales agreement for the Dayton, Ohio Dairy Queen property ("Dayton DQ"); on May 24, 2007, Vora entered into a sales agreement for the Reynoldsburg, Ohio Dairy Queen property ("Reynoldsburg DQ"); and on May 18, 2007 and May 24, 2007, the Oswood Trust entered into a sales agreement for the Brookville, Ohio Dairy Queen property ("Brookville DQ") and for the Fairborn, Ohio Dairy Queen property ("Fairborn DQ"). (*Id.,* ¶¶ 72, 115, 156.) The sales agreements are not attached to the Amended Complaint.

- After entering into the sales agreement, each Plaintiff was encouraged by Flinders/IREA to use Defendant Slatt Mortgage as its mortgage broker. (*Id.,* ¶¶ 73, 116, 160.) No date or manner of referral was specified in the Amended Complaint.

- Defendant Slatt Mortgage required an appraisal of each property and Defendant PGP Valuation, Inc. performed each appraisal. (*Id.,* ¶¶ 74, 75, 117, 162.) Plaintiffs allege that each appraisal was fraudulent because "it was based on the sham triple-net lease" and used only "comparables" of other of the IDC Entities' properties that were part of the "scam" or averred that the property was "reflective of market value." (*Id.,* ¶¶ 75, 117,

162, 163.) No appraisal is attached to the Amended Complaint.

- "[O]n or about June 1, 2007," Perin entered into a commitment letter with Defendant Slatt Mortgage, which Defendant Slatt Mortgage prepared and Defendant Flinders emailed to Perin. (*Id.,* ¶ 74.) Neither the email nor the commitment letter is attached to the Amended Complaint.

- After entering into the sales agreement, each Plaintiff entered into a "triple net lease" agreement with Defendant IDC Holdings, LLC: Perin on June 17, 2007 (*Id.,* ¶ 72, attached as Exh. B); Vora on June 15, 2007 (*Id.,* ¶ 115, attached as Exh. D); and the Oswood Trust on June 15, 2007 (*Id.,* ¶¶ 157–158, attached as Exhs. E and F). The Amended Complaint does not specify where each lease was executed nor how each Plaintiff was provided with the lease.

  **\*3** • Defendant IDC Holdings, LLC was the lessee of each property, and it paid the rent pursuant to the lease for a few months. (*Id.,* ¶¶ 92, 121, 187.)

- On July 12, 2007, Defendant Slatt Mortgage obtained a mortgage for Perin through non-party Standford Federal Credit Union. Defendant Slatt Mortgage required Perin to sign a personal guarantee for the promissory note and mortgage. (*Id.,* ¶ 78.) None of these documents is attached to the Amended Complaint.

- On July 12, 2007, Defendant Slatt Mortgage obtained a mortgage for Plaintiff Vora through non-party California Credit Union. Defendant Slatt Mortgage allegedly required Vora to sign a personal guarantee for the promissory note and mortgage. (*Id.,* ¶ 121.) None of these documents is attached to the Amended Complaint.

- On July 13, 2007, the Oswood Trust entered into a mortgage for the Fairborn Dairy Queen and on September 5, 2007, it entered into a mortgage for the Brookville Dairy Queen, signing personal guarantees for the mortgage and the promissory note for each property. (*Id.,* ¶¶ 174, 181.) None of these documents is attached to the Amended Complaint.

- A Limited Warranty Deed ("LWD") was executed on July 18, 2007 conveying the Dayton Dairy Queen to Perin (*id.,* ¶ 80); a LWD was executed on July 3, 2007, conveying the Reynoldsburg Dairy Queen to Vora (*id.,* ¶ 123); and LWDs were executed on July 18, 2007

and on September 7, 2007, conveying the Fairborn and Brookville Dairy Queens, respectively, to the Oswood Trust (*id.,* ¶¶ 176, 183). None of these documents is attached to the Amended Complaint.

- From "January 2008" (*id.,* ¶ 85) through September 15, 2008 (*id.,* ¶ 136), Plaintiffs received various communications from some of the Defendants, regarding (1) late rent payments from Defendant IDC Holdings (*id.,* ¶¶ 92, 127, 130–133, 187); (2) tax liens on some of the properties (*id.,* ¶¶ 85, 86, 189); (3) renovations to the Dairy Queen properties (*id.,* ¶¶ 86, 87, 89, 134, 188, 192); and (4) an "opportunity" from Defendant Tom Slack to convert the existing Dairy Queen properties into "Great American BBQ & Rib Company franchises" (*id.,* ¶¶ 90, 91, 129, 135, 191). Only a few of those communications reference specific dates and form of communication. Only one communication is attached: the March 1, 2008 letter from Defendant Tom Slack about renovations. (*Id.,* Exh. C.)

Many of Plaintiffs' allegations of the Defendants' misrepresentations are not specific as to time, place, or form of communication. Frequently throughout the Amended Complaint, Plaintiffs provide vague timeframes such as "early 2007" or "spring of 2007" or "approximately July 2007" (*id.,* ¶¶ 60, 67, 68, 88, 101, 104, 111, 146) or, vaguer still, "[d]uring the sales process" or "[d]uring the due diligence phase" (*id.,* ¶¶ 75, 117, 161, 162).

## II. LAW AND DISCUSSION

### A. Standard for Granting Motion to Dismiss

**\*4** Rule 12(b) (6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed if it fails to state a claim upon which relief can be granted. Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, *Roth Steel Prods. v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir.1983), the focus is on whether the plaintiff is entitled to offer evidence to support the claims, rather than on whether the plaintiff will ultimately prevail. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 184, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). The purpose of a motion to dismiss under Rule 12(b)(6) "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993). If there is an absence of

law to support the type of claim made, or if the facts alleged are insufficient to state a valid claim, or if on the face of the complaint there is an insurmountable bar to relief, dismissal of the action is proper. *Little v. UNUMProvident Corp.,* 196 F.Supp.2d 659, 662 (S.D.Ohio 2002) (citing *Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 697 (6th Cir.1978)).

The function of the complaint is to afford the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *See Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lewis v. ACB Business Serv., Inc.,* 135 F.3d 389, 405 (6th Cir.1998). A complaint need not set down in detail all the particularities of a plaintiff's claim. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." However, "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.*See also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("A formulaic recitation of the elements of a cause of action" is not enough). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (emphasis in original).

Legal conclusions "must be supported by factual allegations" that give rise to an inference that the defendant is, in fact, liable for the misconduct alleged. *Iqbal,* 129 S.Ct. at 1949–50. The factual allegations must show more than a possibility that the defendant acted unlawfully. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 1949 (quoting *Twombly,* 550 U.S. at 557).

**\*5** In addition, Federal Rule of Civil Procedure 9(b) requires that fraud be plead with particularity. "To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentation(s) upon which he relied." *Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir.1984) (upholding the district court's dismissal of RICO claims where the complaint failed to allege adequate particularity) (citations omitted).

2011 WL 53166

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *See Scheuer,* 416 U.S. at 236; *Arrow v. Federal Reserve Bank of St. Louis,* 358 F.3d 392, 393 (6th Cir.2004); *Mayer,* 988 F.2d at 638. The court will indulge all reasonable inferences that might be drawn from the pleading. *See Sagliocco v. Eagle Ins. Co.,* 112 F.3d 226, 228 (6th Cir.1997). However, it will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. *See Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir.2000); *Lewis,* 135 F.3d at 405.

### B. The Racketeering Influenced and Corrupt Organizations Act

Although the Racketeer Influenced and Corrupt Organizations Act ("RICO") was passed as part of a larger initiative, the Organized Crime Control Act of 1970, that specifically targeted organized crime and mob activity, *see United States v. Turkette,* 452 U.S. 576, 589 n. 11, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court has recognized that RICO reaches racketeering activity committed by legitimate businesses and organizations as well. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 498–99, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime.... [RICO can be] used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct."). 18 U.S.C. § 1964(c) creates a civil cause of action and treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." Section § 1962(c), which forms the basis for Plaintiffs' claim, provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." To state a § 1962(c) RICO claim, then, a plaintiff must plead a person's "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496; *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir.2006); *see also Salinas v. U.S.,* 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

"Conduct" refers to a defendant's conduct or participation in the alleged enterprise's affairs. The words "conduct or participate" imply a degree of direction, and mean that the defendant must have *"some* part in directing the enterprise's affairs[.]" *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). This is commonly referred to as the "operation or management" test. *Id.; Stone v. Kirk,* 8 F.3d 1079, 1092 (6th Cir.1993) ("[A]lthough 'RICO liability is not limited to those with primary responsibility for the enterprise's affairs' ... one cannot be liable under § 1962(c) unless one has participated, in some degree, 'in the operation or management of the enterprise itself.' " (*quoting Reves,* 507 U.S. at 179)).

**\*6** Section 1961(4) defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court defines an enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583. Proving the existence of a "legal entity" enterprise, such as a partnership or corporation, is relatively straightforward. Proving the existence of a "non-legal entity", "association in fact" enterprise, however, is more difficult. "An association in fact enterprise can be proven by showing 1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000). These elements "require a certain amount of organizational structure which eliminates simple conspiracy from [RICO's] reach.... [T]he parties [must be] organized in a fashion that would enable them to function as a racketeering organization for other purposes.... All that is required is some minimal level of organizational structure between the entities involved." *Id.*

"Racketeering activity" is further defined in 18 U.S.C. § 1961(1) as any one of a numerous list of state and federal offenses that qualify as racketeering activity. A pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." *Turkette,* 452 U.S. at 583. 18 U.S.C. § 1961(5) requires at least two racketeering acts. While proof of the enterprise and pattern of racketeering activity elements may at times overlap, the Supreme Court has made it clear that these are separate elements. "[P]roof of these separate elements [need not always] be distinct and independent, [but] the proof offered [must be] sufficient to satisfy both elements." *United States v. Johnson,* 440 F.3d 832, 840 (6th Cir.2006) (*quoting United States v. Quaod,* 777 F.2d 1105, 1115 (6th Cir.1985)).

Case 2:19-cv-13721-LVP-EAS ECF No. 39-6, PageID.1284 Filed 02/28/20 Page 24 of 58
HMV Properties, LLC v. IDC Ohio Management, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 53166

The requisite "pattern" element requires at least two predicate acts of racketeering activity within 10 years of each other. *Vemco, Inc. v. Camardella,* 23 F.3d 129, 133 (6th Cir.1994) (citing *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237–38, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "A pattern is not automatically established, however, by a large number of unrelated acts; the acts must be ordered and arranged so as to exhibit 'relatedness' and 'continuity.' " *Id.* at 133 (citing *H.J., Inc.,* 492 U.S. at 238).

"Continuity" refers to a "closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.,* 492 U.S. at 241. "Whether a pattern of racketeering activity satisfies the continuity requirement depends on the particular facts of each case." *Moon v. Harrison Piping Supply,* 465 F.3d 719, 724 (6th Cir.2006) (citing *H.J., Inc.,* 492 U.S. at 241). "[P]laintiffs can prevail if they demonstrate either a closed-ended conspiracy of sufficient duration or an open-ended conspiracy that could have continued into the future." *Thompson v. Paasche,* 950 F.2d 306, 311 (6th cir.1991).

**\*7** Closed-ended continuity requires a showing of predicate acts extending over a "substantial" period of time. "Although there are no rigid rules regarding what amounts to a substantial period of time, racketeering activity lasting only a few weeks or months and threatening no future criminal conduct is insufficient." *Moon,* 465 F.3d at 725 (citing *H.J., Inc.,* 492 U.S. at 242) (internal quotation marks omitted)). *See also Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994), *cert. denied,*513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994) (predicate acts over 17 months did not satisfy the closed period analysis); *Vild v. Visconsi,* 956 F.2d 560, 569 (6th Cir.1992), *cert. denied,*506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992) (predicate acts over six or seven months not sufficient under closed-period analysis).

## C. Analysis of Plaintiffs' RICO claims

### 1. RICO claims under 18 U.S.C. § 1962(c): "Pattern" and "enterprise"

Plaintiffs allege that the Defendants in this case were part of a RICO enterprise whose function was to dupe Plaintiffs into purchasing Ohio Dairy Queen properties at inflated sales prices, while enabling Defendants to realize hefty profits on each sale and to walk away from their obligations under the lease. (Am.Compl.¶¶ 10–12.) The Moving Defendants argue that Plaintiffs' RICO claims should be dismissed because

Plaintiffs have failed to sufficiently allege the "predicate acts" necessary to sustain a RICO claim, have failed to adequately allege a RICO "enterprise" or "pattern of racketeering," and failed to plead their RICO claims with requisite specificity. (Slack/Machuga Mot. Dismiss, pp. 4–11; Flinders/IREA Mot. Dismiss, pp. 4–9; John Slack Mot. Dismiss, pp. 4–7; Chicago Title Mot. Dismiss, pp. 6–11.) While the Moving Defendants argue that Plaintiffs' Amended Complaint is deficient in multiple respects, this Court focuses on the inadequacies of Plaintiffs' allegation of a "pattern of racketeering" and "enterprise."

### a. *Plaintiffs fail to establish closed-ended continuity for the purpose of establishing a pattern of racketeering activity.*

Plaintiffs allege sufficient "relatedness" regarding the acts that constituted Defendants' scheme to induce them to purchase the Dairy Queen properties. *See H.J., Inc.,* 492 U.S. at 240 (finding that predicate acts with "the same or similar purposes, results, participants, victims, or methods of commission" fulfill the relatedness requirement). However, the Amended Complaint fails to set forth sufficient facts and circumstances to allege the requisite "continuity." *See Sedima,* 473 U.S. at 496, n. 14 (noting that it is the "factor of continuity plus relationship which combines to produce a pattern.").

Plaintiffs assert that closed-ended continuity is sufficiently alleged, as "[D]efendants perpetrated the same property-flipping scheme on each of the plaintiffs, which involved four different Dairy Queen Properties and *which took place over a period of eighteen months."* (Pls.' Resp. to Slack/Machuga Mot., p. 11; *see also* Pls.' Resp. to Flinders/IREA Mot., pp. 8 and Pls.' Resp. to Chicago Title's Mot., pp. 8–9; emphasis added.) A review of the Amended Complaint, though, reveals allegations describing activity only for approximately nine months.

**\*8** Defendants' scheme, as described by Plaintiffs, was "to artificially inflate the value of the Dairy Queen Properties purchased by Plaintiffs [.]" (Am.Compl., ¶ 246.) To advance that scheme, Plaintiffs assert, Defendants misrepresented themselves as "triple-net lease" experts, (*id.,* ¶¶ 60, 145), misrepresented their expertise in running Dairy Queens (*id.,* ¶¶ 66, 68, 104, 113, 146, 148), misrepresented the value of the properties by way of bogus appraisals (*id.,* ¶¶ 75, 117, 162, 163), and misrepresented their intentions to run the Dairy Queen enterprises by entering into leases they never intended to honor (*id.,* ¶¶ 99, 141, 198).

Case 2:19-cv-13721-LVP-EAS ECF No. 39-6, PageID.1285 Filed 02/28/20 Page 25 of 58
HMV Properties, LLC v. IDC Ohio Management, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 53166

... Defendants' conspiracy to scam [Plaintiffs] was a complete success. With mathematical precision, Defendants artificially inflated the value of the property, which plummeted when Defendants walked away [from the lease obligations]. As a result, [Plaintiffs] suffered severe financial damages, including the loss of the fair market value of [their] investment[s], future rents and out-of-pocket damage, all of which [they] are entitled to recover.

