UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLSTATE INSURANCE COMPANY;
ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; ESURANCE
INSURANCE COMPANY; and
ESURANCE PROPERTY AND
CASUALTY INSURANCE COMPANY,

                  Plaintiffs,

v.

INSCRIBED PLLC; INTEGRATIVE
NEUROLOGY PLLC; DIAGNOSTIC
SOLUTIONS LLC; WOOK KIM, M.D.,
P.C. d/b/a FARMBROOK
INTERVENTIONAL PAIN & EMG;
DETROIT INSTITUTE OF PAIN
MUSCULOSKELETAL MEDICINE
PLLC; MICHIGAN INSTITUTE OF
MUSCULOSKELETAL MEDICINE
PLLC; ZMC PHARMACY, L.L.C.;
INTEGRA LAB MANAGEMENT LLC;
GIREESH VELUGUBANTI, M.D.;
ARVINDER DHILLON, M.D.; BACHU
ABRAHAM, M.D.; and JALAL
ZAWAIDEH, R.PH.,

                  Defendants.

19-cv-13721
Hon. Linda V. Parker

## ANSWER TO COMPLAINT OF
## ZMC PHARMACY, L.L.C. AND JALAL ZAWAIDEH

Defendants ZMC Pharmacy, L.L.C. ("ZMC") and Jalal Zawaideh, collectively referred to herein as "Respondents" hereby submit the following as their Answer to Plaintiffs' Complaint.

1.      This is a case about medical clinics, a pharmacy, a clinical urine drug testing laboratory, and the physicians, owners, managers, agents, and representatives of the same who abused the unlimited benefits available under the Michigan No-Fault Act, Mich. Comp. Laws §500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered and, if performed at all, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants, but deny as to Respondents because the allegations are untrue as to them.**

2.      Defendants Inscribed PLLC ("Inscribed"); Integrative Neurology PLLC ("Integrative Neurology"); Diagnostic Solutions LLC ("Diagnostic Solutions"); Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG

2

("Farmbrook"); Detroit Institute of Pain Musculoskeletal Medicine PLLC ("DIPMM"); Michigan Institute of Musculoskeletal Medicine PLLC ("MIMM"); ZMC Pharmacy, L.L.C. ("ZMC Pharmacy"); Integra Lab Management LLC ("Integra") (collectively, the "Defendant Entities"); Gireesh Velugubanti, M.D. ("Velugubanti"); Arvinder Dhillon, M.D. ("Dhillon"); Bachu Abraham, M.D. ("Abraham"); and Jalal Zawaideh, R.Ph. ("Zawaideh") (collectively with the Defendant Entities referred to hereinafter as "the defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

3.      The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

4.     The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were not actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

5.     To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients to undergo unnecessary treatment and services.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

6.     The treatment, when provided, was part of a predetermined protocol consisting of unreasonable and unnecessary diagnostic testing, injections and other procedures, medications, and urine drug testing.

4

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

7.    The defendants also engaged in several fraudulent billing practices, including unbundling services to inflate the amount charged and upcoding office visits in order to charge Allstate for more services than were actually provided.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

8.    The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including office visits, diagnostic testing, injections, durable medical equipment ("DME"), and medication.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

9.    Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

10.    Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

11.    Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

12.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

13.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

14.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract applicable in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

15.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

**ANSWER: No response necessary, however, Respondents deny that Plaintiffs are entitled to the relief sought at least with respect to Respondents.**

16.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

**ANSWER: No response necessary, however, Respondents deny that Plaintiffs are entitled to the relief sought at least with respect to Respondents.**

17.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that

were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful services and treatment that was designed and implemented solely to increase their profits; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

**ANSWER: No response necessary, however, Respondents deny that Plaintiffs are entitled to the relief sought at least with respect to Respondents.**

18.    As a result of the defendants' fraudulent acts, Allstate has paid in excess of $2,547,427 to them related to the patients at issue in this Complaint.

**ANSWER: Respondents deny the allegations because they are untrue.**

19.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

20.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

21.   Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

22.   Esurance Insurance Company and Esurance Property and Casualty Insurance Company each have their respective principal places of business in San Francisco, California.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

23.   At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

24.   Inscribed PLLC is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

25.    Inscribed is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Inscribed described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

26.    Defendants Dhillon, Abraham, Zawaideh, Diagnostic Solutions, Farmbrook, DIPMM, and ZMC Pharmacy also participated in the control and operation of Inscribed.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

27.    Inscribed's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

28.    Inscribed billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent treatment was rendered at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 1.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

29.     Integrative Neurology PLLC is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

30.     Integrative Neurology is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Integrative Neurology described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

31.     Defendants Dhillon, Zawaideh, Diagnostic Solutions, Farmbrook, and ZMC Pharmacy also participated in the control and operation of Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

32.     Integrative Neurology's principal place of business is located in Ann Arbor, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

33.    Integrative Neurology billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

34.    Diagnostic Solutions LLC is a limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

35.    Diagnostic Solutions is owned and controlled by defendant Velugubanti, and Velugubanti is responsible for all actions of Diagnostic Solutions described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

36.    Defendants Inscribed and Integrative Neurology also participated in the control and operation of Diagnostic Solutions.

13

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

37.     Diagnostic Solution's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

38.     Diagnostic Solutions billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

39.     Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG is a professional service corporation incorporated under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

40.     Farmbrook is owned and controlled by defendant Dhillon, and Dhillon is responsible for all actions of Farmbrook described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

14

41.     Defendants Velugubanti, Zawaideh, Inscribed, Integrative Neurology, and ZMC Pharmacy also participated in the control and operation of Farmbrook.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

42.     Farmbrook's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

43.     Farmbrook billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 4.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

44.     Detroit Institute of Pain Musculoskeletal Medicine PLLC is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

15

45.     DIPMM is owned and controlled by defendant Abraham, and Abraham is responsible for all actions of DIPMM described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

46.     Defendants Velugubanti, Inscribed, and Integra also participated in the control and operation of DIPMM.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

47.     DIPMM's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

48.     DIPMM billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 5.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

49.     Michigan Institute of Musculoskeletal Medicine PLLC is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

50.     MIMM is owned and controlled by defendant Abraham, and Abraham is responsible for all actions of MIMM described throughout this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

51.     Defendants DIPMM, Velugubanti, Inscribed, and Integra also participated in the control and operation of MIMM.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

52.     MIMM's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

53.     MIMM billed Allstate for services that were unlawful and medically unnecessary and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 6.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

54.     ZMC Pharmacy, L.L.C is a limited liability company organized under the laws of the State of Michigan.

17

**ANSWER: Respondents admit.**

55.     ZMC Pharmacy is owned and controlled by defendant Zawaideh, and Zawaideh is responsible for all actions of ZMC Pharmacy described throughout this Complaint.

**ANSWER: Respondents admit that ZMC Pharmacy is owned by Zawaideh.**

56.     Defendants Velugubanti, Dhillon, Inscribed, Integrative Neurology, and Farmbrook also participated in the control and operation of ZMC Pharmacy.

**ANSWER: Respondents deny the allegations because they is untrue.**

57.     ZMC Pharmacy's principal place of business is in Royal Oak, Michigan.

**ANSWER: Respondents admit.**

58.     ZMC Pharmacy billed Allstate at excessive rates for unlawful and unnecessary medications allegedly distributed to several patients at issue herein, including the patients set out in Exhibit 7.

**ANSWER: Respondents deny the allegations because they are untrue.**

59.     Integra Lab Management LLC is a limited liability company organized under the laws of the State of Florida.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

60.     Defendants Abraham, DIPMM, and MIMM participated in the control and operation of Integra.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

61.     Integra's principal place of business is in Jupiter, Florida.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

62.     Integra filed its Certificate of Authority to Transact Business in Michigan on January 10, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

63.     Integra billed Allstate for testing that was medically unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 8.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

64.     Gireesh Velugubanti, M.D. is a resident and citizen of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

65.    At all times relevant to this Complaint, Velugubanti owned and controlled Inscribed, Integrative Neurology, and Diagnostic Solutions, and participated in the control and operation of Farmbrook, DIPMM, MIMM, and ZMC Pharmacy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

66.    As an owner and manager of Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, and ZMC Pharmacy, Velugubanti rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including for the patients listed in Exhibits 1 through 7.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

67.    Arvinder Dhillon, M.D. is a resident and citizen of the State of Michigan.

20

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

68.    At all times relevant to this Complaint, Dhillon owned and controlled Farmbrook and participated in the control and operation of Inscribed, Integrative Neurology, and ZMC Pharmacy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

69.    As an owner and manager of Farmbrook, Inscribed, Integrative Neurology, and ZMC Pharmacy, Dhillon rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment services billed at excessive rates, including for the patients listed in Exhibits 1, 2, 4, and 7.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

70.    Bachu Abraham, M.D. is a resident and citizen of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

71.    At all times relevant to this Complaint, Abraham owned and controlled DIPMM and MIMM, and participated in the control and operation of Inscribed and Integra.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

72.    As an owner and manager of DIPMM, MIMM, Inscribed, and Integra, Abraham rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including for the patients listed in Exhibits 1, 5, 6, and 8.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

73.    Jalal Zawaideh, R.Ph. is a resident and citizen of the State of Michigan.

**ANSWER: Respondents admit that Zawaideh is a resident and citizen of the State of Michigan, but deny he is an "R.Ph." as he has a "Pharm. D."**

74.    At all times relevant to this Complaint, Zawaideh owned and controlled ZMC Pharmacy and participated in the control and operation of Inscribed, Integrative Neurology, and Farmbrook.

**ANSWER: Respondents admit that Zawaideh at all relevant times Zawaideh owned ZMC and controlled many aspects of the company, however Respondents deny that Zawaideh participated in the control and operation of Inscribed, Integrative Neurology, and Farmbrook because the allegations are untrue**.

75.    As an owner and manager of Inscribed, Integrative Neurology, Farmbrook, and ZMC Pharmacy, Zawaideh rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services billed at excessive rates, including the patients listed in Exhibits 1, 2, 4, and 7.

**ANSWER: Respondents deny the allegations because they are untrue.**

76.    Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

**ANSWER: Respondents deny that jurisdiction s properly conferred upon this court over this action.**

77.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

**ANSWER: Respondents deny that supplemental jurisdiction is proper.**

78.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are citizens of the State of Illinois for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

79.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company are citizens of the States of Wisconsin and California for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

80.    Inscribed is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

81.    Velugubanti, the sole member of Inscribed, is a citizen of and resides in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

82.    Thus, Inscribed is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

24

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

83.   Integrative Neurology is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

84.   Velugubanti, the sole member of Integrative Neurology, is a citizen of and resides in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

85.   Thus, Integrative Neurology is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

86.   Diagnostic Solutions is a limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

87.   Velugubanti, the sole member of Diagnostic Solutions, is a citizen of and resides in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

88.     Thus, Diagnostic Solutions is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

89.     Farmbrook is a professional service corporation organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

90.     Farmbrook's principal place of business is located in Southfield, Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

91.     Thus, Farmbrook is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

92.     DIPMM is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

93.     Abraham, the sole member of DIPMM, is a citizen of and resides in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

94.     Thus, DIPMM is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

95.     MIMM is a professional limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

96.     Abraham, the sole member of MIMM, is a citizen of and resides in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

97.     Thus, MIMM is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

98.    ZMC Pharmacy is a limited liability company organized under the laws of the State of Michigan.

**ANSWER: Respondents admit.**

99.    All members of ZMC Pharmacy are citizens of and reside in Michigan.

**ANSWER: Respondents admit.**

100.    Thus, ZMC Pharmacy is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents admit.**

101.    Integra is a limited liability company organized under the laws of the State of Florida.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

102.    Thomas Hughes, the sole member of Integra, is a citizen of and resides in Florida.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

103.    Thus, Integra is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

104.    Velugubanti is a resident and citizen of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

105.    Dhillon is a resident and citizen of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

106.    Abraham is a resident and citizen of the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

107.    Zawaideh is a resident and citizen of the State of Michigan.

**ANSWER: Respondents admit.**

108.    Further, the amount in controversy as to each defendant, exclusive of interest and costs, exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

**ANSWER: Respondents deny because there is no legitimate amount in controversy between Plaintiffs and Respondents.**

109.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

110.   Velugubanti established a series of entities to bill Allstate for medically unnecessary and excessive treatment, if any treatment was rendered at all.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

111.   Velugubanti used Inscribed and Integrative Neurology to bill Allstate for unnecessary patient evaluations, injections, and diagnostic tests (such as ambulatory Electroencephalography ("EEG") and Quantitative EEG ("qEEG") diagnostic tests).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

112.   Velugubanti also used Integrative Neurology and Diagnostic Solutions to bill Allstate for medically unnecessary neurofeedback therapy and sleep studies.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

113.   Velugubanti used his three (3) entities (defendants Inscribed, Integrative Neurology, and Diagnostic Solutions) interchangeably.

30

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

114.   Patient I.S. (Claim No. 0428425573) told Allstate that Inscribed and Diagnostic Solutions "are side by side and that the people go back and forth between the two."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

115.   Integrative Neurology allegedly stopped treating patients in October 2018 and Velugubanti transferred the evaluations to Inscribed and the diagnostic tests and neurofeedback therapy to Diagnostic Solutions.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

116.   Velugubanti hired unlicensed individuals to render treatment at his entities, as discussed *infra*.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

117.   To increase the amount billed to Allstate, Velugubanti entered into *quid pro quo* arrangements with pain management physicians to refer patients to him.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

31

118. Velugubanti coordinated with defendants Dhillon and Abraham through *quid pro quo* arrangements.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

119. Dhillon and Abraham, through Farmbrook, DIPMM, and MIMM, fabricated patient head injuries to justify referrals to Inscribed and Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

120. In turn, Velugubanti recommended that patients continue to treat at Farmbrook, DIPMM, and MIMM for pain management of injuries allegedly suffered to other areas of the patients' body.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

121. Velugubanti's clinics are located directly next to Farmbrook and Dhillon in the Farmbrook Medical Building.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

122. Velugubanti testified that Simrat Dhillon—Farmbrook's office manager and defendant Dhillon's wife—is his point of contact regarding Inscribed's

use of space in the Farmbrook Medical Building and that "[w]e go to her with issues
. . . ."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

123.   Dhillon testified that he receives patients from Velugubanti and that he refers patients to Velugubanti as well.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

124.   DIPMM, MIMM, and Abraham operate across the street from the Farmbrook Medical Building.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

125.   Velugubanti and Abraham previously treated patients at Michigan Neurology Associates, P.C.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

126.   Velugubanti submitted a letter of support for Abraham as part of a formal disciplinary proceeding against Abraham in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

127.   Inscribed, Integrative Neurology, Farmbrook, Velugubanti, and Dhillon required patients at issue in this Complaint to have their prescriptions filled by their co-conspirator ZMC Pharmacy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

128.   DIPMM, MIMM, and Abraham also ordered unnecessary and excessive definitive urine drug testing, which was billed by Integra.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

129.   Defendants Velugubanti and Abraham have significant disciplinary and criminal histories.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

130.   Velugubanti pleaded guilty to operating a vehicle while under the influence on December 13, 2006.  He was sentenced to forty-six (46) days in jail, twelve (12) months' probation, and fines and costs, and was required to attend outpatient substance abuse counseling three (3) times per week.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

131.   Velugubanti testified that his staff privileges at an Albuquerque, New Mexico hospital were revoked due to drug and alcohol issues:

> Q.   Have you had your privileges revoked at any time?
>
> A.   While I was working in Albuquerque, New Mexico, briefly I had my staff privileges revoked.
>
> Q.   At both locations?
>
> A.   It was related to a drug and alcohol problem I had in 2000.
>
> Q.   In 2000 you said?
>
> A.   2010, sorry.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

132.   Velugubanti and the New Mexico Medical Board entered into a Stipulation of Licensure on March 31, 2011.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

133.   Pursuant to the March 31, 2011 Stipulation, Velugubanti entered into a treatment contract with the Monitored Treatment Program.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

134.   The State of Michigan filed an Administrative Complaint against Velugubanti on March 2, 2012, alleging that the New Mexico disciplinary proceeding and his 2006 conviction violated the Public Health Code.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

135.   Velugubanti entered into a Stipulation with the State of Michigan on June 26, 2012, through which he agreed to enter into a three-year monitoring program.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

136.   Pursuant to a July 8, 2012 Consent Order, the State of Michigan placed Velugubanti on probation for one (1) year and required him to enter into a monitoring agreement with the Health Professional Recovery Program.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

137.   The Arizona Medical Board denied Velugubanti's medical license application in April 2016 after Velugubanti refused to comply with a requested assessment by the Arizona Physician's Health Program.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

138.   In December 2016, the State of Michigan received a complaint from a former colleague of Velugubanti detailing numerous allegations, including that Velugubanti (1) prescribed medications for off-label use, (2) over-diagnosed patients with traumatic brain injury ("TBI") to justify billing for unnecessary services, (3) charged insurance companies for unnecessary EEGs, (4) charged insurance companies for services not rendered, (5) upcoded services by spending excessive time during patient encounters, (6) overmedicated patients with unnecessary and irrelevant medications, (7) used a template for his physical examinations, and (8) recommended unnecessary follow-up visits for lab work, imaging, and evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

139.   The State of Michigan filed an Administrative Complaint against Velugubanti on June 8, 2017, alleging that Velugubanti accessed patient files without authorization twelve (12) times between August 22, 2015 and September 15, 2015 and that he failed to complete 196 progress notes on patients' charts.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

140.   Velugubanti entered into a Consent Order on November 14, 2018, finding the allegations against him true and that he violated the Public Health Code. The State of Michigan placed him on probation for one (1) year, fined him $10,000, and required that he complete additional continuing education credits.  The terms of his probation require that Velugubanti meet on a quarterly basis with a reviewer approved by the Michigan Board of Medicine.  The Consent Order also prohibits Velugubanti from "work[ing] in any capacity for which a medical doctor license is required" until the Michigan Department of Licensing and Regulatory Affairs ("LARA") received written confirmation that a reviewer has been approved.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

141.   Velugubanti testified in January 2019 that he was not treating patients "for health reasons."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

142.   These purported "health reasons" were in fact him awaiting Board approval of a person to review his medical records.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

143.   Velugubanti also testified that Integrative Neurology stopped treating patients on October 5, 2018 due to his "health reasons."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

144.   In truth, Velugubanti signed a Stipulation just three (3) days earlier on October 2, 2018, through which he agreed that the facts alleged in the June 8, 2017 Administrative Complaint are true and that he agreed to the terms of the November 14, 2018 Consent Order.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

145.   The estate of Marc Orlewicz, D.O. ("Orlewicz") filed a medical malpractice and wrongful death lawsuit against Velugubanti on January 4, 2019. The lawsuit alleges that Velugubanti prescribed Orlewicz with the maximum daily dosage of Vyvanse for a period of at least five (5) months despite Velugubanti's awareness of Orlewicz's substance abuse history.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

146.   As discussed *infra*, Velugubanti prescribed Vyvanse to patients at issue in this Complaint as part of his predetermined treatment protocol.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

147.   Orlewicz's autopsy revealed that he died of amphetamine toxicity, and an affidavit by Michael Gold, M.D. affirmed that Velugubanti and Integrative Neurology failed to perform necessary acts and violated the standard of care by repeatedly prescribing Vyvanse to Orlewicz.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

