# EXHIBIT K



## SMART-FILL / ABDC MEMBER AGREEMENT

This Member Agreement ("**Agreement**") is made as of the effective date in the table below ("**Effective Date**") by and among Smart-Fill Management Group, Inc., a Minnesota corporation ("**Smart-Fill**"), the customer listed below ("**Member**") and AmerisourceBergen Drug Corporation, a Delaware Corporation ("**ABDC**").

Smart-Fill, a group purchasing organization ("**GPO**") as defined in 42 CFR 1001.952(j), has established a Program ("**Program**") for the purchase of pharmaceutical and other health care products by participating Smart-Fill members, including Member; Smart-Fill, has entered into an agreement ("**ABDC Agreement**") with ABDC, a national distributor of pharmaceutical and other products, pursuant to which its members will purchase prescription ("**Rx**") and over-the-counter ("**OTC**") pharmaceuticals, nutritional, health and beauty care ("**HBC**") and home health care ("**DME**") products (collectively, "**Products**"), and related services ("**Services**"); and Member wishes to participate in the Program upon the terms and conditions in this Agreement.

| **MEMBER** | Legal Entity Name: | Zmc Pharmacy LLC | |
| --- | --- | --- | --- |
| | D/B/A: | Zmc Pharmacy | |
| | Address: | 1041 S Main St, , | |
| | | Royal Oak Michigan, 48067-3274 | |
| | | | |
| **ENTITY** | Check one: | ☐ Corporation | ☐ Partnership |
| | | ☒ Limited Liability Company | ☐ Individual |
| | | ☐ Limited Partnership | ☐ Government Entity |
| | | | ☐ Other: _____ |
| **CONTACT INFORMATION** | Name: | Jalal Zawaideh | |
| | Phone: | 248-280-6401 | |
| | Fax and/or Email: | 248-280-6411customrxllc@gmail.com | |
| **NOTICE ADDRESS** (If different) | Address: | Zmc Pharmacy | |
| | | 1041 S Main St, , Royal Oak Michigan, 48067-32 | |
| | | | |
| | Attn: | Jala Zawaideh | |
| | Fax & Email: | | |

Smart-Fill Member Agreement ABDC (2019 v1)    1

Smart-Fill Management Group, Inc. 000445

| AGREEMENT SUMMARY TABLE ||
|---|---|
| EFFECTIVE DATE | 10/7/19 |
| CONTRACT TERM | One year from the Effective Date |
| AVERAGE MONTHLY VOLUME | $ 600,000 ("Volume Commitment") |
| INVOICED PRICE OF GOODS | Brand Rx: Cost minus 3.50 %  3.50<br>Brand Schedule II Rx (with or without CSOS): Cost minus 2.0 %<br>Specialty Brand Rx: Cost minus 2.00%<br>OTC: Cost + 0.00%<br>PRxO Generics: Special Price Product<br>All Other Products: Special Price Product |
| PAYMENT TERMS | ☐ Weekly   ☒ Semi-Monthly |
| AVERAGE MONTHLY GENERIC VOLUME | $ 72000 ("Generic Volume Commitment") |
| NOTICE ADDRESS | Zmc Pharmacy<br>1041 S Main St., Royal Oal<br>Attn: Jala Zawaideh<br>Fax: 248-280-6411 |

Each party's authorized officer, partner, or principal has signed this Agreement as of its Effective Date.

**MEMBER**
By: _[signature]_
Name: Jalal Zawaideh
Title: Owner
Date Signed: 10/7/19

**ABDC:** AmerisourceBergen Drug Corporation
By: _____
Name: _____
Title: Vice-President
Date Signed: _____

**SFMG:** Smart-Fill Management Group, Inc.
By: _[signature]_
Name: Jamie Kassab
Title: business consultant
Date Signed: 10/7/19

1.   **TERM.** The Term of this Agreement will begin on the Effective Date and continues for one year. Thereafter, this Agreement will automatically renew on a month to month basis until either party provides not less than ninety (90) days' written notice of non-renewal to the other party.