(*Id.,* ¶¶ 100, 142, 199.) In other words, once Plaintiffs closed on the real estate deals, purchasing property at an inflated price, the scheme was complete. At best, the facts allege that this activity began "sometime in early 2007" (*id.,* ¶ 60) and ended with the closings of the sales of the four Dairy Queen properties, sometime in June or July 2007.[6] Even interpreting ambiguities in Plaintiffs' favor—that the activity began January 1, 2007 and ended September 7, 2007 when the last closing appeared to have taken place —Plaintiffs' best argument for a "substantial" period of racketeering activity falls well short of what is required. *Moon,* 465 F.3d at 725 ("racketeering activity lasting only a few weeks or months and threatening no future criminal conduct is insufficient" to allege a substantial period of time); *Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994), *cert. denied,*513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994) (predicate acts over 17 months did not satisfy the closed period analysis); *Vild v. Visconsi,* 956 F.2d 560, 569 (6th Cir.1992), *cert. denied,*506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992) (predicate acts over six or seven months not sufficient under closed-period analysis).

Plaintiffs attempt to extend the period of activity to include schemes that Defendants allegedly perpetrated against *other* investors, investors who are not parties to this action. "The Defendants carried out the same property-flipping scheme on fourteen other individuals, which involved fifteen Dairy Queen Properties, over a period of three years." (Pls.' Resp. to Chicago Title's Mot. Dismiss, p. 9, citing ¶¶ 54–56 of the Amended Complaint; *see also* Pls. Resp. to Slack/Machuga's Mot. Dismiss, p. 11; Pls.' Resp. to Flinders/IREA Mot. Dismiss, p. 8.) Plaintiffs point to *Arnold v. Petland, Inc.,* Case No. 2:07–cv–01307, 2009 WL 816327 (S.D.Ohio, March 26, 2009) for the proposition that the existence of related legal actions involving the same scheme can be used to determine the requisite "substantial period of time" to establish closed-ended continuity. (Pls.' Resp. to Chicago Title's Mot., p. 8; Pls.' Resp. to Slack/Machuga Mot., p. 11; Pls.' Resp. to Flinders/IREA Mot., p. 8.)

*9 In *Arnold,* partners in a pet store franchise brought a RICO claim against the franchisor and supplier, alleging a scheme that lasted eleven months. The court denied defendants' motion to dismiss, finding that plaintiffs had adequately alleged a pattern of racketeering activity because the pleading was not limited to a single scheme. 2009 WL 816327, at *11.

Rather, plaintiffs also allege that Petland had used the same scheme to victimize other past and present Petland franchisees .... At this point, the Court may take judicial notice that the other franchisees have brought actions *in this Court against the same defendants, asserting similar factual allegations and claims.* The Court finds that these related cases support plaintiffs' assertion that Petland has employed the same scheme against multiple franchisees over a substantial period of time.

*Id.* (emphasis added). Here, Plaintiffs point to actions filed in several Ohio county courts, but they offer this Court no further information beyond case name and number. (Am.Compl., ¶ 56, n. 2.) The nature of those cases is not clear, nor is the identity of all of the defendants. This Court declines to take judicial notice of these other actions. Consequently, the facts as alleged in the Amended Complaint fall short of establishing closed-ended continuity, as a nine-month period is decidedly insufficient.

    b. *Plaintiffs fail to show open-ended continuity.*
In similar fashion, Plaintiffs' attempt to establish an open-ended period of activity also falls short. While closed-ended continuity looks at a substantial but finite period of time over which the alleged predicate acts took place, open-ended

2011 WL 53166

continuity contemplates short-term racketeering activity that could continue into the future. *Thompson v. Paasche,* 950 F.2d 306, 311 (6th Cir.1991). This kind of "future threat" can arise in two general situations: one, "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes" or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' " *H.J., Inc.,* 492 U.S. at 242–43.

In *Paasche,* the Sixth Circuit reversed the trial jury's finding in favor of plaintiffs' RICO claims against several defendants, in a matter involving several real estate deals. 950 F.2d at 311. There, the court found that a scheme involving the sale of nineteen lots to several different purchasers did not have the requisite continuity to state a claim under RICO. The plaintiffs alleged, *inter alia,* that Paasche and others defrauded them in land sales in which Paasche had retained mineral rights ostensibly to "preserve the natural beauty of the land, when, in fact, he was selling the oil and gas rights at the very same time." *Id.* at 310. The court overturned the jury verdict in favor of plaintiffs, finding that the RICO claim did not survive a continuity analysis.

> **\*10** Paasche's fraudulent scheme was an inherently short-term affair. He had nineteen lots to sell. Once he sold all of the lots, the scheme was over. It had to be, he had no more land to sell. Thus the scheme was, by its very nature, insufficiently protracted to qualify as a RICO violation.... [T]he instrumentality used to commit the fraud—the land—was sold during the last course of the fraudulent conduct, which itself lasted only a few months. And there is no indication of any continuing opportunity or scheme to purchase or re-sell potentially oil-bearing land.

*Id.* at 311 (internal citation and footnote omitted). Similarly, in *Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994), *cert. denied,* 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994), the court found that once the "goal" of the scheme was achieved, there were no facts pleaded that indicated any future

threat of continued racketeering activity. Here, too, Plaintiffs have failed to plead facts indicating that Defendants' scheme, although allegedly successful against them, will continue into the future.

Plaintiffs argue that the existence of a different scheme, involving a few of the defendants, shows the risk of continued racketeering. (Pls.' Resp. to Chicago Title's Mot. Dismiss, pp. 9–10; Pls.' Resp. to Slack/Machuga Mot. Dismiss, p. 13; Pls.' Resp. to Flinders/IREA's Mot. Dismiss, pp. 10–11.) Plaintiffs allege that on April 16, 2008, Defendants Flinders/IREA forwarded to each of them an email from Defendant Tom Slack encouraging Plaintiffs to convert their Dairy Queen properties into a new franchise, the "Great American BBQ & Rib Company." (Am. Compl. ¶¶ 90, 91, 129, and 191.) Plaintiffs contend that this BBQ franchise opportunity is evidence of a threat of continued racketeering activity. "Defendants' racketeering acts include a specific threat of repetition extending into the future. The Defendants are advertising the sale of franchises for the Great American BBQ & Rib Company.... The Defendants' conduct in advertising, marketing and selling this 'franchise' will only result in more victims." (Pls.' Resp. to Chicago Title's Mot., p. 9; *see also* Pls.' Resp. to Slack/Machuga Mot., p. 12; Pls.' Resp. to Flinders/IREA Mot., p. 9.)

This argument fails, as the "relatedness" factor necessary to establish a pattern of racketeering is missing. *See H.J., Inc.,* 492 U.S. at 240 (describing "relatedness" as showing predicate acts with "the same or similar purposes, results, participants, victims, or methods of commission"). This "BBQ scheme" is decidedly different than the Dairy Queen scheme: there is no mention of inflated property values and triple-net leases, and there are several Dairy–Queenscheme defendants missing from the BBQ scheme, such as Defendants PGP Valuation, Slatt Mortgage and Chicago Title which is alleged to only *possibly* play a role. (Pls.' Resp. to Chicago Title's Mot., p. 9, "... Chicago Title *may* act [as] the escrow agent for any sales of the alleged 'franchise." (emphasis added).)

**\*11** Plaintiffs also point to *other* legal actions purportedly involving some of the Defendants in this action, working the same scheme, as evidence of a future threat of racketeering activity. "There are at least four other lawsuits currently pending in Ohio involving other investors that were scammed by Defendants' fraudulent property flipping scheme in 2006 through 2008." (Am.Compl.¶ 56.) They also argue that Defendant Tom Slack's criminal history is significant: "The

2011 WL 53166

defendants' racketeering acts include a specific threat of repetition extending into the future. In fact, [Defendant] Thomas Slack previously was indicted in Massachusetts and Indiana for a similar fraudulent scheme." (Pls.' Resp. to Slack/ Machuga Mot., p. 11; Pls.' Resp. to Flinders/IREA Mot., pp. 9.) However, those matters are not in the record before this Court, and this Court declines to take judicial notice of them, as noted *supra.* Furthermore, those actions do not speak to any *future* threat; they merely underscore the possibility that a similar scheme was worked on other investors in the past.

c. *Plaintiffs cannot meet the Sixth Circuit "multi-factor" test.*

In *Fleischhauer v. Feltner,* 879 F.2d 1290 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 and 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 611 (1990), the Sixth Circuit adopted a "multi-factor test" for determining whether a pattern exists in any given RICO case, a test that includes relevant factors such as the "number and variety of predicate acts" and the length of time spanning the acts. In *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101 (6th Cir.1995), the court re-affirmed the *Feltner* holding, noting that two Supreme Court decisions "buttressed the validity of the multi-factor approach to the determination of whether a pattern exists." *Id.* at 1110 (referencing *Sedima* and *H.J., Inc., supra* ). The Sixth Circuit summed up the multi-factor test as follows:

> Therefore, to state the inquiry simply, a pattern is the sum of various factors including: the length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); the number of victims (the more the better); and the number of perpetrators (the less the better).

*Id.* at 1110. In *Tatum,* the court found that where the complaint alleged a "significant period of activity" encompassing almost nine years, listing "dozens of examples of what [plaintiff] Columbia considers to be mail and wire fraud[,]" and

alleging "various kinds of predicate acts" which provided the "foundation for various schemes" resulting in numerous and varied injuries, a sufficient pattern of racketeering was pled. *Id.* at 1110–11. That the number of victims was "limited" and was "more than balanced by the strength presented in other areas." *Id.* at 1111.

**\*12** The pattern of racketeering activity alleged by Plaintiffs is paltry in comparison, alleging a time period of a few months to conduct one scheme, by way of only a handful of predicate acts perpetrated by an amorphous group of defendants, resulting in one injury to only four plaintiffs. In sum, Plaintiffs have failed to allege the "pattern of racketeering activity" element of a § 1962(c) claim.

d. *Plaintiffs fail to sufficiently allege the "enterprise" element.*

Equally unsuccessful is Plaintiffs' allegation of the "enterprise" element of their RICO claims. The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). According to the Supreme Court, an enterprise is an entity "associated together for a common purpose of engaging in a course of conduct." *U.S. v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). It can be proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* More recently, the Supreme Court has clarified that "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.,* ––– U.S. ––––, ––––, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009).

The Court noted as well that while the enterprise need not have a "hierarchical structure" or "chain of command" there must be a showing of enterprise distinct from the pattern of racketeering activity—that the existence of an enterprise "is a separate element that must be proved." *Id.* at 2245. "For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates .... Proof of these patterns would not be enough to show that the individuals were members of an enterprise." *Id.* at 2245, n. 4.

HMF Properties, LLC v. IDC Ohio Management, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 53166

Plaintiffs, here, argue that under *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 790 (3d Cir.1984), a complaint's "bare allegation" of entities "believed to be enterprises" is enough to satisfy that RICO element at the pleading stage. (Pls.' Resp. to Slack/Machuga Mot. Dismiss, pp. 7–8; Pls.' Resp. to Flinders/IREA Mot. Dismiss, p. 4; Pls.' Resp. to Chicago Title's Mot. Dismiss, pp. 10–11.)

This Court, however, is bound by the Sixth Circuit, which requires proper pleading of an enterprise under *Turkette.* In *Begala v. PNC Bank, Ohio,* the Sixth Circuit affirmed the dismissal of a RICO claim where plaintiffs "wholly failed" to plead an association-in-fact. 214 F.3d 776, 781 (6th Cir.2000). "A properly pled RICO claim must cogently allege activity that would show on-going, coordinated behavior among the defendants that would constitute an association-in-fact." *Id.* at 781 (citing *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993) (internal quotation marks omitted). Instead of alleging facts in support of "coordinated behavior among the defendants," the *Begala* complaint "essentially list[ed] a string of entities allegedly comprising the enterprise, and then list[ed] a string of supposed racketeering activities in which the enterprise purportedly engage[d]." *Id.* In sum, the *Begala* plaintiffs' complaint failed to allege facts that suggested the listed entities' behavior was "coordinated in such a way that they function[ed] as a coordinating unit[.]" *Id.* at 782 (citing *Frank,* 4 f.3d at 1386) (internal quotation marks omitted; alterations added).

*13 So, too, here, Plaintiffs have alleged only a string of actions taken by Defendants either severally or in small sub-groups, and they have alleged no facts that support any allegation of "coordinated behavior" among the Defendants. In their Amended Complaint, Plaintiffs assert the "enterprise" in only generic terms:

> Defendants conducted, [through] a pattern of racketeering activity, an association-in-fact enterprise (the "IDC Enterprise," comprised of the following individuals and entities: IDC Ohio Holdings, LLC, IDC Ohio Management, LLC, John Slack, Tom Slack, Susan Machuga, IREA, Benjamin Flinders, Slatt Mortgage and Chicago Title. As set forth throughout this Complaint, each participant in the IDC Enterprise played and continues

to play a designated, well-defined and ongoing role in the affairs of the enterprise.

(Am.Compl., ¶ 206.) Plaintiffs further state that the "IDC Enterprise is an ongoing and continuing organization" (*id.,* ¶ 207) and that "Defendants conducted the IDC Enterprise and its fraudulent schemes by entering into a contractual agreement with each other" (*id.,* ¶ 208). In addition, they state that "[t]hrough the IDC Enterprise, Defendants have engaged, and continue to engage in consensual decision-making to implement their fraudulent scheme [.]" (*Id.,* ¶ 213.) Plaintiffs offer only conclusory allegations, no facts in support of the existence of an enterprise "by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583. A review of the entire Amended Complaint offers little else. Defendants IREA/Flinders forwarded to Plaintiffs an email from Tom Slack (Am.Compl., ¶¶ 90, 91, 129, 135, 191), but that action does not provide evidence of "on-going, coordinated behavior among the defendants." *Begala,* 214 F.3d at 781. The "Slack Defendants" are often referred to collectively, but the allegations of organization are related more to the individuals' membership in the defendant LLCs. (Am.Compl., ¶¶ 24–28.) Similarly, Defendant PGP Valuation, Inc. is alleged to have prepared fraudulent appraisals for each of the four Dairy Queen properties (Am.Compl., ¶¶ 74, 75, 117, 162), but there are no allegations of any interpersonal relationship between PGP and any of the other defendants.

Basically, Plaintiffs do little more than offer conclusory statements as to the existence of an association-in-fact enterprise without offering any facts in support of the *Boyle* factors: purpose, relationship, or longevity. In other words, Plaintiffs' assertion that a RICO association-in-fact exists is little more than a conclusion and a "formulaic recitation of the elements" for a RICO cause of action. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Papason v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). As a result, Plaintiffs fail to sufficiently allege an enterprise for the purpose of stating a RICO claim.

*14 Because this Court concludes that Plaintiffs have failed to sufficiently allege the "pattern of racketeering activity" and "enterprise" elements of their § 1962(c) claims, the Court

need not consider the additional arguments presented by the Moving Defendants. This Court finds that Plaintiffs fail to state a claim under RICO, and, as a result, Count I is dismissed with prejudice. Because Count I fails to state a RICO claim, this dismissal is in regard to *all* Defendants, including all non-moving Defendants.

### 2. Plaintiffs' Claim of Aiding and Abetting under RICO

To the extent Count II of the Amended Complaint, "Aiding and Abetting," is brought in connection with their RICO claim, Plaintiffs fail to state a claim. First, there is no provision within RICO that permits a private right of action for "aiding and abetting." Although the Sixth Circuit has not expressly ruled that RICO prohibits such an action, other courts have extended the Supreme Court's ruling in a securities case to apply to RICO claims. In *Central Bank of Denver v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court ruled that private aiding and abetting suits were not authorized under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j). "Congress knew how to impose aiding and abetting liability when it chose to do so. If ... Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Id.* at 192.

Further, the Court specifically rejected the argument that the phrase "directly or indirectly" (as contained in both § 10(b) and § 1962(c)) can be interpreted to create a civil aiding and abetting claim. *Id.* at 176–77.*See also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 657 (3d Cir.1998) (concluding "that a private cause of action for aiding and abetting a RICO violation cannot survive the Supreme Court's decision" in *Central Bank* ). Therefore, under a statutory analysis, there appears to be no private cause of action for aiding and abetting under RICO.