148.   Abraham is currently subject to an open formal proceeding in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

149.   The Bureau of Professional Licensing filed an Administrative Complaint against Abraham on March 15, 2018, stemming from a procedure that he performed on August 20, 2015.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

150.   According to the Administrative Complaint, Abraham failed to confirm the site was numb before initiating a medial branch nerve block, and he ignored the patient's requests that he stop the procedure.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

151.   Between injections, Abraham asked a nurse to numb the area so he could continue, but the patient again experienced severe pain and repeatedly asked Abraham to stop the procedure.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

152.   A nurse entered the surgery room and stated to Abraham that the patient could feel everything, to which Abraham stated that he was almost done with the procedure.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

153.   Abraham also allegedly failed to change into proper surgical attire and performed the procedure with a lead apron over his street clothes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

154.   The defendants' pervasive pattern of faxing and mailing demands for payment to Allstate for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment

was actually rendered and whether it was medically necessary (discussed in detail *infra*).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

155.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never actually occurred are fraudulent.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

156.   Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

157.   A former employee of Inscribed has testified that her name was placed on EEGs that she did not perform and that patients were charged by Inscribed for testing even though the corresponding reports failed to identify any of the data allegedly determined by said testing:

```
Q.   Can you repeat why you stopped working there at
     Inscribed?
A.   Many reasons.  I found out that my name was being
     placed on tests that I did not perform.  There was
     people being charged for tests and there was no data.
```

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

158.   The former employee's testimony confirms that Inscribed billed for services that were never rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

159.   The defendants routinely submitted claims for reimbursement for services that were not performed in each of the categories set forth below.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

## A.    BILLING FOR EVALUATIONS NOT PERFORMED

160.    Defendants Integrative Neurology and Farmbrook faxed and mailed bills to Allstate seeking payment for patient evaluations.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

161.    Defendant Integrative Neurology billed Allstate for evaluations purportedly conducted by Velugubanti when they were performed by a nurse practitioner or physician assistant, if performed at all.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

162.    Integrative Neurology submitted bills containing Velugubanti's signature and National Provider Identifier ("NPI") number.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

163.    Velugubanti, however, did not render any treatment to the patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

164.    Each instance of Integrative Neurology submitting bills to Allstate seeking payment for an evaluation by Velugubanti when in fact Velugubanti was not present is an instance of billing for an evaluation that was not performed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### B.  BILLING FOR AMBULATORY EEGs NOT PERFORMED

165.    Defendants Inscribed and Integrative Neurology faxed and mailed bills to Allstate seeking payment for the purported performance of ambulatory EEGs on patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

166.    Inscribed and Integrative Neurology billed Allstate using Current Procedural Terminology ("CPT") Code 95951 for supposedly conducting ambulatory EEGs.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

167.    According to the CPT Code Book, CPT Code 95951 is for "combined electroencephalographic (EEG) and video recording and interpretation . . . each 24 hours."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

168.    This CPT Code *requires* that the patient's behavior be monitored and recorded using visual video equipment throughout the duration of the EEG, with that

45

video being reviewed and interpreted by the neurologist to correlate EEG readings with observed patient behavior.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

169.    Despite Inscribed and Integrative Neurology's use of the video EEG billing code for every ambulatory EEG at issue in this Complaint, not once was a video EEG actually performed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

170.    Every instance of Inscribed and Integrative Neurology billing under CPT Code 95951 is an instance of billing for a service that was never rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

171.    Moreover, Inscribed and Integrative Neurology billed Allstate for ambulatory EEGs lasting 72 hours when the EEG was performed for a substantially shorter period of time, if it was performed at all.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

172.    Allstate is not required to compensate Inscribed or Integrative Neurology for services that were never rendered and is entitled to the return of money paid in reliance on their fraud.  *See* Exhibits 1 and 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### C.   BILLING FOR NEUROBEHAVIORAL ASSESSMENTS NOT PERFORMED

173.    Defendant Inscribed faxed and mailed bills to Allstate seeking payment for allegedly conducting neurobehavioral assessments on patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

174.    Inscribed billed Allstate using CPT Code 96116 for each neurobehavioral assessment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

175.    According to the CPT Code Book, CPT Code 96116 is for "[n]eurobehavioral status exam . . . per hour of the psychologist's or physician's time, both face-to-face time with the patient and time interpreting test results and preparing the report."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

176. The AMA therefore requires that a licensed psychologist or physician perform the services billed for under CPT Code 96116, which include both performance of the assessment and interpretation of the assessment's results.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

177. Inscribed billed Allstate for neurobehavioral assessments performed and interpreted by individuals who were not licensed psychologists or physicians.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

178. For example, Inscribed billed Allstate under CPT Code 96116 for neurobehavioral assessments allegedly conducted for Patient S.N. (Claim No. TXA-0178760) on January 29, 2018 and March 19, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

179. Inscribed's records note that the assessment was "performed by [the] patient with the assistance of Ms. Christina Hammond."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

48

180.   Christina Hammond, R.N. ("Hammond") is not a licensed psychologist or physician.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

181.   Marianne McKissick, P.A. ("McKissick") interpreted the results for both assessments.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

182.   McKissick is not a licensed psychologist or physician.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

183.   A licensed psychologist or physician is required to perform the assessment and interpret the results when billing CPT Code 96116.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

184.   Inscribed did not provide services from a licensed psychologist or physician to patients at issue in this Complaint even though Allstate was billed for such treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

185.   Allstate is not required to compensate Inscribed for services that were not rendered and is entitled to the return of money paid in reliance on its fraud.  *See* Exhibit 1.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### D.   BILLING FOR SURGICAL ASSISTANT SERVICES NOT PERFORMED

186.   Defendant DIPMM mailed bills to Allstate seeking payment for Abraham allegedly assisting on surgeries purportedly performed on patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

187.   However, Abraham was not physically present in the operating room to assist on these surgeries.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

188.   Summit Surgical Neuro Monitoring Services, LLC f/k/a Summit Neuromonitoring Services, LLC ("Summit") submitted bills and medical records through the U.S. Mail seeking payment for services Abraham provided outside of the surgical suite during the exact time Abraham was allegedly in the surgical suite assisting on surgical procedures.

50

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

189.   In other words, DIPMM billed Allstate claiming that Abraham was assisting on surgical procedures performed in a surgical suite while Summitt billed Allstate seeking payment for services Abraham provided outside of the surgical suite relating to the same patient and on the same date of service.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

190.   It is impossible for Abraham to physically be in two separate locations at the same exact time.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

191.   Allstate is not required to compensate DIPMM and Abraham for services that were never rendered and is entitled to a return of money paid in reliance of its fraud.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

E.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

1.   Patient S.G. (Claim No. 0482998035)

192.   Patient S.G. allegedly presented to defendant Integrative Neurology on January 2, 2018 for an initial evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

193.   Integrative Neurology submitted a bill to Allstate containing Velugubanti's signature and NPI number for a level four (4) initial patient evaluation, but Velugubanti did not conduct the examination, which constitutes fraudulent billing for services not rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

**2.   Patient M.M. (Claim No. 0421745613)**

194.   Patient M.M. was allegedly involved in a motor vehicle accident on July 20, 2016.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

195.   M.M. allegedly presented to defendant Integrative Neurology on September 8, 2016.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

196.   Integrative Neurology billed Allstate for allegedly conducting a 72-hour ambulatory EEG that allegedly began on September 9, 2016 and ended on September 11, 2016.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

197.   Integrative Neurology submitted a report to Allstate dated September 10, 2016 documenting the results for a 24-hour ambulatory EEG.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

198.   Integrative Neurology then submitted an "[e]dited correction" to Allstate dated September 14, 2016 for a 72-hour ambulatory EEG.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

199.   The date of study in the "correction," however, is September 9, 2016 through September 10, 2016, which is a 24-hour ambulatory EEG.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

200.   Integrative Neurology therefore billed Allstate $28,500 for an ambulatory EEG that was not rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

201.    Integrative   Neurology   submitted   claims   for   payment   and accompanying medical records relative to M.M. to Allstate through the U.S. Mail and interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

202.    Allstate is not required to pay Integrative Neurology for treatment that was never rendered to M.M.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

**3.      Patient S.H. (Claim No. 0421535188)**

203.    Patient S.H. was allegedly involved in a motor vehicle accident on July 18, 2016.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

204.    S.H. allegedly presented to defendant Inscribed on November 16, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

205.   Inscribed billed Allstate for a 72-hour ambulatory EEG that allegedly began on November 20, 2017 and ended on November 22, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

206.   Diverse Transportation Services LLC ("Diverse Transportation") transported S.H. to Inscribed on November 20, 2017 at 9:15 a.m.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

207.   Diverse Transportation then picked up S.H. at 11:00 a.m. that same day and transported her to physical therapy for a 12:00 p.m. appointment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

208.   A person cannot perform physical therapy while wearing ambulatory EEG equipment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

209.   Inscribed therefore billed Allstate $28,500 for an ambulatory EEG that was not rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

210.   Inscribed submitted claims for payment and accompanying medical records relative to S.H. to Allstate through interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

211.   Allstate is not required to pay Inscribed for treatment that was never rendered to S.H.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 4.   Patient R.P. (Claim No. 0461342511)

212.   Patient R.P. was allegedly involved in a motor vehicle accident on May 30, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

213.   R.P. allegedly presented to defendant Inscribed on November 14, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

214.   Inscribed billed Allstate for allegedly performing a neurobehavioral assessment of R.P. on November 14, 2017 using CPT Code 96116.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

215.    As discussed *supra*, a licensed psychologist or physician must perform the assessment and interpret its results in order to bill for services under CPT Code 96116.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

216.    Inscribed faxed medical records to Allstate stating that the neurobehavioral assessment was "performed by [the] patient with the assistance of Angela Pace MA."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

217.    "Angela Pace" is not a licensed physician or psychologist in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

218.    Inscribed therefore billed Allstate $650 for a neurobehavioral assessment that was not rendered by a licensed physician or psychologist.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

219.   Inscribed submitted claims for payment and accompanying medical records relative to R.P. to Allstate through interstate wires for treatment that was not provided, upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

220.   Allstate is not required to pay Inscribed for treatment that was never rendered to R.P. and is entitled to the return of money paid to Inscribed in reliance on its fraudulent bills.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 5.   Patient A.F. (Claim No. 0541405619)

221.   Patient A.F. was allegedly involved in a motor vehicle accident on March 20, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

222.   A.F. allegedly presented to defendant Farmbrook on May 14, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

223.   Farmbrook billed Allstate for trigger point injections into the right trapezius muscle with steroid that was purportedly performed by Dhillon on May 14, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

224.   Farmbrook submitted a procedure note that listed Hangming Ruan, P.A. ("Ruan") and stated that "dr. D is in office with me" and was also allegedly electronically signed by Dhillon on May 19, 2019 at 1:10 p.m.:

> hangming Ruan PA.,
> dr D is in office with me.
>
> Electronically signed by Arvinder Dhillon MD on 5/19/2019 1:10:17 PM

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

225.   However, according to Dhillon's own wife, Dhillon was on medical leave from open heart surgery that started March 1, 2019 and he was not back to work until June 2019, one month after he allegedly performed the trigger point injection procedure billed to Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

226.   Farmbrook billed Allstate in excess of $4,374 for an injection procedure that was not rendered by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

227. Farmbrook submitted claims for payment and accompanying medical records relative to A.F. to Allstate through the U.S. Mail for treatment that was not provided, upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

228. Allstate is not required to pay Farmbrook for treatment that was never rendered to A.F.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

## 6. Patient J.M. (Claim No. 0479909185)

229. Patient J.M. was allegedly involved in a motor vehicle accident on October 26, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

230. J.M. allegedly presented to the Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View Surgery Center") on October 4, 2018 for an anterior cervical discectomy procedure that was purportedly performed by Stefan Pribil, M.D. ("Pribil") and assisted by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

231.   DIPMM billed Allstate $37,730.00 for Abraham allegedly assisting Pribil perform the anterior cervical discectomy procedure on J.M. at Fountain View Surgery Center on October 4, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

232.   Summitt also billed Allstate for neurophysiology monitoring of J.M. during the October 4, 2018 surgical procedure using CPT Code 95941 (*"Continuous intraoperative neurophysiology monitoring, from outside the operating room (remote or nearby) or for monitoring of more than one case while in the operating room, per hour"*).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

233.   According to the CPT Code Book, CPT Code 95941 should be reported "for all cases in which there was no physical presence by the monitoring professional in the operating room during the monitoring time or when monitoring more than one case in the operating room."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

234.   The Neurophysiology Tech Report that was submitted to Allstate by Summitt for the neurophysiology monitoring of J.M. during his October 4, 2018 surgical procedure identifies Abraham as the "Remote Monitorist" and further confirms that  J.M.'s "case was monitored remotely and read by licensed medical professional and a dedicated Neurophsiologist."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

235.   In other words, Summitt billed Allstate seeking payment for Abraham remotely monitoring (outside of the operating room) the neurophysiology activity of J.M. during the same time that Abraham claimed to be assisting Pribil with the anterior cervical discectomy procedure for which DIPMM billed Allstate $37,730.00.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

236.   DIPMM therefore billed Allstate $37,730.00 for Abraham assisting on a surgical procedure when he was not physically located in the operating room.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

237.   Allstate is not required to pay DIPMM for treatment that was never rendered to J.M.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

## VI.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

### A.   UNLICENSED TREATMENT RENDERED BY LIMITED LICENSE PSYCHOLOGISTS

238.   Defendants Inscribed, Integrative Neurology, and Diagnostic Solutions billed for treatment to patients by unsupervised limited license psychologists in violation of Michigan law.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

239.   The State of Michigan requires a limited license psychologist to be supervised by a licensed psychologist to engage in the practice of psychology.  Mich. Comp. Laws § 333.18223(2).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

240.   The State of Michigan defines the "practice of psychology" to include rendering services that "involv[e] the application of principles, methods, and procedures . . . for the purposes of the diagnosis, assessment related to diagnosis, prevention, amelioration, or treatment . . . ."  Mich. Comp. Laws § 333.18201(1)(b).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

241.   The "practice of psychology" includes biofeedback techniques and psychological tests.  Id.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

242.   Inscribed, Integrative Neurology, and Diagnostic Solutions submitted bills and records to Allstate for services performed by unsupervised limited license psychologists that engaged in the practice of psychology.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

243.   Velugubanti testified that he contracted with limited license psychologists "to perform psychological services and neurofeedback services."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

244.   Inscribed billed Allstate for neurobehavioral assessments performed by limited license psychologists, which Inscribed then (improperly) used to diagnose TBIs.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

245.   Integrative Neurology and Diagnostic Solutions billed Allstate for qEEGs conducted by limited license psychologists, which Inscribed and Integrative Neurology then (improperly) used to diagnose TBIs.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

246.   Integrative Neurology and Diagnostic Solutions billed Allstate for neurofeedback therapy—also known as biofeedback therapy—allegedly provided to patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

247.   No licensed psychologist supervised any services rendered by limited license psychologists at Inscribed, Integrative Neurology, or Diagnostic Solutions.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

248.   Indeed, Integrative Neurology submitted records falsely identifying a licensed psychologist, William Brooks, Ed.D. ("Brooks"), as Integrative Neurology's "Clinical Supervisor."  *See* Exhibit 9.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

249.   Despite listing Brooks on its medical records, Velugubanti testified that Brooks was not employed by Integrative Neurology:

> Q.   Okay.  And then who is William Brooks?
>
> A.   I'm not familiar with that name.
>
> Q.   You're not familiar with a William Brooks who's a counselor out of Kalamazoo?
>
> A.   No.
>
> Q.   Have you ever known that name to be employed by Integrative Neurology as an employee or an independent contractor?
>
> A.   No.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

250.   Integrative Neurology listed Brooks on its medical records to conceal the fact that it rendered unsupervised—and therefore unlawful—treatment by limited license psychologists.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

251.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

252. Allstate is not required to pay Inscribed, Integrative Neurology, or Diagnostic Solutions for the unlawful services billed by limited license psychologists and is entitled to restitution of monies paid.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

B. <u>UNLICENSED TREATMENT RENDERED BY PHYSICIAN ASSISTANTS</u>

253. Defendant Inscribed billed for unlicensed treatment by physician assistants operating without a practice agreement in violation of Michigan law.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

254. As of March 22, 2017, the State of Michigan prohibits a physician assistant from "engag[ing] in the practice as a physician's assistant except under the terms of a practice agreement." Mich. Comp. Laws § 333.17047(1).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

255. The State of Michigan even defines "practice as a physician's assistant" to mean "the practice of medicine with a participating physician **under a practice agreement**." Mich. Comp. Laws § 333.17001(1)(k) (emphasis added).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

67

256.   The Michigan Board of Medicine requires "a physician who supervises a physician's assistant" to "establish a written authorization that delegates to the physician's assistant the performance of medical care services."  Mich. Admin. Code R. 338.2409(1).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

257.   The Michigan Board of Medicine requires the participating physician to maintain the written practice agreement at his "primary place of practice."  Mich. Admin. Code R. 338.2409(3).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

258.   A physician assistant cannot prescribe medication in the State of Michigan without the existence of a practice agreement.   Mich. Comp. Laws § 333.17076(2).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

259.   Physician assistants McKissick and Ruan allegedly treated patients and prescribed medication to patients at Inscribed after March 22, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

260.   Upon information and belief, no practice agreements ever existed between Ruan, McKissick, and any "participating physician" at Inscribed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

261.   When asked about the existence of a written practice agreement between Velugubanti and physician assistants at Inscribed, Inscribed did not admit the existence of a practice agreement.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

262.   Velugubanti acknowledged under oath that the State of Michigan requires that he supervise physician assistants treating patients at Inscribed:

> Q.   Here's what I'm getting at.   You referred to Mr. Ruan as your subordinate—
>
> A.   As a mid-level.
>
> Q.   —because he is a physician's assistant who must work under your license.
>
> A.   Yes.
>
> . . .
>
> Q.   So Mr. Ruan doesn't need your supervision when he prescribes medicine?
>
> A.   In the State of Michigan he needs my supervision.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

263.   Nonetheless, Ruan and McKissick rendered treatment to Inscribed patients without Velugubanti's supervision or a written practice agreement.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

264.   For example, Patient I.S. (Claim No. 0428425573) told Allstate that McKissick treated her on two (2) visits, and that she was upset that Velugubanti was not even in the building.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

265.   Treatment and services rendered by physician assistants without a practice agreement is rendered in violation of Michigan law.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

266.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

267.   Allstate is not required to pay Inscribed for unlawful treatment rendered by physician assistants.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

## C.   DEFENDANTS FAILED TO OBTAIN THE REQUIRED LICENSURE TO ISSUE DME IN THE STATE OF MICHIGAN

268.   Defendants Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, and Abraham issued DME to patients without obtaining the required licensure from the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

269.   The Michigan Board of Pharmacy governs the "practice of pharmacy" in the State of Michigan.  Mich. Comp. Laws § 333.17722.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

270.   The Michigan Board of Pharmacy's duties include the "regulat[ion], control, and inspect[ion] [of] the character and standard of pharmacy practice and of drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** and procure samples and limit or prevent the sale of drugs **and devices** that do not comply with this part."  Mich. Comp. Laws § 333.17722(a) (emphasis added).