2.   **ABDC COMMITMENTS.** ABDC will:

(a)   **Distribution.** Distribute Rx and other Products to each Member Facility five days a week (Monday - Friday), once a day except holidays and warehouse physical inventory days. Members may be charged for non-scheduled and emergency orders. "**Facility**" means each of Member's retail pharmacies and any other facilities Member is affiliated with or operates during the Term in the United States, subject to ABDC's approval. A newly acquired facility with an existing agreement with another distributor will become a Facility upon the earlier of expiration of such existing agreement or the date Member may terminate it, with or without cause, without breaching it or paying a material termination penalty. Service to Facilities outside ABDC's normal service area (which does not include Alaska, Hawaii and U.S. territories) may be subject to a delivery surcharge.

(b)   **Software/Hardware.** Provide the hardware and software for ordering at no cost to Member. However ABDC retains title to all hardware and software.

(c)   **Recalls.** Notify Member of all recalls as instructed in the supplier's notification.

3.   **SMART-FILL COMMITMENTS.** Smart-Fill will:

**Compliance Rebate.** Provide Member with a rebate based on Member's Generic Compliance Rate, within 25 days after the end of each month, if Member complies with all terms of this Agreement, including Volume Commitment, Prime Vendor Requirement, and PRxO Generics requirements. No rebate will be issued if (i) Member discontinues using ABDC as its Prime Vendor (ii) fails to honor payment or other terms of this Agreement or (iii) has Net Purchases of PRxO Generics during the preceding month less than 14.00% of Member's total Rx gross purchase volume. Member must be compliant with all terms of this Agreement to be eligible for any rebate under this paragraph.

4.   **MEMBER COMMITMENTS.**

(a)   **Monthly Purchase Volume.** Member will place orders electronically (and Schedule II controlled substances, when allowed); purchase no less than 90% of all brand Rx pharmaceutical Products it purchases, as verified quarterly ("**Prime Vendor Requirement**"); and purchase the Volume Commitment set forth in the Table. Volume Commitment is net of returns, credits, rebates, late payment fees, and similar terms. Purchases made from Smart-Fill's Central Fill Pharmacy/Distribution Center count towards the 90% purchase requirement. If Member requests that ABDC stock special inventory, Member will notify ABDC at least 45 days before changing suppliers and assist ABDC in disposing of any excess of such inventory.

(b)   **Payment.** Member will pay on payment terms in the Table by electronic funds transfer (EFT) to the account ABDC designates in connection with this Agreement ("**Collection Account**"). Member and Smart-Fill are jointly and severally liable to ABDC for such payments and, Member will repay Smart-Fill if Smart-Fill has paid ABDC on Member's behalf; provided, however, Member's obligation with respect to any specific payment for Products and Services will be discharged to the extent it transferred such payment into the Collection Account.

(c)   **PRxO Generics Program.** Member will purchase no less than 90% of its generic Rx Products through the PRxO Generics program and purchase PRxO Generics equal to at least 14.00% of Member's total Rx gross purchase volume from all facilities. Calculations are quarterly, with no carryover from one quarter to the next.

(d)   **Pricing.** Member will pay the Price of Goods, which includes ABDC's fees for distribution, as set forth in the Table. For Products other than Special Price Products, Member's Price of Goods is based upon ABDC's Cost. "**Cost**" with respect to any Product means the lower of (i) the price of the Product on a supplier's price list on the date the Product is shipped to Member or (ii) any applicable Member/GPO contract price for the Product authorized by a supplier and maintained in an ABDC bid file, in each case exclusive of discounts for prompt payment given to ABDC by its manufacturers. Cost outside the continental U.S. may be higher than manufacturer's/supplier's normal price list. "**Specialty Brand Rx Products**" are defined as those pharmaceuticals and biologicals designated by ABDC that generally have any of the following characteristics: (i) large, complex molecules, generally biologically derived proteins, (ii) warrant special handling, monitoring, or product-specific support services, (iii) manufactured for small orphan or ultra-orphan populations, (iv) treat rare, life-threatening and debilitating diseases, (v) high in cost ($600 or more per month); (vi) complex treatment regimens that require ongoing clinical monitoring and patient education, and (vii) limited distribution and not readily available to community pharmacies. ABDC will support at least three invoice price options for Members' Specialty Brand Rx pricing. "**Special Price Products**" including but not limited to drop shipments, Specialty Brand Rx Products, food, gift items, HBC items, home healthcare (DME), items deemed operationally difficult to manage, items purchased from suppliers not offering cash discounts of 2% or better, deliveries FOB destination or other standard terms, generics, nutritionals, private label, school and office items, slow-moving items, supplies (bottles & vials) and Services will not be billed based upon ABDC's Cost (as defined above),

but will instead be billed in accordance with the pricing and other terms and conditions established by ABDC from time to time for such Products and Services. Purchases of Special Price Products count toward total Net Purchase volume.