Even if such a right existed, Plaintiffs still fail to state a claim because they failed to successfully allege all elements of the underlying, substantive RICO claim. *See United States v. Horton,* 847 F.2d 313, 322 (6th Cir.1988) ( "Before a conviction for aiding and abetting can be upheld, it is essential that the jury find that all essential elements of the underlying crime were committed by someone."). Therefore, to the extent that Plaintiffs allege Count II under RICO, that claim is dismissed with prejudice as to all Defendants.

### 3. RICO claims under 18 U.S.C. § 1962(d)

Plaintiffs' claim of a RICO conspiracy also fails to state a claim. To establish a violation of 18 U.S.C. § 1962(d), Plaintiffs must successfully allege all elements of a RICO violation, in addition to alleging "the existence of an illicit agreement to violate the substantive RICO provision." *United States v. Sinito,* 723 F.2d 1250, 1260 (6th Cir.1983). Where, as here, the substantive RICO count fails to state a claim, the conspiracy claim fails, too. *Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485, 495 (6th Cir.1990). Therefore, Count III of the Amended Complaint is dismissed with prejudice. As noted *supra,* since Plaintiffs fail to state a claim of conspiracy under RICO, that claim fails as to all Defendants.

### 4. Plaintiffs' claims against John Does I–III

**\*15** According to the Amended Complaint, John Does were "employees, agents, partners, associations and/or independent contractors of Defendants or were entities that were joined with Defendants or engaged in prohibited conduct [.]" (Am.Compl., ¶ 36.) Plaintiffs' claims against these John Doe defendants must be dismissed without prejudice because, over the course of the past two years, Plaintiffs have failed to identify these individuals or to serve them within the time allotted by the federal rules.[7] *See*Fed.R.Civ.P. 4(m) (requiring service of summons and complaint upon a defendant within 120 days after the filing of the complaint).

### D. Plaintiffs' State Claims

Plaintiffs have also alleged state law claims, including fraud, negligent misrepresentation, and conversion. However, since the Court will dismiss Plaintiffs' federal claims, it declines to exercise jurisdiction over Plaintiffs' supplemental state law claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that if the federal claims supporting supplemental jurisdiction are dismissed prior to trial, the state claims should be dismissed as well); 28 U.S.C. § 1367(c); *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254–55 (6th Cir.1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims ...").

### III. CONCLUSION

As a result of the foregoing, the following motions are **GRANTED in part:** Defendants Tom Slack and Susan Machuga's Motion to Dismiss, R. 93; Defendants Krikorian Investment Services, Inc. and Benjamin Flinders' Motion to

2011 WL 53166

Dismiss, R. 95; and Defendant Chicago Title Company's Motion to Dismiss, R. 117. Defendant John Slack's Motion to Dismiss, R. 99 is rendered **MOOT.** Plaintiffs' Counts I, II, and III are **DISMISSED with prejudice as to all Defendants.** This Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims. Therefore, all of Plaintiffs' remaining state-law claims are **DISMISSED without prejudice.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 53166

---

Footnotes

1    Susan Machuga is not named as a defendant in the caption of the Amended Complaint, but she is identified as a defendant in ¶ 26, and she has filed a Motion to Dismiss.

2    Krikorian Investment Services, Inc., d/b/a Investment Real Estate Associates, Inc. is referred to in the Amended Complaint as "IREA." (See ¶ 31).

3    The following factual information is taken from Plaintiffs' Amended Complaint (R. at 85) and is assumed to be true for the purposes of the motions before the Court. See *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

4    Plaintiff HMV Properties, LLC is referred to throughout the Amended Complaint as Mr. Jitendra Vora ("Vora"), its managing member.

5    Plaintiff The Perinpanathan Trust is referred to throughout the Amended Complaint as "Perin Trust" or "Perin."

6    A Limited Warranty Deed was executed on July 18, 2007 conveying the Dayton Dairy Queen to Perin (*id.,* ¶ 80); a LWD was executed on July 3, 2007, conveying the Reynoldsburg Dairy Queen to Vora (*id.,* ¶ 123); and LWDs were executed on July 18, 2007 and on September 7, 2007, conveying the Fairborn and Brookville Dairy Queens, respectively, to the Oswood Trust (*id.,* ¶¶ 176, 183).

7    On September 22, 2008, Plaintiffs filed their original Complaint, naming John Does I–V. (R. at 1.) Plaintiffs filed for Leave to Amend on May 22, 2009 (R. at 75), and leave was granted on July 31, 2009 (R. at 85). Plaintiffs Amended Complaint named three John Doe defendants.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Burgese v. Starwood Hotels & Resorts Worldwide, Inc., D.N.J., April 14, 2015

253 Fed.Appx. 224
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Thomas MAGNUM; Willie Magnum; James
Money; David Porter; Walter J. Daly; Mary
Logan, Alfred Roberts; Nicholas Siravo; Bill
Henis; Joan McCrane; John Quinn; James
Spoerl; John Doe; Jane Doe, Appellants,
v.
ARCHDIOCESE OF PHILADELPHIA; Justin
Rigali, His Eminence Cardinal; Anthony
Bevilacqua, His Eminence Cardinal; John
Krol, Estate of His Eminence Cardinal.

No. 06–5117.
|
Submitted Under Third Circuit
LAR 34.1(a) Oct. 26, 2007.
|
Filed: Nov. 6, 2007.

**Synopsis**
**Background:** Individuals claiming childhood sexual abuse
by certain Diocesan priests brought action alleging that
Archdiocese engaged in pattern of concealing child abuse
by clergy in violation of Racketeer Influenced and Corrupt
Organizations Act (RICO), and claims under § 1985 and §
1986. The United States District Court for the Eastern District
of Pennsylvania, Legrome D. Davis, J., 2006 WL 3359642,
dismissed action. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Hardiman, Circuit Judge,
held that:

[1] underlying wrong of childhood sexual abuse did not
implicate injury to "business or property" under RICO;

[2] lost opportunity to bring unliquidated tort claims was not
"property" in Pennsylvania;

[3] unliquidated personal injury claims were too speculative
to confer standing under "injury to business or property"
provision;

[4] minor children did not constitute protected class for
purposes of Equal Protection Clause;

[5] purported right to "substantive due process rights to bodily
integrity" was not protected against private encroachment
under § 1985; and

[6] cause of action did not exist under § 1985 for alleged
conspiracy to violate "substantive rights created under state
law designed to protect children."

Affirmed.

West Headnotes (6)

[1]     **Racketeer Influenced and Corrupt
Organizations**
        ☞ Business, property, or proprietary injury;
personal injuries

        Underlying wrong of childhood sexual abuse
did not implicate injury to "business or
property," and thus lost opportunity to bring state
law personal injury claim against Archdiocese
arising from that wrong was not cognizable
as injury to "business or property" in civil
action under Racketeer Influenced and Corrupt
Organizations Act (RICO); although cause of
action could be form of property, physical or
emotional harm to person was not property and
losses which flowed from personal injuries were
not "property" under civil RICO. 18 U.S.C.A. §§
1962(c), 1964(c).

        30 Cases that cite this headnote

[2]     **Property**

**Maghum v. Archdiocese of Philadelphia, 253 Fed.Appx. 224 (2007)**

RICO Bus.Disp.Guide 11,388

↪ Subjects of property

Lost opportunity to bring unliquidated tort claims was not "property" in Pennsylvania.

2 Cases that cite this headnote

**[3]    Racketeer Influenced and Corrupt Organizations**

↪ Business, property, or proprietary injury; personal injuries

Unliquidated personal injury claims against Archdiocese brought by individuals claiming childhood sexual abuse by Diocesan priests were unassignable and could not be presently valued and thus were too speculative to confer standing under "injury to business or property" provision of Racketeer Influenced and Corrupt Organizations Act (RICO) even if relevant state law recognized some property right in unliquidated personal injury tort claims. 18 U.S.C.A. §§ 1962(c), 1964(c).

24 Cases that cite this headnote

**[4]    Constitutional Law**

↪ Children and the unborn

Minor children did not constitute protected class for purposes of Equal Protection Clause. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[5]    Conspiracy**

↪ Rights or privileges involved

Purported right to "substantive due process rights to bodily integrity" was not protected against private encroachment under § 1985. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1985.

1 Cases that cite this headnote

**[6]    Conspiracy**

↪ Rights or privileges involved

Cause of action did not exist under § 1985 for alleged conspiracy to violate "substantive rights created under state law designed to protect children," since § 1985 only vindicated

rights constitutionally protected against private interference. 42 U.S.C.A. § 1985.

8 Cases that cite this headnote

**\*225** On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. No. 06–cv–2589), District Judge: Legrome D. Davis.

**Attorneys and Law Firms**

James A. Wells, Belden Law, Greensburg, PA, for Appellants.

Jeffrey A. Lutsky, Michael D. O'Mara, Christine M. Debevec, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Appellees.

Before: SLOVITER, CHAGARES and HARDIMAN, Circuit Judges.

OPINION OF THE COURT

HARDIMAN, Circuit Judge.

**\*\*1** In this civil RICO action, fourteen individuals sued the Archdiocese of Philadelphia and three of its Cardinals (collectively, the Archdiocese). The District Court dismissed the complaint, finding that Plaintiffs lacked RICO standing and failed to state a claim for civil conspiracy. We will affirm.

**I.**

Appellants claimed childhood sexual abuse by certain Diocesan priests from 1956 to 1985. The gravamen of their complaint is that the Archdiocese engaged in a pattern of concealing child abuse by clergy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 et seq., and 42 U.S.C. §§ 1985 and 1986. The District Court properly exercised subject matter jurisdiction pursuant to 18 U.S.C. § 1962 et seq. and 42 U.S.C. §§ 1985 and 1986. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**II.**

Our review of a district court's dismissal for failure to state a claim upon which relief may be granted under Rule 12(b)(6) is plenary, and we apply the same test as the district court. See *Maio v. Aetna, Inc.,* 221 F.3d 472, 481 (3d Cir.2000). Accordingly, "[a] motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Id.* at 481–82. In other words, a complaint only may be dismissed "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004).

We accept as true all factual allegations in the complaint, but we "need not accept as true unsupported conclusions and unwarranted inferences." **\*226** *Doug Grant, Inc. v. Great Bay Casino Corp.,* 232 F.3d 173, 184 (3d Cir.2000). We also exercise plenary review over the District Court's determination that Appellants lacked standing to pursue their claims under 18 U.S.C. § 1964(c). See *Maio,* 221 F.3d at 482.

### III.

#### A. The District Court Properly Dismissed Appellants' Civil RICO Claims

The District Court dismissed Appellants' civil RICO claims, holding that they: (1) lacked standing to sue because their alleged damages stemmed from personal injury claims, which are not cognizable under RICO; (2) could not plead proximate cause; and (3) could not plead a RICO "enterprise" or "pattern of racketeering activity." Because we find that the District Court correctly held that Appellants lacked RICO standing, we do not address its additional holdings.

The federal civil RICO statute allows "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c).[1] The adequacy of a plaintiff's claim of "injury to business or property" implicates his standing to sue under civil RICO. See *Maio,* 221 F.3d at 482. Thus, these questions properly are resolved by way of a Rule 12(b)(6) motion. *Id.* at 482 n. 7; see also *Anderson v. Ayling,* 396 F.3d 265, 269 (3d Cir.2005).

#### 1. The Lost Opportunity To Bring A State Law Personal Injury Claim Is Not "Business or Property" Within The

Meaning Of § 1964(c), And Cannot Support A Civil RICO Claim Under § 1962(c).

**\*\*2** **[1]** Appellants allege only one type of injury to their "business or property": they claim that the Archdiocese concealed the truth about sexual predators in its midst for so long that by the time Appellants learned of the Archdiocese's culpability, it was too late to pursue state law tort remedies. The District Court characterized this claim as "a somewhat novel pleading of injury," and we agree.

Although RICO is to be read broadly, see *Tabas v. Tabas,* 47 F.3d 1280, 1291 (3d Cir.1995), Congress's limitation of recovery to "business or property" injury "retains restrictive significance." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). This restrictiveness "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Maio,* 221 F.3d at 483. We have stated that "a showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Id.* (citation and internal quotation marks omitted).

In light of the foregoing, it is clear that Appellants' allegation of a lost opportunity to bring state law personal injury claims against the Archdiocese is not cognizable as an injury to "business or property" in a civil RICO action. Because Appellants do **\*227** not allege that the Archdiocese's conduct injured them in their "business" pursuits, their claim is viable only if their lost opportunity to bring state law personal injury claims is "property." We have held that "physical or emotional harm to a *person*" is not "property" under civil RICO. See *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 918 (3d Cir.1991) (emphasis in original). Similarly, losses which "flow" from personal injuries are not "property" under RICO. See *Evans v. City of Chicago,* 434 F.3d 916, 930–31 (7th Cir.2006) (lost earnings on account of personal injury insufficient to satisfy § 1964(c)'s injury to "business or property" requirement).

Distinguishing our decision in *Malley–Duff & Assoc. v. Crown Life Ins. Co.,* 792 F.2d 341 (3d Cir.1986), the District Court noted that it "involved causes of action affecting business interests grounded in contract, not tort." See *Magnum v. Archdiocese of Phila.,* No. 06–CV–2589, 2006 WL 3359642 at \*6 (E.D.Pa. Nov.17, 2006). We agree that this distinction is meaningful. In *Malley–Duff,* an insurance agent claimed that its principal committed various unfair practices to steal the agent's territory, defraud it of commissions, and drive it out of business. See *Malley–Duff,*

792 F.2d at 343. After losing a lawsuit against the company, the agent brought a civil RICO suit, alleging injury to his "business or property" because the company interfered with the prior suit by subornation of perjury, blackmail, witness intimidation, and other forms of obstruction of justice. *See id.* at 344 and n. 4. The district court concluded that this was not an injury to "business or property" actionable under civil RICO and dismissed the claim, *see id.* at 353, but we disagreed, explaining:

> **3** If RICO's reference to injury to "business or property" is to be given meaning, RICO standing cannot be limited to "business" injuries only. We would certainly think, for example, that an individual harmed in his personal property by loansharking activities should have a civil remedy under RICO. A cause of action is, of course, a form of "property," and *when it arises out of the termination of a business,* we think it is not unfair to characterize conduct tending to impair it as "business injury."

*Id.* at 354 (emphasis added). Thus, we held that *Malley–Duff*'s allegations that its adversary's obstructions of justice caused "great expenses, delays, and inconvenience" in the prosecution of the first lawsuit sufficiently pleaded injury to business or property under the RICO statute. *Id.* at 355.

The Tenth Circuit recently followed *Malley–Duff* on similar facts. *See Deck v. Engineered Laminates,* 349 F.3d 1253 (10th Cir.2003). There, Engineered Laminates sued Deck after he began to compete with his former boss. *Deck,* 349 F.3d at 1256. The case settled after the company agreed to pay Deck a sum of money in exchange for Deck's promise not to compete. *Id.* Soon after settling the case, however, the company transferred assets to related companies and defaulted on its settlement obligations. *Id.* Deck then brought a civil RICO action, claiming that Engineered Laminates agreed to the settlement knowing that it intended to default on its obligations after rendering the company insolvent. *Id.* at 1258. The district court rejected this claim on the ground that it did not state a civil RICO injury to "business or property," but the Tenth Circuit reversed, explaining: "[f]raud, as alleged in this case, *that causes one to relinquish a cause of action*

*arising out of his business* is an injury to 'business or property' " under the RICO statute. *Id.* at 1259 (emphasis added) (quoting *Malley–Duff* ).

**\*228** As the emphasized portions of *Malley–Duff* and *Deck* reflect, although a cause of action indeed may be a form of property, injuries to that property will only be redressable under civil RICO if the plaintiff can allege that the wrong to be vindicated is itself an injury to "business or property" within the meaning of RICO. This distinction separates *Malley–Duff* and *Deck* from the case at bar, because the wrong underlying Appellants' lost opportunity to sue —personal injury from childhood sexual abuse—does not implicate injury to "business or property" under § 1964(c), as we have explained above. *See Genty,* 937 F.2d at 918; *see also Evans,* 434 F.3d at 930–31.