71

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

271.   "Device" means "an instrument, apparatus, or contrivance, including its components, parts, and accessories, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or other animals, or to affect the structure or function of the body of human beings or other animals." Mich. Comp. Laws § 333.17703(2).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

272.   One of the ways in which the Michigan Board of Pharmacy regulates, controls, and inspects the issuance of devices in the State of Michigan is to require an individual or entity issuing the device to obtain a license from the Board.  Mich. Comp. Laws § 333.17722(c).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

273.   The issuance of a license for an activity within the scope of the Michigan Board of Pharmacy's governance determines whether the activity is lawful.  Mich. Comp. Laws § 333.16106(2).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

274.   The Michigan Public Health Code defines a "license" as "an authorization issued under this article to practice **where practice would otherwise be unlawful**." Id. (emphasis added).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

275.   Therefore, the State of Michigan requires a license issued by the Michigan Board of Pharmacy in order to issue medical equipment/devices to individuals.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

276.   Defendants Inscribed, Integrative Neurology, DIPMM, Velugubanti, and Dhillon each failed to obtain a license from the Board of Pharmacy and therefore unlawfully issued DME to patients at issue herein.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

277.   Defendants Farmbrook and Dhillon issued DME to patients at issue in this Complaint before obtaining a license from the Board of Pharmacy on or about August 22, 2017.  *See* Exhibit 4.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

278.   Unlawfully-rendered services are not compensable under the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

279.   Allstate is not required to pay Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, or Abraham for the unlawful issuance of DME and is entitled to restitution of monies paid.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

VII.   **UNLAWFUL SOLICITATION**

A.   **MICHIGAN'S ANTI-SOLICITATION LAWS**

280.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

**ANSWER: no answer necessary.**

281.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such

activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

**ANSWER: no answer necessary.**

282.   A former employee of Inscribed testified that patients "would come in in bus loads" with "no[] understanding why they were there" and that this employee "would get the burden of trying to explain why they were there."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

283.   The same former employee further testified that some of the patients had case workers appear with them at Inscribed and that she witnessed "a large amount of cash in the case workers' bags that I could just see bluntly there."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

284.   It is illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

**ANSWER: no answer necessary.**

285.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

**ANSWER: no answer necessary.**

286.   As set forth more fully below, the defendants participated in, and willingly benefited from, schemes to solicit patients through conduct prohibited under Michigan law.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

### B.   ILLEGAL SOLICITATION OF MOTOR VEHICLE ACCIDENT VICTIMS

287.   Defendants Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham obtained patients through *quid pro quo* arrangements with personal injury attorneys.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

288.   These personal injury attorneys solicited motor vehicle accident victims within days and weeks of their alleged motor vehicle accidents.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

289.   Michigan's anti-solicitation laws also apply to solicitation conducted through attorneys.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

290.   After retaining the accident victims as clients, the personal injury attorneys referred them to Integrative Neurology, Farmbrook, DIPMM, and MIMM for unnecessary treatment and services.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

291.   Treatment directed by layperson attorneys rather than by licensed medical professionals is unlawful, unreasonable, and unnecessary, and Allstate has no obligation to pay any charges resulting therefrom.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

292.   Unlawful solicitation and unqualified referrals by laypersons to the defendants negate the validity of the medical treatment billed by the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

293.    Referrals of solicited patients to the defendant clinics and physicians bore no relation to actual medical necessity, as the patients at issue in this Complaint would not have sought treatment but for the unlawful solicitation.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

294.    By steering patients to defendants Integrative Neurology, Farmbrook, DIPMM, and MIMM, the defendants knew that the patients would receive excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges billed to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

295.    Accordingly, the defendants' treatment of the solicited patients was unlawful and led directly to unreasonable and unnecessary care.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

C.   SPECIFIC EXAMPLES OF PATIENT SOLICITATION

296.   The following representative patients exemplify the fact and extent of the defendants' illegal solicitation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

1.   Patient K.L. (Claim No. TXA-0187454)

297.   Patient K.L. was allegedly involved in a motor vehicle accident on April 27, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

298.   K.L. testified that "Rodney the One" approached him in the hospital about obtaining an attorney:

> Q.   What is Rodney The One?
>
> A.   He said, that's what his name is.  The One.  Because of his job.  What he does.  Goes out scouting for people who have been in accidents.  And gets them too, with his lawyer.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

299.   Rodney the One picked K.L. up at his home a few days later and drove him to meet with the attorney.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

300.   K.L. testified that the attorney referred him to Abraham:

> Q.   Okay.  So here's what I want to know.  So, first off, we've already identified the picture that you're looking at as Dr. Abraham that you treated with?
>
> A.   Yes.
>
> Q.   Who referred you to Dr. Abraham?
>
> A.   Uhm, it was Dailey Law Firm, Justin Grove.
>
> . . .
>
> Q.   So the only way you got to Dr. Abraham is because Justin Grove with the Dailey Law Firm told you, hey, go to see Dr. Abraham?
>
> A.   Yes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

301.   K.L. presented to DIPMM on June 9, 2017 for an initial patient evaluation that was purportedly performed by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

302.  DIPMM, Integra, and Abraham submitted claims for payment and medical records relative to K.L. through the U.S. Mail upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

303.  Allstate is not required to compensate DIPMM, Integra, or Abraham for unnecessary treatment that derived from illegal solicitation and is entitled to a return of monies paid to DIPMM.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

**2.  Patient S.G. (Claim No. 0482998035)**

304.  Patient S.G. was allegedly involved in a motor vehicle accident on November 22, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

305.  S.G. presented to defendant Farmbrook on December 6, 2017 for an initial evaluation with defendant Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

306.   S.G. told an independent medical evaluator that she went to Farmbrook at the direction of her attorney.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

307.   S.G. presented to defendant Integrative Neurology on January 2, 2018 for an initial evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

308.   S.G. told an independent medical evaluator that her attorney referred her to Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

309.   Farmbrook, Integrative Neurology, and Dhillon submitted claims for payment and medical records relative to S.G. through the U.S. Mail and interstate wires upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

310.   Allstate is not required to pay Farmbrook, Integrative Neurology, or Dhillon for unnecessary treatment that derived from illegal solicitation and is entitled to a return of monies paid to Farmbrook.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 3. Patient T.S. (Claim No. 0461626020)

311.  Patient T.S. was allegedly involved in a motor vehicle accident on June 24, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

312.  T.S. presented to A. Rodnick Chiropractic, P.C. ("Rodnick Chiropractic") to initiate chiropractic treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

313.  T.S. testified that his lawyer instructed him to receive chiropractic treatment and referred him to Rodnick Chiropractic:

Q.    Okay. How did you find Rodnick Chiropractic?

A.    That was – they mentioned.

Q.    Who mentioned?

A.    Mike Morse.

Q.    So someone at Mike Morse told you about Rodnick Chiropractic?

A.    Yes, because they were close to where I lived.

Q.   Okay.  Did they tell you – did someone tell you to go to a chiropractor –

A.   Yes.

Q.   -- or did you just go of your own volition?

A.   They told me.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

314.   T.S. testified that Rodnick Chiropractic referred him to defendants Farmbrook and Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

315.   Farmbrook and Dhillon submitted claims for payment and medical records relative to T.S. through the U.S. Mail upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

316.   Allstate is not required to pay Farmbrook or Dhillon for unnecessary treatment that derived from illegal solicitation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

**4.   Patient D.J. (Claim No. TXA-0185605)**

317.   Patient D.J. was allegedly involved in a motor vehicle accident on May 12, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

318.   D.J. testified that an individual approached him in the hospital about obtaining a personal injury attorney.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

319.   D.J. then presented to DIPMM on May 30, 2017 for an initial patient evaluation that was purportedly performed by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

320.   DIPMM, Integra, and Abraham submitted claims for payment and medical records relative to D.J. through the U.S. Mail upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

321.   Allstate is not required to compensate DIPMM, Integra, or Abraham for unnecessary treatment that derived from illegal solicitation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

5.      **Patient R.L. (Claim No. TXA-0197188)**

322.   Patient R.L. was allegedly involved in a motor vehicle accident on December 12, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

323.   R.L. testified that a transportation company picked him up at his home one (1) week after his alleged accident and drove him to an attorney's office.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

324.   R.L. testified that his attorney referred him to defendants Farmbrook and Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

325.   R.L. presented to Farmbrook on January 3, 2018 for an initial patient evaluation that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

326.   Farmbrook, ZMC Pharmacy, and Dhillon submitted claims for payment and medical records relative to R.L. through the U.S. Mail upon which Allstate relied in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations, specifically as to Allstate's reliance.**

327.   Allstate is not required to pay Farmbrook, ZMC Pharmacy, or Dhillon for unnecessary treatment that derived from illegal solicitation.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

328.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) unlicensed, and (3) not lawfully rendered demonstrates their willingness to also bill for treatment that was unnecessary and unreasonable.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

329. Moreover, but for the solicitation of patients, as discussed *supra*, the patients at issue herein would not have sought treatment with or by the defendants.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

330. The defendants' goal in treating patients was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

331. As set out below, the defendants grossly overutilized diagnostic tests, injections, neurofeedback therapy, medications, and urine drug testing in wanton disregard for standards of care.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

332.    The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective benefit to patients.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

333.    The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment for which they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

334.    The unnecessary treatment rendered by the defendants, discussed more fully below, includes the services and treatment billed to Allstate relating to the patients set out in the charts annexed hereto at Exhibits 1 through 8.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

335.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable services and treatment are fraudulent.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

### A.   PREDETERMINED TREATMENT PROTOCOL

336.   The defendants engaged in a predetermined treatment protocol that consisted of Farmbrook, DIPMM, MIMM, Dhillon, and Abraham fabricating diagnoses of headaches and referring patients to treat with Velugubanti at Inscribed and/or Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

337.   Velugubanti, by and through Inscribed and Integrative Neurology, then made the following referrals or decisions to nearly every patient during the initial patient evaluation: (1) order an ambulatory EEG; (2) order a qEEG; (3) prescribe unnecessary medications and provide samples of a dietary supplement; (4) perform canalith repositioning (also known as epley maneuver); (5) perform injections; (6) issue DME (specifically a cervical pillow and heating pad unit); (7) discuss and recommend neurofeedback therapy; (8) order a brain magnetic resonance imaging ("MRI") scan; and (9) refer the patient to an optometrist.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

338.   Velugubanti referred patients to entities owned by him (Integrative Neurology and Diagnostic Solutions) to bill for the ambulatory EEG, qEEG, and neurofeedback.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

339. Farmbrook, DIPMM, MIMM, Dhillon, and Abraham rendered concurrent treatment pursuant to the predetermined protocol.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

340.   Farmbrook and Dhillon billed for urine drug screens, EMGs, and injections, and issued DME and compounded medications to nearly every patient at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

341.   DIPMM, MIMM, and Abraham performed injections and ordered definitive urine drug testing, for which Integra billed Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

342.   The defendants also prescribed medication pursuant to a protocol, which was then billed for by ZMC Pharmacy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

343.   The defendants engaged in this protocol for nearly every patient at issue in this Complaint regardless of the particular needs of each patient.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

344.   A former staff member at Inscribed testified that Velugubanti provided the staff member with a treatment protocol to follow for Inscribed patients.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

345.   This staff member testified that every patient received a cervical pillow, a heating pad unit, a bottle of 5-HTP, and a bottle of L-Theanine.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

346.   Velugubanti told this staff member to provide every patient with the above DME and nutritional supplements not based on medical necessity, but because Velugubanti "wanted patients to leave with gifts, so to speak, and to make them come back."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

347.   This staff member testified further that Velugubanti instructed staff to order a 72-hour ambulatory EEG, a qEEG, an MRI scan of the brain, and a neurobehavioral assessment for every patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

348.   Every patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

349.   The defendants also engaged in symptom magnification, often identifying symptoms and diagnoses that conflict with emergency room records.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

350.   Diagnosis of a TBI requires review of records immediately following the onset of the allegedly injury (i.e., the emergency room records).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

351.   This type of information includes the Glasgow Coma Scale score, documented loss of consciousness, documented posttraumatic confusion, neurologic examination, and neuroimaging results.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

352.   The Glasgow Coma Scale is a neurological rating scale that aims to give a reliable and objective way of recording the conscious state of a person for initial as well as subsequent assessment by assigning points based on level of functioning in the areas of eye opening response, best verbal response, and best motor response after trauma.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

353.   Scores between thirteen (13) and fifteen (15) can be indicative of concussion, but a score of fifteen (15) is also the score that would be given to anyone who has normal functioning without trauma.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

354.   If one has a score of 15 and has sustained a concussion, there must be another indicator of trauma such as the factors noted above (e.g., loss of consciousness, posttraumatic confusion or disorientation, etc.).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

355.  The defendants rarely (if ever) reviewed the emergency room records to determine the existence of a brain injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny that Respondents played any role in same.**

356.  A former Inscribed staff member testified that Inscribed physicians reviewed prior medical records "approximately 10 percent of the time."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

357.  Farmbrook, DIPMM, MIMM, Dhillon, and Abraham used subjective complaints of headaches to justify medically unnecessary referrals to Inscribed, Integrative Neurology, and Velugubanti.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

358.  Inscribed, Integrative Neurology, and Velugubanti then used self-assessment questionnaires completed by the patients to determine diagnoses instead of an objective examination of the patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

359.   This resulted in Inscribed, Integrative Neurology, and Velugubanti exaggerating symptoms with template notes indicating that patients suffered from headaches, dizziness, short-term memory loss, irritability, and changes in their mood.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

360.   Indeed, Velugubanti reported symptoms and diagnoses which often conflicted with statements made by his patients.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

361.   For example, Patient S.C. (Claim No. 0392658324) told Velugubanti that "I didn't catch a headache until later on," but Velugubanti noted that S.C. suffered from daily headaches since the alleged accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

362.   Inscribed, Integrative Neurology, and Velugubanti listed an absurd number of diagnoses in an attempt to mask the fact that the patient did not actually suffer from a TBI.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

363.   Moreover, Velugubanti included diagnoses for which he did not have the neuropsychological test data to support.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

364.   For example, Velugubanti frequently diagnosed patients with "frontal lobe and executive functioning deficit."  This diagnosis is cognitive in nature, and requires formal testing to support it.  Velugubanti failed to perform any formal testing to support diagnoses that are cognitive in nature.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

365.   In addition to using unsupported diagnoses to falsely support findings of TBI in patients, one former employee from Inscribed testified that she manipulated the testing data to support TBI findings "if [Velugubanti] felt that the patient did have a TBI, based on clinical symptoms, and it was not producing a TBI automatically, then I would extract raw data that fit the guidelines."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

366.   In fact, she further testified that testing results often failed to evidence TBI in patients and that when this occurred, Inscribed would send the data out to a doctor in Texas who would then return results that supported a TBI finding:

> A.   Now, there was [sic] times where it did not produce a TBI.  There were oftentimes it did not produce a TBI.  So, then they would send that data to some doctor in, I can't recall, in Texas.  I can't recall his name.
>
> Q.   And what would he do with that data?
>
> A.   They would often come back and that patient would have a TBI.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

367.   A former Inscribed staff member testified that Velugubanti prohibited medical staff from determining the diagnosis codes listed in the medical records, but instead instructed a transcription company to determine diagnoses.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

368.   Inscribed and Velugubanti therefore allowed individuals with no healthcare licensure to determine the medical diagnoses of Inscribed patients.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

369.   Velugubanti attempted to use Conners Continuous Performance Test 3rd Edition ("CPT-3") assessments to justify some diagnoses; however, CPT-3 assessments are not accepted in the medical field as a tool to assess cognitive function or the existence of a TBI.  Rather, the CPT-3 assessment is used to assess attention deficit hyperactivity disorder ("ADHD").  Indeed, the indices derived from the CPT-3 are specific to the diagnosis of ADHD and the test is sensitive to that condition.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

370.   Inscribed and Velugubanti used all of these false diagnoses in an attempt to justify treatment that was above and beyond the standard of care for treating a concussion.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

371.   Even if the patients sustained a concussion (which almost none did), treatment went on much longer than would be expected and was excessive.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

372.   Concussions typically resolve themselves without formal treatment in approximately seven (7) to ten (10) days.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

373.   Inscribed, Integrative Neurology, and Velugubanti also billed Allstate for unnecessary canalith repositioning (also known as epley maneuvers) on patients as part of the predetermined treatment protocol.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

374.   The epley maneuver is used to treat benign paroxysmal positional vertigo, a condition from which none of the patients at issue in this Complaint actually suffered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

375.   The epley maneuver is performed by having the patient lie down with a pillow placed at their shoulder so that their neck and head are lower than their shoulders.  This is a simple maneuver, which can be performed at home and can be shown through an instructional video, which Velugubanti purportedly did.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

376.   Inscribed, Integrative Neurology, and Velugubanti charged Allstate $300 for performing this routine, medically unnecessary "procedure."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

377.   The defendants also engaged in a consistent pattern of ordering MRI scans of the brain without any of the necessary associated findings to justify the need for an MRI scan.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

378.   Furthermore, the treatment rendered to the patients did not change after the patient received the MRI scan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

379.   Brain MRI guidelines direct to reserve imaging for patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

380.   The defendants, however, ordered brain MRI scans based on subjective complaints of headaches.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

381. The defendants also ordered brain MRI scans unnecessarily using susceptibility weighted imaging ("SWI") and NeuroQuant Volumetric Analysis ("NeuroQuant") in the scans.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

382. Neither SWI nor NeuroQuant are accepted in the medical field as the standard of care for determining the existence of a concussion or TBI.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

383. Indeed, SWI is considered an experimental protocol and has been criticized for having too many false positives.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

384.   NeuroQuant is more often used in assessing epilepsy and dementia, and even in these clinical settings, there have been problems with reliability and validity.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

385.   NeuroQuant detects atrophy in the brain; however, it does not distinguish between atrophy that occurs as a normal part of the aging process and atrophy stemming from a motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### B.   UNNECESSARY AND EXCESSIVE DIAGNOSTIC TESTING

386.   Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon billed Allstate for excessive and unnecessary diagnostic tests, including ambulatory EEGs, qEEGs, EMGs, and sleep studies.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

387.   These tests had no effect on medical decision making by these defendants, as the reports containing the results contained template entries, and the results were often not even mentioned in the ordering physicians' subsequent records, including Velugubanti and Dhillon.