(e)     **Return Goods**. Member will only return goods to ABDC in accordance with ABDC's standard policy for returned goods, as amended from time to time; provided that Member shall receive 100% credit on returns within 365 days of invoice, 80% credit on returns after 365 days from invoice and 50% credit on un-saleable or outdated Products. If Member averages returns of more than 3% of its OTC Net Purchases, or 3% of its Rx Net Purchases in any quarter, Member may be assessed an additional restocking fee over and above any standard stocking fee in the Returned Goods Policy. After the Member's first six months with ABDC, Member may not return Product unless it was purchased from ABDC and Member provides to ABDC the invoice number and date of purchase. To be eligible for return, Product must be stocked at ABDC's primary servicing distribution center and have a minimum of nine months dating before expiration. ABDC may reject returns not accompanied by the invoice number and date of purchase or that exceed in amount the amount indicated on the referenced invoice number. ABDC reserves the right to refuse all future returns from Member in the event that Member submits any counterfeit item for return.

(f)     **GPO Designation**. Member will designate Smart-Fill as its only GPO and, if either ABDC or Member is obligated to pay administrative fees based on such Member's joining another GPO, be responsible for any additional fees, chargebacks, eligibility issues or other concerns relating to other GPO affiliations and authorize ABDC to increase its pricing by such amount for as long as its membership continues in more than one GPO, and pay any amount not received by ABDC in connection with its purchases from ABDC.

(g)     **GPO Reporting**. Member hereby grants to ABDC a non-revocable, non-exclusive license to use, reproduce, create derivative works from, and market and distribute those derivative works from Dispensing Data for the following purposes: (i) providing Member or Smart-Fill with reports, studies, analyses and other compilations; (ii) in any such manner that Member is unidentifiable as the source of Dispensing Data disclosed to other third parties; (iii) pursuant to the Pharmacy Data Consent in section 4(h) below; and (iv) any other use to which Member gives its express written consent. Member represents that Smart-Fill is its HIPAA **"business associate"** with which it has a valid business associate agreement that is currently in effect. Members hereby authorizes and directs ABDC, in ABDC's capacity as its business associate, to share Dispensing Data and personal health information (**"PHI"**) with Smart-Fill, to the extent such PHI disclosures would be permissible and for purposes of such Member's "payment" or "health care operations." Member will promptly notify ABDC if it terminates its business associate agreement with Smart-Fill during the Term.

(h)     **Elevate Provider Network and Data Consent**. Member will participate in ABDC's Elevate Provider Network with Advanced Features (as defined in Term Sheet 1 of the MPA) pursuant to standard program terms and conditions. If Member is not eligible to participate, or if ABDC agrees to allow Member not to participate, Member will otherwise provide or authorize Smart-Fill to provide reliable data on its sales from which to assess compliance under this Agreement (**"Dispensing Data"**) to ABDC, all consistent with applicable laws and regulations, which Smart-Fill or ABDC may periodically validate. If one or more of Member facilities serves as a 340B contract pharmacy you may be required to submit quarterly reports of replenished products from the covered entity's intermediary to earn full credit toward achievement on rebate calculations. Member hereby grants consent ("**Pharmacy Data Consent**") to ABDC to derive dispense usage data from Pharmacy Data (as defined in the Data Privacy Policy for Pharmacy Data, Exhibit A of the parties' Master Agreement or Master Program Agreement, or "MPA") and to use and share such data, including pharmacy performance and benchmarking data, with ABDC's Sales and other AmerisourceBergen associates, as well as Smart-Fill, for the purposes of aiding Member in its healthcare operations activities, including meeting its purchasing obligations under its agreements with ABDC, as well as improving the overall effectiveness of the PRxO Generics program. In all cases, ABDC use of Pharmacy Data will be in accordance with ABDC's Data Privacy Policy and applicable laws and regulations including HIPAA. This Pharmacy Data Consent applies to Pharmacy Data captured through any Available Program (as defined in the MPA) in which Member is enrolled as of or enrolls in subsequent to the Effective Date, notwithstanding any limitations of use in any such authorization.