**[2]** Pennsylvania law supports this conclusion. Although federal law governs most issues under RICO, we look to state law to determine whether a particular interest is "property" within the meaning of § 1964(c). *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *see also Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Unliquidated personal injury claims are not considered "property" in Pennsylvania. *See Chiropractic Nutritional Assoc., Inc. v. Empire Blue Cross & Blue Shield,* 447 Pa.Super. 436, 669 A.2d 975, 983 (1995); *see also DeMasi v. DeMasi,* 366 Pa.Super. 19, 46, 530 A.2d 871 (1987). "As a general rule, a personal injury tort claim remains unliquidated until it is reduced to a definite amount by a verdict or a settlement." *Prevish v. Northwest Medical Center Oil City Campus,* 692 A.2d 192, 199 (Pa.Super.1997) (citation omitted). Because Appellants' unliquidated tort claims are not recognized as "property" in Pennsylvania, neither is the lost opportunity to bring such claims.

**\*4** Appellants argue that the District Court gave short shrift to *Hurley v. Hurley,* 342 Pa.Super. 156, 492 A.2d 439 (1985), which made the general observation that "[m]odern decisions suggest that the term 'property' refers generally to rights of action arising out of tort as well as contract, whether such right of action is for injury to the person or to property." *See Hurley,* 492 A.2d at 441 (citation and internal quotation marks omitted). But the Superior Court in *Hurley* also stated:

> Decisions in Pennsylvania, however, have held that there are significant property differences which distinguish unliquidated personal injury claims from claims based on contract. 'A right of action strictly personal is not

assignable and the general doctrine is, both in law and equity, that a right of action for a pure tort is not the subject of assignment.... Such a right does not seem to us to be a property right, capable of assignment, prior to liquidation....' *Sensenig v. Pennsylvania R.R. Co.,* 229 Pa. 168, 172, 78 A. 91, 91–92 (1910).

*Id. Hurley* then held that a spouse's unliquidated tort claim for personal injuries was not marital property in Pennsylvania. *Id.* at 442. Thus, *Hurley*'s discussion of the "significant property differences" between tort and contract claims actually reinforces the distinction the District Court made here between contract and tort rights.

**[3]** Even if Pennsylvania law recognized some property right in unliquidated personal injury tort claims, it is unclear whether such a right would apply in the civil RICO context. *See Doe v. Roe,* 958 F.2d 763, 768 (7th Cir.1992) (noting that "we are not required to adopt a state interpretation of 'business or property' if it would contravene Congress' intent in enacting RICO.") (citing *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946)). Congress did not intend to recognize a **\*229** cause of action in civil RICO where the damages from the injuries alleged are "speculative." *See Maio,* 221 F.3d at 495; *see also Doug Grant,* 232 F.3d at 188 (expressing doubt that "lost speculative opportunity" would be an injury to business or property under the civil RICO statute). Here, Appellants' claims are unassignable and cannot be valued yet, so their claims are too speculative to confer RICO standing. *See In re Taxable Mun. Bond Securities Litig.,* 51 F.3d 518, 522–23 (5th Cir.1995) (lost opportunity to obtain low interest loan too speculative to support RICO standing); *see also Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 847–48 (1st Cir.1990) (unliquidated, inchoate damages too speculative to support civil RICO claim).

In sum, we conclude that any damages Appellants may have sustained from the lost opportunity to bring personal injury tort claims against the Archdiocese do not constitute "injury to business or property" within the meaning of 28 U.S.C. § 1964(c). Accordingly, the District Court did not err when it held that Appellants lacked standing under § 1962(c).

### 2. Appellants' Inability To Plead A Violation Of § 1962(c) Required Dismissal Of Their Conspiracy Claim Under § 1962(d).

**\*\*5** The District Court also dismissed Appellants' RICO conspiracy claim, explaining that their inability to state a

claim under § 1962(c) doomed their claim under § 1962(d). We find no error in this regard because "[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1192 (3d Cir.1993); *see also Lum,* 361 F.3d at 227 n. 5. A plaintiff alleging a civil RICO violation under *either* § 1962(c) or (d) must plead a cognizable injury to "business or property" under § 1964(c). *See* 18 U.S.C. § 1964(c) (connecting the civil remedy for all claims brought under § 1962 to the showing of an injury to business or property). Thus, a plaintiff's inability to allege injury to business or property for purposes of § 1962(c) necessarily forecloses any claim brought under § 1962(d). *See Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 290 (3d Cir.1996).

Although Appellants acknowledge that their RICO conspiracy claim rises under § 1962(d) and falls with their § 1962(c) claim, they insist that they stated a claim under § 1962(c). As we have explained, Appellants' § 1962(c) claim fails because they did not plead injury to their business or property within the meaning of § 1964(c).

### B. The District Court Properly Dismissed Appellants' Civil Rights Claims.

Appellants also brought obstruction of justice and conspiracy claims under 42 U.S.C. §§ 1985 and 1986, which the District Court dismissed for failure to state a claim. For the reasons that follow, we conclude that the District Court did not err in rejecting these claims.

### 1. Appellants Did Not State A Claim Under 42 U.S.C. § 1985.

Section 1985(2) provides a remedy when:

two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any

person, or class of persons, to the equal protection of the laws[.]

**\*230** 42 U.S.C. § 1985(2). Appellants also alleged a violation of Section 1985(3), which provides a remedy when:

> two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[.]

42 U.S.C. § 1985(3).

To state a claim under §§ 1985(2) or (3), a plaintiff must allege four things: (1) a conspiracy; (2) motivated by a racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. *See Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *see also Brawer v. Horowitz,* 535 F.2d 830, 839 (3d Cir.1976). In light of these pleading requirements, Appellants' complaint fails to state a claim for two independent reasons.

**\*\*6** **[4]** First, the District Court held that Appellants' status as minors during the relevant time period was insufficient to state a claim under § 1985. The Supreme Court has stated "that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" to state a claim under § 1985. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268–269, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).[2] As the Archdiocese points out, Appellants have cited no authority—nor have

we found any—for the proposition that "minor children" constitute a protected class for purposes of the Equal Protection Clause. Instead, insofar as we have recognized that § 1985 protects "victims of historically pervasive discrimination" and those with "immutable characteristics," *see Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *Lake v. Arnold,* 112 F.3d 682, 687 (3d Cir.1997), we hold that minor children—who have not been recognized as "victims of historically pervasive discrimination" and whose sole classifying characteristic (*i.e.,* their minority) is not immutable—fall outside the ambit of the statute.

**[5]** Second, Appellants have not pleaded a violation of any right protected against private encroachment by § 1985. "[I]n the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel." *Brown v. Philip Morris Inc.,* 250 F.3d 789, 805 (3d Cir.2001) (citations omitted). The deprivations Appellants allege, *viz.,* their "substantive due process rights to bodily integrity," **\*231** fit neither category. Because the Fourteenth Amendment does not protect Appellants from deprivations by private actors, this theory of recovery under § 1985 fails to state a claim. *See Bray,* 506 U.S. at 278, 113 S.Ct. 753 (recognizing that "deprivation of [a] federal right (whatever its contours) cannot be the object of a purely private conspiracy" under § 1985).

**[6]** Appellants also allege a conspiracy to violate "substantive rights created under state law designed to protect children." This theory fails because § 1985 only provides a cause of action to vindicate rights "*constitutionally* protected against private interference." *Id.* (emphasis added); *see also Brown,* 250 F.3d at 805 (observing that " § 1985 does not itself create any substantive rights but acts as a vehicle to vindicate other federal rights and privileges," and explaining that plaintiffs "first must establish a violation of their *constitutional rights* in order to have a successful § 1985 claim.") (alteration, citation, and internal quotation marks omitted) (emphasis added).

Accordingly, the District Court did not err in dismissing Appellants' claims under 42 U.S.C. § 1985. And because Appellants' claims under 42 U.S.C. § 1986 are derivative of their claims under § 1985, *Clark v. Clabaugh,* 20 F.3d 1290, 1295–96 (3d Cir.1994), the District Court properly dismissed them as well.

Magnum v. Archdiocese of Philadelphia, 253 Fed.Appx. 224 (2007)

RICO Bus.Disp.Guide 11,388

---

**\*\*7** For the foregoing reasons, we will affirm the decision below.

**All Citations**

253 Fed.Appx. 224, 2007 WL 3257209, RICO Bus.Disp.Guide 11,388

---

Footnotes

1    Section 1962 states, in relevant part:

 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

 18 U.S.C. § 1962(c)–(d). The term "racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a list of crimes punishable under state law by a term of imprisonment in excess of one year, as well as certain federal crimes.

2    We reject Appellants' contention that they are not required to show class-based animus to show that the Archdiocese conspired in violation of the so-called "hindrance clause" of § 1985(3). The only support for this contention is Justice Souter's concurring opinion in *Bray.* Although Justice Souter did indeed so speculate in his concurring opinion, a majority of the Court flatly rejected that hypothesis. *See Bray,* 506 U.S. at 281, 113 S.Ct. 753 ("Judging from the statutory text, a cause of action under the 'hindrance' clause would seem to require the same class-based, invidiously discriminatory animus that the 'deprivation' clause requires ....") (internal quotation marks omitted).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 548265

2020 WL 548265
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Dawn BACHI-REFFITT, Plaintiff-Appellant,

v.

Kevin REFFITT, et al., Defendants-Appellees.

No. 18-1666
|
FILED February 04, 2020

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Mark Granzotto, Law Office, Berkley, MI, for Plaintiff-Appellant

Conor Brendan Dugan, Ashley Grace Chrysler, Warner Norcross & Judd, Grand Rapids, MI, for Defendants-Appellees

Before: BATCHELDER, LARSEN, and MURPHY, Circuit Judges.

**Opinion**

ALICE M. BATCHELDER, Circuit Judge.

*\*1* Kevin Reffitt and Dawn Bachi-Reffitt had been married for almost 20 years, and actively engaged in divorce proceedings for over a year, when they finalized their divorce by mutual agreement and entered a Consent Judgment with the Grand Traverse County, Michigan, Circuit Court's Family Division ("Family Court") in April 2013. Prior to that agreement, they had been preparing for a trial in which the Family Court would decide the division of their marital property, most importantly Kevin's stake in his family's privately-held business, Peninsula Construction, a stake he had owned since 2006.

During discovery, Dawn's divorce lawyer pursued information about that asset via interrogatories and requests for production of documents. Kevin answered that he had sold it to his father, Ronald Reffitt, Sr., on February 7, 2012 (just days prior to the divorce filing), for about $150,000. Kevin produced copies of an executed option agreement, corporate consents, stock certificates, and other documents pertaining to the sale. In Kevin's trial brief, filed a month before the anticipated trial, his attorney explained that the $150,000 amount was based on an appraised value set in July 2011 and he offered that Peninsula's corporate accountant, Brad Niergarth, was available to Dawn's attorney to answer "any and all questions relative to the financial status of the company." Kevin proposed dividing the $150,000 equally with Dawn.

As mentioned, Kevin and Dawn decided to forgo trial and instead settle the divorce and the division of marital property by mutual agreement, which they formalized via a Consent Judgment in the Family Court. Among other things, that Judgment divided the $150,000. It also includes provisions releasing all claims, acknowledging final settlement of all marital rights and obligations, providing a contractual remedy for a party's non-disclosure of assets, and reserving jurisdiction to the Family Court as necessary to enforce the Judgment.

In June 2014, Dawn moved the Family Court for relief from judgment pursuant to Michigan Court Rule 2.612(C)(1)(c), claiming that Kevin had concealed or not disclosed the full value of his stake in Peninsula. [1] Dawn alleged that Kevin's stake in Peninsula when he sold it to his father was not $150,000, as he had asserted, but was actually over $2 million. Following a hearing, the Family Court held that the motion was barred by the rule's one-year statute of limitations and further opined:

> But looking at the facts of this case[,] both parties are represented by counsel. The discovery was undertaken.... All the documents with respect to transferring the corporation were provided to [Dawn's divorce attorney].
>
> ...
>
> ... I am not seeing where there was hidden assets.... It was revealed -- all those assets were revealed during the course of the divorce, and I don't see any indication here of any hidden assets.... If you go forward and you decide[ ] that there is [evidence of fraud], you can always file an action

for fraud in this matter. The Court [i.e., this Family Court] would be really willing to look at that.

**\*2** Dawn did not appeal or immediately pursue a fraud claim in Family Court. [2]

Instead, Dawn sued Kevin and his father in the Grand Traverse County, Michigan, Circuit Court's General Division ("Circuit Court"), accusing them of fraud in transferring Kevin's ownership in Peninsula and in Kevin's representation of the monetary value of his share. At the conclusion of a hearing, the Circuit Court determined that, even though the action was "a free standing claim for fraud," it was barred by the one-year statute of limitations. The Circuit Court also explained that, to the extent "that this is claimed to be an enforcement action to enforce the judgment of divorce," Dawn must "file[ ] [it] within the judgment of divorce" in the Family Court, so:

> I am going to dismiss the case without prejudice and [Dawn] can assert it, if at all, I would suggest[,] as a motion within the divorce case [in the Family Court]. But, however it's done it should be related to the divorce case not here.

From the present record, it appears that Dawn did not appeal this dismissal or return to the Family Court to pursue this claim as the Circuit Court had suggested.

Instead, in March 2017, Dawn filed the present case in federal court, naming four defendants (Kevin, his father, his father's secretary, and Peninsula) and alleging a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, and some state-law claims. While the RICO claim was new, the fundamental factual accusation was the same as in the Family and Circuit Courts, namely that Kevin committed discovery fraud in their divorce proceedings by misrepresenting the monetary value of his stake in Peninsula, albeit with the help of his father and his father's secretary who notarized the documents.

The defendants moved for a Rule 12(b)(6) dismissal and for Rule 11 sanctions. The district court dismissed the RICO action for four separate reasons: (1) Michigan law prohibits a separate action to challenge a final judgment when, as here,

relief from judgment is available by rule, namely Michigan Court Rule 2.612(C)(1)(c), which specifically provides for relief from judgments procured by fraud; (2) res judicata and comity require the federal court to defer to the state court's prior decision on this issue; (3) the Consent Judgment's release provision and jurisdiction provision place this claim in the Family Court; and (4) Dawn lacked statutory standing to maintain a RICO claim because she had established no property interest but only an expectancy interest in Kevin's share of Peninsula. *Bachi-Reffitt v. Reffitt*, No. 1:17-CV-263, 2017 WL 5998112, at *5-9 (W.D. Mich. Dec. 4, 2017). The district court further found that Dawn, or rather her attorney, had: ignored the guidance from the Family Court and Circuit Court that she move for relief from judgment in the Family Court; knew that her claims were barred by res judicata; pressed an "unreasonable reading of the Consent Judgment"; and did not cite a single case that supported her positions. The court granted the defendants' motion for Rule 11 sanctions. *Id.* at *10-11.

**\*3** Dawn moved the district court to reconsider, arguing that the imposition of sanctions was unwarranted and also arguing, circumspectly, that she was right and the court was wrong on the arguments for dismissal. The court upheld its prior judgment, re-emphasizing why Dawn "had no good faith reason to file this case," *Bachi-Reffitt v. Reffitt*, No. 1:17-cv-263, Dkt. No. 47 at 5 (W.D. Mich. May 8, 2018) (Order), and further opining in a footnote:

> While the [district court's prior opinion] had no need to reach [the] [d]efendants' arguments concerning [Dawn]'s failure to properly plead the elements of her RICO claims, it would have dismissed [her] RICO claims on one or more of the grounds [the] [d]efendants cited in their brief. For example, [Dawn] failed to allege a 'pattern' of racketeering for purposes of RICO. Kevin's alleged one-off attempt to hide assets from [her] during the divorce proceeding did not constitute a closed-ended period of repeated conduct extending over a substantial period of time, and [Dawn]'s reliance on the 2007 divorce of Kevin's now-deceased brother—an unrelated proceeding

**Bachi-Remit v. Reffitt, --- Fed.Appx. ---- (2020)**

2020 WL 548265

separated by at least four years and involving different participants and alleged victims—falls short of establishing RICO's relatedness and continuity requirements. Moreover, [Dawn] failed to allege that Ronald Reffitt, Jr. or anyone else committed a predicate criminal act of mail and/or wire fraud during the 2007 divorce proceeding. [Dawn]'s attempted use of RICO in this case was not unique, and it certainly was not proper.