104

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

388.   Among the most brazen of the tests and services routinely billed by the defendants without any indication of medical need were 72-hour ambulatory EEGs.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

389.   Ambulatory EEGs are tests that are used to detect seizures and to confirm diagnoses of epilepsy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

390.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

391.   The defendants' use of ambulatory EEGs was not only medically unnecessary for the types of symptoms (allegedly) reported by patients, they were performed in disregard for the appropriate course of care, which calls for a

traditional, in-office EEG to be performed before subjecting a patient to a three-day-long procedure.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

392.   The methodology allegedly used by Inscribed and Integrative Neurology was to attach the equipment to a patient's head and direct him or her to keep the equipment on for three (3) days while performing normal activities.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

393.   The dates of the ambulatory EEG tests allegedly performed by the defendants rarely, if ever, corresponded with dates that patients were at Inscribed and Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

394.   Inscribed and Integrative Neurology invariably charged Allstate $9,500 per day, or $28,500 per ambulatory EEG test allegedly performed.  *See* Exhibits 1 and 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

395.   The ambulatory EEGs for which Inscribed and Integrative Neurology billed Allstate, if performed at all, were never medically necessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

396.   The standard of care calls for a traditional, in-office EEG to be performed before subjecting a patient to an extended EEG.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

397.   The defendants ordered 48- or 72-hour ambulatory EEGs with no clinical basis and without performing or ordering an in-office EEG.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

398.   The defendants also relied upon qEEG, a procedure that processes the recorded EEG activity from a multi-electrode recording using a computer that processes the EEG activity into color maps of brain functioning.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

399.   The defendants' reliance on qEEG is not an accepted assessment and treatment tool due to poor reliability and validity, and qEEG is considered experimental with no clinical value.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

400.   Formulas used for diagnosis of a TBI via qEEG have not been independently replicated.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

401.   The defendants inappropriately used qEEGs as a method to diagnose TBIs.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

402.   Velugubanti has testified that qEEG provides "screening software that helps us determine causation."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

403.   The qEEG is not an appropriate method to diagnose TBI because TBI is diagnosed based on acute injury characteristics alone, and not findings many months or years later.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

404.   Multiple patients indicated that the defendants never discussed the results of their qEEGs with them.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

405.   In the EEG reports, Velugubanti stated that many of the findings are consistent with medication effects.  This indicates that there are factors other than a TBI that may be disrupting electrical systems in the brain.  Velugubanti therefore discounts his own findings when he is treating these individuals for TBI.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

406.   A former Inscribed staff member testified that the qEEGs ordered and billed for by the defendants were medically unnecessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

407.   The staff member testified that Velugubanti used the qEEG "to rate the severity of a traumatic brain injury," but that "[p]eople got the same treatment regardless" of the rating issued by the defendants.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

408.   Other diagnostic tests billed by the defendants were also unnecessary, excessive, and well below the standard of care.  For example, the sleep studies ordered and billed for by the defendants never altered the treatment rendered by the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

409.   In fact, patients at issue in this Complaint stated that no one went over the sleep study results with them.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

410.   As another example, electromyography ("EMG") testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

411.   An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

412.   There are at least two (2) components to a properly administered EMG test.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

413.   First, after the needle is inserted below the skin, the muscle is examined at rest.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

414.   In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

415.   A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

416.   The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

417.   In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

418.   If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

419.   Farmbrook improperly double billed Allstate for EMG testing purportedly performed on a patient's upper extremity during one (1) visit and then billed Allstate for performing a second EMG of the same patient's lower extremity during the next office visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

420.   The EMG testing billed by Farmbrook was unnecessary and problematic because the defendants failed to discuss the EMG results with patients and, furthermore, the EMG results were not used in any way to affect patient treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

C.   UNNECESSARY AND EXCESSIVE USE OF INJECTION PROCEDURES

421.   Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham billed Allstate for excessive, unnecessary, and unreasonable injections.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

422.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon an adequate diagnosis and legitimate medical necessity.

113

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

423.    The defendants repeatedly recommended and billed Allstate for performing injections to patients even when not medically necessary.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

424.    The defendants exaggerated symptoms as a basis to justify performing medically unnecessary and excessive injections.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

425.    For example, Inscribed, Integrative Neurology, and Velugubanti billed Allstate for trigger point and Xeomin injections conducted during patients' initial visits to treat spasmodic torticollis.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

426.   Spasmodic torticollis, also known as cervical dystonia, is an extremely painful chronic neurological movement disorder that causes the neck to involuntarily turn.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

427.   The defendants failed to document any subjective complaints by patients describing this condition or document any objective examination findings indicating the existence of spasmodic torticollis.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

428.   The defendants therefore falsely used this diagnosis in order to bill Allstate for excessive and unnecessary injections.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

429.   The defendants also inappropriately performed Xeomin injections as an initial procedure rather than attempting more conservative treatment methods.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

430.   Xeomin injections may be used to treat chronic headaches; however, it is the standard of care to use at least two (2) or three (3) other preventative agents for a reasonable period of time prior to initiating the injections.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

431.   In direct violation of the standard of care, Inscribed, Integrative Neurology, and Velugubanti injected patients with Xeomin during the initial evaluation and before more conservative preventative agents were attempted.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

432.   The defendants also billed Allstate for injecting an excessive amount of Xeomin.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

433.   The manufacturer of Xeomin's website recommends 120 units as an initial dose to treat cervical dystonia.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

116

434.   A clinical trial conducted by the manufacturer of Xeomin revealed that there is no meaningful efficacy difference between 120 units and 240 units.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

435.   Inscribed and Velugubanti billed for injecting 400 units of Xeomin into patients at issue in this Complaint, which is far above the recommended amount.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

436.   Inscribed and Velugubanti also violated the standard of care by performing multiple Xeomin injections within a 90-day period.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

437.   The standard of care requires that Xeomin injections be separated by at least 90 days.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

438.   The manufacturer of Xeomin's website states that the frequency of repeat treatments for cervical dystonia should generally be no more frequent than every twelve (12) weeks.

117

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

439.   Inscribed, Integrative Neurology, and Velugubanti also consistently billed Allstate for greater occipital nerve blocks, which were often done during the initial evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

440.   DIPMM, MIMM, and Abraham also billed Allstate for injections that provided no therapeutic value and were therefore medically unnecessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

441.   For example, patient D.J. (Claim No. TXA-0185605) testified that he received an injection from Abraham at DIPMM and "I told him the injection he gave me really wasn't working."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

442.   Patient S.J. (Claim No. TXA-0185605) testified that her injection provided relief for only two (2) hours, and "they said some people they get it and it lasts a month, some it don't [sic] work."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

D.   UNNECESSARY AND EXCESSIVE USE OF NEUROFEEDBACK THERAPY

443.   Defendants Inscribed, Integrative Neurology, and Diagnostic Solutions (by and through Velugubanti) billed Allstate for excessive, unnecessary, and unreasonable neurofeedback therapy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

444.   Neurofeedback, also known as biofeedback, measures brain waves to produce a signal than can be used as feedback to teach self-regulation of brain function.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

445.   Neurofeedback commonly uses video or sound, with positive feedback for desired relaxation levels and negative feedback for undesired activity levels.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

446.   Neurofeedback is not an accepted treatment tool in the medical field for brain injuries.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

447.   It has been used mostly for ADHD, but even in that condition the clinical guidelines are mixed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

448.   Velugubanti testified that neurofeedback is "brain training" and acknowledged that it is "mostly defined as third, fourth, fifth line therapy for treatment of neurological conditions."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

449.   Velugubanti confirmed that first and second "lines" of therapy include medication and rehabilitation and one-on-one counseling with a psychologist.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

450.   Nonetheless, Velugubanti, by and through Inscribed, Integrative Neurology, and Diagnostic Solutions, consistently billed Allstate for neurofeedback therapy conducted before the patient ever received rehabilitation or counseling.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

451.   Velugubanti's patient evaluation records included a template note to recommend or schedule "neurofeedback therapy as a form of neurocognitive treatment concomitantly with neurocognitive rehabilitation of close head injuries through neuroplasticity."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

452.   Despite including this note in almost every patient record, the defendants never provided simultaneous "neurocognitive rehabilitation," nor did they make referrals for such treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

453.   Indeed, even if the patients had received such rehabilitation services (which they did not), providing concurrent neurofeedback and neurocognitive rehabilitation is not accepted in the medical field to treat head injuries.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

454.   Finally, Velugubanti's statement that neurofeedback helps with "neuroplasticity" is not supported by empirical evidence.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

455.   Integrative Neurology submitted template neurofeedback records confirming that treatment had no effect on the patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

456.   For example, Integrative Neurology billed Allstate for thirty-seven (37) sessions of neurofeedback therapy allegedly rendered to Patient S.C. (Claim No. 0392658324) between March 29, 2017 and November 3, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

457.   For all thirty-seven (37) sessions spanning more than seven (7) months, Integrative Neurology reported that S.C. had the exact same orientation ("fully oriented"), mood ("anxious"), affect ("normative/consistent"), cognitive condition ("inattentive"), manner ("co-operative"), and appearance ("well groomed/neat/clean").

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

458.   Moreover, the plan of care remained the same for every single visit: "Client will attend one to two sessions weekly to improve cognitive function, stabilize mood, improve sleep and reduce chronic pain."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

459.   The identical, template nature of the treatment records demonstrates that neurofeedback therapy had no effect on S.C.'s condition and that the treatment plan never changed despite the lack of improvement in S.C.'s mood and cognitive function.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### E.   MEDICALLY UNNECESSARY MEDICATION

460.   Defendants Inscribed, Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham violated established standards of care by prescribing medications, including controlled substances, following the initial evaluation of patients.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

461.   Inscribed, Integrative Neurology, and Velugubanti prescribed the same drugs to nearly every patient during their initial evaluation, including (1) a controlled substance used to treat ADHD, (2) an NSAID, and (3) a dietary supplement.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

462.    The defendants then arranged to have these unnecessary prescriptions filled by defendant ZMC Pharmacy as part of their *quid pro quo* agreements.

**ANSWER: Respondents deny because the allegations are untrue.**

463.    The defendants prescribed controlled substances that were not indicated at all for the treatment of patients' purported conditions.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

464.    Inscribed, Integrative Neurology, and Velugubanti prescribed Vyvanse and Focalin, which are classified as Schedule II controlled substances because they can be abused and lead to dependence.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

465.    A former employee who worked with Velugubanti testified that her "employment [was] terminated at Inscribed because I refused to write Dr. Gireesh Beluguvanti [sic] a prescription for Vyvanse."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

466.    Vyvanse and Focalin are traditionally prescribed to treat ADHD, which is a condition that Velugubanti did not diagnose for the patients at issue in this Complaint (all of whom were allegedly involved in motor vehicle accidents).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

467. The defendants' frequent prescription of Schedule II controlled substances is particularly egregious, as it contributed to a significant public health crisis in Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

468. On October 26, 2015, a bipartisan task force formed by Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

469. The task force reported:

Prescription drug abuse has reached epidemic proportions. The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers. In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

470.  The  defendants  prescribed  Schedule  II  controlled  substance medications as a matter of course at the expense of the proper care and safety of their patients and the safety of the community at large.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 1.  <u>Medically Unnecessary Compounded Medications</u>

471.  Farmbrook and Dhillon billed Allstate for prescribing and dispensing compounded cream as part of their predetermined treatment protocol.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

472.  There is little to no research to support the use of topical compounded products and they are therefore largely considered experimental.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

473.  In order to establish any medical necessity for compounded topical agents, one or more of the following must be established: (1) intolerance to commercially available products; (2) failure to improve in spite of commercially available products; (3) avoidance of gastrointestinal problems from oral intake; (4) need to reduce systematic exposure; or (5) documented difficulties ingesting oral medication.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

474.   Farmbrook and Dhillon never documented any justification for the use of compounded medications.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

475.   Rather, the use of compounded medications was part of their predetermined slate of medication prescribed as a matter of course without any analysis of the efficacy or tolerance of other commercially-available options.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

476.   When compounded medications were prescribed to the patients at issue herein, it was never clear what body part(s) the cream was intended to treat.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

477. Farmbrook and Dhillon never provided patients with specific instructions as to where or how the compounded creams prescribed were to be applied.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

478.   Instead, Farmbrook and Dhillon provided boilerplate instructions to apply the cream to the "affected area(s)" without identifying which part(s) of the patient's body constituted an affected area.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

479.   As with the other treatment and testing described herein, the compounded cream billed for by Farmbrook and Dhillon was designed solely to increase the total amount of charges submitted to Allstate and not for the actual medically necessary treatment of patients.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 2.   Other Medically Unnecessary Medications

480.   Velugubanti, by and through Inscribed and Integrative Neurology, billed for medications that were of no clinical value.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

481.   For example, Velugubanti provided patients with L-Theanine, which he testified was used as a natural alternative for "sleep promotion."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

128

482.   Velugubanti gave patients an instruction sheet for use of L-Theanine with a link to the National Institute of Health.  That site states that the U.S. Food and Drug Administration allows the sale of L-Theanine "as a dietary supplement."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

483.   The website also mentions that the European Food Safety Authority advised negatively on health claims related to L-Theanine and cognitive function, alleviation of psychological stress, and maintenance of normal sleep.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

F.   MEDICALLY UNNECESSARY URINE DRUG TESTING

484.   Defendants Farmbrook and Dhillon billed Allstate for presumptive urine drug screening that was billed for as a matter of course and was not used to affect each patient's treatment plan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

485.   Integra billed Allstate for definitive urine drug testing that was medically unnecessary, unreasonable, excessive, and not performed in accordance with established standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

486.   Farmbrook, Integra, and Dhillon routinely billed for urine drug testing for the same patient on a regular schedule, often within weeks of each other.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

487.   DIPMM, MIMM, and Abraham failed to perform presumptive urine drug screening prior to referring specimens to Integra for excessive and unnecessary definitive urine drug testing in violation of the standard of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

488.   These defendants also routinely billed for urine drug testing on urine specimens provided by patients who were not prescribed controlled substances at all, rendering such urine drug testing unnecessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 1.   Medically Unnecessary Presumptive Urine Drug Screens

489.   Farmbrook and Dhillon required patients to undergo presumptive urine drug screening on every visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

490.   Presumptive urine drug screening is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

491.   Toxicology monitoring is only reasonable and medically necessary when it is performed randomly to assess a patient's compliance with treatment with controlled substances.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

492.   Farmbrook and Dhillon billed Allstate for presumptive urine drug screens performed as a matter of course and without regard to medical necessity.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

493.   The presumptive urine drug screens billed to Allstate had no effect on medical decision making by Farmbrook and Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

131

494. These defendants continued rendering treatment pursuant to their predetermined protocol and did not alter treatment decisions based upon the results of the presumptive urine drug screens.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

495. Allstate is not required to reimburse Farmbrook for medically unnecessary urine drug screening, and Allstate is entitled to a return of monies it paid to Farmbrook for these medically unnecessary urine drug screens.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

2.  **Medically Unnecessary Definitive Urine Drug Testing**

496. DIPMM, MIMM, and Abraham routinely ordered, and Integra routinely billed for, medically unnecessary definitive urine drug testing for dozens of substances for the same patient on a regular schedule, often within just weeks of each other, which violates the standard of care for urine drug testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

497. The standard of care for urine drug testing is that only unexpected screening results should be confirmed (absent extenuating circumstances that must be documented in the patient's medical records by the treating provider).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

498.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.   Clinical correlation is appropriate . . . .   In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.   However, if the patient disputes the unexpected findings, a confirmatory test should be done" (emphasis added).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

499.   Thus, SAMHSA confirms that, at most, only *unexpected* initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

500. However, DIPMM, MIMM, and Abraham never performed presumptive urine drug screening before referring patients' specimens to Integra for expensive and medically unnecessary definitive urine drug testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

501. In these instances, pursuant to the standard of care for clinical laboratories, Integra should have performed its own presumptive testing instead of immediately performing definitive testing, but it did not.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

502. At all relevant times to this Complaint, Integra submitted charges to Allstate seeking payment for presumptive testing relative to only eight (8) dates of service. *See* Exhibit 8.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

503. This is not surprising as presumptive testing is usually reimbursed at a much lower rate than definitive testing per specimen.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

504.   At all relevant times, Integra has been, and remains, capable of performing presumptive testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

505.   But instead of performing a presumptive test in those instances where a screen had not already been performed by DIPMM, MIMM, and Abraham to determine whether definitive testing was warranted, Integra instead made the deliberate decision to perform definitive testing immediately.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

506.   Integra's decision resulted in hundreds of instances where expensive and complex definitive testing was unnecessarily performed that could have been avoided if initial testing to screen out expected results had been performed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

507.   Integra can offer no legitimate or valid reason why it did not perform presumptive testing on specimens received from DIPMM, MIMM, and Abraham when no presumptive testing results were submitted to Integra.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

508.   Indeed, as discussed above, the standard of care in the clinical laboratory community is to conduct a presumptive test and then confirm only those drugs/drug categories where the screening result was unexpected or where the treating provider has a patient-specific reason to request confirmation of a presumptive test result.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

509.   Integra blatantly disregarded the standard of care in favor of maximizing its profits.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

510.   Furthermore, the level of definitive testing that DIPMM, MIMM, and Abraham ordered, and Integra billed for, on the specimens of patients undergoing pain management treatment after involvement in predominantly low-level motor vehicle accidents significantly exceed the level of confirmation required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

511.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

512.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3)(i).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

513.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory drug testing."  10 C.F.R. § 26.5.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

514.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

515.   In comparison, DIPMM, MIMM, and Abraham ordered, and Integra billed for, unnecessary definitive testing for almost every patient at issue herein, all of which involve patients purportedly injured in low-level motor vehicle accidents and none of whom are known to maintain and/or operate nuclear power reactors.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

516.   DIPMM, MIMM, and Abraham ordered definitive urine drug tests on patients even when the patient was not prescribed any medications, or was prescribed only non-controlled substances, which has no medical basis.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

517.   Patient D.J. (Claim No. TXA-0185605) testified that DIPMM and Abraham required D.J. to provide a urine sample during every visit and that Abraham explained that it is "just normal procedure."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

518.   Patient G.E. (Claim No. TXA-0230489) also testified that even though he refused prescriptions from Abraham, Abraham required G.E. to provide a urine sample during each office visit because "[t]hat's one of his requirements."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

519.   The definitive testing at issue herein was ordered only to generate charges to Allstate; it was not used to influence the treatment plan of patients, which was also predetermined.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

520.   The failure to actually use test results to inform treatment plans reveals that the defendants ordered such testing as a matter of course to increase charges submitted to Allstate, and not out of medical necessity for the treatment of the patients at issue herein.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

521.   Not only were the results of tests not used to alter patient treatment, but in many instances DIPMM, MIMM, and Abraham never even consulted the results prior to continuing a patient's medication regimen.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

522.   The ordering of definitive urine drug testing for nearly every DIPMM and MIMM patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

523.   Furthermore, the fact that patients were very much aware that they were required to provide a urine specimen each time they presented to Abraham at DIPMM and MIMM further supports that the definitive urine drug testing at issue herein was useless in determining a patient's compliance with his/her treatment regimen because it was not performed randomly.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

524.  Integra has also confirmed that the urine drug testing ordered by DIPMM, MIMM, and Abraham is based upon non-patient specific panel preferences:

| ORDERED TESTS | | | | | |
|---|---|---|---|---|---|
| **Presumptive Testing (EIA)** | | | | **Confirmatory Testing (LC/MS/MS)** | |
| ☐ Standard 8 Panel Screen | *Reflex:* | Targ. | Exp. | None | ☐ Standard Comprehensive Panel |
| ☐ Standard 10 Panel Screen | *Reflex:* | Targ. | Exp. | None | ☐ Standard Basic Panel |
| ☐ Standard 12 Panel Screen | *Reflex:* | Targ. | Exp. | None | ☒ Standard Custom Panel |
| Specimen Validity Test. | | YES | NO | | ☐ Confirmation of POC/EIA Results    Targ.    Exp. |
| Additional Screening Tests: | | | | | ☐ Confirmation of Prescribed/Listed Medications: |
| | | | | | ☐ Other Tests: |

**PATIENT RELEASE, CONSENT, AND ASSIGNMENT**

I understand that I have the right to select the laboratory of my choice to conduct testing on my behalf. I authorize Integra Lab Solutions to conduct testing on this specimen and bill my coverage provider for all associated costs. I grant to Integra Lab Solutions an assignment of right to enforce full payment of all claims and appeals related to testing of this specimen and/or charges incurred for benefits due/past due for medical services for which charges are payable under any policy of insurance. This includes self-insured coverages and the right to file suit to enforce the full payment of the benefits due or past due. I acknowledge that Integra Lab Solutions may be out of network with my coverage provider and agree to remit any payments in full made to me for the testing of this specimen directly to Integra Lab Solutions within 30 days, as required by law. I agree to accept full financial responsibility for all costs directly related to the testing of this ... Integra Lab Solutions that are not covered by my cov...