(i)     **Five-Star Rebate Program Enrollment**. By executing this Smart-Fill Member Agreement, each of Member's Facilities are hereby enrolled in the Five-Star Rebate Program through which each of Member's Facilities will be eligible for a rebate of up to 100 basis points (1.00%) on its overall Net Purchases of rebatable PRxO Generics (the "**Five-Star Rebate**") based on its Star Measures Average Rating, as follows:

| Five-Star Rebate Grid | | | | |
|---|---|---|---|---|
| EQuIPP™ Star Measures Average Rating: | 0-2.99<br>« « | 3.0-3.99<br>« « « | 4.0-4.49<br>« « « « | 4.5-5.0<br>« « « « « |
| PRxO Generics Rebate Level | 0.25% | 0.50% | 0.75% | 1.00% |

To be eligible, Member must participate in the Elevate Provider Network[sm] with Advanced Features (as defined in Term Sheet 1 of the MPA). Further eligibility requirements and other terms and conditions of the Five-Star Rebate Program are described in Term Sheet 3 of the MPA and Member hereby agrees to be bound by those terms.

(j)     **Compliance.** Member will comply with applicable state and federal laws, including (if applicable) reporting or reflecting discounts, rebates and other price reductions pursuant to 42 U.S.C. Sec. 1320a-7b(3)(A) on reports or claims submitted to state or federal healthcare programs, retaining invoices and related pricing documentation and making them available on request to healthcare program representatives; and indemnify Smart-Fill and ABDC and their employees and agents against any claims for failure to do so. Smart-Fill represents that aggregate administrative fees paid to Smart-Fill by ABDC does not exceed 3% of aggregate purchases made by all Members annually.

**4.     PROVISIONS AND POLICIES.** The attached Exhibit is incorporated by this reference. Pursuant to the Telephone Consumer Protection Act, Member consents to receiving notices, including product updates, recalls, new product launches and programs, advertisements and other marketing materials by telephone facsimile (fax) machine from ABDC, and its affiliates and their related companies. ABDC may, from time to time, develop policies and procedures relative to new or existing services offered to customers, on an interim or as-needed basis. If ABDC develops such policies or procedures or changes current ones, ABDC will provide Member with written notice at least thirty (30) days before such changes are effective.

Smart-Fill Management Group, Inc. 000449

# EXHIBIT TO
# SMART-FILL MEMBER AGREEMENT
# PROVISIONS

## 1. DUTIES OF ABDC

1.1 Orders. Orders may be subject to minimum order size requirements. ABDC may adjust the per-delivery charge from time to time to reflect ABDC's shipping and handling costs. Other than supplier back-ordered Products, ABDC will make reasonable efforts to deliver orders placed by ABDC's normal order cut-off time by the next delivery day. Hawaii, Alaska, U.S. territories and foreign deliveries may be subject to a delivery surcharge. All orders for controlled substances are subject to, and monitored by, ABDC's Order Monitoring Program. Notwithstanding any contrary provision of this Agreement, suspicious orders of controlled substances may be rejected or restricted by ABDC and may result in future restrictions on Member's orders of controlled substances and other Products.

1.2 Emergency Orders. ABDC will use commercially reasonable efforts to meet a requested delivery time for emergency orders, which may be subject to an additional charge. If ABDC cannot do so, Member may fill emergency orders outside the Program on such occasions using another provider notwithstanding minimum purchase commitments in this Agreement.

## 2. DUTIES OF MEMBER

2.1 Orders. For Products required by Facilities, Member will submit an electronic order for all Products. If allowed, non-electronic orders may be subject to additional charges. If Member purchases less than $25,000.00 per month, a delivery charge of $25.00 per delivery may be assessed for each order that is less than $1,250.00

2.2. Contract Administration. In connection with any Member-specific contract with a GPO/supplier, (i) Member shall comply with applicable supplier's terms, (ii) Member shall use all Products for its "own use" (as defined in judicial and legislative interpretations), (iii) upon changing suppliers, Member shall assist ABDC in disposing of any excess inventory acquired for Member. Member shall notify Smart-Fill and ABDC before discontinuing purchases of any special inventory that it has requested that ABDC stock (whether or not pursuant to a contract) and assist ABDC in disposing of any excess of such inventory. When invoiced, Member will promptly reimburse ABDC for any unpaid chargebacks that are (x) denied by a GPO or manufacturer/supplier or (y) not paid within forty-five (45) days and, in either case, Member will look solely to such GPO or manufacturer/supplier for redress.