*Id.* at 5 n.2 (citations omitted). The court further explained that Dawn had named Kevin's father, his secretary (Wierenga), and Peninsula—mere "window dressing" to the fraud claim against Kevin—in an effort to concoct a RICO enterprise or conspiracy out of ordinary fraud. But, even including them, she had failed to state a claim under RICO because she "did not allege that Pen[insula] or Wierenga, whose sole act was notarizing the back-dated stock transfer documents, played any part in directing the enterprise's affairs, ... [or] that Reffitt, Sr., Wierenga, or Pen[insula] committed at least two predicate acts." *Id.* at 6 (citations omitted). The court denied Dawn's motion to reconsider and made clear that it was declining to exercise supplemental jurisdiction over the state-law claims and dismissing them without prejudice. *Id.* at 7.

On appeal, Dawn argues that the district court was mistaken in all five of its reasons for dismissing her complaint: i.e., (1) Michigan's court rule for challenging a judgment procured by fraud; (2) res judicata and comity; (3) the Consent Judgment's release and jurisdiction provisions; (4) Dawn's lack of RICO standing; and (5) Dawn's failure to plead the elements of a RICO claim. If any one of these reasons is correct, then the district court was correct to dismiss the complaint. We therefore will analyze only the last reason—Dawn's failure to plead the elements of a RICO claim—because we can do so most concisely and because that failure best demonstrates why the Rule 11 sanctions were warranted in this case.

Before proceeding, however, it bears mention that in researching this issue, we found an almost unanimous belief among the courts presented with RICO claims like this one that "[c]oncealment of assets by a husband from a wife is reprehensible and may be a crime under certain circumstances but that does not render it a pattern of racketeering activity perpetuated through an enterprise" for purposes of RICO.

*DeMauro v. DeMauro*, 215 F.3d 1311, 2000 WL 231255, at *4 (1st Cir. 2000) (Table); *see also DeMauro v. DeMauro*, 115 F.3d 94, 99 (1st Cir. 1997) ("Divorces are frequently accompanied by disputes about property, including both interim and final allocations. Such state court authority would be threatened if civil RICO actions become the shadow proceeding for policing such disputes."); *Cohen v. Cohen*, 993 F. Supp. 2d 414, 423 (S.D.N.Y. 2014) ("[D]omestic relations disputes are rarely the nebulae from which viable civil RICO claims coalesce. They tend to involve private concerns as opposed to matters of public importance."); *Rosner v. Rosner*, 766 F. Supp. 2d 422, 426 (E.D.N.Y. 2011) ("Th[is] plaintiff is not the first person involved in a matrimonial case to attempt to bring a RICO claim against a spouse for allegedly hiding marital assets. The courts that have previously addressed this type of allegation have almost universally found such claims to be a misuse of the RICO statute."); *Davit v. Davit*, 366 F. Supp. 2d 641, 657 (N.D. Ill. 2004), *aff'd*, 173 F. App'x 515 (7th Cir. 2006) ("RICO has not federalized every state common-law cause of action available to remedy business deals gone sour. That teaching is equally apt when assessing whether every disgruntled divorce court litigant should be able to relitigate such disputes in the federal courts." (quotation marks omitted)); *Boston v. Estate of Clark*, No. 11-14935, 2012 WL 4048877, at *5 (E.D. Mich. Sept. 13, 2012) ("Other federal courts have also found that RICO was not an appropriate cause of action for a plaintiff seeking to recover marital assets or spousal support."); *Ruttenberg v. Ruttenberg*, No. 08 C 4898, 2009 WL 424548, at *4 (N.D. Ill. Feb. 18, 2009) ("It is not surprising, then, that a number of courts have concluded that the sort of fraud involved in hiding assets in connection with a divorce does not constitute a pattern of racketeering for purposes of RICO."); *Merrilees v. Merrilees*, 375 Ill.Dec. 855, 998 N.E.2d 147, 156, ¶ 18 (Ill. Ct. App. 2013) ("RICO was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions.") (quoting *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007)); *LaPorte v. LaPorte*, 621 A.2d 186, 186 (R.I. 1993) ("The wil[l]ful concealment of marital assets from the Family Court, in our opinion, does not constitute 'racketeering activity.' "); Brett R. Turner, ECONOMIC CLAIMS BETWEEN FORMER SPOUSES OUTSIDE THE DIVORCE CASE, Fam. Advoc., Fall 2016 26, 30 ("The lure of treble damages will probably continue to attract interest in RICO actions, but no reported cases so far have found RICO liability on the facts."); *but see Perlberger v. Perlberger*, No. CIV. A. 97-4105, 1998 WL 76310, at *1 (E.D. Pa. Feb. 24, 1998) (the lone case in which a

Case 2:19-cv-13721-LVP-EAS ECF No. 39-6, PageID.1301 Filed 02/28/20 Page 41 of 58
Bachi-Reffitt v. Reffitt, --- Fed.Appx. ---- (2020)

2020 WL 548265

court refused to dismiss a wife's RICO complaint against her ex-husband for concealing marital assets during the divorce).

**\*4** We review de novo a district court's dismissal under Rule 12(b)(6). *Swanigan v. FCA US LLC*, 938 F.3d 779, 783 (6th Cir. 2019). "To survive a 12(b)(6) motion, the plaintiff must sufficiently plead facts that, when taken as true, contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *Thomas v. Noder-Love*, 621 F. App'x 825, 828 (6th Cir. 2015) (quotation marks omitted).

"Congress created a civil cause of action" under RICO "[t]o prevent organized crime from obtaining a foothold in legitimate business." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013) (quotation marks and citation omitted). "The statute provides in relevant part that any person injured in his business or property by reason of a violation [of 18 U.S.C. § 1962] may sue therefor ... and shall recover threefold the damages he sustains." *Id.* at 483-84 (quotation marks, editorial marks, and citations omitted). RICO plaintiffs must ultimately prove that the "defendants conducted the affairs of a qualifying enterprise through a pattern of racketeering activity" and "that the RICO violation was the proximate cause of the injury to their business or property." *Id.* at 484.

To state a RICO claim under 18 U.S.C. § 1962(c), the plaintiff must plead facts that would plausibly demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The "pattern of racketeering activity" element requires "at least two predicate acts of racketeering activity occurring within a ten-year period[,] ... consist[ing] of offenses [that] are indictable under any of a number of federal statutes, including the mail and wire fraud statutes." *Id.* (quotation marks and citations omitted). Moreover, "[a]lthough *necessary* to sustain a RICO claim, the pleading of two predicate acts may not be *sufficient* because [the statute] assumes that there is something to a RICO pattern beyond the number of predicate acts involved." *Id.* at 724 (quotation marks omitted; emphasis added). The plaintiff must plead "a relationship between the predicates and [ ] the threat of continuing activity. It is this factor of *continuity plus relationship* [that] combines to produce a pattern." *Id.* (quoting *H.J., Inc. v. Nw. Bell Tele. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).

As pertinent to this appeal, Dawn's complaint does not allege an actionable "pattern of racketeering activity" because it pleads only a single scheme targeting a single victim, namely a scheme to conceal the true value of Kevin's stake in Peninsula from his ex-wife, Dawn. In *Moon*, 465 F.3d at 725-26, we concluded that, because all the predicate acts were directed at a single victim over a limited time frame, the claims failed to "bear the markings of the 'long-term criminal conduct' about which 'Congress was concerned' when it enacted RICO." *See also Vemco, Inc. v. Camardella*, 23 F.3d 129, 135 (6th Cir. 1994) ("We do not find that a defendant who engages in several different forms of fraud for a single purpose, to defraud a single victim through activities surrounding one construction project, without more, has engaged in more than one criminal scheme."). Because Dawn did not plead a "pattern of racketeering activity," her complaint fails to state a viable RICO claim and the district court properly dismissed it.

**\*5** Dawn also appeals the district court's imposition of Rule 11 sanctions. Our review is for abuse of discretion. *Indah v. S.E.C.*, 661 F.3d 914, 926 (6th Cir. 2011). Importantly, because it is more "[f]amiliar with the issues and litigants, the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). Here, the district court explained that Dawn and her attorney "had no good faith basis to file this case," knew that they did not, and could offer no "non-frivolous" explanation as to why they did so anyway. This is enough to demonstrate that the court did not abuse its discretion. But another point, specific to RICO and Dawn's (and her attorney's) actions here, bears mention:

> A civil RICO claim is an unusually potent weapon—the litigation equivalent of a thermonuclear device. For this reason, there is a strong temptation for plaintiffs to raise a RICO claim, even when the claim is obviously frivolous. To deter such conduct, courts have not hesitated to impose Rule 11 sanctions as a sanction for bringing frivolous RICO claims. A sanction under Rule 11 is appropriate where a RICO claim

is filed even though no reasonable and competent attorney would believe the claim has merit.

*Martinez v. Martinez*, 207 F. Supp. 2d 1303, 1308 (D.N.M. 2002), *aff'd in part, vacated in part*, 62 F. App'x 309 (10th Cir. 2003) (quotation marks and citations omitted).

For all of the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

--- Fed.Appx. ----, 2020 WL 548265

**Footnotes**

1   Dawn also claimed that Kevin had concealed or failed to disclose $1.5 million in life insurance proceeds that he received when his brother, Ronald Reffitt, Jr., died in March 2013. The Family Court initially dismissed the motion as to this claim, but ultimately considered this claim on the merits, determined that Kevin had violated the Consent Judgment's disclosure provision by concealing that asset, and awarded Dawn the entire $1.5 million pursuant to the contractual remedy specified in that provision. This is not at issue in the present case or appeal.

2   It is perhaps noteworthy that in Michigan, as in most every jurisdiction, a plaintiff must plead fraud with particularity, Mich. Court Rule 2.112(B)(1), and one of the elements is reasonable reliance, *Smith Living Tr. v. Erickson Ret. Cmtys.*, 326 Mich.App. 366, 928 N.W.2d 227, 239 (2018). Given the Family Court's reference to the representation by counsel and the quality of discovery, with the expectation that Dawn's attorney would be trying this issue in an adversary proceeding, it is questionable whether Dawn could plead or prove reasonable reliance.

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Poole v. Federal National Mortgage Association, W.D.Mich., June 2, 2016

508 Fed.Appx. 465
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Cedric M. WILLIAMS, Plaintiff–Appellant,

v.

PLEDGED PROPERTY II, LLC, and Litton
Loan Servicing LP, Defendants–Appellees.

No. 12–1056.
|
Dec. 13, 2012.

**Synopsis**

**Background:** Home mortgagor brought action against loan servicer, relating to foreclosure of the mortgage, and asserting claims for quiet title, unjust enrichment, breach of implied agreement, misrepresentation, fraud, constructive trust, and breach of Michigan statute governing designation of agent for foreclosure by advertisement. Action was removed based on diversity jurisdiction. The United States District Court for the Eastern District of Michigan granted summary judgment to loan servicer. Mortgagor appealed.

**Holdings:** The Court of Appeals, Robert Holmes Bell, District Judge, sitting by designation, held that:

[1] loan servicer's alleged fraud did not provide basis for extending the redemption period, and

[2] loan servicer's alleged oral promise to delay the foreclosure sale constituted a "financial accommodation" under Michigan's statute of frauds.

Affirmed.

West Headnotes (4)

[1] **Mortgages and Deeds of Trust**
    👉 Loss mitigation; duty to pursue foreclosure alternatives

    **Mortgages and Deeds of Trust**
    👉 Tolling or extension of redemption period

    Mortgage loan servicer's alleged fraud in giving oral assurances to home mortgagor, in negotiations during the foreclosure process, regarding a change to the terms of the loan modification agreement, did not provide a basis for extending mortgagor's redemption period under Michigan law, for purposes of Michigan's rule that all of a mortgagor's rights in the property are extinguished by operation of law once the redemption period has expired, where the negotiations remained separate from the foreclosure process itself. M.C.L.A. §§ 600.3236, 600.3240.

    69 Cases that cite this headnote

[2] **Frauds, Statute Of**
    👉 Credit agreements

    Mortgage loan servicer's alleged oral promise to home mortgagor, before or after foreclosure, to delay the foreclosure sale, constituted a "financial accommodation," within meaning of Michigan's statute of frauds, which prohibited an action against a financial institution to enforce a promise or commitment to waive a provision of a loan or make any other financial accommodation unless the promise or commitment is in writing and signed. M.C.L.A. § 566.132(2).

    18 Cases that cite this headnote

[3] **Implied and Constructive Contracts**
    👉 Effect of Express Contract

    **Mortgages and Deeds of Trust**
    👉 Persons entitled to sue; standing; parties

    **Mortgages and Deeds of Trust**
    👉 Particular cases, contexts, and questions in general

Under Michigan law, the existence of a loan modification agreement which controlled the mortgage foreclosure precluded home mortgagor from bringing a claim against mortgage loan servicer for unjust enrichment.

17 Cases that cite this headnote

**[4]** **Federal Civil Procedure**
👈 Time for amendment

**Federal Civil Procedure**
👈 Form and sufficiency of amendment; futility

Denial of home mortgagor's motion to amend his complaint against mortgage loan servicer, to add a claim for unfair or deceptive trade practices, relating to foreclosure of the mortgage, was not an abuse of discretion, where the motion was filed on the same day the loan servicer filed a motion for summary judgment, the loan servicer was prejudiced by the untimely filing of the motion to amend, and amendment would have been futile because mortgagor's vague and speculative allegations were insufficient to state a plausible claim of fraud or irregularity.

**\*466** On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: CLAY and STRANCH, Circuit Judges; BELL, District Judge. [*]

**Opinion**

BELL, District Judge.

**\*\*1** Plaintiff–Appellant Cedric M. Williams ("Williams") appeals an order granting summary judgment to Defendant–Appellees, Pledged Property II, LLC ("Pledged Property") and Litton Loan Servicing, LP ("Litton"). For the following reasons, we **AFFIRM.**

**BACKGROUND**

This case arose out of a dispute over the foreclosure and subsequent sale of a home in Wayne County, Michigan. Williams purchased the home on March 23, 2007, and financed the purchase with a mortgage. Litton contracted to service the loan beginning March 30, 2007. Williams became past due on the mortgage in September of 2007, and received Notice of Default in December of 2007. At Williams's request, Litton agreed to a loan modification on January 2, 2008. Williams did not make his first three payments under the modified loan and filed for bankruptcy in July of 2008. The automatic bankruptcy stay was lifted to allow for the foreclosure to continue in March of 2009.

Notice of Foreclosure Sale was first published in the Detroit Legal News on June 8, 2009. Prior to the scheduled foreclosure sale, Williams requested a second loan modification from Litton. Litton adjourned the foreclosure sale to review the request. On October 2, 2009, Litton denied the loan modification request and proceeded with the foreclosure. Mortgage Electronic Registration Systems, Inc. (MERS) purchased the home at the foreclosure sale on October 14, 2009, and recorded its Sheriff's Deed on October 26, 2009. Thereafter, MERS conveyed its interest to Pledged Property by quit claim deed the same month. After the sale, Litton continued to discuss potential options with Williams until the lender released Litton from servicing the loan on March 1, 2010.

On June 9, 2010, after the redemption period had run, Williams filed this action in Wayne County Circuit Court, bringing the following claims: (1) quiet title, (2) unjust enrichment, (3) breach of implied agreement, (4) misrepresentation, (5) fraud, (6) constructive trust, and (7) breach of Mich. Comp. Laws § 600.3205. Defendants removed the case to district court on July 12, 2010, on the basis of diversity jurisdiction. On December 17, 2010, Defendants filed a motion for summary judgment. On the same day, Williams filed a motion to amend the complaint to add a claim of "Deceptive Act and/or Unfair Trade Practice." The motion to amend was denied on February 17, 2011, without prejudice. Williams did not file a response to the motion for summary judgment, and the motion was granted by the district court on March 9, 2011. Williams filed a motion for reconsideration, which was granted on June 9, 2011.