Patient Name (Print)          Patient Signature          7·10·18

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

525.   Abusive laboratory practices, including non-patient specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

526.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

527.   With respect to custom profiles and testing panels, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "standing orders . . . too often . . . have led to abusive practices." Id. at 45081.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

528.   The OIG has also stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill." Id. at 45079.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

529.   The OIG further guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." Id.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

530.   Integra's use of predetermined testing violates established standards of practice that demand that only medically necessary urine drug testing be performed,

as decided on a patient-by-patient and visit-by-visit basis by a licensed healthcare professional.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

531.   By testing for the exact same substances for every patient, regardless of age, medications prescribed, comorbidities, or other factors, Integra knowingly submitted claims that could not have been medically necessary for each patient's clinical condition.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

532.   It is the responsibility of Integra to assure that it is performing only tests that are reasonable and medically necessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

533.   None of the records submitted to Allstate by DIPMM or MIMM contain any indication that the DIPMM and MIMM physicians ordering urine drug tests, including Abraham, made any determination as to what type of testing should be performed or for which substances should be tested.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

143

534.   No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes medically necessary urine drug testing in all cases.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

535.   Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

536.   Instead of taking steps to ensure that it was only submitting claims for necessary urine drug testing, Integra intentionally worked to increase the number of medically unnecessary tests billed to payors like Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

537.   Tests that have no bearing on patient treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

144

538.   Allstate is not required to reimburse Integra for urine drug testing that is not patient-specific and that is unnecessary, and Allstate is entitled to a return of monies it paid to Integra for these medically unnecessary urine drug tests.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

G.   SPECIFIC EXAMPLES OF UNREASONABLE AND UNNECESSARY TREATMENT

539.   The following claims exemplify the defendants' billing for unreasonable and unnecessary treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

1.   **Patient S.G. (Claim No. 0482998035)**

540.   S.G. was allegedly involved in a motor vehicle accident on November 22, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

541.   S.G. presented to Farmbrook on December 6, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

542.   Dhillon also wrote a prescription that ordered MRI scans of S.G.'s lumbar spine, cervical spine, and brain.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

543.   S.G. presented to Integrative Neurology on January 2, 2018 where she was allegedly seen by Dawn Daniels, NP-C ("Daniels"), notwithstanding the fact that Integrative Neurology submitted a bill to Allstate for the January 2, 2018 date of service that states Velugubanti treated S.G.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

544.   According to the medical record dated January 2, 2018, Integrative Neurology ordered an ambulatory EEG, qEEG, marked the CPT-3 assessment, and diagnosed S.G. with "frontal lobe and executive functioning deficit" among seven (7) additional diagnoses.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

545.   Integrative Neurology billed Allstate for DME consisting of a cervical pillow and heating pad unit that was allegedly issued to S.G. on January 2, 2018 for which there is no evidence supporting that S.G. was actually given the DME that was billed to Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

546.    On February 12, 2018, almost three (3) months after the alleged motor vehicle accident, Integrative Neurology billed Allstate for a qEEG procedure that was purportedly performed on S.G. by Velugubanti.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

547. According to the report generated by the experimental qEEG procedure, S.G. had a "moderate" TBI level of severity.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

548. qEEG is not an accepted assessment and treatment tool and is considered to have no clinical value in determining TBI, especially months after the alleged traumatic event occurred.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

549.    In fact, S.G. presented to Henry Ford Hospital shortly after her motor vehicle accident and received a neurological exam that was negative, as was her psychiatric/behavioral examination, and the medical records submitted to Allstate by Henry Ford Hospital indicated that S.G. was fully oriented, her head was

described as "atraumatic," her pupils were reactive to light, and S.G. was not diagnosed with a brain injury.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

550.   Farmbrook billed Allstate for upper extremity EMG testing that was purportedly performed on S.G. on August 29, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

551.   According to the report authored by Dhillon, there was no evidence of radiculopathy in S.G.'s upper extremity.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

552.   All of the treatment and testing ordered and billed for by Farmbrook and Integrative Neurology was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient S.G., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

553.   Farmbrook and Integrative Neurology submitted claims for payment and accompanying medical records relative to S.G. to Allstate through the U.S. Mail

and interstate wires for unreasonable and unnecessary treatment and testing, and
Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient
information to form a belief as to the truth of the allegations.**

554.   Allstate is not required to pay Farmbrook and Integrative Neurology for
the fraudulent, unnecessary, and unreasonable treatment and testing related to S.G.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient
information to form a belief as to the truth of the allegations.**

### 2.      Patient I.S. (Claim No. 0428425573)

555.   I.S. was allegedly involved in a motor vehicle accident on September
8, 2016 and presented to Botsford Hospital on the same date.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient
information to form a belief as to the truth of the allegations.**

556.   According to the medical record submitted to Allstate by Botsford
Hospital, I.S. was in a "[v]ehicle going about 15-20 miles per hour when it struck a
parked car" and I.S. was "unsure" whether she suffered any loss of consciousness
resulting from the motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient
information to form a belief as to the truth of the allegations.**

557.   The medical record submitted by Botsford Hospital also indicated that there were no focal neurologic deficits noted and the diagnostic imaging of I.S.'s head resulted in a negative finding for brain injury.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

558.   I.S. presented to Inscribed on January 4, 2018 for an initial patient evaluation that was purportedly performed by Velugubanti.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

559.   Contrary to the medical record submitted by Botsford Hospital that was authored on the same date as the alleged motor vehicle accident, Velugubanti reported that I.S. "was going at 55 miles per hour" and that she reported "[p]ositive loss of consciousness" as a result of the motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

560.   Velugubanti ordered a "48-Hour Ambulatory EEG assessment," "[qEEG] testing ordered for diagnostic screening of TBI trauma with loss of consciousness," prescribed Vyvanse for I.S.'s ADHD, and issued I.S. DME consisting of a cervical pillow, heating pad, a bottle of 5-HTP, and a bottle of L-Theanine.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

561.   I.S. presented to Inscribed on February 12, 2018 and purportedly met with McKissick who reported that I.S. received Xeomin injections during the January 4, 2018 office visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

562.   McKissick recommended steroid treatment but I.S. refused and instead opted for Xeomin injections going forward.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

563.   McKissick also ordered a "72-hour ambulatory EEG assessment" instead of the 48-hour ambulatory EEG ordered by Velugubanti.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

564.   All of the treatment and testing ordered and billed by Inscribed and Velugubanti was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient I.S., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

565.   Inscribed submitted claims for payment and accompanying medical records relative to I.S. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

566.   Allstate is not required to pay Inscribed for the fraudulent, unnecessary, and unreasonable treatment and testing related to I.S.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 3.    Patient T.S. (Claim No. 0461626020)

567.   T.S. was allegedly involved in a motor vehicle accident on June 24, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

568.   T.S. presented to Farmbrook on May 23, 2018 for an initial patient evaluation that was purportedly performed by Dhillon and resulted in Dhillon

assessing T.S. with the following three (3) diagnoses: (1) lower back pain, (2) lumbar herniated disc, and (3) lumbar radiculopathy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

569.   Dhillon also ordered T.S. to undergo EMG studies of his bilateral lower extremities and then to follow up after the EMG studies were completed even though there was no medical justification for EMG studies.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

570.   T.S. presented to Farmbrook on November 12, 2018 for EMG studies of his bilateral lower extremities that was purportedly performed by Jacqueline Tribelhorn, N.P. ("Tribelhorn") "with Dr. Dhillon in office and immediately available for assistance."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

571.   Tribelhorn listed "numbness and tingling" under the "Review of Systems" section of the medical record dated November 12, 2018 and also assessed T.S. with "Paresthesias."   Both of these entries were not originally included by Dhillon during T.S.'s initial patient evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

572.   T.S. presented to Farmbrook on December 10, 2018 for EMG studies of his upper bilateral extremities even though T.S. first presented to Farmbrook with complaints of only his lower back.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

573.   Dhillon diagnosed T.S. with a cervical sprain/strain and carpel tunnel syndrome for the first time since the alleged motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

574.   Without any basis, Dhillon diagnosed T.S. with lower back pain and lumbar herniated disc/bilateral L5 radiculopathy during the March 25, 2019 follow-up evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

575.   All of the treatment and testing ordered and performed by Farmbrook was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient T.S., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

576. Farmbrook submitted claims for payment and accompanying medical records relative to T.S. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

577. Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to T.S.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

### 4.   Patient S.N. (Claim No. TXA-0178760)

578. S.N. was allegedly involved in a motor vehicle accident on December 15, 2016.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

579.   S.N. presented to Inscribed on January 29, 2018 for an initial patient evaluation that was purportedly performed by McKissick.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

580.   McKissick reported that S.N. "cannot recall for certain if she lost consciousness" as a result of the motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

581.   A CPT-3 assessment was performed on S.N. during her initial patient evaluation that purportedly produced results indicating S.N. had "a very high likelihood of having a disorder characterized by attention deficits such as ADHD."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

582.   McKissick ordered S.N. to undergo a Brain MRI with SWI and Neuroquant protocol, a 72-hour EEG assessment, and a qEEG for "diagnostic screening of TBI trauma with loss of consciousness" even though S.N. did not report loss of consciousness.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

583.   McKissick also prescribed and dispensed L-Theanine PM and 5-HTP to S.N. in addition to prescribing and issuing S.N. DME consisting of a cervical pillow and a heating pad.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

584.   All of the treatment and testing ordered and billed for by Inscribed and McKissick was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient S.N., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

585.   Diagnostic Solutions billed Allstate for a sleep study relating to S.N. that was allegedly performed on January 30, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

586.   According to the medical record submitted by Diagnostic Solutions, a report that is completely devoid of any findings, S.N.'s appointment time was listed as 8:30 p.m. and her arrival time is listed as 9:21 a.m.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

157

587.   It is highly unlikely that the sleep study billed by Diagnostic Solutions occurred at all.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

588.   Furthermore, Diagnostic Solutions billed Allstate for an EMG that was purportedly performed on S.N. on February 9, 2018, which resulted in normal findings.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

589.   Diagnostic Solutions also billed Allstate for a second EMG just a month later that was purportedly performed on S.N. on March 9, 2018 but failed to document any findings in the corresponding medical record dated March 9, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

590.   Inscribed and Diagnostic Solutions submitted claims for payment and accompanying medical records relative to S.N. to Allstate through interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

591.    Allstate is not required to pay Inscribed or Diagnostic Solutions for the fraudulent, unnecessary, and unreasonable treatment and testing related to S.N.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

592.    J.F. was allegedly involved in a motor vehicle accident on February 11, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

593.    J.F. presented to DIPMM on March 8, 2018 for an initial patient evaluation that was purportedly performed by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

594.    Abraham indicated that J.F. "will continue to get medication from another doctor" without identifying the medications at issue.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

595.    J.F. allegedly provided a urine specimen during her March 8, 2018 DIPMM office visit that was referred to Integra for definitive urine drug testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

596.   According the lab report submitted to Allstate by Integra, J.F.'s urine specimen tested positive for Nortriptyline, Sertraline, THC-COOH, Gabapentin, and Oxycodone.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

597.   The lab report submitted by Integra fails to identify what medications were prescribed to J.F. as of March 8, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

598.   J.F. presented to DIPMM for a follow-up evaluation that was purportedly performed by Abraham on April 12, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

599.   The April 12, 2018 medical record submitted to Allstate by DIPMM is devoid of any reference relating to the March 8, 2018 definitive urine drug testing results identified in Integra's lab report, including any acknowledgement of the five (5) positive findings.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

600.   Abraham allegedly collected a urine specimen from J.F. during the April 12, 2018 office visit and referred the specimen to Integra for definitive urine drug testing without making a single notation in the medical record why additional urine drug testing was warranted at all.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

601.   According to the lab report submitted to Allstate by Integra, J.F.'s urine specimen that was allegedly collected on April 12, 2018 tested positive for Nortriptyline, Sertraline, Gabapentin, and Oxycodone.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

602.   Both the March 8, 2018 and the April 12, 2018 medical records indicate only that J.F. "will continue to get medication from another doctor."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

603.   J.F. presented to DIPMM for another follow-up office visit on May 17, 2018 that was purportedly performed by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

604.   According to the May 17, 2018 medical record, J.F.'s April 12, 2018 urine drug testing results were "consistent w/ meds. pt will continue getting narcotics from kneepro."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

605.   Although Abraham had not prescribed J.F. any narcotics during her three (3) office visits to DIPMM, Abraham allegedly collected another urine specimen from J.F. that was referred to Integra for definitive urine drug testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

606.   There was no medical necessity for Abraham to order excessive and expensive definitive urine drug testing relating to J.F. when Abraham was not prescribing controlled substances or narcotics to J.F. and, furthermore, Abraham failed to identify the "narcotics" J.F. was prescribed by "kneepro."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

607.   Integra submitted claims for payment and accompanying medical records relative to J.F. to Allstate through the U.S. Mail for unreasonable and unnecessary definitive urine drug testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

608.   Allstate is not required to pay Integra for the fraudulent, unnecessary, and unreasonable definitive urine drug testing relative to J.F.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

609.   J.W. was allegedly involved in a motor vehicle accident on June 3, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

610.   J.W. presented to Farmbrook the following day on June 4, 2018 for an initial patient evaluation that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

611.   Dhillon diagnosed J.W. with "[h]eadache/dizziness/blurry vision," "[l]umbar sprain strain/radiculopathy," "[c]ervical sprain strain/radiculopathy," and "[m]ultiple lacerations" according to the medical record authored by Dhillon that is dated June 4, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

612.   Dhillon wrote a prescription that ordered MRI scans of J.W.'s lumbar spine, cervical spine, and brain and a prescription for Norco.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

613.   Dhillon issued J.W. a disability certificate that not only disabled J.W. from housework, driving, and recreational activities, but also allowed for attendant care services and case management.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

614.   The disability certificate lists the four (4) diagnoses identified by Dhillon but also includes two (2) additional diagnoses of shoulder pain and knee pain.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

615.   Farmbrook also billed Allstate for performing a presumptive urine drug test on June 4, 2018 that is not mentioned in the medical records submitted by Farmbrook.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

616.   J.W. presented to Farmbrook on June 15, 2018 for trigger point injections that were purportedly performed by Tribelhorn on J.W.'s left shoulder and lower back despite Dhillon indicating less than two (2) weeks prior during the initial patient evaluation that J.W. "may benefit from some physical therapy for his neck and low back."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

617.   Tribelhorn also added TBI and long term use of opiates to J.W.'s growing list of diagnoses.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

618.   Farmbrook billed Allstate for performing a presumptive urine drug test on J.W. on July 3, 2018.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

619.   According to the medical records submitted by Farmbrook, Tribelhorn continued to prescribe Norco to J.W. on July 3, 2018, March 19, 2019, and April 17, 2019 even though the presumptive urine drug testing "[r]esults [were] pending review."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

620.   In fact, the presumptive urine drug testing results on March 19, 2019 and April 17, 2019 both returned a negative result for opiates, indicating that J.W. was not complying with his opiate medication.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

621.   Yet, Tribelhorn failed to discuss or mention this in the medical records submitted to Allstate, instead, she continued to prescribe Norco to J.W.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

622.   All of the treatment and testing ordered and billed for by Farmbrook was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient J.W., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

623.   Farmbrook submitted claims for payment and accompanying medical records relative to J.W. to Allstate through the U.S. Mail for unreasonable and

unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

624.  Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to J.W.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

625.  J.F. was allegedly involved in a motor vehicle accident on October 10, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

626.  J.F. presented to Farmbrook on October 19, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

627.  Dhillon issued J.F. DME consisting of a back brace and transcutaneous electrical nerve stimulation ("TENS") unit, dispensed lidocaine cream, prescribed Oxaydo and Amrix to J.F., and also prescribed MRIs of the cervical spine, lumbar

spine, and brain with neuroquant technology during the October 19, 2017 initial patient evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

628.  J.F. presented for a follow-up patient evaluation on November 20, 2017 that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

629.  Dhillon ordered J.F. to undergo EMG studies of her bilateral upper extremities and referred J.F. to a neurologist.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

630.  J.F. presented to Inscribed on January 18, 2018 for an initial patient evaluation that was purportedly performed by McKissick.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

631.  McKissick reported "[p]ositive loss of consciousness with a recollected memory of her car turning before losing consciousness," contradicting Dhillon's initial patient evaluation indicating that J.F. "does not recall if she had a loss of consciousness" as a result of the motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

632.   A CPT-3 assessment was performed on J.F. during her initial patient evaluation that purportedly produced results indicating J.F. had "a moderate likelihood of having a disorder characterized by attention deficits such as ADHD."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

633.   McKissick ordered J.F. to repeat her Brain MRI with SWI and Neuroquant protocol, a 72-hour EEG assessment, and a qEEG for "diagnostic screening of TBI trauma with loss of consciousness" even though J.F. originally stated that she was unsure if she experienced a loss of consciousness.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

634.   McKissick also prescribed Cambia, L-Theanine, and 5-HTP to J.F. in addition to prescribing and issuing J.F. DME consisting of a cervical pillow and a heating pad.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

635.   All of the treatment and testing ordered and performed by Inscribed and McKissick was based on predetermined and boilerplate findings that did not have

any relation to the individual needs of patient J.F., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

636.   On March 9, 2019, almost five (5) months after the alleged motor vehicle accident, Diagnostic Solutions billed Allstate for a qEEG procedure that was purportedly performed on J.F. by Donald Magder, M.A., T.L.L.P. ("Magder").