2.3 Notice of Changes. Member will promptly notify Smart-Fill and ABDC of changes in control, ownership, name or business form (e.g., sole proprietorship, partnership or corporation), changes in state of incorporation or formation, or any intent to sell, close, move or modify its operations.

2.4 No Set-Off. Member's obligation to pay for Products will be absolute, unconditional and not subject to reduction, set-off, counterclaim or delay.

2.5 Billing Statements. Billing disputes must be brought to the attention of both Smart-Fill and ABDC's accounts receivable department within twelve (12) months after receipt of the first statement containing the amount in dispute or Member will be deemed to accept the accuracy of such statements and to waive its right to dispute the amount.

2.6 Late Payment. Price of Goods reflects a prompt payment discount. If payment is not received by the due date, either Smart-Fill or ABDC will invoice Member such unearned discount by recalculating Price of Goods based on Cost + 2% (or, if greater, 2% more than the invoiced Price of Goods) effective as of the due date. Thereafter, if payment is delinquent, Smart-Fill and ABDC may assess a per-day late payment fee of the lower of 0.05% (18%/360) or the maximum rate permitted by law on the outstanding balance until paid, beginning on the first (1st) business day after such due date. Additionally, Smart-Fill and ABDC may adjust future Price of Goods to reflect Member's payment history. Such rights are in addition to Smart-Fill's and ABDC's other remedies and will not relieve Member of its obligation to make prompt payment in accordance with this Agreement.

2.7 Title And Risk Of Loss. All goods are F.O.B. Member's location, with freight prepaid for normal delivery. Expedited delivery is extra. Title and risk of loss pass upon delivery to Member.

2.8 Extension Of Credit. Payment terms are an extension of credit based upon an evaluation of Member's financial condition upon commencement of this Agreement as reflected in written information from Member. Member will abide by Smart-Fill's and ABDC's standard credit terms as amended from time to time. Member will promptly notify Smart-Fill and ABDC in writing of any Claim that, with an unfavorable result, would have a material adverse effect on Member's financial condition or operation. Upon request, Member will furnish Smart-Fill and ABDC complete annual statements and other evidence of its financial condition necessary to establish, in ABDC's and Smart-Fill's opinion, Member's ability to perform its obligations. If either ABDC or Smart-Fill reasonably believes Member's ability to make payments is impaired or its financial condition has materially deteriorated, ABDC or Smart-Fill may from time to time amend Member's payment terms, require past due amounts to be paid and/or require posting of adequate security or such other documents as they may require. Pending receipt of requested items, ABDC or Smart-Fill may withhold delivery of Products and providing Services to Member; place Member on a C.O.D. basis if they have not received payment when due after giving notice by 10:00 a.m. and giving Member until 2:00 p.m. the same day for them to receive payment; and/or require Member to pay part or all of any past due amount as a condition to continued service.

## 3. NO WARRANTIES

Member acknowledges that ABDC is not the manufacturer of any Products and ABDC DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, FOR PRODUCTS AND SERVICES. No oral or written information provided by ABDC, its employees or other representatives will create any such warranty. In no event will ABDC be liable for any special, incidental or consequential damages in connection with or related to Products, hardware, Software, including ordering software, or Services.

## 4. CONFIDENTIALITY

Member, and its employees or representatives ("**Receiving Party**") will protect all proprietary and confidential information ("**Confidential Information**") disclosed by Smart-Fill or ABDC ("**Disclosing Party**") and not use or disclose it except in connection with the Program or as otherwise agreed. Confidential Information does not include information (i) available on a non-confidential basis, (ii) known or able to be formulated by Receiving Party, or (iii) required to be disclosed by law. Pricing and payment terms are confidential and shall not be shared with any third party and Member will remove any information concerning pricing or payment terms (or request confidential treatment) if it discloses this Agreement for any reason, including in a Securities and Exchange Commission filing.