**\*467** After oral argument on November 22, 2011, the district court again granted Defendants' motion for summary judgment. The court explained in its oral opinion that it was granting the motion on two grounds: (1) lack of standing

and (2) the Statute of Frauds. Williams appeals this ruling, claiming that Litton made an oral promise that it would not go forward with the foreclosure sale and would come to terms to let Williams keep the home. Williams argues that Litton breached its promise and acted fraudulently when it sold the house at the foreclosure sale. Williams also appeals the denial of his motion to amend.

## STANDARD OF REVIEW

**\*\*2** This Court reviews a district court's grant of summary judgment *de novo. Bowling Green v. Martin Land Dev. Co.,* 561 F.3d 556, 558 (6th Cir.2009). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding a motion for summary judgment, the court examines all evidence in the light most favorable to the non-moving party. *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 529 (6th Cir.2012).

This Court reviews the denial of a motion to amend for abuse of discretion. *Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 420 (6th Cir.2000).

## DISCUSSION

The district court, in its oral decision, did not specify which claims failed due to lack of standing and which claims failed due to the Statute of Frauds. This opinion will address each of these issues separately.

### I. Standing under Michigan Law

Under Michigan law [1], a party must have "a legal or equitable right, title, or interest in the subject matter of the controversy" to establish standing. [2] *MOSES, Inc. v. Se. Mich. Council of Gov'ts,* 270 Mich.App. 401, 716 N.W.2d 278, 286 (2006) (internal quotation marks omitted); *Awad v. Gen. Motors Acceptance Corp.,* No. 302692, 2012 WL 1415166, at \*2 (Mich.Ct.App. Apr. 24, 2012) (per curiam). Upon foreclosure, the rights of both the mortgagor and mortgagee are controlled by statute. *Senters v. Ottawa Sav. Bank, FSB,* 443 Mich. 45, 503 N.W.2d 639, 642 (1993). Michigan's foreclosure statute provides that, once the redemption period is expired, all of the mortgagor's rights in the property are extinguished by operation of law. Mich. Comp. Laws § 600.3236; *Piotrowski*

*v. State Land Office Bd.,* 302 Mich. 179, 4 N.W.2d 514, 517 (1942). This includes any rights arising under equity. *Senters,* 503 N.W.2d at 644 ("Where, as in the present case, a statute is applicable to the circumstances and dictates the requirements **\*468** for relief by one party, equity will not interfere.").

The redemption period following a foreclosure is six months after the date of the sale, Mich. Comp. Laws § 600.3240, and Michigan law does not allow for an extension of the statutory redemption period absent a clear showing of fraud or irregularity. *Schulthies v. Barron,* 16 Mich.App. 246, 167 N.W.2d 784, 785 (1969). The Michigan courts have determined that, after the expiration of the redemption period, a mortgagor does not have standing to bring an action to quiet title or challenge the foreclosure proceedings. *See Overton v. Mortg. Elec. Registration Sys.,* No. 284950, 2009 WL 1507342, at \*1 (Mich.Ct.App. May 28, 2009) (per curiam); *Sagmani v. Lending Assocs. LLC,* No. 302865, 2012 WL 3193940, at \*1 (Mich.Ct.App. Aug. 7, 2012) (per curiam); *Awad,* 2012 WL 1415166, at \*4.

In this case, the district court held that Williams lacked standing to bring this case because, after the redemption period expired, Williams did not have a legal interest in the house. The foreclosure sale occurred on October 26, 2009, and the case was filed on June 9, 2010, nearly eight months after the sale and well after the end of the statutory redemption period. Thus, absent a clear showing of fraud or irregularity, Williams's rights to the property were extinguished, and he lacked standing under Michigan law to challenge the foreclosure proceedings or the foreclosure sale. *See Overton,* 2009 WL 1507342, at \*1 (citing Mich. Comp. Laws § 600.3236).

**\*\*3** **[1]** Williams attempts to invoke the fraud or irregularity exception to extend the redemption period. In order to qualify for the exception and extend the redemption period, the fraud or irregularity must be in "conducting the legal measures." *Heimerdinger v. Heimerdinger,* 299 Mich. 149, 299 N.W. 844, 846 (1941). This requires that the fraud or irregularity be present in the foreclosure procedure itself. *Sagmani,* 2012 WL 3193940, at \*1 ("A party can challenge the foreclosure after the redemption period only if there is clear evidence of fraud or irregularity in the foreclosure proceedings."). However, Williams's claim of fraud relies on oral assurances during a negotiation to change the terms of the contract. Despite the fact that the negotiations may have taken place during the foreclosure process, these negotiations remained separate from the foreclosure process itself. As

such, even if assumed to be true, Williams's allegations of fraud would not qualify him for the fraud exception because they are not fraud or irregularity in "the legal measures" of the foreclosure process.

Consequently, Williams did not have standing to assert any claim to legal or equitable title in the home because the redemption period had expired and he did not allege any fraud or irregularity in the foreclosure process. Without any legal or equitable title in the home, Williams cannot receive injunctive relief restoring him to title in the home. Therefore, Williams's claims for quiet title and constructive trust were properly dismissed.

## II. Michigan Statute of Frauds

 [2]    Williams also seeks relief for breach of implied agreement, misrepresentation, and fraud on account of an oral promise allegedly made by Litton to delay the foreclosure sale. However, the Michigan Statute of Frauds expressly states that "[a]n action shall not be brought against a financial institution to enforce [a promise or commitment to waive a provision of a loan or make any other financial accommodation] unless the promise or commitment is in writing and signed." Mich. Comp. Laws § 566.132(2). The language **469 of this statute is unambiguous and should be read as an "unqualified and broad ban" of any claim—"no matter its label"—against a financial institution to enforce the terms of an oral promise waiving a loan provision. *Crown Tech. Park v. D & N Bank, FSB,* 242 Mich.App. 538, 619 N.W.2d 66, 72 (2000).

Williams, relying on *Schering–Plough Healthcare Products, Inc. v. NBD Bank, N.A.,* 98 F.3d 904 (6th Cir.1996), argues that the meaning of "financial accommodation" in § 566.132(2) requires that the financial institution be exposed to some sort of risk of loss before there would be a writing requirement. Williams's argument is misplaced. In the period between *Schering–Plough* and this case, the Michigan Court of Appeals has clearly interpreted § 566.132(2) to include promises to delay foreclosure sales, holding that "an agreement to delay a foreclosure sale is an agreement to make a 'financial accommodation.' " *FEI Co. v. Republic Bank, S.E.,* No. 268700, 2006 WL 2313612, at *2 (Mich.Ct.App. Aug. 10, 2006) (quoting Mich. Comp. Laws § 566.132(2)(a)).

 **4 Here, Williams's claims relied on an alleged promise or agreement by Litton to delay the foreclosure sale. Although Williams does not specify whether these assurances happened before, after, or both before and after the foreclosure sale,

this uncertainty does not affect the outcome of this case. Williams did not support his allegations with a writing. He relied solely on oral assurances allegedly made by Litton. The courts cannot enforce such a promise without evidence that would satisfy the Statute of Frauds. Because Williams did not come forward with a writing, his claims of breach of implied agreement, misrepresentation, and fraud were properly dismissed.

## III. Unjust Enrichment

 [3]    Williams's claim of unjust enrichment was also properly dismissed, because this transaction was governed by contract. Upon establishing the elements of unjust enrichment, the law will imply a contract, but only if there is no express contract governing the same subject matter. *Belle Isle Grill Corp. v. Detroit,* 256 Mich.App. 463, 666 N.W.2d 271, 280 (2003). In this case, there was a contract which controlled the foreclosure, so a claim for unjust enrichment cannot succeed.

## IV. Violation of M.C.L. § 600.3205

Williams also claims that Defendants were in violation of § 600.3205. This statute applies only to proceedings in which the first notice was published after July 5, 2009, and before December 31, 2012. Mich. Comp. Laws § 600.3204(5). First notice of the foreclosure was published on June 9, 2009, before the effective date of the statute. Therefore, this statute could not have been violated, and this claim was also properly dismissed.

## V. Amended Complaint

 [4]    Finally, the district court did not abuse its discretion in denying, without prejudice, Williams's motion to amend his complaint to add a claim of "Deceptive Act and/or Unfair Trade Practice." The district court applied the correct standard in its determination and cited both the untimely nature of the motion and also the prejudice that would have been suffered by the Defendants had it allowed the motion. Furthermore, any amendment would have been futile because Williams's vague and speculative assertions were insufficient to state a plausible claim of fraud or irregularity. See *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## *470 CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

508 Fed.Appx. 465, 2012 WL 6200270

Footnotes

\*    The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1    This Court is exercising diversity jurisdiction, thus it "must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal court is located." *Corrigan v. U.S. Steel Corp.,* 478 F.3d 718, 723 (6th Cir.2007).

2    In this case, the arguments brought by the parties and the conclusion stated by the district court are based on standing under Michigan state law, not Article III. Although not addressed, this Court is satisfied that Williams has standing under Article III to raise his claims. Therefore, the discussion is limited to Williams's standing under Michigan law. *See Morell v. Star Taxi,* 343 Fed.Appx. 54, 57 (6th Cir.2009) ("When jurisdiction is premised on diversity of citizenship, a plaintiff must have standing under both Article III and state law in order to maintain a cause of action."); *see also Owen of Ga., Inc. v. Shelby Cnty.,* 648 F.2d 1084, 1088–90 (6th Cir.1981).

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3377416

KeyCite Yellow Flag - Negative Treatment
Distinguished by Dottore v. Huntington Nat. Bank, N.D.Ohio, February 10, 2014

2004 WL 3377416
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Western Division.

William T. WULIGER, Plaintiff,

v.

LIBERTY BANK, N.A., et al., Defendant.

No. 3:02 CV 1378.
|
March 4, 2004.

**Attorneys and Law Firms**

William T. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH, Pro Se.

John E. Sullivan, III, Julia Ryan Sullivan, Patrick J. Rhoa, Sullivan & Sullivan, Matthew P. Moriarty, Tucker Ellis & West, Robert E. Cahill, Brzytwa, Quick & McCrystal, Cleveland, OH, Roger A. Hipp, US Department of Justice Civil Division Commercial Litigation Branch, Washington, DC, Wallace A. Showman, New York, NY, Nicole M. Lundrigan, Richard S. Wayne, Strauss & Troy, Cincinnati, OH, for Plaintiff.

Ronald H. Isroff, Maria A. Del Monaco, Suzanne E. Duddy, Ulmer & Berne, Cleveland, OH, David W. Zoll, Zoll & Kranz, Toledo, OH, for Defendant.

*MEMORANDUM OPINION*

KATZ, J.

INITIAL BACKGROUND

*\*1* This action is related to a pending viatical insurance fraud action [1] which has spawned it own universe of civil litigation [2] and multiple criminal convictions. [3] *See Liberte v. Capwill,* 229 F.Supp.2d 799 (N.D.Ohio 2002). Victor M. Javitch is presently the Receiver [4] in the *Liberte* litigation. In that litigation, Liberte Capital Group, Inc. ("Liberte") and Alpha Capital Group ("Alpha") contend that James A.

Capwill ("Capwill"), through the entities Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL"), unlawfully diverted investor funds escrowed for insurance premiums or awaiting placement in viatical contracts.

As an outgrowth of the *Liberte* litigation, the Receiver initiated suit against Liberty Bank, N.A. ("Liberty Bank"), Capwill and John and/or Jane Does Nos. 1–20 (defined as present or former officers and/or directors of Liberty Bank) asserting claims sounding in RICO, aiding and abetting, failure to maintain banking records, negligence, as well as spoliation of evidence.

This matter is now before the Court on Defendant's motion to dismiss, Plaintiff's response, Defendant's reply, Plaintiff's surreply, Plaintiff's notice of supplemental authority, and Defendant's final brief in support. Also before the Court are the supplemental letter briefs of the parties contained in Doc. Nos. 60, 61, 62 and 63.

The Defendant's motion first challenges the Receiver's standing to bring claims on behalf of the investors. Second, the Defendant charges the claims sounding in RICO, aiding and abetting, negligence, failure to maintain proper bank records and spoliation of evidence are without a basis as a matter of law.

RELEVANT LEGAL STANDARDS

Generally, Fed.R.Civ.P. 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall into two categories: facial attacks and factual attacks. FED. R. CIV. P. 12(b)(1); *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir.1994). A facial attack challenges the sufficiency of the pleading itself. Upon receiving such a motion, the Court must take all of the material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Id.* (citing *Scheuer v. Rhodes,* 416 U.S. 232, 235–37, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974)). In contrast, a factual attack challenges the factual existence of subject matter jurisdiction. *See Ohio Hosp. Ass'n v. Shalala,* 978 F.Supp. 735, 739 (N.D.Ohio.1997).

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the function of the Court is to test the legal sufficiency of the complaint. In scrutinizing the complaint, the Court is required to accept the allegations stated in the complaint as true, *Hishon v. King & Spalding,*

Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)

2004 WL 3377416

467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), while viewing the complaint in a light most favorable to the plaintiffs, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). The Court is without authority to dismiss the claims unless it can be demonstrated beyond a doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Westlake, supra,* at 858. *See generally* 2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE, § 12.34[1] (3d ed.2003).

STANDING

*A. Applicable Standard*

 **\*2**  The party invoking federal jurisdiction has the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561–562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The nature of the standing doctrine encompasses both constitutional and prudential requirements. Failure to establish standing is a jurisdictional defect. *Stupak–Thrall v. Glickman,* 346 F.3d 579 (6th Cir.2003). Moreover, standing is determined as of the date the suit is filed. *Senter v. General Motors Corp.,* 532 F.2d 511, 518 (6th Cir.) *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

With regard to the constitutional aspects, in order to meet this burden the plaintiff must establish the requirements set forth to satisfy Article III standing requirements, which require a plaintiff to show:

> "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Cleveland Branch, N.A.A.C.P. v. City of Parma, Oh.,* 263 F.3d 513, 523–524 (6th Cir.2001), *cert. denied,* 535 U.S. 971, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002) (citations omitted).

The prudential standing considerations require the court to consider: (1) whether the alleged injury to plaintiff falls within the "zone of interests" protected by the statute or constitutional provision at issue; (2) whether the complaint raises nothing more than abstract questions amounting to generalized grievances that are more appropriately resolved by the legislative and executive branches; and (3) whether the plaintiff is asserting its own legal rights and interests rather than those of a third party. *See In re Cannon III,* 277 F.3d 838, 853 (6th Cir.2002). With this framework in mind, the Court now turns to the parties contentions.

*B. Receiver History*

Before delving into the legal analysis as to standing, the Court deems it necessary to outline the history of the Receivership and its odyssey to this juncture. The *Liberte* case was initiated in early April 1999. On July 2, 1999, the Court approved the appointment of a receiver based upon the following conclusions of law:

> 1. There is an imminent danger that the funds managed by Capital [Fund Leasing ("CFL") ] for the benefit of the investors, Liberte and Alpha will be lost, concealed, or diminished in value to the detriment of the plaintiff, the intervening plaintiff and the investors in viatical contracts.

> 2. The investors, Alpha and Liberte have no adequate remedy at law.

> 3. The denial of the appointment of a Receiver has the probability of causing Liberte and Alpha more harm than the appointment of a Receiver will cause the Capwill interests who oppose the appointment of a Receiver.

> 4. There exists the probability of success on the part of Liberte and Alpha in this action along with the strong probability of irreparable harm if the appointment of a Receiver is denied.

>  **\*3**  5. The interests of Liberte and Alpha will be served by the appointment of a Receiver.

*Liberte,* Doc. 121, p. 15.