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

637.   Diagnostic Solutions failed to submit a report identifying the results of the alleged qEEG procedure to Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

638.   qEEG is not an accepted assessment and treatment tool and is considered to have no clinical value in determining TBI, especially months after the alleged traumatic event occurred.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

639.   The qEEG billed by Diagnostic Solutions was based on predetermined and boilerplate findings that did not have any relation to the individual needs of

170

patient J.F., and was medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

640.   Farmbrook, Inscribed, and Diagnostic Solutions submitted claims for payment and accompanying medical records relative to J.F. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

641.   Allstate is not required to pay Farmbrook, Inscribed, or Diagnostic Solutions for the fraudulent, unnecessary, and unreasonable treatment and testing related to J.F.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

642.   D.C. was allegedly involved in a motor vehicle accident on August 8, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

643.   D.C. presented to MIMM on October 1, 2019 for a patient evaluation that was purportedly performed by Abraham.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

644.   D.C. allegedly provided a urine specimen during his October 1, 2019 MIMM office visit that was referred to Integra for definitive urine drug testing.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

645.   Abraham selected Integra's "Standard Comprehensive Panel" on the requisition form submitted to Integra.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

646.   The requisition form fails to identify any medications prescribed to D.C. and also indicates that no presumptive urine drug screen was performed by Abraham during the October 1, 2019 office visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

647.   Instead of performing a presumptive urine drug screen in-office, Abraham referred D.C.'s urine specimen for expensive definitive urine drug testing

even though Abraham indicated that D.C. was not currently prescribed any narcotics during his October 1, 2019 office visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

648.   There was no medical necessity for Abraham to order excessive and expensive definitive urine drug testing relating to D.C. when Abraham was not prescribing controlled substances or narcotics to D.C.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

649.   In support of Integra's definitive urine drug testing charges, it submitted a generic letter of medical necessity that was not related to D.C. that Integra's Chief Executive Officer and sole member Thomas Hughes admitted "makes the general case" for the definitive urine drug testing billed to Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

650.   However, the letter of medical necessity submitted to Allstate fails to state why definitive urine drug testing, the urine drug testing billed by Integra, was medically necessary for D.C.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

651.   MIMM and Integra submitted claims for payment and accompanying medical records relative to D.C. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary medical treatment and definitive urine drug testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

652.   Allstate is not required to pay MIMM and Integra for the fraudulent, unnecessary, and unreasonable treatment and definitive urine drug testing relative to D.C.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

653.   T.A. was allegedly involved in a motor vehicle accident on June 13, 2017.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

654.   T.A. presented to Farmbrook on August 4, 2017 for an initial patient evaluation that was purportedly performed by Dhillon.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

655.   Dhillon indicated that T.A. "states that her neck pain is constant and it is intermittently radiating into the left upper extremity."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

656.   Dhillon issued T.A. a TENS unit, dispensed Lidocaine cream to T.A. during her office visit, ordered MRIs of her cervical and lumbar spine, and further indicated that T.A. will "initiate some conservative care to help reduce the intensity of her neck and lower back pain."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

657.   T.A. presented to Farmbrook on September 20, 2017 for a follow-up patient evaluation that was purportedly performed by Tribelhorn.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

658.   Tribelhorn issued T.A. DME consisting of a back brace and knee brace and further ordered an EMG of her upper and lower extremities indicating that T.A. "has radicular signs on exam, numbness, and disc bulges on the MRI reports."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

175

659.   Farmbrook billed Allstate for an EMG of T.A.'s upper extremities that was purportedly performed on October 9, 2017 by Dhillon that resulted in normal findings with no evidence of radiculopathy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

660.   Farmbrook then billed Allstate for an EMG of T.A.'s lower extremities that was purportedly performed on November 9, 2017 by Dhillon that also resulted in normal findings with no evidence of radiculopathy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

661.   Notwithstanding the fact that the EMGs purportedly performed by Farmbrook each returned results of no radiculopathy in T.A.'s upper and lower extremities, medical records submitted by Farmbrook dated December 8, 2017, January 10, 2018, and February 9, 2018 each continue to include diagnoses for cervical and lumbar radiculopathy relating to T.A. in an attempt to falsely justify continued treatment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

662.   The EMGs billed by Farmbrook were not used to further T.A.'s treatment, as the results were not used to further her treatment plan or confirm her diagnoses.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

663.   Instead, the EMGs billed by Farmbrook were based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient T.A., and were medically unnecessary and performed in disregard for the applicable standards of care.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

664.   Farmbrook submitted claims for payment and accompanying medical records relative to T.A. to Allstate through the U.S. Mail for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

665.   Allstate is not required to pay Farmbrook for the fraudulent, unnecessary, and unreasonable treatment and testing related to T.A.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

666.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

667.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

668.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

669.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

670.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

671.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

672.   Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

673.   It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

674.   As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were not actually performed, (2) were not lawfully rendered, (3) were not performed consistent with the AMA's requirements, and (4) were wholly unwarranted and unnecessary.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

675.   Moreover, the billing codes submitted to Allstate by, and on behalf of, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

676.   Most prominently, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham submitted bills to Allstate seeking reimbursement for high-level office visits and office consultations that did not occur as billed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

180

677.   There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

678.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

679.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

680.   The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|       | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|-------|---------|-------------|-------------------------|-------------------|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 10 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |

| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

681.   Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

682.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

683.   The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | **HISTORY** | **EXAMINATION** | **MEDICAL DECISION MAKING** | **FACE-TO-FACE TIME** |
|---|---|---|---|---|
| **99211** | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| **99212** | Problem focused | Problem focused | Straight forward | 10 minutes |
| **99213** | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| **99214** | Detailed | Detailed | Moderate complexity | 25 minutes |
| **99215** | Comprehensive | Comprehensive | High complexity | 40 minutes |

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

684.   Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

685.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

686.   The criteria developed by the AMA to properly assign the CPT Code for an initial consultation include the components illustrated in the chart below:

|       | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|-------|---------|-------------|-------------------------|-------------------|
| 99241 | Problem focused | Problem focused | Straight forward | 15 minutes |
| 99242 | Expanded problem focused | Expanded problem focused | Straight forward | 30 minutes |
| 99243 | Detailed | Detailed | Low complexity | 40 minutes |
| 99244 | Comprehensive | Comprehensive | Moderate complexity | 60 minutes |
| 99245 | Comprehensive | Comprehensive | High complexity | 80 minutes |

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

687.   The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| Straight forward decision making (CPT Code 99201-99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT Code 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT Code 99204) | Multiple | Moderate | Moderate |
| High complexity medical decision making (CPT Code 99205) | Extensive | Extensive | High |

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

688.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

689.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion.

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

690.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

185

691.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

692.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99245, including:

- "Initial office consultation of a 35-year-old multiple trauma male patient with complex pelvic fractures, for evaluation and formulation of management plan."

- "Office consultation for independent medical examination of a patient with a history of complicated low back and neck problems with previous multiple failed back surgeries."

*CPT 2015: Professional Edition Codebook.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

693.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99244, including:

186

- "Initial office consultation for a patient with a failed total hip replacement with loosening and pain upon walking."

- "Office consultation for 66-year-old female, history of colon restriction for adenocarcinoma six years earlier, now with severe mid-back pain; X-rays showing osteoporosis and multiple vertebral compression fractures."

*CPT 2015: Professional Edition Codebook.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

694.   The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

695.   Instead, at most, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

696.   Yet, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham almost always billed Allstate for level four (4) and five (5) examinations for patient evaluations (i.e., CPT Codes 99204, 99205, 99214, 99215, 99244, and 99245).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

697.   Inscribed billed for a level four (4) and five (5) evaluation more than 99% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 1.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

698.   Integrative Neurology billed for a level four (4) and five (5) evaluation or consultation more than 94% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

699.   DIPMM and Abraham billed for a level four (4) and five (5) evaluation more than 95% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 5.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

700.   MIMM and Abraham billed for a level four (4) and five (5) evaluation 100% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 6.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

701. The defendants' billing for level four (4) or five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered, as the defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

702. By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

703. However, all of the bills prepared and submitted by Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham were submitted using fraudulent and deceptive examination CPT Codes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

704.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

705.   Defendants Integrative Neurology and MIMM submitted charges to Allstate for alleged prolonged evaluations using billing codes indicating a longer evaluation than was actually rendered.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

706.   The evaluation and management of a patient that extends beyond the period of time provided for in the CPT Code for office visits/examinations or consultations is billed under CPT Codes 99354 and 99355.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

707.   Per the CPT Code Book, CPT Code 99354 is used to report the first hour of prolonged services, and CPT Code 99355 is used to report each additional thirty (30) minutes beyond the first hour.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

708.   The AMA has published the total duration of prolonged services required to bill for CPT Code 99354 or 99355:

| TOTAL DURATION OF PROLONGED SERVICES | CODE(S) |
|---|---|
| Less than 30 minutes | Not reported separately |
| 30-74 minutes | 99354 |
| 75-104 minutes | 99354 and 99355 |
| 105 minutes or more | 99354 and 2 units of 99355 |

*CPT 2017: Professional Edition Codebook.*

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

709.   A physician must bill using CPT Code 99354 for the first hour of prolonged services before billing for services under CPT Code 99355.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

710.   CPT Code 99355 is reimbursed at a higher rate than CPT Code 99354 because CPT Code 99355 indicates a prolonged examination lasting longer than an additional hour.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

711.   Integrative Neurology and MIMM charged Allstate for prolonged evaluations and consultations using CPT Code 99355 without first using CPT Code 99354.  *See* Exhibits 2 and 6.

191

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

712.   By failing to use CPT Code 99354, Integrative Neurology fraudulently billed Allstate seeking a higher level of reimbursement than the services allegedly performed during the prolonged evaluations.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

713.   MIMM billed Allstate for a level five (5) initial patient evaluation (i.e., CPT Code 99205) and prolonged evaluation services under CPT Code 99354 for an initial evaluation of thirty-seven (37) year old Patient J.P. (Claim No. 0548836725) on July 3, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

714.   Yet, there is nothing contained in the July 3, 2019 MIMM medical record authored by Abraham that justifies a level five (5) initial patient evaluation, much less a charge for a prolonged level five (5) office visit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

715.   Abraham's July 3, 2019 medical record evidences that: (1) there is no comprehensive history listed for J.P., (2) Abraham did not perform a comprehensive

examination, and (3) Abraham's diagnoses do not rise to the level of high complexity.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

716.    Moreover, there is nothing that indicates Abraham required no less than an additional thirty (30) minutes (in addition to the typical 60 minutes usually spent face-to-face with the patient during a level five (5) initial patient evaluation) to complete J.P.'s initial patient evaluation on July 3, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

717.    MIMM billed Allstate the unreasonable and excessive amount of $3,509.56 for Abraham's purported level five (5) patient evaluation of J.P. on July 3, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

718.    MIMM then billed Allstate for a level five (5) patient evaluation (i.e., CPT Code 99215) of J.P. on July 25, 2019 and then again on August 23, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

719.   MIMM also billed Allstate using CPT Code 99354 on both July 25, 2019 and August 23, 2019.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

720.   Again, the medical records submitted by MIMM relating to Abraham's purported performance of level five (5) established patient evaluations of J.P. on July 25, 2019 and August 23, 2019 fail to justify not only the level five (5) established patient evaluations billed under CPT Code 99215 but also the prolonged evaluation services lasting at least thirty (30) minutes that were billed under CPT Code 99354.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

721.   The Centers for Medicare and Medicaid Services instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

722.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and reimbursement) of the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

723.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure which are included in another billing code also billed for the same date of service.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

724.   Each NCCI edit has a modifier indicator assigned to it.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

725.   A modifier indicator of "0" indicates a modifier cannot be used to bypass the edit.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

726.   A modifier indicator of "1" indicates that a properly-codified modifier can be used to allow submitted services or procedures if certain criteria are met.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

727.   Many procedure codes cannot be reported together because they are mutually exclusive of each other and mutually exclusive procedures cannot be performed at the same anatomic site or during the same patient encounter.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

728.   Integra submitted bills to Allstate that contained unbundled charges in order to inflate the amount it charged Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

729.   For example, Integra submitted bills to Allstate that contained charges for CPT Codes 80369 and 80370 for the same patient on the same date of service.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

730.   CPT Code 80369 ("Skeletal muscle relaxants; 1 or 2") is a Column Two code and CPT Code 80370 ("Skeletal muscle relaxants; 3 or more") is a Column One code when each are billed on the same date of service for the same patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

731.   CPT Code 80369 cannot be billed on the same date of service for the same patient as CPT Code 80370 under any circumstances.

196

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

732.   Yet, Integra submitted a charge under CPT Code 80369 in addition to a charge under CPT Code 80370 on the same date of service and for the same patient 370 times regarding patients at issue in this Complaint.  *See* Exhibit 10.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

733.   Integra also submitted bills to Allstate that contained charges for CPT Code 80336 ("Antidepressants, tricyclic and other cyclicals; 3-5") and CPT Code 80337 ("Antidepressants, tricyclic and other cyclicals; 6 or more") for the same patient on the same date of service.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

734.   CPT Code 80336 ("Antidepressants, tricyclic and other cyclicals; 3-5") is a Column Two code and CPT Code 80337 ("Antidepressants, tricyclic and other cyclicals; 6 or more") is a Column One code when each are billed on the same date of service for the same patient.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

735.   CPT Code 80336 cannot be billed on the same date of service for the same patient as CPT Code 80337 under any circumstances.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

736.   However, Integra submitted a charge under CPT Code 80336 in addition to a charge under CPT Code 80337 on the same date of service and for the same patient at least twelve (12) times regarding patients at issue in this Complaint. *See* Exhibit 11.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

737.   Unbundling that is done knowingly and intentionally constitutes a fraudulent billing practice.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

738.   Allstate is not obligated to pay the defendants for fraudulently billed treatment.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

739. The amounts the defendants charged to Allstate were far above reasonable and customary prices for the treatment and services allegedly rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

740. Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee." McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

**ANSWER: Respondents admit.**

741. The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder. Mich. Comp. Laws § 500.3107(1)(a).

**ANSWER: Respondents admit.**

742. Michigan law is clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider and insurers have an obligation to police and challenge unreasonable charges.

**ANSWER: Respondents admit.**

743. For the reasons discussed *infra*, the defendants cannot meet their burden, thereby vitiating Allstate's obligation to pay any of the unreasonable charges for office visits, injections, diagnostic testing, neurofeedback, urine drug testing,

issuing DME, and dispensing medication, and entitling Allstate to reimbursement for those amounts paid that are in excess of a reasonable amount for the services purportedly rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

744. In addition to not providing treatment that warranted level four (4) or five (5) evaluations, as discussed *supra*, the defendants charged excessive amounts for their purported evaluations.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

745. Defendants DIPMM and Abraham submitted bills to Allstate for level four (4) and five (5) initial evaluations that were as high as $1,056.00, and for level four and five (5) re-evaluations as high as $736.00. *See* Exhibit 5.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

746. Defendants MIMM and Abraham submitted bills to Allstate for level five (5) initial evaluations that were charged at $2,153.12, and for level four (4) and five (5) re-evaluations that were as high as $1,506.16. *See* Exhibit 6.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

747.    Defendants Inscribed, Integrative Neurology, and Velugubanti submitted bills to Allstate for level four (4) and five (5) initial evaluations that were as high as $715.00, and for level four (4) and five (5) re-evaluations as high as $495.00.  *See* Exhibits 1 and 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

748.    Defendant Inscribed regularly charged Allstate at these excessive rates for patient evaluations conducted by physician assistants.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

749.    Defendant Inscribed submitted bills for these physician assistant evaluations signed by defendant Velugubanti in an attempt to mask the fact that the services were rendered by a physician assistant rather than a medical doctor (if they were rendered at all).

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

750.   The rates at which defendant Inscribed charged Allstate are excessive for services provided by a medical doctor; they are egregious for services provided by a physician assistant.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

751.   In addition to these outrageous charges, Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham billed Allstate at excessive rates for alleged prolonged patient evaluations.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

752.   As discussed *supra*, the defendants submitted bills for prolonged evaluations using CPT Codes 99354 and 99355.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

753.   Defendants Inscribed, Integrative Neurology, and Velugubanti billed Allstate up to $330.00 under CPT Code 99354, and as much as $550.00 under CPT Code 99355.  *See* Exhibits 1 and 2.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

754.    Defendants DIPMM and Abraham billed Allstate up to $750.00 under CPT Code 99354, and as much as $669.28 under CPT Code 99355.  *See* Exhibit 5.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

755.    Defendants MIMM and Abraham billed Allstate $1,356.44 under CPT Code 99354 and $1,258.00 under CPT Code 99355.  *See* Exhibit 6.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

756.    The excessive and outrageous nature of these charges for a patient evaluation are best demonstrated by the example of charges submitted to Allstate for the alleged initial patient evaluation of Patient T.G. (Claim No. 0383060746) by defendant Inscribed.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

757.    Inscribed billed Allstate $715.00 for a level five (5) initial patient evaluation, $330.00 for the evaluation lasting an additional hour, and $440.00 for the evaluation continuing an additional half hour.  Inscribed therefore submitted charges totaling $1,485.00 for a single patient evaluation.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

758.   The excessive rates charged by the defendants further demonstrate that the purpose of their scheme was to maximize the amount they billed to auto insurers like Allstate.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

759.   Allstate is not obligated to pay any pending bills for patient evaluations billed at excessive amounts, and it is entitled to reimbursement for the evaluations for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

760.   In addition to injecting a medically unsafe amount of Xeomin into patients at issue in this Complaint as discussed *supra*, defendants Inscribed and Velugubanti charged Allstate at excessive rates for these medically unnecessary injections.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

761.   Inscribed and Velugubanti charged Allstate $10,000.00 for injecting 400 units of Xeomin.  *See* Exhibit 1.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

762.   The same amount of Xeomin may be purchased at local pharmacies in Southfield for less than $2,000.00.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

763.   Inscribed and Velugubanti therefore charged Allstate more than five (5) times the cost to obtain the same amount of Xeomin from a local pharmacy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

764.   Inscribed and Velugubanti cannot justify the nearly $8,000.00 price difference as purported medical decision making to inject the Xeomin, as they separately billed for office visits.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

765.   Allstate is not obligated to pay any pending bills for Xeomin injections, and it is entitled to reimbursement for the injections for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

766.   As discussed above, defendants Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon aggressively pressured

patients to undergo unnecessary testing, including EEGs, EMGs, sleep studies, and nerve conduction studies.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

767.   When the defendants were successful in coercing patients to undergo medically unnecessary testing, the bills that resulted from such testing and treatment were staggering.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

768.   For example, defendants Inscribed, Integrative Neurology, and Velugubanti submitted charges of $9,500.00 per day for purported ambulatory EEG monitoring using CPT Code 95951.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

769.   The average Medicare reimbursement for CPT Code 95951 in the Detroit area is $335.52.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

770.   Defendant Diagnostic Solutions submitted charges of $10,000.00 for purported sleep studies using CPT Code 95810.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

771.   The average Medicare reimbursement for CPT Code 95810 in the Detroit area is $624.45.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

772.   Defendants Farmbrook and Dhillon submitted charges of $3,500.00 for nerve conduction studies using CPT Codes 95910 and 95911.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

773.   The average Medicare reimbursement for CPT Code 95910 in the Detroit area is $199.97.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

774.   The average Medicare reimbursement for CPT Code 95911 in the Detroit area is $240.23.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

775.   Defendants Farmbrook and Dhillon also submitted charges up to $4,000.00 for EMGs using CPT Code 95886.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

776.   The average Medicare reimbursement for CPT Code 95886 in the Detroit area is $96.88.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

777.   Allstate is not suggesting that a reasonable price under the No-Fault Act is necessarily equivalent to Medicare reimbursement rates, but charges that are up to thirty (30) times higher than the amounts paid by other payors are *per se* unreasonable.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

778.   Defendants Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon's charges are well outside the spectrum of reasonableness and they cannot sustain their burden of proving otherwise.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

779.   Allstate is not obligated to pay any pending bills for testing billed at excessive amounts, and it is entitled to reimbursement for the testing for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

780.    In addition to charging Allstate for unlicensed and medically unnecessary neurofeedback therapy, as discussed *supra*, defendants Inscribed, Integrative Neurology, Diagnostic Solutions, and Velugubanti billed Allstate at excessive rates for said therapy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

781.    These defendants charged Allstate $495.00 per session of neurofeedback therapy.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

782.    Patient I.S. (Claim No. 0428425573) told Allstate that her neurofeedback sessions lasted about fifteen (15) minutes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

783.    Indeed, defendant Diagnostic Solutions's own website promotes that neurofeedback "[t]reatment times are extremely short (about 5 minutes)." *See* Exhibit 12.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

784.   Charging Allstate $495.00 for five (5) to fifteen (15) minutes of unlicensed and medically unnecessary treatment is excessive, and defendants Inscribed, Integrative Neurology, and Diagnostic Solutions cannot meet their burden of proving otherwise.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

785.   Allstate is not obligated to pay any pending bills for neurofeedback therapy billed at excessive amounts, and it is entitled to reimbursement for the bills for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

786.   As discussed above, the predetermined treatment protocol used by the defendants involved the (unlawful) issuance of DME.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

787.    In addition to being unlicensed, defendants Inscribed and Farmbrook charged Allstate at excessive rates for issuing this DME.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

788.    For example, Farmbrook billed Allstate $2,450.00 per unit for the "IF 4000 Tens Unit" and $400 for the accompanying electrodes.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

789.    The IF-4000 Inferential Unit and four (4) electrodes may be purchased at retail for $199.00.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

790.    Farmbrook therefore billed Allstate over fourteen (14) times more than the retail price for the same product.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

791.    Inscribed also billed Allstate up to $3,850.00 for issuing TENS units to patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

792.   When told the amount that Farmbrook charged Allstate for a TENS unit, Patient E.J. (Claim No. 0483737482) testified, "I didn't know that thing cost that much.  I would have been like no thank you."