## 5. TERMINATION OF AGREEMENT

5.1 Default. In addition to other available remedies, Smart-Fill or ABDC may immediately terminate this Agreement for cause upon Member's:

(a) (i) filing an application for or consenting to appointment of a trustee, receiver or custodian of its assets; (ii) having an order for relief entered in Bankruptcy Code proceedings; (iii) making a general assignment for the benefit of creditors; (iv) having a trustee, receiver or custodian of its assets appointed unless proceedings and the person appointed is dismissed within thirty (30) days; (v) insolvency within the meaning of Uniform Commercial Code Section 1-201 or failing generally to pay its debts as they become due within the meaning of U.S. Bankruptcy Code Title 11, Section 303(h)(1) (11 U.S.C. §303(h)(1)), as amended; or (vi) certification in writing of its inability to pay its debts as they become due (and either party may periodically require the other to certify its ability to pay its debts as they become due) (collectively, "**Bankruptcy**");

(b) Failure to pay any amount due to Smart-Fill or ABDC and such failure continues five (5) days after the date on which such amount was due or Repeated Failures to pay material amounts due. "**Repeated**

Smart-Fill Management Group, Inc. 000450

**Failures**" means either 3 consecutive failures to pay amounts due, or 4 failures in a 12-month period;

(c)  Sale or transfer of the business of Member, in whole or in part, or a change in control in Member. As used in this Agreement, "**change in control**" means (if applicable) the sale, transfer or assignment of all or substantially all of the assets of the Member or of 25% or more of the voting equity in Member or a change in the power to vote 25% or more of the voting interest in Member; or

(d)  Failure to perform any other material obligation of this Agreement or any other Program requirements and such failure continues for thirty (30) days after Member receives notice of such breach; provided, however, if the Member has commenced to cure such breach within such thirty (30) days, but such cure is not completed within such thirty (30) days, it will have a reasonable time to complete its cure if it diligently pursues the cure until completion. "For cause" does not include Member receiving a more favorable offer from a Smart-Fill or ABDC competitor.

5.2  Survival Upon Termination. Upon expiration or earlier termination of this Agreement for any reason, all amounts owed hereunder shall be due and payable within the agreed terms, and Member will promptly return to ABDC all hardware, Software and other equipment, including ordering devices and totes, or pay to ABDC the replacement cost of such items that are not returned. Obligations in Paragraphs 4, 5.2, 6 and 9 of this Exhibit and any Agreement provision the context of which shows the parties intended it to survive will remain in effect after the Term.

### 6. INDEMNIFICATION

Member will indemnify and defend Smart-Fill and ABDC, their employees and representatives ("**Indemnified Party**") against all claims and damages (including expenses and attorneys' fees) ("**Claim**") to the extent arising out of Member's obligations under this Agreement. Failure to give prompt written notice of a Claim will not relieve Member of liability except to the extent caused by such failure. Member will defend a Claim with counsel reasonably satisfactory to Indemnified Party and Indemnified Party will cooperate fully in such defense.

### 7. MEMBER'S INSURANCE

Member will maintain sufficient insurance to cover all unpaid inventory in its possession. Member will maintain professional liability insurance with limits of no less than $1,000,000 per incident and $3,000,000 aggregate. ABDC and Smart-Fill will be named on such policies as additional insureds. Smart-Fill or ABDC may reasonably increase such required limits from time to time.

### 8. SOFTWARE LICENSE

8.1  License. ABDC has granted Member a non-exclusive, nontransferable and revocable license to use software and related documentation ABDC provides for use in the Program ("**Software**"). Member may not make, or allow others to make, copies except one backup copy. Member must include all proprietary notices in permitted copies. Member may not modify Software or create derivative works and may not translate, reverse engineer, disassemble or decompile Software.

8.2  Limited Warranty. ABDC warrants that, for ninety (90) days from the Effective Date, (i) Software will perform substantially in accordance with its documentation if operated as directed and (ii) hardware provided by ABDC and diskettes, CD-ROMs or other media on which the Software is provided will be free from defects under normal use. ABDC DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, FOR HARDWARE AND SOFTWARE. No oral or written information provided by ABDC, its employees or other representatives will create any warranty.