The judgment entry appointing the Receiver states in pertinent part:

> that it is beneficial for a Receiver to be forthwith appointed as requested

*Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)*

2004 WL 3377416

by Intervenors to take charge of the assets belonging to VES and CFL, to manage those assets and to see to the proper administration and, where appropriate, eventual sale of said assets and distribution to creditors in order to the legal priorities and that, in the interim, litigation among the parties to this action be stayed except upon conditions that may be set by the Court.

*Id.* Doc. No. 132. The entry further states the Receiver is "to take charge of the property of Defendants Viatical Escrow Services, LLC ("VES") and Capital Fund Leasing ("CFL")" with the overall goal of the receivership as "preserv [ing], and increas[ing] the estate for the benefit of all the creditors, investors, owners and parties to this case." *Id.* While the entry of appointment states that the Receivership is to "oversee and to administer the business and assets of VES and CFL," those actions were delineated in part as follows:

(b) if advisable, to obtain an appraisal of some or all of the assets of VES and CFL;

(c) to sell the assets of VES and CFL, including real property, on terms, provisions and conditions as shall be prescribed pursuant to further order of the Court;

(d) to satisfy the claims of creditors, including investors and other parties, in order of legal priority;

(e) to perform an accounting of VES and CFL property, including the making of recommendations to the Court regarding findings of fact and conclusions of law on claims among the parties with respect to VES and CFL;

...

(h) upon application and approval by the Court, to *institute, prosecute,* defend, intervene in, become party to, compromise or settle all such cases and proceedings as are in the Receiver's property or to carry out the terms of this Order, whether such cases and proceedings are now pending or hereafter brought by or against the Receiver in his capacity as Receiver of VES and/or CFL, against VES, or against CFL in state or federal courts or administrative agencies or other forums.

*Id.* at pp. 2–3. (Emphasis added.)

As the case against Capwill (in *Liberte* ) was evolving, the federal government filed a forfeiture action against J.Richard Jamieson, Liberte Capital Group, LLC and related entities. *United States v. Jamieson,* 3:00 CV 7312 (N.D.Ohio). In the *Jamieson* action, the government sought and obtained an injunction enjoining the *Jamieson* defendants from defrauding insurance companies as well as the investors. On October 17, 2000, Victor M. Javitch, Receiver, was directed to administer the sales of non-fraudulent Liberte policies, thereby expanding the scope of the estate to cover the interests in those policies funded by the Liberte investors. *Liberte,* Doc. No. 777.

**\*4** It was during this period that the broad scope of the case was just beginning to emerge as the initial status reports filed by the Receiver were focused on identifying areas of inquiry necessary to assessing the state of affairs relative to the Receivership Estate. *Liberte,* Doc. Nos. 173, 236, 286, and 324. Upon delving further into the dealings of Capwill, Jamieson and related entities, it became increasingly clear that the financial havoc created by the principals (and their entities) had severe ramifications for the parties to the *Liberte* action as well as other individuals and entities associated with or having dealings with the principals or their associates. That history is set forth in the Receiver's detailed reports.[5]

In the interim, the Court also adopted a settlement agreement entered into by the Receiver, existing intervening plaintiffs, defendant Capwill, and counsel for Andrew Capwill. (*Liberte,* Doc. No. 925.) The import of that order was to resolve procedural issues "including the receiver's ability to bring ancillary legal actions." *Id.* On May 31, 2002, the Receiver's authority was further expanded "to commence litigation against the banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services." *Liberte,* Doc. No. 1619.

Most recently, in April 2003, the Court noted the Receiver's "efforts are necessary not only to vindicate interests within the strict confines of the entities in receivership, but in the direct and larger interest of the investors as well." *Id.,* Doc. No.1982. To this end, the Receiver has been "empowered to represent and pursue the interests of the investors directly." *Id.* With that history in mind, the Court now turns to the parties' contentions.

### B. Analysis

There is no dispute as to the Receiver's standing as it pertains to VES and CFL given the Court's order of July 1999. The Defendant states that by virtue of the Sixth Circuit's decision in *Javitch v. First Union Securities, Inc.,* 315 F.3d 619 (6th Cir.2003), [6] the Receiver is prohibited from prosecuting this action on behalf of the investors and can only bring it on behalf of the entities VES and CFL. Since the opinion in *Javitch,* this Court in the *Liberte* case expanded the Receiver's authority to prosecute additional causes of action including those on behalf of the investors. The Defendants object to the Receiver's standing regarding his ability to bring suit on behalf of the investors on the basis that: (1) it is contrary to the *Javitch* decision; (2) it violates Article III of the Constitution; and (3) it results in an irreconcilable conflict of interest. Alternatively, the Defendant challenges the Receiver's ability to sue on behalf of the entities as barred by the doctrine of *in pari delicto.* For the reasons stated below, the Court finds Defendant's arguments are not well taken.

 **\*5** Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation. It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which he or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property." 12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed.1997). *See also,* 65 Am.Jur.2d Receivers § 129 (2d ed) (powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court).

In the *Liberte* case, the VES, CFL and Alpha entities are both defunct. Additionally, both receivers operate under the Court's directives, which are generally aimed at marshaling assets for the benefit of the class/investors, [7] among others. The evolving nature of the *Liberte* action is evident from the orders regarding the Receiver's responsibilities following his initial appointment. For example, in October 2000, the Court approved the request to allow the Receiver to take control of Liberte policies in order to maximize their worth "in the best interest of the investors." *Liberte,* Doc. No. 777. Nearly two years later and due to a conflict by the General Receiver, the Alpha Receiver was *"authorized to commence litigation against banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from*

*Capital Fund Leasing and Viatical Escrow Services."* Liberte, Doc. No. 1610. (Emphasis added.)

Later that same year, the Court granted the joint motion of the Alpha and General Receiver regarding the recovery of commissions relative to Liberte and Alpha agents/brokers. Since the claims against agents and/or brokers sounding in contract or tort arose from claims by investors, those claims were "deemed to be assets of the receivership estates" and were only to be pursued by the Receivers. *Liberte,* Doc. No. 1758. Most recently, in April 2003, the Court expanded the Receivers' responsibilities and authorized them "to represent and pursue the interests of the investors directly." *Liberte,* Doc. No.1982. The banks are challenging this latest expansion of the Receivers' authority in the *Liberte* action. [8]

Under the May 31, 2002 Order in *Liberte,* the Receiver's authority was expanded to initiate the type of suit involved in the case *sub judice.* Therefore, the Receiver was authorized to prosecute claims sounding in RICO, negligence and tort actions against the banks. The Defendant places great emphasis on the discussion of the Receiver's authority in the *Javitch* decision; however, it must be noted that the Sixth Circuit determined the propriety of claims rested upon "the authority granted by the appointing court and actually exercised by the receiver." *Javitch,* 315 F.3d at 626. (Citations omitted). In addition, the Court in *Javitch* noted that "fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue." *Scholey v. Schroeder,* 744 F.Supp. 1419, 1422–1423 (N.D.Ill.990) (emphasis in original). (Change sentence.) To the extent that the entities are entitled to pursue claims against the Defendants for injuries to the entities and by virtue of the initial order of appointment and subsequent orders expanding that authority, the Receiver has standing to bring suit against the Defendant bank. This is consistent with the Sixth Circuit's position in *Javitch* and comports with the constitutional dictates of standing. Because this Court finds the Receiver has standing to bring this action on behalf of the VES and CFL entities, it is unnecessary to discuss the propriety of the Receiver's standing as it pertains to investor claims.

 **\*6** However, the Defendant also challenges the Receiver's ability to pursue claims based upon the doctrine of *in pari delicto.* [9] This is because James Capwill, the principal of both VES and CFL, was the chief architect in the wrongful conversion/embezzlement of investor funds. Therefore, they argue, his wrongful acts are imputed to the entities and

Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)
2004 WL 3377416

thereby imputed to the Receiver and preclude claims against the Defendant. This Court disagrees.

Actions by equity receivers against third parties are viable where the "wrongdoer" has been removed. For example, in *Scholes v. Lehman,* 56 F.3d 750, 754–755 (7th Cir.), *cert. denied sub. nom, African Enterprise Inc. v. Scholes,* 516 U.S. 1029 (1995), Judge Posner provided this explanation:

> Though injured by the [corporate agent] Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud ... But the reason, of course, ... is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys-for the benefit not of Douglas but of innocent [creditors]—that Douglas had made the corporations divert to unauthorized purposes. That return would benefit the [creditors] is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the [creditors] were not complicit in Douglas's fraud; they were its victims.

> Put differently, the defense of *in Parti Delicto* loses its sting when the person who is *in Parti Delicto* is eliminated. Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their ... creditors, we cannot see an objections to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

*See also, McCandless v. Furland,* 296 U.S. 140, 56 S.Ct. 304, 80 L.Ed. 473 (1935) (participation by debtor's management or agents in wrongful conduct does not bar a receiver's action under the doctrine of *in parti delico* ).

Even in the context of a bankruptcy dispute, the imputation of wrongdoing to an innocent successor estate does not comport with the equitable doctrine of *in pari delicto:*

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the [debtor]; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [debtor]'s assets to cure any associated defects ... In light of these considerations we conclude that the equities between a party asserting an equitable defense and a [debtor] are at such variance with the equities between a party and a receiver of the [debtor] that equitable defenses good against the [debtor] should not be available against the receiver. To hold otherwise would be to elevate form over substance —something courts sitting in equity traditionally will not do ... [T]he [debtor']s inequitable conduct is not imputed to [a receiver].

**\*7** *F.D.I.C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir.1995). *See also Official Committee of Unsecured Creditors v. R.F. Laferty & Co.,* 267 F.3d 340, 358 (3d Cir.2001).

Most recently, a subsidiary's receiver's suit against the parent and its officers was allowed to proceed despite the claim that the doctrine of *in pari delicto* barred the suit. *DeNune v. Consolidated Capital of North America, Inc.,* 288 F.Supp.2d 844 (N.D.Ohio, Sept.23, 2003) (Carr, J.). The Defendants' reliance upon *In re Cannon,* 277 F.3d 838 (6th Cir.2002), is also distinguishable given that case involved a trustee in bankruptcy. There the Sixth Circuit noted the bankruptcy trustee's powers are conferred by statute alone. *Id.* at 853. See also *In re Dayton Title Agency, Inc.,* 292 B.R. 857, 870 n. 4 (S.D.Ohio 2003) (noting the difference where the debtor chooses to pursue claims outside the bankruptcy which are further complicated by pursuing funds held in trust but for the bankruptcy estate directly).

As contrasted with a bankruptcy trustee, an equity receiver's duties are fashioned and may be modified by the appointing

**Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)**

2004 WL 3377416

court. Because this Court has expressly given the Receivers authority to pursue claims sounding in "money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services," the Receiver's duties herein are not limited by the bankruptcy statutes and the Receiver is not precluded from these actions under the doctrine of *in pari delicto.*

## RICO CLAIMS

*A. Compliance with Fed.R.Civ.P. 9(b)*
Fed.R.Civ.P. (b) states in pertinent part:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

"The Sixth Circuit reads this rule liberally, however, requiring a plaintiff, at a minimum to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." ' *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–162 (6th Cir.1993). Rule 9 is also balanced against Rule 8, which requires pleadings to be "simple, concise and direct." With both rules in mind, the Sixth Circuit has noted that "allegations of fraudulent misrepresentation[s] must be made with a sufficient particularity and a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Organization for Patients and Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.), *cert. denied,* 528 U.S. 871, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999) (citation omitted). There is support for the proposition that a date, time or place of fraud need not be plead where the plaintiff uses an alternative means of injecting precision and some measure of substantiation into their allegations of fraud. *Jairett v. First Montauk Securities Corp.,* 203 F.R.D. 181, 186 (E.D.Pa.2001). *See also Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679–680 (6th Cir.1988) (advocating reading Rules 8 and 9(b) in harmony).

**\*8** Having carefully reviewed the fifty page complaint in this case, the essence of the complaint is that the Defendants knew or deliberately ignored banking regulations and failed

to perform due diligence, all of which would have put them on notice of Capwill's illicit activities. The time frame during which these events took place was from 1998 through 2000. During that time there were approximately 13 Capwill controlled accounts, (Compl. at p. 19), involving numerous transactions many of which were directed to and from Capwill's personal account. The complaint lists, in part, the account name, account number, the date of the transaction, whether there was a deposit or withdrawal and incidents of overdrafts. (Compl. at pp. 14–25.) In the Court's view, the specificity of the allegations comports with the dictates of Rule 9(b), especially given the time frame over which these numerous transactions occurred. *See Fujisawa Pharm Co. v. Kapoor,* 814 F.Supp. 720, 726 (N.D.Ill.1993) (complexity of each case determines the amount of specificity required, misrepresentations which are numerous and occur over an extended period of time may be held to somewhat less stringent Rule 9(b) standards).

*B. Operation or Management Test as Related to Count 1— § 1962(c)*
Under 18 U.S.C. § 1962(c):

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to demonstrate a violation under RICO, a plaintiff must establish the following elements:

> 1) that there were two or more predicate offenses; 2) that an "enterprise" existed; 3) that there was a nexus between the pattern of racketeering activity and the enterprise; and 4) that an injury to

Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)

2004 WL 3377416

business or property occurred as a result of the above three factors.

*VanDenBroeck v. Commonpoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir.2000).

The Defendant seeks dismissal of Count 1 on the basis the Receiver has not satisfied the operation or management test as enunciated by the Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The Receiver advocates a broad application of *Reves* to include conduct attributable to the Defendant bank.

In a related action, this Court considered and rejected identical arguments premised by a securities brokerage firm which opened accounts for and transferred monies pursuant to James Capwill's direction. *Javitch v. Capwill,* 284 F.Supp. 848 (N.D.Ohio 2003). This Court noted that the *Reves* decision and those of other courts supported the proposition that:

> [M]ere participation in the activities of the enterprise is insufficient/ the defendant must participate in the operation or management of the enterprise." *Abbott v. Chemical Trust,* 2001 WL 492388 (D.Kan.2001), citing *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 727 (7th Cir.1998). *See also, Stone v. Kirk,* 8 F.3d 1079, 1091–1092 (6th Cir.1993) (applying the *Reves* operation or management test).

**\*9** *Id.* at 853.

After discussion of the relevant cases, many of which are cited by both parties here, the Court framed the issue as follows:

> Stated differently, was the account activity conducted by Union at Capwill's direction sufficient to meet the test of managing or directing the affairs of the enterprise? Union acted according to Capwill's directives. Even assuming Union turned its head to Capwill's activities, "[s]*imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)." United States v. Swan,* 250 F.3d 495, 499 (7th Cir.2001), quoting

*Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 727 (7th Cir.1998). Having reviewed the second amended complaint in its entirety, there is no allegation upon which Union's conduct amounts to control or direction of the enterprise. Union merely carried out Capwill's directives (and others at Capwill's behest) in accordance with their business relationship.

*Id.* at 854. (Emphasis added.)

Applying this analysis to the case *sub judice,* Liberty Bank's conduct is similar to that of the brokerage house insofar as it merely provided banking services in the context of a business relationship. Participation in a business relationship without more does not equate to liability under § 1962(c). *McNew v. Peoples Bank of Ewing,* 999 F.2d 540, 1993 WL 243772 (6th Cir.1993) (unpublished) (no actionable RICO claim against bank where the institution merely serviced the customer). As the complaint does not allege a basis to sustain the "operations or management" test in *Reves,* Defendant's motion is granted as to Count 1.

**C.** *§ 1962(d)—Conspiracy*
Under 18 U.S.C. § 1962(d):

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Where a plaintiff is unable to set forth viable claims under § 1962(a), (b), or (c), it is fatal to a claim of conspiracy under (d). *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 495 (6th Cir.1990). *See also, International Brotherhood of Teamsters v. Carey,* 297 F.Supp.2d 706, 2004 U.S.Dist. LEXIS 1073 at *35–36 (S.D.N.Y. Jan.29, 2004); *Miller v. Norfolk Southern Ry. Co.,* 183 F.Supp.2d 996, 1003 (N.D.Ohio 2002); *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 658 (S.D.N.Y.1996) citing *Craighead.*

As the Court has determined there has been a failure to plead the conduct or participation in a racketeering enterprise under § 1962(c), the Plaintiff's claim of conspiracy, which is dependent upon the viability of (c), must also fail as a matter of law. Accordingly, Defendant's motion is well taken as to Count 2.