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

793.   Farmbrook also billed Allstate up to $3,300.00 per back brace issued to patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

794.   Farmbrook submitted a list to the State of Michigan with the DME "we plan on dispensing/prescribing," which included TENS units, "orthoses – pre-fab," and "orthoses – off the shelf."  *See* Exhibit 13.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

795.   Billing Allstate $3,300.00 for an off-the-shelf, pre-fabricated back brace is not reasonable.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

796.   Farmbrook also billed Allstate $200.00 per patient using CPT Code 97760 for purportedly showing the patients how to use the DME.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

797. Charging $200.00 to supposedly show a patient how to put on and take off an off-the-shelf back brace confirms that defendant Farmbrook's goal—like the goal of all of the defendants—was to maximize the amount billed to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

798. Allstate is not obligated to pay any pending bills for DME billed at excessive amounts, and it is entitled to reimbursement for the DME for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

799. Defendants ZMC Pharmacy and Farmbrook charged Allstate at excessive rates for allegedly dispensing medication to patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

800.   The charges for medication dispensed by ZMC Pharmacy are excessive when compared to pricing from pharmacies dispensing the same medications in the same geographic area.

**ANSWER: Respondents deny because the allegations are untrue.**

801.   Indeed, the excessive nature of the charges is indicated by the mark-up from what it cost ZMC Pharmacy to obtain the medication compared to what it charged Allstate for dispensing the medication.

**ANSWER: Respondents deny because the allegations are untrue.**

802.   For example, ZMC Pharmacy billed Allstate up to $6,807.00 for dispensing 90 tablets of Duexis 26.6mg/800mg.

**ANSWER: Respondents admit.**

803.   That same medication can be obtained from a local pharmacy in Royal Oak—the same city in which ZMC Pharmacy is located—for between $2,500.00 and $2,600.00.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

804.   ZMC Pharmacy therefore charged Allstate more than two-and-a-half times as much as local pharmacies to dispense the same medication.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

805.   As another example, ZMC Pharmacy billed Allstate up to $2,986.50 for dispensing thirty (30) tablets of Amrix 30mg.

**ANSWER: Respondents admit.**

806.   That same medication can be obtained from a local pharmacy in Royal Oak for between $1,120.00 and $1,150.00.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

807.   ZMC Pharmacy therefore charged Allstate more than two-and-a-half times as much as local pharmacies to dispense the same medication.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

808.   ZMC Pharmacy also billed Allstate up to $214.65 for dispensing sixty (60) tablets of Naproxen 500mg.

**ANSWER: Respondents admit.**

809.   That same medication can be obtained from a local pharmacy in Royal Oak for less than $20.00.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

810.   ZMC Pharmacy therefore charged Allstate more than ten (10) times as much as local pharmacies to dispense the same medication.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

811.   Defendant Zawaideh testified that ZMC Pharmacy's rates are reasonable because negotiating with automobile insurance companies is "very labor intensive" and because ZMC Pharmacy needs to wait a longer period of time to receive payment:

> Q.   -- that the rates charged must be reasonable.  Have you ever considered that question in regard to how much you charge?
>
> A.   Sure.  I mean, I look at the turnaround time and – so, I mean, in your client's case we have claims that date back over a year, so, I mean, you're asking me to compare that to other claims where the typical turnaround time in a Blue Cross claim is going to be two weeks.
>
> Q.   So you're saying – and by turnaround time you mean the time between the time you submit the bill and the time you're paid?
>
> A.   Correct.
>
> Q.   Okay.   And you're saying that the rates were reasonable because the turnaround time is longer in the case of Allstate?
>
> A.   There's a higher – there's a higher risk.

216

**ANSWER: Respondents admit Plaintiffs accurately quote portions of Mr. Zawaideh's deposition testimony.**

812.   A hypothetical delay in payment for services rendered does not justify charging over two-and-a-half times more than surrounding pharmacies, nor does it justify charging more than three (3) times the cost to obtain the medication.

**ANSWER: Respondents deny because the allegations are untrue.**

813.   Defendant Farmbrook submitted charges to Allstate at excessive rates for dispensing ibuprofen cream.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

814.   Defendant Farmbrook billed Allstate $1,550.00 for dispensing 120 grams of ibuprofen 10% cream.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

815.   One hundred-twenty (120) grams of Ibuprofen 10% gel—the same product in gel form—is available at retail at less than $150.00.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

816.   Farmbrook therefore charged Allstate more than ten (10) times the retail price for ibuprofen cream.

217

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

817.   Moreover, an article published in December 2017 analyzed the effect of ibuprofen taken orally and topically, and determined that "topical ibuprofen has comparable efficacy to oral ibuprofen." Martin Anthony Christopher Manoukian, *et al.*, *Topical Administration of Ibuprofen for Injured Athletes: Considerations, Formulations, and Comparison to Oral Delivery*, SPORTS MED. – OPEN, Dec. 2017, at 5.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

818.   Farmbrook therefore charged Allstate $1,550.00 for a product available for purchase in pill form—with comparable effect—for less than $20.00.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

819.   Allstate is not obligated to pay any pending bills for medication billed at excessive amounts, and it is entitled to reimbursement for the medication for which it has already tendered payment.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

820.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they provided and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

821.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

**ANSWER: Respondents admit.**

822.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157.

**ANSWER: Respondents admit.**

823.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

824.   There are no less than thirteen (13) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.     The defendants billed Allstate for treatment and service that were not actually provided.  Integrative Neurology and Velugubanti billed for patient evaluations not performed on patients at issue in this Complaint. Inscribed and Integrative Neurology submitted bills to Allstate for ambulatory EEGs that were never performed.  Inscribed also billed Allstate for neurobehavioral assessments that were not performed. DIPMM billed for Abraham assisting on surgical procedures when he was not physically present to do so.

b.     Inscribed, Integrative Neurology, and Diagnostic Solutions billed for treatment through limited license psychologists and physician assistants in violation of Michigan law.  Inscribed, Integrative Neurology, Farmbrook, DIPMM, Velugubanti, Dhillon, and Abraham also issued DME to and for patients at issue in this Complaint without the necessary licensure.  Allstate is not required under the Michigan No-Fault Act to compensate the defendants for unlawfully rendered services.

c.      The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with layperson attorneys. The defendants' method of obtaining patients did not include considerations of medical necessity.

d.      The defendants used an unlawful predetermined treatment protocol, implemented by the ordering of unnecessary ambulatory EEGs, qEEGs, and brain MRI scans to falsely justify TBI diagnoses, prescribing unnecessary medications, performing unnecessary injection procedures, issuing unwarranted DME as a matter of course, and referring patients for excessive and unnecessary definitive urine drug testing.   This predetermined protocol is also confirmed by the substantially similar treatment billed relative to all patients at issue in this Complaint, including treatment plans that have no patient-specific considerations.

e.      Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, Velugubanti, and Dhillon subjected patients to excessive and unnecessary diagnostic tests, including ambulatory EEGs, qEEGs, EMGs, and sleep studies.  The results of the diagnostic testing described herein were not used to guide patient treatment but instead were used to falsely justify TBI diagnoses.

f.      Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham subjected patients to excessive, unnecessary, and unreasonable injection procedures.   These defendants exaggerated symptoms for patients in order to justify performing the medically unnecessary and excessive injection procedures, including trigger point injections and Xeomin injections. The medically unnecessary injection procedures were ordered and billed for in violation of applicable standards of care.

g.      Inscribed, Integrative Neurology, and Diagnostic Solutions billed Allstate for excessive, unnecessary, and unreasonable neurofeedback therapy relating to patients who allegedly received a TBI during motor vehicle accidents.  Neurofeedback therapy is not an accepted treatment tool in the medical field for brain injuries.  Velugubanti typically included a template note in each patient's record recommending "neurofeedback therapy as a form of neurocognitive treatment concomitantly with neurocognitive rehabilitation of close head

injuries" yet patients were never provided with "neurocognitive rehabilitation," nor were patients referred for such rehabilitation by Inscribed, Integrative Neurology, Diagnostic Solutions, or Velugubanti.

h.  Inscribed, Integrative Neurology, Farmbrook, DIPMM, MIMM, Velugubanti, Dhillon, and Abraham violated established standards of care by prescribing medications, including controlled substances and compounded medications, following the initial evaluation of patients on a *pro forma* basis in an attempt to incentivize patients to continue to return to them for medically unnecessary treatment.  The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

i.  Integra submitted bills to Allstate for unnecessary and excessive urine drug testing, primarily at the request of DIPMM, MIMM, and Abraham, with no justification or basis for such testing.  DIPMM, MIMM, and Abraham ordered and Integra billed for drug testing for patients at issue in this Complaint regardless of whether medications were actually prescribed.  This further demonstrates that the defendants billed for urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

j.  Inscribed, Integrative Neurology, DIPMM, MIMM, Velugubanti, and Abraham fraudulently upcoded office visits, as almost every single office visit billed to Allstate was for level four (4) or five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels.  When done intentionally, upcoding constitutes a fraudulent billing practice.

k.  Integrative Neurology and MIMM charged Allstate for prolonged patient evaluations through CPT Codes suggesting a longer patient evaluation than was actually performed, which is a fraudulent billing practice.

l.  Integra submitted claims using multiple CPT Codes to describe the same procedure allegedly performed, which constitutes a fraudulent billing practice known as unbundling.

222

m.  Inscribed, Integrative Neurology, DIPMM, MIMM, Diagnostic Solutions, Farmbrook, ZMC Pharmacy, Velugubanti, Dhillon, and Abraham submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services herein, including office evaluations, injections, diagnostic testing, neurofeedback therapy, DME, and medication.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

825.  As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

826.  If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary under Michigan law.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

827.   The foregoing facts – billing for services not rendered, unlawfully soliciting patients, unlicensed treatment and services, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of procedures allegedly performed, and using fraudulent billing practices such as upcoding and unbundling – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

828.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing billed for by the defendants unnecessary and unlawful.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

829.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 8, 10, and 11.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

830.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

831.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

832.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, DME, and ancillary services for which they billed Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

833.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

834.   As licensed medical professionals, defendants Velugubanti, Dhillon, Abraham, and Zawaideh were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but admit that Zawaideh is bound by professional oaths and pledges.**

835.   Each misrepresentation made by Velugubanti, Dhillon, Abraham, and Zawaideh was in violation of their legal and ethical obligations as healthcare professionals.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

836.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

837.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

838.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek reimbursement under Michigan's No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

839.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

840. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

841. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

842.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

843.   As a result, Allstate has paid in excess of $2,547,427 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

844.   As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

845.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 8, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

846.   This objective necessarily required the submission of claims for reimbursement to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

847. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

848. All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

849. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

850.   Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

851.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate for filing.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

852.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

853.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

854.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

855.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

856.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be

submitted to Allstate via interstate wires or the U.S. Mail related to each exemplar patient discussed in this Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

857.   It was within the ordinary course of business for Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra to submit claims for No-Fault reimbursement to insurance carriers like Allstate through interstate wires and the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but admits as to Respondents.**

858.   Moreover, the business of providing medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking reimbursement to which each Defendant Entity is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

859.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the Defendant Entities.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

860.   The Defendant Entities, at the direction and with the knowledge of their owners and managers (the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to litigate against Allstate seeking to collect on unpaid claims.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

861.   Thus, the defendants' commission of mail and wire fraud continues.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

862.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

863.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

864.   Allstate reasonably relied on the submissions it received from Inscribed, Integrative Neurology, Diagnostic Solutions, Farmbrook, DIPMM, MIMM, ZMC Pharmacy, and Integra, including the representative submissions set out in Exhibit 14 annexed hereto and identified in the exemplar claims above.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

865.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

## XIII.  DAMAGES

866.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

867.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $2,547,427.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

868.   Exhibits 15 through 22 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but admit that Allstate has identified monies to Respondents.**

869.   Exhibit 15 details payments made by Allstate to Inscribed since 2017.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

870.   Exhibit 16 details payments made by Allstate to Integrative Neurology since 2016.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

871.   Exhibit 17 details payments made by Allstate to Diagnostic Solutions since 2018.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

872.   Exhibit 18 details payments made by Allstate to Farmbrook since 2011.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

873.   Exhibit 19 details payments made by Allstate to DIPMM since 2016.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

874.   Exhibit 20 details payments made by Allstate to MIMM since 2019.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

875.   Exhibit 21 details payments made by Allstate to ZMC Pharmacy since 2013.

**ANSWER: Respondents admit.**

876.   Exhibit 22 details payments made by Allstate to Integra since 2015.

**ANSWER:  Respondents  can  neither  admit  nor  deny  for  lack  of information sufficient to form a belief as to the truth of the allegations.**

877.   Every claim identified in Exhibits 15 through 22 derives from an Allstate insurance policy.

**ANSWER:  Respondents  can  neither  admit  nor  deny  for  lack  of information sufficient to form a belief as to the truth of the allegations.**

878.   Allstate's claim for compensatory damages, as set out in Exhibits 15 through 22, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

**ANSWER:  Respondents  can  neither  admit  nor  deny  for  lack  of information sufficient to form a belief as to the truth of the allegations.**

879.   Every payment identified in Exhibits 15 through 22 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 15 through 22.

**ANSWER:  Respondents  can  neither  admit  nor  deny  for  lack  of information sufficient to form a belief as to the truth of the allegations.**

880.   Moreover, every payment identified in Exhibits 15 through 22 derives from a check sent by Allstate to the defendants through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

881.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

882.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

883.    Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Inscribed Enterprise)
### Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.

884.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

885.    Inscribed constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

886. In connection with each of the claims identified in the within Complaint, Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Inscribed, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Inscribed's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Inscribed would occur, in furtherance of the Count I defendants' scheme to defraud.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

887. The Count I defendants employed, knew, or should have foreseen that, two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

888.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

889.   Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

890.   Payments to Inscribed from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

891.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Inscribed, which they knew would be billed by Inscribed, in order to collect payment

from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

892. Velugubanti owned and managed Inscribed and was responsible for all actions taken by Inscribed and its physicians.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

893. Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Inscribed.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

894. Diagnostic Solutions and its owner Velugubanti billed for unwarranted diagnostic testing such as neurofeedback therapy, ambulatory EEG, qEEG, and other procedures, if performed at all, that were each used to falsely create the appearance that patients sustained a head injury as a result of the alleged motor vehicle accident, thereby allowing Inscribed to continue billing for unlawful and medically

unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

895.   Farmbrook and its owner Dhillon fabricated medical records indicating patients suffered head injuries, such as TBI, during motor vehicle accidents in order to falsely justify patient referrals made to Inscribed pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

896.   DIPMM and its owner Abraham also fabricated medical records indicating patients suffered head injuries during motor vehicle accidents in order to falsely justify patient referrals made to Inscribed pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged head injury.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

897.  ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Inscribed to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

898.  As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Inscribed for the benefit of the Count I defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

248

899. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

900. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

901. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Inscribed for the benefit of the Count I defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

902.    The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

903.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

904.    The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

250

905.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

906.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

907.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

### COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Inscribed Enterprise)

**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook
Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal
Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.;
Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph.**

908. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

909. Defendants Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a

Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal

Medicine PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder

Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count II

defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the

facilitation of the operation of Inscribed.

**ANSWER: Respondents can neither admit nor deny as to any other
Defendants for lack of information sufficient to form a belief as to the truth of
the allegations, but deny as to Respondents because the allegations are untrue
as to them.**

910. The Count II defendants each agreed to further, facilitate, support, and

operate the Inscribed enterprise.

**ANSWER: Respondents can neither admit nor deny as to any other
Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

911.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

912.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Inscribed even though Inscribed was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

913.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

914.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

915.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Integrative Neurology Enterprise)
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

916. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

917. Integrative Neurology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

918. In connection with each of the claims identified in the within Complaint, Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Integrative Neurology, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Integrative Neurology's business, or should have reasonably foreseen that the faxing and mailing of such false medical

255

documentation by Integrative Neurology would occur, in furtherance of the Count III defendants' scheme to defraud.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

919.   The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

920.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

921.   Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

922.   Payments to Integrative Neurology from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

923.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Integrative Neurology, which they knew would be billed by Integrative Neurology, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

924.   Velugubanti owned and managed Integrative Neurology and was responsible for all actions taken by Integrative Neurology and its physicians.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

925.   Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

926.   Diagnostic Solutions and its owner Velugubanti billed for unwarranted diagnostic testing such as neurofeedback therapy, ambulatory EEG, qEEG, and other procedures, if performed at all, that were each used to falsely create the appearance that patients sustained a head injury as a result of the alleged motor vehicle accident, thereby permitting Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

927.   Farmbrook and its owner Dhillon fabricated medical records indicating patients suffered head injuries, such as TBI, during motor vehicle accidents in order

to falsely justify patient referrals made to Integrative Neurology pursuant to their *quid pro quo* patient referral arrangement, thus delivering a steady stream of patients that allowed Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged TBI injury.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

928. ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Integrative Neurology to continue billing for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, relating to each patient's alleged injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

929. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Integrative Neurology for the benefit of the Count III defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

930.  The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

931.  By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

932.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Integrative Neurology for the benefit of the Count III defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

933.    The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

934.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

935.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

936.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

937.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

938.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Integrative Neurology Enterprise)**
**Against Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

939. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

940. Defendants Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Integrative Neurology.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue
as to them.

941.   The Count IV defendants each agreed to further, facilitate, support, and
operate the Integrative Neurology enterprise.