8.3  Remedy. ABDC's liability and Member's exclusive remedy for breach of warranties in Paragraph 8.2 will be, at ABDC's option, to (i) repair or replace Software or hardware so it performs substantially in accordance with its documentation; (ii) advise Member how to achieve substantially the same functionality using different procedures, or (iii) replace defective media returned within ninety (90) days of the Effective Date. Such replacement will not extend such ninety (90) day period.

### 9. MISCELLANEOUS

9.1  Force Majeure. If ABDC's performance is prevented or delayed by labor disputes, fire, terrorism, acts of God or any other cause beyond its control, including unavailability of Products, transportation, materials or fuel, delays by suppliers, loss of facilities, voluntary foregoing a right in order to comply with or accommodate government orders or requests, compliance with any law or any other cause beyond its control ("**Force Majeure**"), ABDC may reduce or eliminate Products without liability or obligation during the Force Majeure period. In addition, if Force Majeure affects ABDC's cost of operations, ABDC may, at its discretion, add to the cost of Products its increased fuel costs, including taxes and other costs associated with Product handling or operations, so long as Force Majeure affects its costs.

9.2  Security Interest. In addition to any security interest previously or hereafter provided by Member to secure such Member's existing and future liability to ABDC or Smart-Fill, Member hereby grants to ABDC and Smart-Fill a security interest which may be a purchase money security interest in all of its Inventory, related Accounts, General Intangibles, including prescription files, and Proceeds and products thereto and thereof, wherever located, now owned or hereafter acquired or arising. Such security interest is not affected by any payment between ABDC and Smart-Fill. Capitalized terms undefined in this Agreement have the meaning in the Uniform Commercial Code as in effect in any jurisdiction in which any of the Collateral may at the time be located ("**UCC**"). ABDC and Smart-Fill may each do such things as are necessary to achieve the purposes of this Paragraph 9.2.

9.3  Assignment. This Agreement shall inure to the benefit of and be binding upon the heirs, successors and assigns of each of the parties; provided, however, that Member may only assign its rights or delegate its duties under this Agreement, including by merger, change in control, asset sale, operation of law or otherwise, with ABDC's and Smart-Fill's written consent. Member hereby consents to ABDC's assigning part or all of its obligations to any affiliate and to assigning or granting a security interest in this Agreement in connection with any financing or securitization by ABDC or any affiliate. Notwithstanding the foregoing, in the event of a Change in control of Member during the Term, Member will be permitted to terminate this Agreement upon at least 180 days' prior written notice to Smart-Fill. If Member does not provide such required notice but still desires to terminate this Agreement as a result of such Change in Control, the Member will pay a "break fee" to Smart-Fill equal to 3.00% of Member's Net Purchases made during the twelve-month period prior to the date of such written notice. If Member undergoes a Change of Control event and does not elect to terminate this Agreement, Member shall cause any transferee who is approved by ABDC and Smart-Fill to assume all obligations of this Agreement through the duration of the Term (whether by an assignment of the Agreement to the transferee or a new distribution agreement between the transferee and ABDC/Smart-Fill).

9.4  EEO Requirements. ABDC has warranted it does not and will not discriminate against any employee or applicant for employment because of race, creed, color, national origin, religion, gender, sexual preference, veteran status, handicap or as otherwise may be prohibited by law and will meet affirmative action obligations as are imposed by law.

9.5  Miscellaneous. ABDC and Smart-Fill will recover from Member all costs they incur, including reasonable attorneys' fees, in connection with enforcing their rights under this Agreement, including in connection with a Bankruptcy proceeding. The successful party in any legal action may recover all of its costs, including reasonable attorneys' fees. Pennsylvania law will govern this Agreement without reference to conflict of laws provisions. Any waiver or delay in enforcing this Agreement will not deprive a party of the right to act at another time or due to another breach. All provisions are severable. This Agreement supersedes prior oral or written representations by the parties that relate to its subject matter other than the security interest and, which is in addition to and not in lieu of any security interest created in other agreements. Captions are intended for convenience of reference only. The parties may not modify this Agreement other than by a subsequent writing signed by each party. In the event of a conflict between a prior document between the parties and this Agreement, this Agreement will control. This Agreement will be interpreted as if written jointly by the parties. The parties are independent contractors.