*D. Aiding and Abetting—Count Three*
The Defendant moves for dismissal of Count Three alleging aiding and abetting under RICO and at common law. The Court first discusses the viability of this claim under RICO and then under the common law.

1. *Viability under RICO*
**\*10** In *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held there is no private right of action for an aiding and abetting suit under Securities Exchange Act § 10(b). Following this pronouncement, several district courts extended the teachings of *Central Bank* insofar as it pertained to a private right of action for aiding and abetting under RICO. *See Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 255–257 (S.D.N.Y.1997); *General Motors Corp. v. Ignacio Lopez de Arrortua,* 948 F.Supp. 670, 684 (E.D.Mich.1996); *Department of Economic Development v. Arthur Anderson & Co.,* 924 F.Supp. 449, 475–477 (S.D.N.Y.1996).

More recently, the Third Circuit had occasion to address this issue directly and expressly rejected assertion of a private cause of action against a bank for allegedly aiding and abetting a RICO violation. *Pennsylvania Ass'n of Edwards Heirs v. Rightenour,* 235 F.3d 839 (3d Cir.2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 43, 151 L.Ed.2d 15 (2001). In factual circumstances similar to the present action the defendant bank was accused of aiding and abetting former officers of a nonprofit association. Carefully considering the decision in *Central Bank,* the Third Circuit held "[t]he Supreme Court's language makes it abundantly clear that, in the absence of statutory authorization, there is no presumption in favor of recognizing a civil aiding and abetting claim." *Id.* at 844.

Although the Sixth Circuit has not yet spoken on this issue, this Court finds the Third Circuit's reasoning persuasive. Therefore, this Court finds there is no private right of action for aiding and abetting in violation of RICO. Alternatively, because the Plaintiff has failed to establish one of the essential elements necessary to a RICO claim, the aiding and abetting claim also fails.

2. *Common Law*
Defendant also seeks dismissal of the claim alleging "aiding and abetting at common law." (Compl. at ¶ 250(b).) In reading

Count three, it appears that Plaintiff makes broad allegations of aiding and abetting wrongs committed by Capwill.

The claims for aiding and abetting must, according to Defendants, be dismissed because Ohio does not recognize a cause of action for aiding or abetting common law fraud. *See, Federated Management Company v. Coopers & Lybrand,* 137 Ohio App.3d 366, 382, 738 N.E.2d 842, 853 (April 4, 2000) (distinguishing cases offered by appellants as unpersuasive in supporting a claim of aiding and abetting fraud).

However, just a few months following the appellate court's decision declining to acknowledge such a claim, the Sixth Circuit in *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.,* 219 F.3d 519, 532–534 (6th Cir. July 13, 2000), tackled the issue of aiding and abetting fraud under Ohio law, finding "no conflict between the position that an aider and abettor must have actual knowledge of the primary party's wrongdoing and the statement that it is enough for the aider and abettor to have a general awareness of its role in the other's tortious conduct for liability to attach." In so doing, the Sixth Circuit noted that while the Ohio Supreme Court had never expressly approved Section 876, it had applied Section 876(b) in *Great Cent. Ins. Co. v. Tobias,* 37 Ohio St.3d 127, 524 N.E.2d 168 (1988). Upon this basis, it was determined that if presented with the issue, "the Supreme Court of Ohio would recognize aiding and abetting liability." *Aetna Casualty and Surety Co.,* 219 F.3d at 533. Other Ohio appellate courts have also considered the Restatement in analyzing claims of aiding and abetting. *See State Automobile Mut. Ins. Co. v. Rainsberg,* 86 Ohio App.3d 417, 621 N.E.2d 520 (1993) (adopting Restatement (Second) of Torts § 876); *LeCrone v. Ohio Bell Telephone,* 120 Ohio App. 129, 201 N.E.2d 533 (1963); *Kuhn v. Bader,* 89 Ohio App. 203, 101 N.E.2d 322 (1951).

**\*11** Based upon the claims that the Defendant knew or should have known Capwill was engaged in wrongdoing and assisted him in pursuit of those actions for purposes of this motion, the Court must accept the factual allegations as true. Therefore, at this juncture of the proceedings, it cannot be demonstrated beyond a doubt that the plaintiff can prove no set of facts which would entitle it to relief. Accordingly, the Court denies Defendant's motion as to the this portion of Count 3.

FAILURE TO MAINTAIN PROPER BANK RECORDS

*A. Bank Secrecy Act*

The purpose of the Bank Secrecy Act ("BSA") is contained at 31 U.S.C. § 5311 as follows:

> It is the purpose of this subchapter (except section 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism.

Violations of these regulations are subject to injunctions by the Secretary of the Treasury under § 5320, civil penalties to the United States Government or the Secretary of Treasury pursuant to § 5321, as well as criminal penalties under § 5322.

The Defendant seeks to dismiss allegations that Liberty Bank failed to maintain proper bank records under this statute and point out that there is no relevant case law to support this proposition. The Court's independent research demonstrates that there are only two reported decisions which deal with this precise issue. In *Martinez Colon v. Santander National Bank,* 4 F.Supp.2d 53 (D.Puerto Rico 1998), the district court rejected a private right of action relative to the BSA. Similarly in *Gress v. PNC Bank, National Ass'n,* 100 F.Supp.2d 289, 294–295 (E.D.Pa.2000), the district judge rejected claims by payees of a treasurer check wrongfully paid to a third party and found that the federal statute regulating a bank's record-keeping obligations did not give rise to a private cause of action. *See also Quinn v. United States,* 2003 WL 22133715 at *2 (W.D.Okla.2003) (unpublished) (noting that nothing in § 5313 of the BSA granted an aggrieved party a private right of action).

In *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 308 (6th Cir.2000), the Sixth Circuit noted the four part test enunciated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1974) [10] regarding whether an implied right of action existed relative to a federal statute. The panel in *Parry* stated that since the *Cort* decision the Supreme Court clarified the test as focusing on "whether Congress, expressly or by implication, intended to create a private cause of action." *Parry v. Mohawk Motors of Michigan,*

*Inc.,* 236 F.3d 299, 308 (6th Cir.2000) (citations omitted). Having examined the relevant statutes and case law, the clear import of the statutory language and its relevant enforcement provisions do not support an express or implied private right of action.

*B. Ohio Rev.Code § 1109.69–Retention of Records*

 **\*12**  Similarly, the Receiver has not demonstrated that a parallel private right of action exists under Ohio Rev.Code § 1109.69. *See Nielsen v. Ford Motor Co.,* 113 Ohio App.3d 495, 500–501, 681 N.E.2d 470, 474 (1996) (employing *Cort* test to determine whether statute creates a private right of action for enforcement). Accordingly, Defendant's motion as to Count 4 is well taken.

SPOLIATION OF EVIDENCE

Count 6 of the complaint alleges a spoliation of evidence claim as follows:

202. Liberty Bank's failure to maintain bank records amounts to spoliation of evidence under state law.

203. Liberty Bank is liable for such spoliation.

204. Additionally, any other Liberty Defendant who was involved with said spoliation is also liable to the Receiver under state law for such acts or omissions.

(Compl. at p. 47.)

The Ohio Supreme Court approved a cause of action for destruction of evidence in *Smith v. Howard Johnson Co.,* 67 Ohio St.3d 28, 615 N.E.2d 1037 (1993). The elements essential to this claim include: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Id.* at 29, 615 N.E.2d 1037, 67 Ohio St.3d 30, 615 N.E.2d 1038.

The Defendant advocates dismissal of this claim based upon inadequate pleading of this claim by the Receiver. However, it must be remembered that under Fed.R.Civ.P. 8, the liberal notice pleading standards were "adopted to focus litigation on the merits of a claim." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 999, 152 L.Ed.2d 1

**Wunger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)**

2004 WL 3377416

(2002) (an employment discrimination case rejecting the need to all elements of the *prima facie* case). Viewing the complaint in the light most favorable to the non-movant, the allegation of spoliation of evidence remains viable, although it may not survive a motion for summary judgment. The latter determination, however, necessitates discovery and it is premature to dismiss this claim at this juncture of the proceedings. In sum, the Defendant has been placed on notice of the claim and is capable of fashioning an answer thereto. Therefore, Defendant's motion as to Count 6 is denied.

### NEGLIGENCE

In Counts 7 and 8, the complaint alleges negligence regarding federal law duties and under state law. In his complaint, the Receiver characterizes duties by the Defendant bank as including those enumerated in the Bank Secrecy Act for the protection of the public at large as well as Defendant's account holders. Allegations as to breaches of state law duties are also stated therein. Central to a claim of negligence, however, is a duty which has been breached by a defendant. Therefore, the first question requires examination to whom a duty is owed. Since the Receiver stands in the shoes of the entities, he cannot assert claims on behalf of the investors since they were not customers of the Defendant. It is clear that even in the context of a fiduciary relationship, a bank owes no fiduciary duty to its own customers "in a commercial context when the parties deal at arm's length." *In re Termination of Employment,* 40 Ohio St.2d, 107, 115, 3210 N.E.2d 603 (1974). In the absence of an agreement between the parties, a bank's obligation is limited to the exercise of ordinary care. *Wilson v. Citizens Cen. Bank,* 56 Oho App. 478, 56 Ohio App. 478, 11 N.E.2d 118 (1936). Therefore, a duty of ordinary care was owed to the Capwill-related entities. In this instance, there is no allegation that Capwill was without authority to open the enumerated accounts. The Defendant provided nothing apart from standard banking services. While there were several accounts between and/or among which Capwill transferred monies, the movement of those monies cannot, for example, be held to be a violation of the Ohio Fraudulent Transfer Act. *See Collins v. National City Bank,* 2003 WL 22971874 (Ohio App., Dec.19, 2003) ( vendor seeking to recover funds held in escrow account from bankrupt title company sued bank for recovery and failed to state a negligence claim). Those cases relied upon by the

Receiver dealt with situations in which the banks disregarded instructions thereby disregarding duties of ordinary care. Here, the principal was authorized to open the accounts. In so doing, he was also authorized to transfer monies. That the Bank should have looked behind each transfer in the absence of a suspicious instrument would place an onerous responsibility on the shoulders of all banks. *See Software Design and Application, Ltd. v. Hoefer and Arnett, Inc.,* 49 Cal.App.4th 472, 481–482, 56 Cal.Rptr.2d 756 (1996). However, transfers of funds from these accounts by Capwill directly to Capwill's personal accounts totaling nearly four million dollars ($4,000,000) by this small bank in less than a two year period, raise a question as to whether these transactions violated the bank's duty of ordinary care to the entities within the Receivership estate. *See Sun'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978) (issue of negligence raised where corporate employee presented altered corporate check for payment to the bank and bank placed proceeds in corporate embezzler's account). In addition, the significant amount by which Capwill's personal account was overdrawn, given the amounts wired from the other accounts therein, are sufficient to withstand Defendant's challenge.

**\*13** Since Plaintiff has not presented any authority which establishes a federal common law claim, dismissal is appropriate as to Count 4. With regard to the state law claim, under the circumstances presented in the complaint and viewing the complaint in the light most favorable to the non-movant, Defendant's motion for dismissal is not well taken.

### CONCLUSION

For the aforementioned reasons, Defendant's motion to dismiss is granted as to Counts 1, 2, 3 (to the extent it is based upon RICO), 4, 5 and 7. However, Defendant's motion to dismiss is denied as to Counts 3 (based upon common law), 6 and 8. Defendant is granted to March 26, 2004 to answer the complaint.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3377416

Footnotes

**Wuliger v. Liberty Bank, N.A., Not Reported in F.Supp.2d (2004)**

2004 WL 3377416

1   *Liberte Capital Group, LLC et al., v. James A Capwill, et al.,* 5:99 CV 818 (N.D.Ohio) (*"Liberte"*). That action revolves around the viatical settlement industry. Plaintiff Liberte Capital LLC ("Liberte") and Intervening Plaintiffs Alpha Capital Group LLC and Integrity Management Partners, LLC (collectively "Alpha") were engaged in the business of purchasing life insurance policies from terminally ill policyholders willing to sell their rights to the policies. Liberte also solicited investors for policies on the lives of seniors without terminal illness. Investors were solicited by Liberte and Alpha to purchase viatical life insurance investment programs whereby investors were matched in many cases with the policy on the terminally ill person or "viator".

2   As of the last count, there are over one hundred and fifty related civil actions pending in the Northern District of Ohio as well as a number of state related cases.

3   *United States v. James A Capwill,* 5:01 CR 471 (N.D.Ohio); *United States v. John Richard Jamieson,* 3:02 CR 707 (N.D.Ohio).

4   Initially Frederick M. Luper was appointed Receiver on July 15, 1999; however, effective June 26, 2000, Mr. Javitch replaced Mr. Luper in that capacity.

5   *Liberte,* Doc. Nos. 787, 788, 1002, 1102, 1212, 1306, 1358, 1436, 1547, 1657, 1741, 1838, 1916, 1985, 2030, and 2069.

6   In his capacity as Receiver, Javitch initiated litigation against four brokerage houses alleging, in the main, actions sounding in negligence, breach of fiduciary duties, fraud, and RICO violations. *See, Javitch v. First Union Securities,* Case No. 01 CV 00780; *Javitch v. Charles Schwab & Co., Inc.,* Case No. 01 CV 1015; *Javitch v. Morgan Stanley Dean Witter & Co.,* Case No. 01 CV1077; and *Javitch v. Fifth Third/Maxus Securities, Inc.,* Case No. 01 CV 1126. Those claims stemmed from Capwill's actions in diverting investors funds and their placement in brokerage accounts. At the outset of the litigation, the defendant brokerage houses moved for an order compelling arbitration based upon customer agreements which provided for mandatory arbitration of disputes. This Court denied the defendants' motions on the basis that the Receiver was not bound by the arbitration clauses in those agreements. On appeal, the Sixth Circuit specifically addressed the authority of the receiver. Noting the general rules applicable in receiverships, the appellate panel agreed "based on our assessment of both the claims being asserted by Javitch and the *authority granted to him by the order appointing him as receiver* that the district court properly found that Javitch has asserted claims belonging to the receivership entities." 315 F.3d at 627. (Emphasis added.) The Circuit remanded the case for consideration of validity of the arbitration agreements as a primary determination directly impacting upon enforceability. *Id.* at 627–628.

7   The Liberte investors were certified a class as of March 2001. *Liberte,* Doc. Nos. 991 and 992.

8   The Alpha Receiver initiated litigation in the Northern District of Ohio as against U.S. Bankcorp, as successor to Firstar Bank f/k/a/ Star Bank NA, (*Wuliger v. Star Bank,* Case No. 02 CV 513); Liberty Bank, NA, (*Wuliger v. Liberty Bank,* Case No. 02 CV 1378); KeyBank National Association (*Wuliger v. KeyBank,* Case No. 02 CV 2160). In the *Liberte* case, following this Court's April 2003 Order expanding the scope of the Receivers' authority, the aforementioned banks filed motions to intervene for purposes of challenging that particular order. This Court denied intervention as well as the request to file an amicus brief given that the standing issue was partially briefed in all of the bank litigation cases and that there would be an opportunity for supplemental briefing to allow the banks to raise additional concerns regarding standing. In fact, after the Court's decision in *Liberte* denying intervention, the Defendant banks all filed final briefs on September 9, 2003. On August 20, 2003, the banks appealed denial of their motion for intervention and that appeal is currently pending with the Sixth Circuit. *Liberte v. Capwill,* Appellate Case No. 03–4278.

9   In equal fault; equally culpable or criminal; in a case of equal fault or guilt. BLACK'S LAW DICTIONARY 791 (6th ed.1990).

10  "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U.S. at 78, 95 S.Ct. at 2088.

---

**End of Document**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.