**ANSWER: Respondents can neither admit nor deny as to any other
Defendants for lack of information sufficient to form a belief as to the truth of
the allegations, but deny as to Respondents because the allegations are untrue
as to them.**

942.   As such, the Count IV defendants conspired to violate 18 U.S.C. §
1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other
Defendants for lack of information sufficient to form a belief as to the truth of
the allegations, but deny as to Respondents because the allegations are untrue
as to them.**

943.   The purpose of the conspiracy was to obtain No-Fault payments from
Allstate on behalf of Integrative Neurology even though Integrative Neurology was
not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit nor deny as to any other
Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

944. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

945. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

946. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count IV defendants, and others acting in concert

with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other**

**Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue**

**as to them.**

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Diagnostic Solutions Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh**
**Velugubanti, M.D.**

947.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

948.   Diagnostic Solutions constitutes an enterprise, as defined in 18 U.S.C.

§ 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit for lack of information**

**sufficient to form a belief as to the truth of the allegations.**

949.   In connection with each of the claims identified in the within

Complaint, Inscribed PLLC; Integrative Neurology PLLC; and Gireesh

Velugubanti, M.D. ("Count V defendants") intentionally caused to be prepared,

faxed, and mailed false medical documentation by Diagnostic Solutions, or knew

266

that such false medical documentation would be faxed and mailed in the ordinary course of Diagnostic Solutions's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Diagnostic Solutions would occur, in furtherance of the Count V defendants' scheme to defraud.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

950.    The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

951.    Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

952.    Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

953.    Payments to Diagnostic Solutions from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

954.    As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Diagnostic Solutions, which they knew would be billed by Diagnostic Solutions, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

955.    Velugubanti owned and managed Diagnostic Solutions and was responsible for all actions taken by Diagnostic Solutions and its representatives.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

956.    Velugubanti rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Diagnostic Solutions.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

957. Inscribed, Integrative Neurology, and Velugubanti were responsible for the improper referrals that resulted in testing and services billed by Diagnostic Solutions.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

958. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Diagnostic Solutions for the benefit of the Count V defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

959. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

960.    By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

961.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Diagnostic Solutions for the benefit of the Count V defendants.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

962.    The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

963.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

964.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

965.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

966.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

967.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Diagnostic Solutions Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; and Gireesh
### Velugubanti, M.D.

968.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

969.   Defendants Inscribed PLLC; Integrative Neurology PLLC; and Gireesh Velugubanti, M.D. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Diagnostic Solutions.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

970.   The Count VI defendants each agreed to further, facilitate, support, and operate the Diagnostic Solutions enterprise.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

971.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

972.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Diagnostic Solutions even though Diagnostic Solutions was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

973.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

974.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

975.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

<u>COUNT VII</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Farmbrook Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

976. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

977. Farmbrook constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

978. In connection with each of the claims identified in the within Complaint, Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed

false medical documentation by Farmbrook, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Farmbrook's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Farmbrook would occur, in furtherance of the Count VII defendants' scheme to defraud.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

979.   The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

980.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

981.   Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

982.   Payments to Farmbrook from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

983.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Farmbrook, which they knew would be billed by Farmbrook, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

984.  Dhillon owned and managed Farmbrook and was responsible for all actions taken by Farmbrook and its representatives.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

985.  Dhillon rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Farmbrook.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

986.  Inscribed, Integrative Neurology, and their owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing Farmbrook to continue billing for unlawful and medically unnecessary evaluations, urine drug screens, EMGs, and injections, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

987.   ZMC Pharmacy and its owner Zawaideh submitted bills for extensive (and unnecessary) prescription medications that gave the appearance patients suffered serious injury as a result of the alleged motor vehicle accident, thereby allowing Farmbrook to continue billing for unlawful and medically unnecessary evaluations, urine drug screens, EMGs, and injections, if performed at all, relating to each patient's alleged injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

988.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Farmbrook for the benefit of the Count VII defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

989.   The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face

would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

990.   By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

991.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Farmbrook for the benefit of the Count VII defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

992.    The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

993.    Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

994.    The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

995.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

996.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

997.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

<u>**COUNT VIII**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Farmbrook Enterprise)**
**Against Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.;  Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

998.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

999.   Defendants Inscribed PLLC; Integrative Neurology PLLC; ZMC Pharmacy, L.L.C.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Farmbrook.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1000.  The Count VIII defendants each agreed to further, facilitate, support, and operate the Farmbrook enterprise.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1001.  As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1002. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Farmbrook even though Farmbrook was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1003. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1004. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1005. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(DIPMM Enterprise)**
**Against Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

1006.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1007.  DIPMM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1008.  In connection with each of the claims identified in the within Complaint Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by DIPMM, or knew that such false medical documentation would be faxed and mailed in the ordinary course of DIPMM's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by DIPMM would occur, in furtherance of the Count IX defendants' scheme to defraud.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1009.  The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment

from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1010. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1011. Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1012. Payments to DIPMM from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1013. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by DIPMM, which they knew would be billed by DIPMM, in order to collect payment

from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1014. Abraham is the owner of DIPMM and is responsible for all actions taken by DIPMM and its representatives.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1015. Abraham rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by DIPMM.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1016. Inscribed and its owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing DIPMM to continue billing for unlawful and medically unnecessary evaluations, injections, diagnostic testing, and other procedures, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

287

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1017. Integra billed for medically unnecessary and excessive definitive urine drug testing that was allegedly ordered by DIPMM, if performed at all, that allowed DIPMM to continue billing for unlawful and medically unnecessary evaluations, if performed at all, that were used to continue to prescribe medically unnecessary medications, including controlled substances to patients.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1018. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to DIPMM for the benefit of the Count IX defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1019. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

288

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1020.  By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1021.  The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to DIPMM for the benefit of the Count IX defendants.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1022.  The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1023.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1024. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1025. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1026. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1027. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

<u>COUNT X</u>
**VIOLATION OF 18 U.S.C. § 1962(d)
(DIPMM Enterprise)
Against Inscribed PLLC; Integra Lab Management LLC; Gireesh
Velugubanti, M.D.; and Bachu Abraham, M.D.**

1028.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1029.  Defendants Inscribed PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of DIPMM.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1030.  The Count X defendants each agreed to further, facilitate, support, and operate the DIPMM enterprise.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1031.  As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1032. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of DIPMM even though DIPMM was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1033. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1034. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1035. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to

recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(MIMM Enterprise)**
**Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

1036. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1037. MIMM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1038. In connection with each of the claims identified in the within Complaint Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by MIMM, or knew that such false medical documentation

would be faxed and mailed in the ordinary course of MIMM's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by MIMM would occur, in furtherance of the Count XI defendants' scheme to defraud.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1039. The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1040. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1041. Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1042. Payments to MIMM from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1043. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by MIMM, which they knew would be billed by MIMM, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1044. Abraham is the owner of MIMM and is responsible for all actions taken by MIMM and its representatives.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1045. Abraham rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by MIMM.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1046. DIPMM and its owner Abraham billed for unlawful and medically unnecessary evaluations, injections, diagnostic testing, and other procedures, if performed at all, that were each used to falsely justify patient referrals to MIMM, thus allowing MIMM to continue billing for the same unlawful and medically unnecessary treatment that was billed by DIPMM, if performed at all.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1047. Inscribed and its owner Velugubanti billed for unlawful and medically unnecessary evaluations, injections, and diagnostic testing, if performed at all, that were each used to falsely create the appearance that patients sustained injuries as a result of the alleged motor vehicle accident, thereby allowing MIMM to continue billing for unlawful and medically unnecessary evaluations and injections, if performed at all, pursuant to their *quid pro quo* patient referral arrangement.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1048. Integra billed for medically unnecessary and excessive definitive urine drug testing that was allegedly ordered by MIMM, if performed at all, that allowed MIMM to continue billing for unlawful and medically unnecessary evaluations, if performed at all, that were used to continue to prescribe medically unnecessary medications, including controlled substances to patients.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1049. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to MIMM for the benefit of the Count XI defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1050. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1051. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1052. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to MIMM for the benefit of the Count XI defendants.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1053. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1054. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1055. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1056. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1057. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1058. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (MIMM Enterprise)
**Against Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D.**

1059. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1060. Defendants Inscribed PLLC; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; and Bachu Abraham, M.D. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of MIMM.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1061. The Count XII defendants each agreed to further, facilitate, support, and operate the MIMM enterprise.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1062. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1063. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of MIMM even though MIMM was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1064. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1065. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1066. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (ZMC Pharmacy Enterprise)
### Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, M.D.

1067. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1068. ZMC Pharmacy constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents deny because the allegations are untrue.**

1069. In connection with each of the claims identified in the within Complaint, Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by ZMC Pharmacy, or knew that such false medical documentation would be faxed and mailed in the ordinary course of ZMC Pharmacy's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation

302

by ZMC Pharmacy would occur, in furtherance of the Count XIII defendants' scheme to defraud.

**ANSWER: Respondents deny because the allegations are untrue.**

1070. The Count XIII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents deny because the allegations are untrue.**

1071. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents admit that some of these documents were sent to Allstate, but can neither admit nor deny that all of the documents were sent to Allstate for lack of sufficient information to form a belief as to the truth of the allegations.**

1072. Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1073. Payments to ZMC Pharmacy from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents admit.**

1074. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by ZMC Pharmacy, which they knew would be billed by ZMC Pharmacy, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents deny because the allegations are untrue.**

1075. Zawaideh is the owner of ZMC Pharmacy and is responsible for all actions taken by ZMC Pharmacy and its representatives.

**ANSWER: Respondents admit Zawaideh is the owner of ZMC but denies the remainder of the allegations because they are untrue.**

1076. Inscribed, Integrative Neurology, Farmbrook, Velugubanti, and Dhillon were responsible for the medically unnecessary drug prescriptions that allowed ZMC Pharmacy to submit bills to Allstate.

**ANSWER: Respondents deny because the allegations are untrue.**

1077. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to ZMC Pharmacy for the benefit of the Count XIII defendants that would not otherwise have been paid.

304

**ANSWER: Respondents deny because the allegations are untrue.**

1078. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents deny because the allegations are untrue.**

1079. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents deny because the allegations are untrue.**

1080. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to ZMC Pharmacy for the benefit of the Count XIII defendants.

**ANSWER: Respondents deny because the allegations are untrue.**

1081. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents deny because the allegations are untrue.**

1082.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

**ANSWER: Respondents deny because the allegations are untrue.**

1083.  The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents deny because the allegations are untrue.**

1084.  Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit nor deny for lack of sufficient information to form a belief as to the truth of the allegations.**

1085.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents deny as to them because the allegations are untrue as to them.**

1086.  By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents deny because the allegations are untrue.**

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (ZMC Pharmacy Enterprise)
**Against Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph.**

1087.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1088.  Defendants Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; and Jalal Zawaideh, R.Ph. ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of ZMC Pharmacy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1089.  The Count XIV defendants each agreed to further, facilitate, support, and operate the ZMC Pharmacy enterprise.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1090. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1091. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of ZMC Pharmacy even though ZMC Pharmacy was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1092. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1093. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1094. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Integra Enterprise)
### Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.

1095.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1096.  Integra constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1097. In connection with each of the claims identified in the within Complaint, Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D. ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Integra, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Integra's business, or should

310

have reasonably foreseen that the faxing and mailing of such false medical documentation by Integra would occur, in furtherance of the Count XV defendants' scheme to defraud.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1098. The Count XV defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 14.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1099. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1100. Policies of insurance were delivered to insureds through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1101. Payments to Integra from Allstate were transmitted through the U.S. Mail.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1102. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Integra, which they knew would be billed by Integra, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1103. DIPMM, MIMM, and Abraham were responsible for the medically unnecessary urine drug test prescriptions that allowed Integra to submit bills to Allstate.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1104. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Integra for the benefit of the Count XV defendants that would not otherwise have been paid.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1105. The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1106. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1107. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Integra for the benefit of the Count XV defendants.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1108. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1109. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1110. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1111. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1112. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1113. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

<u>COUNT XVI</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Integra Enterprise)**
**Against Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.**

1114. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1115. Defendants Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; and Bachu Abraham, M.D.

("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Integra.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1116. The Count XVI defendants each agreed to further, facilitate, support, and operate the Integra enterprise.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1117. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1118. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Integra even though Integra was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1119. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1120. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

1121. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**ANSWER: Respondents can neither admit for lack of information sufficient to form a belief as to the truth of the allegations.**

<u>**COUNT XVII**</u>
**COMMON LAW FRAUD**
**Against All Defendants**

317

1122. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1123. The scheme to defraud perpetrated by Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XVII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1124. The misrepresentations of fact made by the Count XVII defendants include, but are not limited to, those material misrepresentations discussed in section XI *supra*.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1125. The Count XVII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1126. The misrepresentations were intentionally made by the Count XVII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1127. The Count XVII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1128. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1129. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

the allegations, but deny as to Respondents because the allegations are untrue as to them.

**COUNT XVIII**
**CIVIL CONSPIRACY**
**Against All Defendants**

1130. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1131. Defendants Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XVIII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1132. The Count XVIII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1133. This purpose was known to all of the Count XVIII defendants and intentionally pursued.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1134. Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged

outrageous and unreasonable prices, the Count XVIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1135. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1136. All of the Count XVIII defendants directly benefited from the payments made to Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1137. All of the Count XVIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVIII defendants in the commission of acts done for the benefit of all Count XVIII defendants and to the unjustified detriment of Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1138. Accordingly, all of the Count XVIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

<u>**COUNT XIX**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG;**

**Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC**

1139. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1140. Allstate paid the amounts described herein and itemized in Exhibits 15 through 22 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC ("Count XIX defendants").

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1141. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIX defendants, which misrepresented the fact,

reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1142.  The Count XIX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1143.  Allstate is entitled to restitution from each of the Count XIX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

**COUNT XX**
**UNJUST ENRICHMENT**
**Against Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC**

1144. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1145. Allstate paid monies, including those amounts set out in Exhibits 15 through 22, in response to the claims submitted, or caused to be submitted, by defendants Inscribed PLLC; Integrative Neurology PLLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; and Integra Lab Management LLC ("Count XX defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

327

1146. Allstate's payments constitute a benefit which the Count XX defendants aggressively sought and voluntarily accepted.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1147. The Count XX defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1148. The Count XX defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1149. The Count XX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

<u>COUNT XXI</u>
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

1150. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 883 set forth above as if fully set forth herein.

**ANSWER: No answer necessary.**

1151. Defendants Inscribed PLLC; Integrative Neurology PLLC; Diagnostic Solutions LLC; Wook Kim, M.D., P.C. d/b/a Farmbrook Interventional Pain & EMG; Detroit Institute of Pain Musculoskeletal Medicine PLLC; Michigan Institute of Musculoskeletal Medicine PLLC; ZMC Pharmacy, L.L.C.; Integra Lab Management LLC.; Gireesh Velugubanti, M.D.; Arvinder Dhillon, M.D.; Bachu Abraham, M.D.; and Jalal Zawaideh, R.Ph. ("Count XXI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of**

**the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1152. The Count XXI defendants also billed for services that were never rendered, which is clearly fraudulent.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1153. The Count XXI defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1154. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1155. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1156. The lack of lawfully-rendered treatment (such as lack of licensure and treatment arising from illicit solicitation or from kickbacks) is also a defense to an insurer's obligation to pay No-Fault benefits.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1157. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1158. Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

**ANSWER: Respondents can neither admit nor deny for lack of information sufficient to form a belief as to the truth of the allegations.**

1159. The Count XXI defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1160. The Count XXI defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XXI defendants for any or all of the reasons set out in the within Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1161. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants billed for

unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1162. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1163. As such, the Count XXI defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any

policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

1164. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

**ANSWER: Respondents can neither admit nor deny as to any other Defendants for lack of information sufficient to form a belief as to the truth of the allegations, but deny as to Respondents because the allegations are untrue as to them.**

Respectfully submitted,

October 13, 2020        **FINK BRESSACK**

By:    /s/ Darryl Bressack
David H. Fink (P28235)
Darryl Bressack (P67820)
John L. Mack (P80710)
Attorneys for Defendants ZMC Pharmacy,
L.L.C. and Jalal Zawaideh

334

38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
Fax: (248) 971-2600
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
jmack@finkbressack.com

## AFFIRMATIVE DEFENSES

For their Affirmative Defenses, Defendants ZMC Pharmacy, LLC and Jalal Zawaideh state as follows:

1.     Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

2.     Plaintiffs suffered no damages as a result of any conduct by Respondents and Plaintiffs are not entitled to any relief.

3.     Plaintiffs' claims are barred because the Complaint Fails to Satisfy the Particularity Requirements of FRCP 9(b).

4.     Plaintiffs' claims are barred by accord and satisfaction.

5.     Plaintiffs' claims are barred by arbitration and award.

6.     Plaintiffs' claims are barred by res judicata.

7.     Plaintiffs' claims are barred by collateral estoppel.

8.     Plaintiffs' claims are barred by estoppel.

9.     Plaintiffs' claims are barred by payment.

10.     Plaintiffs' claims are barred by release.

11.     Plaintiffs' claims are barred by waiver.

12.     Plaintiffs' claims are barred by ratification.

13.     Plaintiffs' claims are barred by failure of consideration.

14.     Plaintiffs' claims are barred by fraud.

15.     Plaintiffs' claims are barred by illegality.

16.     Plaintiffs' claims are barred by laches.

17.     Plaintiffs' claims are barred by statute of frauds.

18.     Plaintiffs' claims are barred by statutes of limitations

19.     Plaintiffs' claims are barred by their unclean hands.

20.     Plaintiffs' claims are barred by lack of causal and proximate causation.

21.     Plaintiffs' claims are barred because they failed to mitigate their damages.

22.     Plaintiffs' claims are barred because Plaintiffs failed to properly plead any cause of action.

23.     Plaintiff's claims are barred by the parol evidence rule.

24.     Plaintiffs' claims are barred because any damages sustained by Plaintiffs resulted from there own negligent, fraudulent or improper actions.

25.     Plaintiffs' claims are barred because any damages sustained by Plaintiffs resulted from the negligence or improper actions of a third-party.

26.     Plaintiff's RICO Claims are Subject to Reverse Preemption.

27.     Plaintiffs' claims are barred because Respondents have, at all times, acted in good faith and with a reasonable belief that it was not acting in violation of any law.

28.     Defendant reserves the right to name additional affirmative defenses as they become known through the course of discovery.

WHEREFORE, ZMC Pharmacy LLC and Jalal Zawaideh, having fully answered Plaintiffs' Complaint, requests that judgment be entered in their favor and against Plaintiffs, or alternatively, that Plaintiffs' claims be dismissed with prejudice, and that the Respondents be permitted to recover all costs incurred.

October 13, 2020                    **FINK BRESSACK**

                                    By:    /s/ Darryl Bressack
                                    David H. Fink (P28235)
                                    Darryl Bressack (P67820)
                                    John L. Mack (P80710)
                                    Attorneys for Defendants ZMC Pharmacy,
                                    L.L.C. and Jalal Zawaideh
                                    38500 Woodward Ave., Ste. 350
                                    Bloomfield Hills, MI 48304
                                    Tel: (248) 971-2500
                                    Fax: (248) 971-2600
                                    dfink@finkandassociateslaw.com
                                    dbressack@finkandassociateslaw.com
                                    jmack@finkbressack.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2020, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record registered for electronic filing.

FINK BRESSACK

By: /s/ Darryl Bressack
Darry Bressack (P67820)
38500 Woodward Ave, Suite 350
Bloomfield Hills, MI  48304
(248) 971-2500
dbressack@finkbressack.com